IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

WANDA JO LENIUS AND
GARY GENE LENIUS

      **Plaintiffs,**

vs.

DEERE & COMPANY a/k/a JOHN
DEERE COMPANY, CLYDE
D'CRUZ, KEVIN KEITH, BRIAN
MATSON, AND ROBERT BARNES,

      **Defendants.**

No. C12-2063

RULING ON MOTION FOR
SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

*I.*   *INTRODUCTION* ........................................ 2

*II.*  *PROCEDURAL HISTORY* ................................ 2

*III.* *RELEVANT FACTS* ..................................... 4
    *A.*   *The Parties* .................................................. 4
    *B.*   *Wanda's Work History* ................................... 6
    *C.*   *Gary's Work History* .................................... 8
    *D.*   *Reorganization of the Supply Management Department* .......... 8
    *E.*   *Global Jobs Evaluation ("GJE") Process* ................... 9
    *F.*   *Implementation of GJE* ................................. 10
    *G.*   *Wanda Complains About Her Pay Grade* ................. 11
    *H.*   *Wanda Applies for Other Positions* ..................... 13
    *I.*   *Wanda's Administrative Charges* ...................... 14
    *J.*   *Wanda Seeks Medical Attention* ....................... 15
    *K.*   *Wanda's Car is Towed* ................................ 16
    *L.*   *Gary's Retaliation Claim* ............................. 17

*IV.*  *SUMMARY JUDGMENT STANDARD* ....................... 19

| V. | DISCUSSION | | | 20 |
|---|---|---|---|---|
| | A. | Gary's Retaliation Claims | | 20 |
| | | 1. | Applicable Law | 20 |
| | | 2. | Discussion | 22 |
| | B. | Wanda's Age and Sex Discrimination Claims | | 23 |
| | | 1. | Applicable Law | 23 |
| | | 2. | Discussion | 25 |
| | | | a. Direct evidence | 25 |
| | | | b. Circumstantial evidence | 28 |
| | C. | Wanda's Retaliation Claims | | 30 |
| | | 1. | Applicable Law | 30 |
| | | 2. | Discussion | 31 |
| | D. | Hostile Work Environment | | 33 |
| | | 1. | Applicable Law | 33 |
| | | 2. | Discussion | 35 |
| | E. | Iowa Equal Pay Act | | 35 |
| | F. | Defamation | | 36 |
| | G. | Additional Defenses | | 36 |
| | | 1. | Exhaustion of Administrative Remedies | 37 |
| | | | a. Failure to timely file a charge | 37 |
| | | | b. Failure to identify individual defendants | 38 |
| | | 2. | Doctrine of Laches | 39 |
| VI. | ORDER | | | 42 |

## I. INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment (docket number 81) filed by the Defendants on February 3, 2014, the Resistance (docket number 94) filed by the Plaintiffs on March 15, and the Reply (docket number 100-2) filed by Defendants on April 1. Pursuant to Local Rule 7.c, the motion will be decided without oral argument.

## II. PROCEDURAL HISTORY

On August 31, 2012, Plaintiffs Wanda Jo Lenius and Gary Gene Lenius, wife and husband, filed a complaint against Defendants John Deere Agri Services, Inc., Deere & Company, a/k/a John Deere Company, Clyde D'Cruz, Kevin Keith, Brian Matson, and

Robert Barnes. The complaint was in eight counts. Wanda asserted sex discrimination, age discrimination, retaliation, and a violation of the Iowa Equal Pay Act. Gary claimed retaliation.

On October 17, 2012 — prior to Defendants filing an answer — Plaintiffs filed an amended complaint adding four additional counts. Wanda added claims for defamation, negligence, and retaliation in violation of the Age Discrimination and Employment Act ("ADEA"). Gary added an additional count of retaliation in violation of the ADEA. Less than one hour after filing their amended complaint, which included John Deere Agri Services, Inc. as a named defendant, Plaintiffs filed a dismissal of Defendant John Deere Agri Services, Inc.

On November 12, 2012, Defendants filed a motion to dismiss, asking the Court to dismiss certain causes of action and certain claims for relief. On February 14, 2013, the Court granted Defendants' motion, dismissing certain claims, finding that certain claims could proceed against Defendant Deere & Company only, and limiting the relief which may be pursued in certain claims. *See* docket number 34. Specifically, the Court concluded that Plaintiffs' claims for sex discrimination, age discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the ADEA would be dismissed against the individual defendants, and would proceed against Deere only. Plaintiffs' claims for emotional distress and punitive damages in the ADEA counts were dismissed, with Plaintiffs' relief on those claims, if any, limited to compensatory damages only. Wanda's defamation claim and negligence claim were dismissed. Regarding Wanda's claim for wage discrimination, the Court concluded that she may only assert a claim for wage discrimination which occurred on or after April 28, 2009. Finally, the Court concluded that Wanda is not entitled to treble damages for wage discrimination which allegedly occurred prior to April 28, 2009.

3

The Court granted Wanda's subsequent request to amend her complaint to replead a claim for alleged defamation. The Court directed Wanda to file a second amended complaint which was fully compliant with the Court's ruling on Defendants' motion to dismiss. On March 25, 2013, Plaintiffs filed a second amended complaint. *See* docket number 36. Wanda asserts sex discrimination in violation of Title VII (Count I), retaliation in violation of Title VII (Count II), age discrimination in violation of the ADEA (Count IV), age and sex discrimination in violation of the Iowa Civil Rights Act ("ICRA") (Count V), retaliation in violation of the ICRA (Count VI), a violation of the Iowa Equal Pay Act (Count VII), defamation (Count IX), and retaliation in violation of the ADEA (Count XI). Gary asserts retaliation in violation of Title VII (Count III), retaliation in violation of the ICRA (Count VIII), and retaliation in violation of the ADEA (Count XII). The second amended complaint does not include a Count X. Defendants filed an answer to the second amended complaint, and affirmative defenses, on April 10, 2013.

Meanwhile, on November 26, 2012, the Court adopted a Scheduling Order and Discovery Plan submitted by the parties. Also at that time, the case was referred to me for the conduct of all further proceedings and the entry of judgment, in accordance with 28 U.S.C. § 636(c) and the consent of the parties. After consulting with counsel, this case was scheduled for trial on December 8, 2014.

On February 3, 2014, Defendants timely filed the instant motion for summary judgment.

### III. RELEVANT FACTS

#### A. The Parties

Plaintiff Wanda Jo Lenius began working at Deere as a contract employee in 2000.[1] Wanda took a salaried position with Deere on March 1, 2001. Wanda's last day of work at Deere was February 17, 2005.

---

[1] To avoid confusion, the Court will refer to plaintiffs by their first names.

Plaintiff Gary Gene Lenius, who is married to Wanda, started working at Deere in 1974. Gary received a degree in Industrial Technology and Electricity Electronics from the University of Northern Iowa ("UNI") in 1972, a bachelor of science in Mechanical Engineering from the University of Iowa in 1974, and obtained a masters degree in business administration from UNI attending night school while working at John Deere. Gary was still working at Deere when the Complaint was filed in August 2012.

Defendant Deere & Company, a/k/a John Deere Company ("Deere"), is in the business of manufacturing agricultural, forestry, foraging, and construction equipment, with its principal place of business located in Moline, Illinois. In Iowa, Deere has facilities in Des Moines, Ottumwa, Waterloo, Dubuque, and Davenport. Deere's Waterloo Works develops and manufactures tractors.

Defendant Clyde D'Cruz was hired by Deere in March 2000 as Division Manager of Purchasing in Waterloo. He was subsequently promoted to be the Manager of the Supply Management department in Waterloo. In that role, D'Cruz oversaw 130 employees.

Defendant Kevin Keith was employed by Deere from 1974 until his retirement in 2012. In August 2003, Keith became the Manager of Human Resources for Deere's Waterloo operations. In 2009, Keith became the group Human Resources Manager for all union factories and design centers in Iowa, the Quad Cities, and Coffeeville, Kansas.

Defendant Brian Matson was hired by Deere in 1991 to work as a supply management engineer at a facility in Ottumwa. After holding a number of positions, Matson transferred to Waterloo Works and became the Cost Management Manager for the Agricultural Division of Supply Management. In 2002, Matson became the Manager of the Supplier Integration division of Supply Management. In that position, he reported to D'Cruz.

Defendant Robert Barnes started working for Deere in March 1980, and is now retired from Deere. At the time of his retirement, Barnes was the "manager of PV&V — Noise, Vibration, and Harshness."

### B. Wanda's Work History

Wanda began working for Deere as a contract employee through a temporary placement agency in 2000. On March 1, 2001, Deere hired Wanda to work in its Supply Management Department at Waterloo Works. She was 42 years old at that time. When Wanda was offered the salaried position as a buyer, she was told by the division manager (Rick Plasket) that she would be given a pay grade 6 position. Wanda was subsequently offered a grade 5 position, however, which she accepted.

The Supply Management Department is responsible for the delivery of products and support systems to Deere. At that time, there were multiple divisions in the Supply Management Department at Waterloo Works, including Business Process, Procurement, Supplier Integration, and Tactical Purchasing. Each of these four divisions had a manager who reported to D'Cruz. In August 2004, Defendant Brian Matson was the Manager of the Supplier Integration Division of Supply Management, which was responsible for the procurement of commodities (parts) for new or developing Deere products. Deere refers to this as "PDP," which stands for Product Delivery Process. Mike McGonegle was the manager of the division responsible for the procurement of commodities for existing Deere products, or the Order Fulfillment Process ("OFP").

In 2002, Wanda had a meeting with Defendant Clyde D'Cruz to discuss her job grade. D'Cruz declined to promote her, saying "why are you so concerned about grade and money? I looked at Gary's salary and position, and he makes a good living and he's not going anywhere so I know I've got you." Wanda remained at grade 5.

On October 1, 2003, Wanda moved to the position of buyer, or Supply Management Specialist ("SMS"), replacing Cathy Klein. A buyer's role is to support the PDP and OFP

process. A buyer must work with engineering to understand what parts Deere needs to manufacture a product, and then identify a capable supplier to provide the necessary parts to build the product. If a buyer had a question about a supplier's ability to provide a quality part on a consistent basis, the buyer may seek input from a supply development engineer. While one of a buyer's most important duties is to ensure Deere obtains a high-quality and reliable part, other important duties include "management of a volume of money allocated to the buyer's commodities and the costs the buyer saves."

Wanda was also given responsibility for the center of excellence reporting duties, and additional responsibility above and beyond what Klein had handled. Wanda also took over for parts handled by Rachelle Beuter while Beuter was on maternity leave. While Klein had been paid at grade 7, Wanda was transferred in at a pay grade 6.

On June 28, 2004, Wanda applied for a job in a different department. A Deere human resources representative (Jennifer Luckenbihl) asked Matson for documentation why in October 2003 Wanda had been transferred to an SMS position at a lower grade than Klein had held. Matson responded in an email dated June 29, 2004:

> Cathy Klein was moved to a Supply Management Specialist position when her SM Information Technology position was eliminated. Cathy was over grade in the SMS position, and when the SAP position was started, Cathy was a good fit. At that time, we were doing GJE mapping and mapped this job to a SMS2. Therefore, Wanda was promoted to this position as a salary grade 6.

Email from Brian Matson to Jennifer Luckenbihl (Plaintiffs' App. 391).

Wanda continued her employment at Deere until she took a short-term leave for medical reasons in October 2004. Wanda attempted to return to work in January 2005, although the record is somewhat imprecise in that regard. Wanda's last day at work at Deere was February 17, 2005.

7

## C. Gary's Work History

Gary, who is 62 years old, started working full-time for Deere on January 13, 1975 in their Product Engineering Center at a pay grade 5. Gary worked with the transmission design group for approximately two years. Gary then went to applied mechanics as an engineer and did all the noise, vibration, harshness, and fatigue testing, as well as tractor roll-over and protective structure testing. In August 1979, Gary was made a grade 7 engineer.

In August 1981, Gary started working with engines, doing engine performance testing and development. In March 1986, Gary was promoted to a pay grade 8. In late 1986, Gary was assigned to Application Engineering as a Senior Engineer responsible for OEM applications. In March 1997, while working as an application manager in the ALPHA program, Gary was moved to pay grade 9.

In January 2004, Gary became a factory liaison and manager engineer. At that time, he had seven or eight people reporting to him. In August 2010, Gary switched from the Series 650 engine to the Manager for the Series 450 engines, and was raised to a pay grade 10. When his deposition was taken on September 10, 2013, Gary was the Series 450 "Continuous Improvement Manager" at a pay grade 10. According to the undisputed facts, however, Gary has since retired.

## D. Reorganization of the Supply Management Department

Beginning in October 2001, D'Cruz began overseeing a four-year reorganization of the supply management department. Around the same time (October 2001), Deere offered special early retirement packages to its employees, which caused some employees to retire. Deere was also implementing another divisional level in the department. D'Cruz testified at his deposition that there were many personnel changes in the department during that time, due in large part to three factors: early retirement, a departmental reorganization, and the introduction of a new divisional level in supply management.

On May 6, 2002, D'Cruz received notification of the results of an internal audit. The notification generally informed D'Cruz that there was a "gap in the knowledge of supply mgmt employees based on position moves & lack of training." The auditor concluded that the problem was of "major" severity.

## E. Global Jobs Evaluation ("GJE") Process

Each position at Deere is assigned a job grade. In or around 2002, Deere began a process to evaluate the job grades of each position in its worldwide organization. This evaluation was referred to as the Global Jobs Evaluation process ("GJE"). GJE is a systemic process for creating a hierarchy of jobs based on their content and value to Deere. It is a formal job evaluation system that produces consistent results. Deere used GJE to assess the work level of salaried employees at Deere on a global level. One of Deere's objectives for implementing GJE was to achieve an improved consistency in job grading and outcomes. GJE did not apply to production workers.

Deere hired the Hay Group, an independent global management consulting firm, to provide consulting services for the implementation of GJE at Deere. The Hay method of job evaluation is the most widely used proprietary job evaluation methodology in the world. It is used by an estimated 8,000 organizations, including half the Fortune 50 organizations, in over 30 countries. The methodology employed in the GJE process is described in detail in Defendants' statement of undisputed facts. Prior to GJE, Deere used a point rating table to assess jobs for job grade purposes. This work was done with a supervisor for the position under review, human resources, and a representative from Deere's corporate office.

Deere implemented GJE on May 1, 2004. Prior to GJE, Deere had 20,000 positions that were mapped to 3,000-4,000 jobs. Through GJE, Deere mapped 20,000 positions to 2,100 jobs. Overall, approximately 70% of jobs at Deere were evaluated in the same grade they had been in before GJE, about 10% were in lower grades, and about

20% were in higher grades. For jobs evaluated at grades lower than the pre-GJE grade, Deere committed to keeping the affected employees in their existing grade as long as the employee remained in the same job. Deere's commitment to not reduce any employee's grade as a result of GJE ensured that employees evaluated in jobs with a lower effective grade would not lose pay or pay opportunity.

### F. Implementation of GJE

Following GJE implementation, the Supply Management job family included four Supply Management Specialist (SMS) positions, numbered I-IV. On the PDP side of supply management, there were nine supply management specialists, including Wanda Lenius and Gayle Forster.[2] Wanda, Forster, and Rachelle Beuter were designated as SMS II, pay grade 6, while the remaining six buyers were identified as SMS III, pay grade 7.[3] Four of the six buyers at pay grade 7 received a raise from pay grade 6. *See* Defendants' App. 160. The four employees receiving a pay grade increase as a result of GJE were a 26-year-old male, a 33-year-old female, a 27-year-old male, and a 37-year-old male. Two older males (ages 52 and 59) were at pay grade 7 before and after GJE was implemented. After GJE was implemented, Wanda and Forster were the only buyers in

---

[2] Forster has also sued Deere, alleging age and sex discrimination. *See Gayle Lela Forster v. Deere & Company, et al.*, No. 6:12-cv-2072-JSS (N.D. Iowa).

[3] In early 2004, prior to implementation of GJE, Rachelle Beuter (a 26-year-old female) was a buyer on the PDP side of supply management. GJE mapped Beuter's position to an SMS II position, at grade 6. Before GJE was implemented, however, Beuter assumed the duties of Richard Brammer, who was moved to the OFP side of supply management. GJE had mapped Brammer's position as an SMS III, pay grade 7. In May 2004, Matson offered Beuter a new position that reflected her reassignment and she was promoted to grade 7 effective June 1, 2004.

PDP remaining at grade 6.[4] At that time, Wanda and Forster were 45 and 48 years old, respectively.

Defendant Kevin Keith testified that decisions about grading SMS positions turned on the type of commodity assigned to that position. Robert Krough, who participated in the GJE function analysis for some SMS positions at Des Moines Works, testified that they had a "big matrix," which was used to identify "all the different things that would be characteristic of the job." Regarding a buyer, it would include "number of parts, complexity level of the parts, number of interactions internally outside the department, number of interactions outside the company with suppliers." Some parts could be "highly engineered," while other parts, such as a fastener, would be a "simple commodity." The complexity of a buyer's position includes the complexity of the parts and commodities the position deals with. The amount of money a buyer may have saved was not used as a metric in the GJE process. Deere asserts that Wanda Lenius and Gayle Forster remained at pay grade 6, unlike the other PDP buyers, because their jobs were less complex.

### G. Wanda Complains About Her Pay Grade

Matson informed Wanda that she had been mapped by GJE to SMS II at pay grade 6. Accordingly, her salary and benefits did not change following GJE implementation. Wanda later learned that she and Forster were the only buyers on the PDP side of supply management who were not mapped by GJE at pay grade 7. Wanda approached Matson at his desk and told him that she "didn't think the rating was fair, it was unacceptable."

---

[4] It is the Court's understanding that there were eight supply management specialists on the OFP side of supply management. *See* Defendants' App. 161. Following implementation of GJE, a 56-year-old made was reduced from pay grade 7 to pay grade 5. Two buyers (a 55-year-old female and a 39-year-old male) remained at pay grade 6. Two females, ages 53 and 36, were increased from grade 6 to grade 7. Three males, ages 55, 56, and 57) remained at pay grade 7.

11

Wanda also told Matson that she wanted to be moved out of the department because "I will never be treated fairly here."

On April 14, 2004, Matson met with Wanda and Gayle Forster to discuss their concerns regarding the GJE scoring. Wanda acknowledged that "everybody was upset at this point in time" and she told Matson that "this is obviously a discrimination situation." Matson told Wanda and Forster that he did not want them discussing the fact that they had not been promoted to pay grade 7, because it was "causing a morale problem in the department." Matson told them to report their concerns to Deere's human resources department. Eventually, Matson walked out of the meeting.

Two days later, on April 16, Wanda called Kevin Keith, who at that time was manager of human resources at the Waterloo Works. On April 26, Keith and Wanda met for at least two hours. Keith asked Wanda to explain her concerns "from the beginning." Wanda told Keith about starting with Deere at pay grade 5, rather than pay grade 6 as originally represented, and about her objection to the GJE scoring, resulting in her remaining at pay grade 6. Wanda also complained that she had been unfairly blamed for Patricia Reed's errors, and told Keith about D'Cruz's comment that she was not going anywhere due to her husband's job being in Waterloo. Wanda also told Keith that she was concerned that D'Cruz had declined her request to work from home but had permitted other younger employees to work from home. At the conclusion of the meeting, Keith informed Wanda that he needed time to "look into things."

A few days later, Keith offered to help Wanda move out of the PDP department in Waterloo. Keith arranged to meet with Wanda on a weekly basis after work hours to discuss her work situation. These meetings occurred during the summer of 2004. Keith and Wanda arranged to meet after work because Wanda did not have time during the workday to meet with Keith. Keith gave Wanda access to his personal calendar so that she could set up the meetings. The meetings were intended to coach and counsel Wanda and

fill her in on "what was going on." During her weekly meetings with Keith, Wanda requested to speak with a physician in Deere's occupational health department to ask him how to handle her work situation from a medical perspective. Wanda testified that her request was "turned down numerous times."

On July 9, 2004, Wanda emailed Keith that she believed some of the employees under D'Cruz's supervision at a different location were under age 35 and did not have enough responsibilities to justify their job upgrades. Keith spoke to D'Cruz and Matson regarding Wanda's concerns. Matson told Keith that his earlier meeting with Wanda and Forster "had some intensity to it." Keith told Matson to "manage his conversations with people and to be respectful."

According to Keith, his approach with concerns raised by Wanda and Forster was to first "get things back on track as far as from an employee relation standpoint." Keith testified that he worked with Wanda and Forster "to correct whatever it was that was going on in the work environment." According to Keith, both women told him that "things were going better."

### H. Wanda Applies for Other Positions

Wanda testified that she applied for "at least" ten positions outside Matson's department so she would qualify for a higher pay grade. According to Wanda, however, Matson told her that every position she applied for would be routed through D'Cruz, who would inform the supervisor that Wanda was unavailable for the position. Any job that Wanda actually interviewed for had to be approved by D'Cruz.

Wanda had at least four interviews, including two positions in Moline, a position in Des Moines, and a position in another Waterloo location. Wanda testified that she believes D'Cruz stepped in and prevented her from receiving an offer for a supply management position at the Des Moines Works. Wanda admits, however, that she does

not have proof that D'Cruz "did or did not say something that prevented her from receiving the Supply Management position at Des Moines Works."

In June 2004, Wanda was also interested in a cost management position at Deere's Waterloo location. While Wanda does not hold an accounting degree, she has a background in accounting. Wanda testified that she heard from another employee that Matson told the manager of accounting that "you don't want" Wanda because "she's making it real troublesome for us up there in supply management." The manager of accounting testified that he has no memory of speaking to Matson about Wanda, and "couldn't pick her out of a lineup."

In August 2004, Wanda interviewed for a supply management buyer position at Deere's location in Moline. The position would have required Wanda to work in Deere's Harvester location in Moline and five to six weeks in China every three months. Wanda rejected the offer because Gary would not have been able to work in Moline, and taking the position would have required her to rent an apartment and live on her own, which she could not afford.

### I. Wanda's Administrative Charges

On October 14, 2004, Wanda filed a charge of discrimination with the EEOC. Wanda complained of alleged age and sex discrimination relating to her pay grade under GJE, and alleged retaliation for complaining of discriminatory practices. While Wanda noted in her charge that she began working in a grade 5 position and later "got a raise to grade 6" in October 2003, she did not allege in her EEOC charge that beginning at grade 5 was the result of any alleged discrimination. The individual defendants (D'Cruz, Keith, Matson, and Barnes) were not named in Wanda's EEOC charge. On October 18, the EEOC cross-filed Wanda's charge with the Iowa Civil Rights Commission ("ICRC"). On November 2, 2004, the ICRC notified Deere of Wanda's charges.

On June 24, 2011 — nearly seven years later — the EEOC issued a "Determination," finding that there is reasonable cause to believe there are violations of Title VII and the ADEA "in that the Respondent did not upgrade Charging Party's position because of her sex and age."[5] The EEOC also concluded that there was reasonable cause to believe Wanda "was subjected to harassment in retaliation for her opposing a discriminatory practice." Notice of the determination was sent to Deere and its attorney.

On July 31, 2012 — more than a year later — the EEOC issued a right-to-sue letter. Copies were sent to Wanda, her attorney, Deere, and its attorney. One week later, on August 7, 2012, the ICRC also issued a right-to-sue letter.

### J. Wanda Seeks Medical Attention

On October 27, 2004 — two weeks after filing her complaint with the EEOC — Wanda sought medical attention with Dr. Hoekstra. Wanda reported that she had a history of migraine headaches, but had been getting them more frequently. Wanda told the doctor that the headaches were triggered by stress, and that she "is under a tremendous amount of stress at work, to the point that she feels that she just can't take it anymore." The doctor diagnosed her with situational depression, "seemingly from her career." The doctor recommended that she take a short term leave from work.

Wanda attempted a return to work on restricted hours in January 2005, but the stress and anxiety were unbearable. At that point, Wanda sought the help of Dr. Harding and Dr. Piburn at Black Hawk-Grundy Mental Health. On February 21, Dr. Harding diagnosed Wanda with post-traumatic stress disorder. Wanda was stressed and anxious over Deere to the point where Wanda refused to go out in public for fear of seeing a Deere employee. When Gary retired, he and Wanda moved to Arizona.

---

[5] EEOC's Determination at 1 (Defendants' App. 817).

### K. *Wanda's Car is Towed*

On February 10, 2005, Wanda met with Keith and D'Cruz, who told her that she was being removed from her buying job because of her "medical issues," and would be transferred to another location in Waterloo. D'Cruz told Wanda that her "new position wasn't clear," but that it "would be some sort of project management work." Wanda believed it was a part-time position.

On February 17, at Wanda's request, Keith set up an appointment for her to meet with Dr. Hoekstra. On that date, prior to her 1:00 p.m. appointment, Wanda's car was towed from Deere's parking lot. Wanda testified that when she learned her car had been towed, she "went nuts" and "literally had a breakdown in front of the whole cafeteria." Wanda called Keith and was screaming at him, stating: "Are you trying to get me fired? You had my car towed. Why did you even bother making this appointment? You're crazy." According to Wanda, everyone in the cafeteria "was cheering" because "they heard me screaming" and "they knew what had happened" and she was "screaming and bawling."

Keith told Wanda that he did not know what she was talking about and did not have her car towed. Wanda later learned that Keith was not responsible for having her car towed. According to Wanda, a security guard named "John" spoke to her husband and told him that Deere's facilities manager, Dave Allbaugh, said "Wanda Lenius thinks she can sue John Deere? Well, screw her and have that car towed." Gary Lenius testified that a security guard named "Bob" told him that Allbaugh authorized Deere to tow Wanda's car.

Wanda's last day of work at Deere was February 17, 2005. Since that time, she has received long-term disability benefits from Deere, although the amount was reduced when she started receiving social security disability benefits sometime in 2008.

## L. *Gary's Retaliation Claim*

Gary worked at Deere for nearly 40 years, beginning in 1974 or 1975 and continuing until his recent retirement. In early 2003, a reorganization took place of Engine Engineering, where Gary was employed. Ted Briedenbach, who was the manager of Engine Engineering at that time, testified that Gary was in a grade 9 project engineering position, despite actually performing the work of a grade 8 senior engineer. While Gary did a good job and always received positive performance evaluations, Briedenbach concluded that it was "not consistent" to have Gary at a grade 9 position, when others at the same salary grade had "broader responsibilities and more challenges." Accordingly, Gary was told he was being downgraded from a pay grade 9 to a pay grade 8.

Gary responded by sending an email to Sam Allen, who was then head of human resources at John Deere, telling him that he thought he was being treated unfairly. Five or six days later, Gary was informed that the demotion would not occur and his status had been reinstated. Gary then sent an email to Allen stating "how grateful I am." Allen responded that "[w]hen I channeled your concerns to the appropriate people in JDPSG, they agreed things were handled incorrectly and made the changes without any prompting from me." Briedenbach testified at his deposition that since the GJE was "so close," they determined to leave Gary at grade 9 for the time being and see "how it worked out for GJE."

Gary's personnel records reflect that he remained a grade 9 project engineer throughout 2003 and actually received a raise in March 2003. That is, the proposed change to his pay grade in March 2003 was "on paper" for five days and did not ever affect Gary's pay, bonus, or benefits. Gary asserts that the short-lived effort to reduce his pay grade in March 2003 occurred shortly after he complained to his supervisor, Robert Barnes, about "gender comments" made by Wanda's manager, Clyde D'Cruz.

When GJE was initially instituted in May 2004, Gary was still a grade 9. Barnes changed Gary's job description, however, resulting in a downgrade to pay grade 8. In September 2004, Gary was informed by Barnes that his *position* was being downgraded from a pay grade 9 to a pay grade 8 as a result of the GJE implementation, but Gary would still be paid at grade 9. On September 14, 2004, Gary sent an email to Barnes confirming that even though his position had been mapped to a grade 8, Gary would remain at grade 9 indefinitely until he took a higher grade job, turned down a job at a grade 9 where he was not required to relocate, or declined two jobs where he would have to relocate. Gary also confirmed that his bonus and benefits would be based on grade 9 and the downgrade in his position would not affect how he is considered for promotional opportunities. Barnes responded the same day, confirming Gary's understanding.

Gary subsequently discussed the issue with Kevin Keith to seek further assurances. Keith confirmed that approximately 30% of the employees in John Deere Power Systems were downgraded, and approximately 15% of the employees in Engine Engineering were downgraded. Despite a downgrade in Gary's position, however, he would continue to receive a "special compensation package" providing for the same pay and benefits. Keith also confirmed that while a hiring manager in a different department would have access to the downgrade information, it would not hurt Gary's opportunity for a promotion.

Gary testified that in 2006, Jim Ruff, manager of Product Verification and Validation, approached him about a potential job opportunity for a manager position in the PV&V department. Gary did not complete an application for the position, assuming that Ruff was "going to be in touch" with him. Gary did not get the job. Although Gary never told Ruff about Wanda's allegations of discrimination, Gary "supposes that this is another thing that's associated with retaliation to the lawsuit and the filing with EEOC and my wife's case and that situation." In an affidavit filed in support of the motion for summary judgment, Ruff states that in a "casual conversation" he asked Gary if he had any interest

in transferring to PV&V. Ruff denies ever promising Gary a position or offering Gary a position. Instead, Ruff hired two other engineers because they "were better qualified to handle the engineering responsibilities for Senior Engineering positions." According to his affidavit, Ruff had no knowledge that Wanda even worked for Deere, and was not aware that Gary or Wanda had lodged any complaints until January 2014.

In August 2010, Gary switched from the Series 650 engine to become the manager for the Series 450 engine, and was promoted to a salary grade 10. At the time of his deposition, Gary was the Series 450 "continuous improvement manager" at a salary grade 10. Gary has retired from Deere since filing this lawsuit.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute as to a material fact "'exists if a reasonable jury could return a verdict for the party opposing the motion.'" *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Humphries v. Pulaski County Special School District*, 580 F.3d 688, 692 (8th Cir. 2009)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to establish the existence of a genuine dispute as to a material fact, the non-moving party "'may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Instead, the non-moving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873); *see also Anderson*, 477 U.S. at 248 (A nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party."). "'Evidence, not contentions,

avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

"There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1018 (8th Cir. 2011). "Although employment discrimination cases are 'often fact intensive and dependant on nuance in the workplace, they are not immune from summary judgment." *Id.* "If there is no dispute of material act and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Id.*

## V. DISCUSSION

In the second amended complaint, Wanda asserts sex discrimination in violation of Title VII and the ICRA (Counts I and V), age discrimination in violation of the ADEA and the ICRA (Counts IV and V), retaliation in violation of Title VII, the ICRA, and the ADEA (Counts II, VI, and XI), a violation of the Iowa Equal Pay Act (Count VII), and defamation (Count IX). Gary asserts retaliation in violation of Title VII, the ICRA, and the ADEA (Counts III, VIII, and XII). For a variety of reasons, Defendants ask that all of Plaintiffs' claims be summarily dismissed.

### A. Gary's Retaliation Claims

#### 1. Applicable Law

The Court will first address Gary's claim that Defendants retaliated against him in violation of Title VII, the ICRA, and the ADEA. Title VII makes it unlawful for an employer to discriminate against an employee because he has "opposed" an unlawful

employment practice or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). Similarly, the ICRA makes it a discriminatory practice for any person to retaliate against another person "because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter." Iowa Code § 216.11(2). The ADEA makes it unlawful for an employer to discriminate against an employee because the employee "opposed" age discrimination or because the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 28 U.S.C. § 623(d).

Without direct evidence of a retaliatory motive, the Court analyzes retaliation claims (whether under Title VII or the ADEA) under the burden-shifting framework of *McDonnell Douglas*. *Stewart v. Independent School Dist. No. 196*, 471 F.3d 1034, 1042-43 (8th Cir. 2007). Using the analytical construct of *McDonnell Douglas*, the initial burden is on the plaintiff to establish a *prima facie* case of retaliation. *Id.* at 1043. The plaintiff in a retaliation action must produce evidence "(1) that he or she engaged in statutorily protected activities; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events." *Id.* (quoting *Greene v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006)). *Accord Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 678 (Iowa 2004) (enumerating the elements necessary to establish a *prima facie* case of retaliation under the ICRA).

If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to show a "non-retaliatory reason for the adverse employment action." *Stewart*, 481 F.3d at 1043. If the defendant can show a legitimate, non-retaliatory reason for its actions, then the burden returns to the plaintiff to present evidence that "(1) creates a question of fact as to whether defendant's reason was pretextual and (2) creates a reasonable inference that

defendant acted in retaliation." *Id.* (quoting *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005)).

### 2. Discussion

Defendants argue that Gary has failed to establish a *prima facie* case of retaliation. Specifically, Defendants argue that Gary cannot show any adverse employment action taken against him. In the second amended complaint, Gary alleges that when he and Wanda complained to Deere regarding age and sex discrimination and a hostile work environment against Wanda, Deere and its employees subjected Gary "to ever increasing adverse action and denied Plaintiff promotional opportunities." In his brief, Gary complains specifically regarding the short-lived demotion in March 2003 and the results of the GJE mapping in 2004. The Court concludes that both claims fail.

A recent Eighth Circuit case sets forth the general definition regarding an "adverse employment action."

> An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge. However, minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action.

*Jackman v. Fifth Judicial Dist. Dept. of Correctional Services*, 728 F.3d 800, 804 (8th Cir. 2013) (internal citation omitted). *See also Spears v. Missouri Dept. of Corrections and Human Resources*, 210 F.3d 850, 853 (8th Cir. 2000) ("Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not.") (internal citation omitted).

22

In March 2003, as part of a reorganization of Engine Engineering, the manager of the department downgraded Gary from a grade 9 to a grade 8, believing that the lower grade was consistent with Gary's job responsibilities. After Gary complained, however, the decision was almost immediately reversed. While the pay grade change was ostensibly "on paper" for five days, there is no evidence it actually affected Gary's pay, bonus, or benefits.

Similarly, implementation of GJE in 2004 did not adversely affect Gary's pay or benefits. While his position was mapped at pay grade 8, he was provided a special compensation package which maintained his pay and benefits at his previous grade. That is, Gary did not suffer any reduction in pay or benefits.

In their brief, Defendants also address a potential argument that Gary was adversely affected when he was not made the manager of the PV&V group in 2006. Gary did not address the issue in his brief, and the Court finds that it is without merit. While Gary "supposed" that this was "another thing" associated with retaliation, there is absolutely no evidence to support that allegation. The person responsible for hiring stated in an affidavit that he had no knowledge that Wanda even worked for Deere, and was not aware that Gary or Wanda had lodged any complaints until January 2014. Because he is unable to show any adverse employment action, the Court concludes that Gary's retaliation claims must be dismissed.

### B. *Wanda's Age and Sex Discrimination Claims*

### 1. *Applicable Law*

The Court will next address Wanda's claim that Defendants discriminated against her based on her age and sex. Title VII makes it unlawful to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment based on the individual's sex. 42 U.S.C. § 2000e-2(a). The ADEA makes it unlawful for an employer to discriminate against an individual because of the individual's age.

28 U.S.C. § 623(a)(1). Similarly, the ICRA makes it unlawful to discriminate against any employee because of the employee's sex or age. Iowa Code § 216.6(1)(a).

A claim of age discrimination may be established either through direct evidence of discrimination or through circumstantial evidence. *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 876 (8th Cir. 2008) (citing *Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir. 2007)); *see also Loeb v. Best Buy Co., Inc.*, 537 F.3d 867, 872 (8th Cir. 2008) ("To establish a claim of intentional age discrimination, a plaintiff may present direct evidence of such discrimination or may prove his claim through circumstantial evidence."). Similarly, to survive summary judgment in a Title VII discrimination claim, the employee must present direct evidence of discrimination, or circumstantial evidence which would establish an inference of unlawful discrimination. *McCullough v. University of Arkansas for Medical Services*, 559 F.3d 855, 860 (8th Cir. 2009).

If there is no direct evidence of age discrimination, then the plaintiff's claims are analyzed under the familiar burden-shifting scheme of *McDonnell Douglas*.[6] At the first step of the analysis in applying the *McDonnell Douglas* test, the plaintiff has the burden of establishing a *prima facie* case of age discrimination. *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1083 (8th Cir. 2013). A *prima facie* case creates a presumption that the employer unlawfully discriminated against the plaintiff and shifts the burden to the employer to articulate a legitimate nondiscriminatory reason for its actions. *Id.* If the employer meets this burden, then the presumption of discrimination dissolves and the

---

[6] In *Tusing*, the Eighth Circuit Court of Appeals acknowledged that the Supreme Court in *Gross* noted that it had not "definitively decided whether the evidentiary framework of *McDonnell Douglas* is appropriate in the ADEA context." 639 F.3d at 515 n.3. Nonetheless, the Eighth Circuit concluded that the *McDonnell Douglas* analysis is likely still an appropriate way to analyze ADEA "pretext" claims, because *McDonnell Douglas* only shifts the burden of *production* while the Court in *Gross* stated that the plaintiff always retains the burden of *persuasion*. *Id.*

24

burden returns to the plaintiff to demonstrate that the proffered reason is a mere pretext for age discrimination. *Id.*

To establish a *prima facie* case of age or sex discrimination, Wanda must show that she (1) is a member of a protected class; (2) was meeting her employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated employees who were not members of her protected class. *Jackman v. Fifth Judicial Dist. Dept. of Correctional Services*, 728 F.3d 800, 804 (8th Cir. 2013); *Gibson v. American Greetings Corp.*, 670 F.3d 844, 856 (8th Cir. 2012).

The Court generally applies the same analysis to age and sex discrimination claims under the ADEA, Title VII, and the ICRA, with one exception: the standard of proof required. *Tusing v. Des Moines Independent Comm. School Dist.*, 639 F.3d 507, 514 (8th Cir. 2011). In *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 180 (2009), the Court held that "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." Regarding her claim of sex discrimination, however, Wanda need only prove that her sex "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Similarly, in an action brought pursuant to the ICRA, the plaintiff need only prove that her age or sex was "a motivating factor" in the employer's decision. *Newberry v. Burlington Basket Co.*, 622 F.3d 979, 981-83 (8th Cir. 2010) (citing *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 11-14 (Iowa 2009)).

### 2. Discussion

#### a. Direct evidence

The parties disagree regarding whether the record establishes direct evidence of age or sex discrimination. Deere argues that "[a]bsent evidence of direct discrimination — and Wanda must concede she lacks direct evidence — Wanda's sex and age claims are

evaluated under the *McDonnell-Douglas* framework."[7] Wanda makes no such concession. Wanda argues that she has "provided ample direct evidence of discrimination through the evidence of Clyde D'Cruz's discriminatory animus" toward older employees.[8] It should be noted, however, that D'Cruz's alleged discriminatory comments were directed toward older workers, not women.

"Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable factfinder that an illegitimate criterion actually motivated the adverse employment action." *King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009). In *King* — a failure to hire case — members of the selection committee allegedly made prior statements regarding a desire for "educated, young blood," that they had hired (on a prior occasion) a "young, skinny blonde," and that the "has-beens need to listen to the newbies." *Id.* at 1159. At a retirement party shortly after the hiring decision was made, it was said that the director of the section had a "philosophy of hiring younger, educated people." *Id.* The trial court found, and the Eighth Circuit Court of Appeals agreed, that the first three statements "were not direct evidence because they did not demonstrate a specific link between the alleged discriminatory animus and the committee's decision to select Evans rather than King." *Id.*

> Because these comments did not relate to the committee's selection process, we agree with the district court's finding that they are statements by decisionmakers unrelated to the decisional process itself and do not constitute direct evidence.

*Id.* at 1161. Because the trial court did not specifically address the fourth statement — made after the hiring decision was made — the appellate court was unable to determine if

---

[7] Deere's Brief (docket number 81-9) at 8.

[8] Sellers' Brief (docket number 94-1) at 30.

it was direct evidence of age discrimination and remanded "to allow the district court to make the requisite finding in the first instance." *Id.* at 1162.

Similarly, in *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149 (8th Cir. 2007), the Court was called upon to determine whether statements made by the plaintiff's supervisor were direct evidence of age discrimination. More than a year prior to the plaintiff's termination, the supervisor said that he wanted to hire "a bunch of young, dumb, and full of cum guys." *Id.* at 1152. At least four months prior to the plaintiff's termination, the supervisor said that "he intended to hire 'young studs' to replace the older sales people." *Id.* The plaintiff argued that the supervisor's comments were direct evidence of age discrimination. The Eighth Circuit Court of Appeals disagreed, finding that because the plaintiff had "not demonstrated a specific link between the comments and his termination," the comments were not direct evidence. *Id.* at 1153.

Here, Wanda argues that she has provided "ample direct evidence of discrimination" through D'Cruz's statements establishing "discriminatory animus." D'Cruz told Michael Sellers and others that "we need to get all these old farts out of here," that older employees "have got way too much baggage" and "they're no good for us," and that they needed to work on "getting the old dogs out of here."[9] When referring to purchasing planners, which averaged 47 years old at the time, D'Cruz said they were "sheep that can be slaughtered later."

While statements made by D'Cruz may be relevant to the issue of whether reasons given by Deere for allegedly adverse employment actions were mere pretext for age discrimination, they do not constitute direct evidence of age discrimination against Wanda. That is, there is no "specific link" between the alleged discriminatory animus exhibited by D'Cruz's statements and any alleged adverse employment actions visited on Wanda. *King*,

---

[9] Sellers also sued Deere, alleging age discrimination and retaliation. *See Michael Sellers v. Deere & Company et al.*, No. 6:12-cv-02050-JSS (N.D. Iowa).

553 F.3d at 1160 (requiring a "specific link between the alleged discriminatory animus and the challenged decision"); *Ramlet*, 507 F.3d at 1152-53 (same).

### b. Circumstantial evidence

Because Wanda has not provided any direct evidence of age or sex discrimination against her, the Court analyzes her claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Greene*, 411 U.S. 792 (1973). Wanda has the initial burden of establishing a *prima facie* case of age or sex discrimination. *Ridout*, 716 F.3d at 1083. To establish a *prima facie* case of age or sex discrimination, a plaintiff must show she (1) is a member of a protected class, (2) was meeting her employer's legitimate job expectations, (3) suffered an adverse employment action, and (4) was treated differently than similarly situated employees who were not members of her protected class. *Jackman*, 728 F.3d at 804; *Gibson*, 670 F.3d at 856.

Deere concedes that Wanda was a member of a protected class and was meeting Deere's legitimate job expectations. Deere argues, however, that Wanda is unable to establish a *prima facie* case of discrimination because she did not suffer an adverse employment action, nor was she treated differently than similarly situated employees who were not members of her protected class. Wanda asserts that because of her age and gender she was hired at a lower pay grade and, when GJE was implemented in 2004, she did not receive an increase in her pay.

Wanda offers no evidence that others who were hired in 2001 to perform the same or similar job, but who were not older women, started at a higher pay grade. Accordingly, Wanda being hired at a pay grade 5 does not demonstrate a *prima facie* case of age or sex discrimination. The Court reaches a different conclusion, however, regarding Wanda remaining at pay grade 6 when GJE was implemented. A failure to promote or provide a pay increase may constitute an "adverse employment action." *AuBuchon v. Geithner*, 743 F.3d 638, 643 (8th Cir 2014) ("Unquestionably, failure to

promote can constitute an adverse employment action that would support a plaintiff's retaliation claim."). When GJE was implemented in 2004, there were nine buyers on the PDP side of supply management, including Wanda and Gayle Forster (ages 45 and 48, respectively). Six of the buyers were at pay grade 6. Four of the six buyers at pay grade 6 received a raise to pay grade 7. The four employees receiving a pay grade increase were three males ages 26 to 37, and a 33-year-old female. The only buyers in PDP remaining at grade 6 were Wanda and Forster. The Court finds the other buyers in PDP were "similarly situated." Accordingly, Wanda's failure to obtain a pay grade increase along with the other buyers meets the requirement of showing she was "treated differently," thereby establishing a *prima facie* case of discrimination.

The burden then shifts to Deere to articulate a "legitimate nondiscriminatory reason for its actions." According to Deere, Wanda and Forster did not receive a pay grade increase because the parts they were buying were less complex. Deere argues that

> the difference between the SMS III grade 7 position and Wanda's SMS II grade 6 position is due to the difference in the complexity of the commodities for those positions. Wanda was responsible for cab commodities, and cab commodities were not as complex as other commodities, handled by SMS III positions, like pumps, valves, and SVCs.

Defendants' Brief (docket number 81-9) at 14.

Wanda bears the burden of demonstrating that the proffered reason is a "mere pretext" for discrimination. *Ridout*, 716 F.3d at 1083. Regarding her claim of sex discrimination, Wanda must prove that her gender was "a motivating factor" in Deere's decision. Regarding her ADEA age discrimination claim, Wanda must prove by a preponderance of the evidence that age was the "but-for cause" of her failure to receive a promotion, while her age discrimination claim pursuant to the ICRA requires only that age be "a motivating factor" in Deere's decision.

To support her claim that Deere's reason for not giving her a pay raise with the other buyers was mere pretext, Wanda points to statements made by Deere management involving older workers, women, and Wanda's personal situation. The head of the supply management department, Clyde D'Cruz, made statements that older employees "have got way too much baggage" and "they're no good for us." At one point, it was necessary for Kevin Keith, who was head of the human resources department, to caution D'Cruz in an email that his view on hiring older workers "creates risk for the company from an age discrimination standpoint which I know you do not want." D'Cruz also told Sellers that "women were easy to control." When Wanda complained initially about being hired at a pay grade 5, D'Cruz told her that her husband "makes a good living and he's not going anywhere so I know I've got you."

In response, Deere argues that the "rigorous multi-review GJE framework" prevented the type of discrimination alleged by Wanda. According to Deere, Wanda's position was mapped by GJE to a grade 6 fair and square, as a result of "myriad levels of examination." Wanda argues, however, that D'Cruz and Matson were involved in the GJE mapping process and could manipulate the results by scoring the "complexity" of the parts being managed by each buyer. Commodities classified as low-complexity in one facility, like hydraulics, were high-complexity commodities in another.

The Court concludes that there is a genuine issue of material fact regarding whether the reason given by Deere for failing to give Wanda the same pay raise received by other buyers in her department was a legitimate nondiscriminatory reason or mere pretext for discrimination. This issue of fact must be resolved by a jury.

### C. Wanda's Retaliation Claims

#### 1. Applicable Law

The Court now considers Wanda's claim that Deere retaliated against her in violation of Title VII, the ICRA, and the ADEA. The Court has previously described the

applicable law when discussing Gary's retaliation claims. Without direct evidence of a retaliatory motive, Wanda must produce evidence (1) that she engaged in statutorily-protected activity, (2) an adverse employment action was taken against her, and (3) a causal connection exists between the two events. *Stewart*, 471 F.3d at 1043. If Wanda can establish a *prima facie* case of retaliation, then the burden shifts to Deere to show a non-retaliatory reason for the adverse employment action. *Id.* The burden then shifts back to Wanda to present evidence that (1) creates a question of fact as to whether Deere's reason was pretextual and (2) creates a reasonable inference that Deere acted in retaliation. *Id.*

### 2. *Discussion*

Deere seems to concede that Wanda engaged in "statutorily protected activity." After Wanda learned that she and Forster were the only buyers in PDP who were not promoted to pay grade 7, she complained to Matson and D'Cruz. Wanda and Forster met with Matson on April 14, 2004, resulting in a meeting which "had some intensity to it." Wanda called Kevin Keith two days later, and met with him for at least two hours on April 26. During that meeting, Wanda aired her various objections, including the GJE scoring and her remaining at pay grade 6. The Court finds that Wanda's complaints of possible age and sex discrimination constituted statutorily protected activity.

Next, the Court considers whether Wanda suffered an "adverse employment action" as a consequence of her complaints. Wanda's brief gives only scant attention to what she considers to be an adverse employment action. Wanda identifies the alleged retaliation — in conclusory terms — in a single sentence:

> There is ample evidence of retaliation — the Matson explosion, the aborted investigation by Kevin Keith, the statements made by Matson to other Deere employees regarding Lenius' reputation as she looked for a new position, the repeated phone calls to Wanda Lenius as she was recovering, and the towed car, among others — that occurred

> only after Wanda Lenius had raised her claim for age and
> gender discrimination to Matson and others in April 2004.

Plaintiff's Brief (docket number 94-1) at 38. In her answer to Interrogatory No. 24, however, Wanda identified nine actions which she believes were motivated by her statutorily-protected activity, which Deere addresses one-by-one in its brief.

Most of Wanda's complaints simply do not rise to the level of an "adverse employment action," for these purposes. Generally, "[a]n adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects. . . ." *Jackman*, 728 F.3d at 804. For example, having Wanda's car towed after she was allegedly given permission to temporarily park her car illegally was petty and undoubtedly annoying, but it is not an adverse employment action within the meaning of Title VII, the ADEA, or the ICRA. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (noting that the law does not set forth "a general civility code for the American workplace."). The Court reaches the same conclusion regarding Wanda's complaints of statements made about her by others, the promotion of a coworker, and the perceived inaction by Kevin Keith. The Eighth Circuit has observed that "ostracism and disrespect by supervisors" and ostracism by coworkers do not constitute an "adverse employment action." *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 969 (8th Cir. 1999).

On the other hand, *if* Wanda was prevented from transferring to another higher-paying position at Deere in retaliation for engaging in statutorily-protected activity, or her future career prospects were otherwise adversely affected, then that would be an "adverse employment action." Similarly, if Wanda was transferred to a part-time "project management" position outside the department in response to her complaints, then that may also be an adverse employment action. *But see Spears v. Missouri Dept. of Corrections*,

210 F.3d 850, 853 (8th Cir. 2000) (suggesting a transfer with no reduction in pay or benefits is not an adverse employment action).

Wanda's claim in this regard fails, however, for a simple reason. Her claim that she was blocked from transferring to other positions lacks proof. Instead, it is based entirely on speculation and hearsay. In fact, it appears that Wanda was offered a promotion at other locations, but declined due to her personal circumstances. While Wanda met with D'Cruz and Keith in February 2005 to discuss a position outside the supply management department, no details were provided regarding the pay and benefits of the proposed position, and Wanda left her employment at Deere before any transfer took place.

The Court concludes that Wanda has not demonstrated that she suffered any adverse employment action, as defined for these purposes, as a consequence of her complaints regarding the results of the GJE job mapping. After Wanda lodged her complaints, she continued at pay grade 6, with the same salary and benefits, until she left her employment in February 2005. Because she has failed to show an adverse employment action, she is unable to establish a *prima facie* case of retaliation. *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1132 (8th Cir. 2014). Wanda's retaliation claims (Counts II, VI, and XI) will be dismissed.

### D. Hostile Work Environment

In her various claims for discrimination and retaliation, Wanda also asserts that she was subjected to harassment and a hostile work environment. Defendants argue that her claim fails "[b]ecause civil rights laws do not protect against the complained-of conduct here." Wanda does not respond in her brief to Deere's argument.

#### 1. Applicable Law

To establish a claim of a hostile work environment, a plaintiff must show: "(1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome

harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment." *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006). *See also Farmland Foods, Inc. v. Dubuque Human Rights Com'n*, 672 N.W.2d 733, 744 (Iowa 2003).

The Eighth Circuit Court of Appeals has described the harassment standards as "demanding." *Arraleh v. County of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (quoting *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005)).

> A hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment. Relevant factors for determining whether conduct rises to the level of harassment include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.

*Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1018 (8th Cir. 2011) (internal quotations and citations omitted).

"To survive summary judgment, a plaintiff must present evidence from which a reasonable jury could conclude that the harassment was sufficiently 'severe or pervasive' to affect a term, condition, or privilege of the plaintiff's employment." *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1077 (8th Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). It is not the purpose of the harassment statutes "to smooth the rough edges of our daily discourse, nor to provide a federal cause of action for every slight." *Id.* The Court has "repeatedly emphasized that anti-discrimination laws do not

create a general civility code." *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 779 (8th Cir. 2012) (quoting *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003)).

### 2. Discussion

Because Wanda did not address the issue in her brief, the Court is left to speculate regarding the facts upon which Wanda relies in asserting a harassment or hostile work environment claim. The Court assumes that Wanda is referring to the meeting of April 14, 2004, when she complained to Matson regarding the GJE results. Viewing the evidence in the light most favorable to Wanda, it was an unpleasant meeting. Wanda acknowledged that "everybody was upset at this point in time" and she told Matson that "this is obviously a discrimination situation." When Keith later investigated Wanda's complaints, Matson acknowledged that the meeting "had some intensity to it." Eventually, Matson told Wanda and Gayle Forster to report their concerns to Deere's human resources department, and then walked out of the meeting.

Even viewing the evidence in the light most favorable to Wanda, the Court concludes that the record does not generate a genuine issue of material fact regarding her hostile work environment claim. Even if Matson reacted badly in response to Wanda's claim of discrimination, a single meeting does not give rise to an actionable claim. *Arraleh*, 461 F.3d at 979 (an isolated incident does not amount to discriminatory changes in the terms and conditions of employment). Matson's conduct at the meeting was not so severe as to support a claim of hostile work environment. *Rester v. Stephens Media, LLC*, 739 F.3d 1129, 1131 (8th Cir. 2014) ("This 'demanding' standard requires 'extreme' conduct 'rather than merely rude or unpleasant' conduct."). The Court concludes Defendants are entitled to summary judgment on Wanda's hostile work environment claim.

### E. Iowa Equal Pay Act

In Count VII of her Second Amended Complaint, Wanda alleges that Deere failed to compensate her "at a rate equal to her younger counterparts and commensurate with

Plaintiff's Pay Grade," in violation of the ICRA. In a pretrial ruling, the Court concluded that Iowa Code § 216.6A could not be applied retrospectively, and Wanda was not entitled to damages for alleged wage discrimination prior to the enactment of the section on April 28, 2009. Deere asks that Wanda's wage-discrimination claim under § 216.6A be dismissed because Wanda has not earned wages from Deere since 2005. Wanda apparently concedes the point. In her brief in resistance, Wanda does not respond in any way to Deere's argument regarding the § 216.6A claim. Because Iowa Code § 216.6A did not become effective until April 29, 2009, the Court concludes that it affords no relief to Wanda under these circumstances. Accordingly, Wanda's claim under Iowa Code § 216.6A (Count VII) will be dismissed.

### F. Defamation

In Count IX of her Second Amended Complaint, Wanda claims that Defendants defamed her by stating that she was a "troublemaker," "damaged goods," "crazy," and "out of her mind." In their instant motion, Defendants assert that the defamation claim is barred by the statute of limitations and also fails on its merits. In the responsive brief, Wanda and Gary state that they "do not resist the entry of summary judgment on their [*sic*] claims of defamation, as they have been barred by the applicable statute of limitations." Accordingly, Wanda's defamation claim (Count IX) will be dismissed.

### G. Additional Defenses

Defendants also argue that Plaintiffs' claims are barred by their failure to exhaust administrative remedies and by the doctrine of laches. Specifically, Defendants assert that any alleged discrimination which occurred more than 180 days prior to Wanda filing a charge with the EEOC are time-barred, and claims against the individual defendants are barred by Wanda's failure to include the individual defendants in her charge filed with the EEOC. Defendants also argue that the extraordinary delay between filing of the EEOC charge and bringing the lawsuit requires dismissal under the doctrine of laches.

## 1. Exhaustion of Administrative Remedies

### a. Failure to timely file a charge

Defendants assert that Wanda's claims of discrimination, if any, arising from her initial hiring in 2001 at pay grade 5 or her increase to pay grade 6 in 2003, are barred by her failure to timely file a charge with the EEOC. The Court has already concluded that Wanda failed to establish a *prima facie* case of discrimination on those occasions and, therefore, those claims fail on the merits. Alternatively, however, the Court finds that Wanda's claims, if any, for discrimination in 2001 and 2003 are time-barred. That is, a person claiming discrimination must file a charge with the EEOC within 180 days after the alleged unlawful employment practice occurred, or file a claim with the ICRC within 300 days after the alleged discriminatory practice.[10] *See* 42 U.S.C. § 2000e-5(e)(1) and Iowa Code § 216.15(12). Wanda did not file her claim with the EEOC until October 14, 2004, and it was cross-filed with the ICRC four days later. Accordingly, any discriminatory acts which occurred more than 180 days (or perhaps 300 days) prior to that time are time-barred. It makes no difference that the earlier claims may be similar to those charged by Wanda in 2004. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."); *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851 (8th Cir. 2012) ("Each discrete act is a different unlawful employment practice for which a separate charge is required."); *Lynch v. City of Des Moines*, 454 N.W.2d 827, 831 (Iowa 1990). In other words, any acts of discrimination which occurred prior to 2004 — even *if* the claims were otherwise meritorious — are time-barred because Wanda did not timely file a charge with the EEOC or the ICRC.

---

[10] Prior to an amendment in 2007, the deadline for filing a claim with the ICRC was also 180 days.

### b. *Failure to identify individual defendants*

As set forth above, the only claims which have survived Defendants' motion for summary judgment are Wanda's claims that age and sex discrimination resulted in her failing to receive a pay grade increase when GJE was implemented in May 2004. It is undisputed that neither Title VII nor the ADEA permit claims against individuals. In her second amended complaint, Wanda directs these claims (Counts I and IV) against Deere only. In her age and sex discrimination claims brought pursuant to the ICRA (Count V), however, Wanda seeks judgment against Deere, D'Cruz, Keith, and Matson. Defendants concede in their brief that "[s]upervisors may be subject to individual liability under the ICRA."[11] *See Vivian v. Madison*, 601 N.W.2d 872, 878 (Iowa 1999). Nonetheless, Defendants argue that the individually-named defendants should be dismissed from the action because they were not identified as "the employer . . . that I believe discriminated against me" in the charge of discrimination filed by Wanda with the EEOC. In response, Wanda argues that the individually-named defendants "held a sufficient identity of interest" with Deere and were "constructively aware" of her EEOC claim.

The parties have not directed the Court to any Iowa case addressing this issue, and the Court has found none. Accordingly, the Court looks to federal authority for guidance. *Id.* at 873. The Eighth Circuit Court of Appeals addressed this issue in *Greenwood v. Ross*, 778 F.2d 448 (8th Cir. 1985). There, Johnny Greenwood filed a charge with the EEOC, claiming the University of Arkansas at Little Rock discriminated against him in violation of Title VIII. He later sued the University, together with its chancellor and athletic director. The individual defendants moved to dismiss the claim against them, noting that they were not named as parties in the EEOC charge. The Eighth Circuit Court of Appeals rejected the defendants' argument.

---

[11] Defendants' Brief (docket number 81-9) at 48.

"Omission of a party's name from the EEOC charge does not automatically mandate dismissal of a subsequent action under Title VII." The filing of an EEOC charge is unnecessary where an unnamed party has been provided with adequate notice of the charge, under circumstances where the party has been given the opportunity to participate in conciliation proceedings aimed at voluntary compliance. "The purpose behind this exception is to prevent frustration of the goals of Title VII by not requiring procedural exactness in stating the charge." A suit is not barred "where there is sufficient identity of interest between the respondent and the defendant to satisfy the intention of Title VII that the defendant have notice of the charge and the EEOC have an opportunity to attempt conciliation."

*Id.* at 451 (internal citations omitted).

At the time of these events, Brian Matson was manager of PDP and Wanda's direct supervisor. Clyde D'Cruz was manager of the supply management department and Matson's direct supervisor. Kevin Keith was manager of human resources for Deere's Waterloo operations. All three had actual knowledge that Wanda filed a claim with the EEOC. All three were named in the narrative portion of Wanda's EEOC charge. The Court believes there is sufficient "identity of interest" between Deere and its managers to satisfy the purposes of requiring an administrative charge. To dismiss Wanda's claims against the individual defendants because they were not named in the EEOC charge would frustrate the purposes of the ICRA requirement of giving administrative notice. Accordingly, Defendants' request that Matson, D'Cruz, and Keith be dismissed will be denied. Because Gary Lenius' claims will be dismissed on summary judgment, however, Defendant Robert Barnes will be dismissed as an individual defendant.

### 2. *Doctrine of Laches*

Finally, Defendants argue that Wanda's discrimination claims are barred by the doctrine of laches. According to Defendants, dismissal of the claims is supported by the "unreasonable and inexcusable delay in filing the instant civil rights claims." Labeling the

argument as "[a] bald faced, cynical, unsubstantiated legal tactic," Wanda argues that "[i]t should be rejected out of principle."[12]

In *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court "observed" that an employer faced with a discrimination claim may raise a laches defense, which bars a plaintiff from maintaining a suit if she unreasonably delays in filing a suit and as a result harms the defendant. "This defense requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Id.* at 121-22. *See also Whitfield v. Anheuser-Busch, Inc.,* 820 F.3d 243, 244 (8th Cir. 1987) ("Laches may be used to bar a lawsuit when the plaintiff is guilty of (1) unreasonable and unexcused delay, (2) resulting in prejudice to the defendant.").

In considering whether there was an "unreasonable and unexcused delay," the Court considers "both the length of the delay and the plaintiff's reasons for the delay." *Id.* at 245. "Each case must be considered on its own facts in determining the reasonableness of the delay; laches is an equitable, hence flexible, doctrine, and no length of time is considered *per se* unreasonable." *Id.* In determining whether a delay has resulted in prejudice to the defendant, the Court considers "loss of evidence in support of the defendant's position or the unavailability of witnesses." *Id.* "In this circuit, laches may apply either when the delay in bringing suit was caused by a private plaintiff or when the delay is the fault of an administrative agency." *Id.* at 244-45. Whether a plaintiff's claim is barred by the doctrine of laches is a matter within the Court's sound discretion. *Brown-Mitchell v. Kansas City Power & Light Co.*, 267 F.3d 825, 827 (8th Cir. 2001); *Hukkanen v. International Union of Operating Engineers*, 3 F.3d 281, 286 (8th Cir. 1993).

Here, Wanda filed a charge of discrimination with the EEOC on October 14, 2004. Her claim was cross-filed with the ICRC on October 18. The EEOC issued a

---

[12] Plaintiff's Brief (docket number 94-1) at 46.

"Determination" on June 24, 2011 and, more than a year later, issued a right-to-sue letter on July 31, 2012. The ICRC issued a right-to-sue letter on August 7, 2012. Wanda filed her action in this Court on August 31, 2012, nearly eight years after filing her initial charge of discrimination with the EEOC.

At her deposition, Wanda affirmed that she was "pretty upset with the EEOC and how long they were taking on this matter." One of Wanda's doctor's records referenced the fact that she was calling the EEOC investigator and "leaving messages threatening her." Wanda acknowledged that the investigator told her "up front" that she "could get a right-to-sue letter anytime in the process." According to Wanda, however, when she talked to the investigator in 2009 and told her she was going to get a right-to-sue letter, the investigator said "please don't do that. A finding is going to be — we're going to have a finding for you." That is, Wanda testified that the EEOC investigator talked her out of seeking an immediate right-to-sue letter. The emails submitted as exhibits reflect that Wanda actively worked with the EEOC in an attempt to move this case forward in 2009, 2010, and 2011.

The Court has not disregarded Deere's argument that Defendants have been prejudiced by the passage of time. In their brief, Defendants cite numerous examples of witnesses who were unable to recall details because the events occurred approximately ten years ago. The Court notes, however, that the only claim surviving summary judgment is Wanda's claim that her failure to receive a pay grade promotion when GJE was implemented in May 2004 was the result of age and sex discrimination. According to Deere, the decision to keep Wanda and Gayle Forster at their previous pay grades, while giving younger male buyers and a younger female buyer an increase to pay grade 7, was the result of a deliberate objective examination of all jobs within Deere's worldwide organization. The Court believes that Deere's response to Wanda's allegations on this claim is less susceptible to the vagaries of fading memories.

While the issue is not without some doubt, the Court concludes, based on all of the facts and circumstances, that Defendants have failed to establish that Wanda's claims are barred by the doctrine of laches. Accordingly, Wanda's remaining claims will not be dismissed on that basis.

## VI. ORDER

IT IS THEREFORE ORDERED that the Motion for Summary Judgment (docket number 81) filed by Defendants is **GRANTED in part** and **DENIED in part** as follows: Wanda's claims of sex and age discrimination arising from her failure to receive a promotion to pay grade 7 in May 2004 will proceed to trial. The claims under Title VII (Count I) and the ADEA (Count IV) will proceed against Defendant Deere only. The claims under the ICRA (Count V) will proceed against Defendants Deere, D'Cruz, Keith, and Matson. Wanda's claims of harassment and hostile work environment are dismissed. Wanda's retaliation claims (Counts II, VI, and XI) and Gary's retaliation claims (Counts III, VIII, and XII) are dismissed. Wanda's claim pursuant to the Iowa Equal Pay Act (Count VII) and her common-law claim of defamation (Count IX) are dismissed.

DATED this 25th day of June, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA