1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA


WANDA JO LENIUS,                          )
                                          )
      Plaintiff,                          )
                                          )
vs.                                       )
                                          ) No. CV 12-2063
DEERE & COMPANY, also known as            )
JOHN DEERE COMPANY, CLYDE D'CRUZ,         )
KEVIN KEITH and BRIAN MATSON,             )
                                          )
_____Defendants._____              ___)
                                          )
GAYLE LELA FORSTER,                       )
                                          )
      Plaintiff,                          )
                                          )
vs.                                       ) No. CV 12-2072
                                          )
DEERE & COMPANY, also known as            )
JOHN DEERE COMPANY, CLYDE D'CRUZ,         )
KEVIN KEITH and BRIAN MATSON,             )
                                          )
      Defendants.                         )




MOTIONS IN LIMINE HEARING AND FINAL PRETRIAL CONFERENCE
     HELD BEFORE THE HONORABLE JON STUART SCOLES,

taken at the Federal Courthouse, 111 Seventh Avenue SE,
Cedar Rapids, Iowa, on the 9th day of February, 2015,
commencing at 12:02 p.m., reported by Kay C. Carr,
Certified Shorthand Reporter in and for the State of
Iowa.



              Kay C. Carr
         Certified Shorthand Reporter
       Registered Professional Reporter
              Cedar Rapids, Iowa
              (319) 362-1543

Contact AMR at 319-343-3590 or sales@amreporters.com
to purchase a complete copy of the transcript.

2

APPEARANCES:

GREGORY T. RACETTE, ESQ., AMY BETH PELLEGRIN, ESQ.,
and PATRICK T. VINT, ESQ., Hopkins & Huebner, PC,
2700 Grand Avenue, Terrace Center, Suite 111,
Des Moines, Iowa 50312, on behalf of the
Plaintiffs.

FRANK HARTY, ESQ., DEBRA HULETT, ESQ., ANGEL ANNA
WEST, ESQ., and RYAN WADE LEEMKUIL, ESQ.,
Nyemaster Goode, PC, 700 Walnut, Suite 1600,
Des Moines, Iowa 50309-3899, on behalf of the
Defendants.

FRAN M. HAAS, ESQ., Nyemaster Goode, PC, One Great
America Plaza, 625 First Street SE, Suite 400,
Cedar Rapids, Iowa 52401-2030, on behalf of the
Defendants.

Case 6:12-cv-02063-JSS   Document 214-3   Filed 02/18/15   Page 2 of 85
Contact YOUR FIRM at 1-949-342-4343 or info@yourfirm.com
to purchase a complete copy of the transcript.

**3**

1     THE COURT: The matter now before the Court
2  is -- there are actually two cases before the Court.
3  Wanda Jo Lenius versus Deere & Company and others,
4  12-CV-2063, and Gayle Lela Forster versus Deere &
5  Company and others, No. 12-CV-2072. This matter comes
6  on for hearing at this time on various pending pretrial
7  motions. It also comes on for a final pretrial
8  conference at this time.
9     The plaintiffs are represented by their
10  attorneys Patrick Vint, Amy Pellegrin and Greg Racette.
11  Defendants are represented by their attorneys Frances
12  Haas, Angel West, Frank Harty, Deb Hulett and Ryan
13  Leemkuil. Also David Meier, who as I understand it, is
14  in-house counsel for Defendant Deere.
15     What I would like to do today is talk about
16  the pending motions and then talk about the trial
17  and the proposed final pretrial order. As you know, there
18  is an overwhelming amount of information that's been
19  submitted. I think the defendants' exhibits -- which I
20  got last week -- fill 13 binders and I just got the
21  plaintiffs' exhibits and it fills 6 or 7 three inch
22  binders. I don't know how many pages that represents,
23  but I -- I'm estimating maybe five or 6,000 pages of
24  exhibits.
25     Obviously, I have to go through those in

**4**

1  some manner at least, and we'll talk about the trial
2  later on, but as I understand it, there's going to be a
3  lot of witnesses in this case. It's expected that the
4  trial is going to take several weeks to try. I
5  encourage the parties to always keep in their mind that
6  this case is being tried to a jury and while those of us
7  in this courtroom get all wrapped up about every little
8  detail and every exhibit or document that we think is
9  remotely related to any of the issues, the average
10  jurors aren't used to that sort of thing. And after
11  having been a judge now for 28-and-a-half years and a
12  trial lawyer before that, I can tell you that when a
13  jury is presented with 5,000 pages of exhibits, it
14  pretty much guarantees they aren't going to look at any
15  of them because there's no way they're going to look at
16  all of those exhibits and to try to pick and choose
17  which ones they look at is, you know, difficult for
18  them.
19     So, you know, I -- obviously you try your
20  case the way you want to try it and it's an important
21  case to all the parties and obviously you're going to do
22  what you think you need to do to represent your clients,
23  but I encourage the parties to try to focus on what the
24  issues are; try to figure out what exhibits are really
25  necessary in order to try to prove or disprove whatever

**5**

1  it is the issue is and present it to the jury in the
2  most efficient way. Because, again, my -- at least from
3  my perspective, the average juror doesn't have the --
4  sort of the patience and the experience that lawyers
5  have in going through this stuff in such fine detail.
6  You know, most jurors after about two days are already
7  sick of the case no matter what the case is about and
8  for an average juror to sit through two weeks of
9  detailed testimony and thousands of pages of exhibits I
10  think is very difficult. But, nonetheless, that's
11  neither here nor there.
12     I guess where I would like to start today is
13  with the pending motions and specifically I want to
14  start with the motions in limine. First with the
15  plaintiffs' motions -- motion in limine and then with
16  the defendants' motion to limine. I think the
17  plaintiffs' motion has 14 parts. The defendants' motion
18  has 41 parts, so between the two of them there are
19  55 issues I guess, to the extent they don't overlap that
20  we need to talk about.
21     And I guess the most efficient way to do
22  this is just go down the line. So referring to the
23  plaintiffs' motion in limine, which is doctor -- or
24  excuse me -- Document No. 149 and I'm going to be
25  referring to the Lenius docket numbers. I realize that

**6**

1  they've been docketed in the Forster case as well, but
2  just for simplicity, I'll refer to the Lenius file, so
3  it's Docket No. 149. Again, it would appear to have
4  14 issues.
5     I have tried to go through these motions and
6  the resistances. Just the motions and resistances fill
7  like six thick binders and I've tried to go through them
8  as best I can, but there aren't six of me working on
9  this case or even three. There's one and I've got all
10  of the other things that I normally do during the course
11  of a day to still do, so I -- I look at them at nights
12  and on weekends and do the best I can, but I have not
13  read every page of every motion and every 49 page brief
14  that goes with it.
15     So the first item on the motion in limine is
16  settlement discussions or offers. And I think what I'll
17  do on each of these is first ask the nonmovant whether
18  or not the issue is contested and if it is, then I'll go
19  back to the movant and hear from them and then hear the
20  resistance. If it's not, then I'll simply note that and
21  we'll move on.
22     So as I understand it, the first issue is
23  settlement discussions or offers. Who's speaking for
24  defendants?
25     MR. HARTY: I'm handling that one,

Contact us at 123-456-7890 . . . . . . . . . . com
to purchase a complete copy of the transcript.

**7**

1 Your Honor.

2     THE COURT: Excuse me?

3     MR. HARTY: I'm handling that one.

4     THE COURT: All right. Mr. Harty, is that

5 resisted?

6     MR. HARTY: It's not. We would just like

7 some guidance from the Court as to whether that -- the

8 order on that would also exclude the evidence concerning

9 the check that was given to Ms. Forster in offer to

10 settle her claims regarding her alleged destroyed office

11 supplies when she was moved.

12     THE COURT: All right. So if I understand

13 it, at some point after she was no longer actively

14 working at Deere, her personal property was removed and

15 there's some issue about whether or not it was destroyed

16 or returned, and in order to resolve that eventually,

17 apparently there was some agreement reached and money

18 was paid to Ms. Forster?

19     MR. HARTY: That's right, Your Honor.

20     THE COURT: I think that's the subject of --

21 that whole sort of issue is the subject of a later item

22 in one of the motions in limine, so let's -- let's

23 assume we'll talk about that then.

24     MR. HARTY: Then we have no resistance,

25 Your Honor.

**8**

1     THE COURT: All right. So as far as whether

2 or not the discrimination case that's been brought here

3 and all of its other parts have been dismissed, both

4 sides agree that neither party will offer any evidence

5 or argument on the issue of settlement.

6     Incidentally, it -- I am going to be

7 entering written orders on all these various motions.

8 I'm not entering any rulings today, but my ruling will

9 say that to the extent I exclude evidence on a

10 particular issue -- for example settlement discussions

11 -- it's incumbent upon the attorneys to advise their

12 witnesses not to volunteer any information on any of

13 those subjects. So, you know, I don't want, you know,

14 anyone coming into trial and saying well, yeah, but they

15 offered us $500,000 and -- or -- or the plaintiff wants

16 X dollars or whatever. So make sure that, you know, you

17 remember to tell your witnesses not to volunteer any

18 information.

19     All right. The second item goes to

20 collateral sources of income. And as I understand it,

21 this goes to the issue of -- and let me make sure I

22 understand the facts correctly. At some point when the

23 plaintiffs stopped working actively at Deere, I think

24 there was perhaps a period of time that they were paid

25 under some sort of salary continuation, and then

**9**

1 subsequent to that time, as I understand it, they

2 received disability insurance benefits and Social

3 Security disability benefits and perhaps workers'

4 compensation benefits. Who's going to be speaking on

5 behalf of plaintiffs?

6     MS. PELLEGRIN: I am, Your Honor.

7     THE COURT: All right. Ms. Pellegrin, first

8 of all remind me as to what the fact is and let's talk

9 about Lenius first. Did she receive some sort of

10 so-called salary continuation where she was paid as if

11 she had been working?

12     MS. PELLEGRIN: Yes, Your Honor. The --

13 both plaintiffs received a salary continuation as well

14 as the disability payments.

15     THE COURT: You can pull that microphone

16 closer to you. How long did they receive -- it actually

17 pulls up if you want. How long did they receive salary

18 continuation payments?

19     MS. PELLEGRIN: I don't actually know the

20 specifics as to how long, Your Honor. I don't have that

21 in front of me right now.

22     THE COURT: Did they immediately transition

23 from salary continuation to then disability benefits?

24     MS. PELLEGRIN: My understanding -- and you

25 guys can correct me if I'm wrong -- but they went on

**10**

1 short-term disability and there may have been a salary

2 continuance at the same time or before that and then as

3 soon as they were qualified for the long-term disability

4 they went off on long-term disability. I'm not sure how

5 long the salary continuance actually existed and the

6 defendants can provide that information if they know it.

7     THE COURT: And then they also -- the

8 plaintiffs also received Social Security benefits then

9 at some point?

10     MS. PELLEGRIN: Yes.

11     THE COURT: Was that at a period of time

12 when they were also collecting disability insurance

13 benefits?

14     MS. PELLEGRIN: Yes.

15     THE COURT: And then -- and are they still

16 receiving disability insurance -- or Social Security

17 disability benefits?

18     MS. PELLEGRIN: Yes.

19     THE COURT: Are they receiving long-term

20 disability benefits through John Deere?

21     MS. PELLEGRIN: I believe they still are,

22 yes.

23     THE COURT: And that -- that's true of both

24 plaintiffs, but you just don't know the specifics as to

25 when they started or what amounts?

Case 6:12-cv-02063-JSS    Document 213-3   Filed 02/13/15   Page 4 of 85

to purchase a complete copy of the transcript.

---

**11**

1    MS. PELLEGRIN:  Correct.  I don't have those
2    dates off the top of my head.  I'm sorry.
3        THE COURT:  And then did one or both of them
4    apply for workers' compensation benefits?
5        MS. PELLEGRIN:  Ms. Forster began a workers'
6    compensation case and that was dismissed at some point.
7        THE COURT:  So no benefits were received?
8        MS. PELLEGRIN:  None that I'm aware of, no.
9        THE COURT:  And Ms. Lenius did not file any
10   workers' compensation claim?
11       MS. PELLEGRIN:  Correct.
12       THE COURT:  All right.  And we'll get to
13   this I think in probably greater extent -- maybe it's,
14   in fact, preferable to wait until we get to the -- I
15   think it's the subject of 104 motion maybe or --
16   obviously the measure of damages and collateral sources
17   and so forth is going to be a big issue in this case.  I
18   take it it's the plaintiffs' position that the salary
19   continuance and the disability benefits and the Social
20   Security disability benefits don't offset any amounts
21   which the plaintiffs are otherwise entitled to receive
22   in this case?
23       MS. PELLEGRIN:  That would be our position.
24       THE COURT:  And if that's the law -- if
25   that's what I determine to be the law, then the

---

**12**

1    plaintiffs' position is that then the jury shouldn't
2    hear about any of that stuff?
3        MS. PELLEGRIN:  That's correct.  It would
4    also be our position if you do believe that there is an
5    offset, that that would be for the Court to decide so
6    the jury should still not hear the source of those
7    collateral incomes in fear that that would prejudice
8    their decision as to the liability, so we think that is
9    in the hands of the Court and so either way, whatever
10   your ruling is on that, that the jury should not hear
11   the specific evidence as to those sources of income.
12       THE COURT:  All right.  And I apologize if
13   I'm delaying here from time to time because I'm going to
14   need to take notes so that I can remember what our
15   discussion was.
16       So if -- well, with respect to the motion in
17   limine, would you agree that the admissibility of this
18   evidence more or less rises or falls on whatever
19   determination I make as to if those other sources are
20   properly included as offset and whether that's a jury
21   issue or a Court issue?
22       MS. PELLEGRIN:  Well, if I'm following you,
23   we feel the sources of income should be inadmissible
24   either way in front of the jury, but for the Court, they
25   may become admissible in the damages phase if the Court

---

**13**

1    determines that there is an offset; if that answers your
2    question.
3        THE COURT:  Yeah, I think so.  If I find
4    that, in fact, there is an offset for one or more of
5    these sources; maybe salary continuance; maybe the John
6    Deere insurance disability; maybe the Social Security
7    disability or some combination of those; if I find
8    that's a measure of damages, then your position is that
9    it's still not a jury issue.  It's just there would be
10   evidence submitted to the Court then and after the jury
11   returns its verdict on the amount, then potentially the
12   Court would offset that by those sources that I find are
13   properly considered as offset.
14       MS. PELLEGRIN:  That's correct.
15       THE COURT:  Okay.  Who's handling that for
16   the plaintiff -- or for the defendant?
17       MS. HULETT:  I am, Your Honor.
18       THE COURT:  All right.  Ms. Hulett?  What's
19   the defendants' position?
20       MS. HULETT:  Your Honor -- and just to
21   clarify some factual information.  Deere has a salary
22   continuance benefit for its employees that is akin to
23   what many companies call short-term disability and that
24   lasts for a year.  After a qualifying employee exhausts
25   salary continuance, the employee transitions to

---

**14**

1    long-term disability benefits, assuming the employee has
2    satisfied the requirements under the terms of Deere's
3    plan.
4        THE COURT:  So -- and just let me see if I
5    -- and I don't need maybe the precise dates, but am I
6    then correct in assuming that both of the plaintiffs
7    basically were paid for a year after they stopped
8    working and then immediately began receiving long-term
9    disability benefits through John Deere's program?
10       MS. HULETT:  That is correct.
11       THE COURT:  Okay.  And are they still
12   receiving those payments as far as you know?
13       MS. HULETT:  That is correct.
14       THE COURT:  And then in addition, they at
15   some point both applied for and received Social Security
16   disability benefits?
17       MS. HULETT:  That is correct.
18       THE COURT:  And that's ongoing as far as you
19   know?
20       MS. HULETT:  To our knowledge, although we
21   don't have privy to the most recent -- we don't have
22   access to the most recent information so if there was
23   some termination of benefits by the Social Security
24   Administration, we may not know about it.
25       THE COURT:  Now, we're going to be talking

Case 6:12-cv-02063-JSS   Document 149-3   Filed 02/18/25   Page 5 of 85
Contact CRI at 319-362-1543 or cri@crimn.com
to purchase a complete copy of the transcript.

---

**15**

1 probably later about what is the measure of damages and
2 whether or not these are appropriate offsets. If I find
3 that they're not offsets, then would you agree that
4 evidence regarding those items would be excluded?
5     MS. HULETT: No, we would not agree,
6 Your Honor. First and foremost, there is valuable --
7 particularly in the damages phase -- impeachment
8 evidence contained within, for example, the Social
9 Security disability applications that the plaintiffs
10 submitted to the United States government. There are --
11 there's also information in the long-term disability
12 applications or the forms that the plaintiffs' treating
13 physicians completed about the plaintiffs' medical
14 condition and I believe it would be very difficult for
15 the Court to oversee the damages stage without that
16 leaking in in some way through the medical records or
17 through impeachment of plaintiffs in terms of
18 representations that they made to the United States
19 government under oath in their Social Security
20 disability applications.
21     THE COURT: So you're saying that even if
22 none of these are properly considered as offsets to
23 damages, that evidence regarding the applications
24 themselves, for example, would be admissible for other
25 purposes?

---

**16**

1     MS. HULETT: Correct.
2     THE COURT: What happens if I -- or the
3 plaintiffs argue that even if I find that these are
4 appropriate offsets -- either one or two or three of the
5 sources are appropriate offsets -- that it's an issue
6 for the Court; not for the jury and, therefore, would be
7 inadmissible?
8     MS. HULETT: Well, I think you can look at
9 the Eighth Circuit decision in Moses v. Union Pacific
10 Railroad. It's cited in our resistance, but I can --
11 the cite is 64 F.3d 413, Eighth Circuit 1995, and that
12 addresses the fact that even if there is a collateral
13 source issue, it doesn't preclude a party from using
14 evidence that implicates a collateral source for other
15 purposes such as impeachment.
16     THE COURT: All right. So that goes to
17 using it for other purposes, but my most recent question
18 was is the offset a jury issue or a Court issue?
19     MS. HULETT: I'm sorry; I misunderstood,
20 Your Honor. The offset -- in terms of the payments by
21 Deere & Company to the plaintiffs, which were not
22 insurance payments, they were paid directly by Deere
23 from Deere's funds.
24     THE COURT: So-called salary continuance.
25     MS. HULETT: And long-term disability, those

---

**17**

1 are direct payments from a defendant -- the employer in
2 this case -- to the plaintiffs. That's -- that's not an
3 offset. If plaintiffs are going to claim backpay,
4 that's directly relevant to what their employer is
5 paying the plaintiffs today.
6     THE COURT: And I think you're still
7 misunderstanding my question. We'll talk, I think, when
8 we get -- I think this is the subject -- one of the
9 subjects of the Rule 104 motion and so at that time I'll
10 hear detailed arguments about what is and is not proper
11 offsets. But if I find that there can be an offset for
12 these items, that it's -- that when judgment is entered
13 for the plaintiffs, it's necessary to offset the amounts
14 they recovered from these other sources, the plaintiffs
15 argue that even under that scenario, that's an issue for
16 the Court; not for the jury. That the jury wouldn't --
17 in other words, the jury wouldn't be instructed here's
18 what the measure of damages is, but you need to subtract
19 the various offsets da, da, da, da, da. Instead, the
20 plaintiffs would say the jury would just be told here's
21 the measure of damages; work it out and then when it
22 comes back to me, I would work out the offset and
23 subtract it off.
24     MS. HULETT: So this is going beyond the
25 collateral source argument? You're asking generally how

---

**18**

1 should the jury be instructed?
2     THE COURT: Exactly.
3     MS. HULETT: I guess -- I guess if the jury
4 is instructed to not take into account the long-term
5 disability payments that Deere has made and the jury is
6 instructed the Court will decide that later, that would
7 be a fair instruction, but we still believe the jury
8 should hear evidence regarding those payments made by
9 Deere & Company because they're not collateral sources.
10     THE COURT: And I apologize because I said
11 earlier that I have not read all the trial briefs and
12 I've skimmed through the instructions and so forth, but
13 -- so if I understand what you're telling me, your
14 instructions don't say that the jury should determine
15 here's the measure of damages and then you're required
16 to reduce that amount by offset that the plaintiffs
17 received for these purposes and so forth?
18     MS. HULETT: We believe that the payments
19 that Deere & Company has made to the plaintiffs would be
20 -- they're not a collateral source by any means, so
21 that's not a basis for excluding that evidence.
22     THE COURT: So the jury would make that
23 calculation.
24     MS. HULETT: We would contemplate that we
25 would present that to the jury and let the jury make

Case 6:12-cv-02063-JSS Document 213-3 Filed 02/18/25 Page 6 of 85
to purchase a complete copy of the transcript.

19

1  that calculation.

2        THE COURT: And again, I have a tendency

3  sometimes to belabor issues because we've got a lot of

4  stuff to talk about this afternoon so I'm going to try

5  to keep it moving, but do both parties agree that when

6  we're talking about the motion in limine here, we're

7  talking about -- I mean obviously plaintiff doesn't

8  believe that this -- there should be any testimony about

9  any of this at any time at least in front of a jury.

10  Does the -- do the defendants agree that it would not

11  come in during the liability phase; that to the extent

12  it's admissible, if at all, it would be in the damages

13  phase?

14        MS. HULETT: In terms of the amounts that

15  plaintiffs have been paid either by Deere & Company or

16  the Social Security Administration, we agree that should

17  not be part of the liability phase.

18        THE COURT: All right. It sounded like you

19  were qualifying your answer there. What's the rest of

20  it?

21        MS. HULETT: I was trying to focus on the

22  collateral source argument in the plaintiffs' motion in

23  limine, which was about the amount of money.

24        THE COURT: At the liability phase, is there

25  going to be any testimony about the fact that John Deere

20

1  continued to pay -- continued to pay the plaintiffs and

2  that they subsequently got long-term disability benefits

3  and that they've also applied and received Social

4  Security disability benefits? Is there going to be any

5  of that in the liability phase?

6        MR. HARTY: Judge, can I just chime in here

7  because it's really a question that has -- that has

8  perplexed me and that is given the bifurcation, how does

9  the Court want to handle that? And that is somehow the

10  jury is going to have to be told that these two

11  plaintiffs have not been going to work at Deere for

12  eight years, and so the question is do we just pretend?

13  Do we say that, you know, they've been collecting --

14  that they've been collecting benefits?

15        THE COURT: Well, I mean here's my general

16  thinking about the way this case is going to get

17  submitted and maybe it's a good time to just sort of

18  talk about it and maybe it will lay a framework for the

19  various pending motions. I have, of course, bifurcated

20  the case between liability and damages, and the

21  liability portion of this I take a relatively narrow

22  view on and it's hard to, you know -- obviously every

23  piece of evidence I have to consider individually, but

24  as a general proposition, I'm taking a pretty narrow

25  view on liability. The liability issue is relatively

21

1  limited in this case; however, I take a pretty broad

2  view on the issue of damages.

3        If we get to the issue of damages, there's

4  going to be a whole lot of stuff that's going to come in

5  that would not have otherwise been admissible under the

6  liability phase. And the issue at the liability phase

7  is whether or not, when these women failed to get

8  promoted to pay Grade 7 when GJE was implemented,

9  whether that was the result of discrimination or whether

10  it was the result of a legitimate business decision

11  based on the kind of work that they were doing.

12        And that's not a -- you know, it's not a

13  broad issue. It's a pretty narrow issue. Now that

14  doesn't mean there's not a lot of evidence that goes

15  into that. There will -- and we'll talk about all of

16  that evidence as we go through these motions. But when

17  I am deciding what's admissible and what isn't

18  admissible at the liability phase, in my mind I'm

19  thinking about is this -- does this go to the issue of

20  whether or not they were discriminated against when they

21  failed to get a raise when GJE was implemented? And if

22  it doesn't; if it's got something to do with defamation

23  or harassment or something that isn't related to this

24  issue of promotion from 6 to 7, then it's unlikely that

25  I would admit it.

22

1        Now -- so issues, for example, that have to

2  do with the fact that they continued to get paid and

3  they got Social Security benefits and they got

4  disability benefits and so forth, that doesn't go to the

5  issue of whether or not they were discriminated against

6  when they didn't get bumped from pay Grade 6 to pay

7  Grade 7. It goes to what happened afterwards, and so as

8  a general proposition, that wouldn't be admissible.

9        Now there might be some evidence that's

10  admissible, you know, for other purposes and I would

11  have to consider, you know, under 403 and so forth

12  whether or not it would still be admissible, but that's

13  kind of the way I'm trying to think about the liability

14  phase.

15        Now I understand -- and we'll talk about

16  these as we get to each one of them, but I understand

17  that there are peculiarities about this case that cannot

18  be ignored. I mean one of the things is that they did

19  stop working relatively shortly after the alleged

20  discrimination occurred and I -- I -- you know, I think

21  there's going to have to be some kind of testimony about

22  that. I mean I don't know how the plaintiffs will get

23  up and testify about sort of what happened without, you

24  know, somehow introducing the fact that they are no

25  longer actively working there and we're going to have to

Case 6:12-cv-02063-JSS   Document 213-3   Filed 02/18/15   Page 7 of 85

to purchase a complete copy of the transcript.

23

1    talk about sort of how that would be handled.

2            It's similar in some ways to the whole EEOC

3    thing; the fact that that pended for seven years and --

4    with the EEOC doing God knows what, and how do we handle

5    that?  I mean, you know, the jury is going to wonder

6    what in the hell are we doing here in 2015 when all of

7    this happened in 2004 and I don't know that we can say

8    nothing about it.  It just seems like we've got to give

9    the jury some kind of explanation as to what's going on

10   here, but I need to try to figure out how you do that in

11   a way that's not prejudicial to either party.

12           My intent is that when we are picking the

13   jury and -- you know, right here in this very courtroom,

14   I'll tell the jury that this case has been divided into

15   two parts; that -- first of all, I'll tell them that

16   it's really two cases that I've consolidated because

17   they're similar in nature.  And then I'll tell them but

18   the case has been -- the trial has been divided in two

19   parts.  First you're going to hear evidence and argument

20   on the issue of whether or not the defendants are liable

21   to the plaintiffs on their claim.  And then if you find

22   that the defendants are liable, you're going to hear

23   additional evidence regarding their claim for damages

24   and additional argument.

25           So the jury is going to know going in that

24

1    they're not going to hear a bunch of damages testimony

2    and sort of what happened, you know, after this alleged

3    discrimination occurred because they're going to hear

4    that later if they find liability.

5            But as you point out, you know, it almost

6    seems like you have to tell them something about the

7    fact that they aren't working there anymore; otherwise

8    the jury is going to wonder well, you know, what's been

9    happening the last 10 years?

10           So I guess we'll talk about how we're going

11   to handle that, but my sense is that on this issue --

12   the issue of whether or not these various income sources

13   are collateral sources or otherwise available for offset

14   or not -- it's difficult for me to see how any of that

15   comes in during the liability phase.

16           With that explanation, do the defendants

17   think that there's any theory under which the

18   applications or the results will come in under

19   liability?

20           MR. HARTY:  Your Honor, if -- if I might

21   just outline a concern that I have.  For example,

22   depending upon what the Court rules, yeah, the

23   collateral source -- that issue I think we agree that

24   that should be something that is really a fighting issue

25   in the liability -- in the damages phase; not the

25

1    liability phase.

2            But you're asking us -- if you ask us will

3    we concede that that should not find its way in, let me

4    just -- again, depending on how the Court rules on some

5    of these other issues, for example, the plaintiff Gayle

6    Forster alleges that being moved from OFP -- the part of

7    the company -- the supply management where they just

8    made sure that the folks on the floor had stuff to work

9    with -- to PDP -- the planning part, the forward

10   thinking -- she said that when she was transferred, that

11   she was told that's a great move but it was a lie and

12   that is evidence of discrimination.

13           So if I'm sitting on the jury, I'm wondering

14   okay; so what happened to her?  You know, did she -- if

15   -- if -- if -- if PDP is the place to go if you want to

16   move in the company --

17           THE COURT:  But how does that have anything

18   to do with after she left work she continued to get paid

19   a salary; got disability benefits; got Social Security

20   benefits?

21           MR. HARTY:  It has to do primarily,

22   Your Honor, with once she hasn't left work.  She's still

23   a Deere employee, but the jury has to be told something

24   about what happened to her because if they -- if they're

25   led to believe that she has basically -- we -- she has

26

1    not advanced in the company, but they don't know that

2    she's out on LTD, then they might buy into this argument

3    that this was not a good move for her; whereas, for

4    example, the other related evidence is the people who

5    were working side by side who she claims should have

6    been given sixes like her or she should have been given

7    sevens, they're going to come in and testify and several

8    of them are going to basically say they've tried.

9            THE COURT:  Well, the problem with your

10   argument is that if I start to go down that road --

11   first of all, again, my focus is okay, does that have --

12   is that probative of whether or not they were

13   discriminated against when they didn't get bumped from

14   6 to 7, and if I find that, well, there's some probative

15   value there -- I mean frankly their work history up

16   until May of 2004, I'm guessing all of it's going to

17   come in.  I mean I don't know how you keep it out,

18   frankly.

19           I'll hear your arguments -- I know you're

20   resisting some of that stuff -- but I'm going to be

21   pretty, you know, expensive about letting stuff in that

22   happened before May of 2004, but if I start letting in

23   the fact that well, they were paid salary continuance

24   and then they got disability benefits, then the

25   plaintiffs are going to be arguing well, then we ought

Case 6:12-cv-02063-JSS   Document 213-3   Filed 02/18/25   Page 8 of 85

to purchase a complete copy of the transcript.

27

1  to be able to explain why all that happened and so forth
2  and at some point, you know, I -- it cuts against your
3  argument that we should bifurcate this trial.  I mean if
4  it all is interrelated, well, then, you know, let's just
5  let it all hang out and let the jury figure it out and
6  instruct them on the whole thing and just do it.
7          So I mean you can't ask that the damages
8  part be done later, but then try to get -- you know, get
9  that into your liability part somehow; at least those
10  parts that you think is useful, you know, on the issue
11  of liability.
12         So again, I want to try to keep moving a
13  little bit here, but -- and I'm not making any decisions
14  about any of this stuff today, but some of my rulings
15  are going to be, you know, sort of contingent rulings.
16  You know, for example on salary continuation and
17  disability and social security benefits, I may well
18  conclude that that's inadmissible with respect to the
19  liability phase of it unless -- you know, and then
20  obviously if you think the door is open somehow or
21  becomes necessary to introduce evidence about that, then
22  you can approach the Court outside the presence of the
23  jury and argue why it has now become necessary to
24  introduce that in the liability -- on the liability
25  phase.

28

1          So again, I'm not prejudging any of it, but
2  it's -- my sense is that sort of what happened to them
3  as far as being compensated is obviously related to
4  damages; not so obviously related to liability.  All
5  right.  Let's try to keep moving.  The -- we'll be
6  coming back to that whole collateral issue because I
7  want to hear your arguments on what the law is in that
8  regard.
9          Prior lawsuits or complaints of
10 discrimination.  As I understand it from -- I think I
11 read it in the resistance someplace.  I've read so much
12 lately I can't remember where I read what, but one of
13 the plaintiffs filed a suit against the previous
14 employer that alleged something or other.
15         Ms. Pellegrin, do you know the facts on
16 that?
17         MS. PELLEGRIN:  Yes.  Ms. Lenius had a prior
18 lawsuit in 1997 against a former employer which alleged
19 sex harassment and discrimination.  I believe she pled
20 retaliation as well.
21         THE COURT:  And what was the result of that
22 lawsuit, just out of curiosity?
23         MS. PELLEGRIN:  It was dismissed in 1999.
24         THE COURT:  Dismissed by summary judgment or
25 voluntarily dismissed?

29

1          MS. PELLEGRIN:  It appears to us that it was
2  voluntarily dismissed.
3          THE COURT:  Pursuant to a settlement?
4          MS. PELLEGRIN:  There was no settlement to
5  our knowledge.
6          THE COURT:  So at some point she just got
7  tired of it and dismissed it?
8          MS. PELLEGRIN:  Your Honor, we don't know
9  that information.  The --
10         THE COURT:  Haven't asked your client?
11         MS. PELLEGRIN:  Our client has a very
12 unclear memory as to what occurred during that
13 litigation.
14         THE COURT:  All right.  So in any event, you
15 don't -- well -- well, in any event, I guess it doesn't
16 make any difference.
17         MR. RACETTE:  As far as we know, Judge, she
18 didn't get a settlement, so it was voluntarily
19 dismissed.  We've asked her.  She doesn't have any
20 recollection of it continuing on and it looks like it
21 was dismissed, you know, properly in the court, so as
22 best as we can tell there was no settlement.
23         THE COURT:  And I take it it's the
24 plaintiffs' position that there should be no evidence of
25 that lawsuit in either phase?

30

1          MS. PELLEGRIN:  That's correct.
2          THE COURT:  All right.  Who's speaking for
3  the defendant?
4          MR. LEEMKUIL:  I am, Your Honor.
5          THE COURT:  Mr. Leemkuil?
6          MR. LEEMKUIL:  I think we briefed this issue
7  pretty well.  I think the Eighth Circuit has held that
8  evidence of prior lawsuits can be admissible as long as
9  it meets the requirement of the 404(b) other acts
10 evidence, and in this case I think that standard is met.
11         This prior lawsuit, first of all, I think it
12 was close enough in time.  You know, this lawsuit was
13 filed in 1997 and dismissed in 1999, which is
14 approximately five years before Ms. Lenius lodged her
15 complaints against Deere.  We also think that the
16 similarity in the allegations in that suit, it's almost
17 strikingly similar to this one.  It included allegations
18 of a policy of isolation that the employer had put in
19 place; that she was subjected to increased criticism and
20 increased supervision and that she wasn't paid as well
21 as her coworkers, which is essentially what her
22 allegations are with respect to discrimination under
23 GJE.
24         So given the similarities and the closeness
25 in time, we think that the evidence comes in under

Case 6:12-cv-02063-JSS   Document 213-3   Filed 02/18/25   Page 9 of 85
CALLS FOR 1319-349 cindanthis.com
to purchase a complete copy of the transcript.

31

1  404(b).

2  THE COURT: What is the evidence? I mean

3  who testifies and how -- what do they testify to?

4  MR. LEEMKUIL: Well, Your Honor, I think we

5  have marked as trial exhibits, you know, Ms. Lenius'

6  complaint that she filed in that case; the Iowa Civil

7  Rights Commission charge that she filed in that case and

8  certainly Ms. Lenius can testify to that on

9  cross-examination.

10  THE COURT: So you don't have -- not

11  intending to call any witnesses that -- from the prior

12  lawsuit? I mean I'm just trying to figure out how -- if

13  I find that it -- that you're permitted to offer

14  evidence regarding this prior dismissed lawsuit, how you

15  intend to do that and you're saying basically that you

16  would ask Ms. Lenius about it and then you would

17  introduce these exhibits. Anything else?

18  MR. LEEMKUIL: My understanding is that

19  would be it.

20  THE COURT: Would the jury be told that it

21  was voluntarily dismissed or what would the jury be told

22  about -- I mean they're going to be told there's a

23  lawsuit filed. What are they going to be told about

24  what happened to it?

25  MR. LEEMKUIL: Well, Your Honor, I suppose

32

1  that would depend on what Ms. Lenius' testimony is about

2  the lawsuit. It sounds as if she doesn't necessarily

3  even recall being involved in that lawsuit. I can tell

4  the Court that in her deposition in this case, she

5  testified under oath that she had never been deposed

6  before. Meanwhile, we have a copy of a hundred-plus

7  page transcript of a deposition that she gave in that

8  prior discrimination case.

9  THE COURT: Do you have any evidence as to

10  what the disposition of this case was; the earlier case?

11  MR. LEEMKUIL: My understanding is, you

12  know, that as they stated, that it was dismissed with

13  prejudice. I don't know the precise nature of it, but I

14  think it is our belief or our understanding that it was

15  dismissed pursuant to a settlement agreement.

16  THE COURT: Because I understand the

17  argument that, you know, she's made these claims before.

18  You know, that it goes to her credibility as to whether

19  or not you should take her claim seriously in this case,

20  but there are problems associated once you start down

21  that path and that is if you tell the jury that she's

22  made these complaints before; she filed a lawsuit

23  before; the jury is going to be wondering -- and if you

24  tell them it was dismissed, they're going to be thinking

25  well, did she get paid? How much did she get paid? You

33

1  know, what happened in that case?

2  And -- so do you think that -- you know, do

3  you think that -- what do you think the jury should be

4  told about how that case was resolved? And you're going

5  to offer evidence that she filed the claim. Are you

6  going to ask her how did the case end up or --

7  MR. LEEMKUIL: I don't think we would

8  anticipate asking that question. I think certainly if

9  Ms. Lenius' counsel on rebuttal is -- wants to ask her

10  how that case was disposed of, you know, if she -- if

11  she can recall, certainly she can testify to that.

12  THE COURT: All right. Any response by the

13  plaintiffs?

14  MS. PELLEGRIN: It appears that the

15  defendants rely on two cases to support admissibility of

16  this other lawsuit. In Batiste -- I believe it's an

17  Eighth Circuit decision -- the Court actually finds that

18  it should have been excluded. Now they find that there

19  wasn't reversible error when it was admitted, but they

20  did state that the prior lawsuit should have been

21  excluded.

22  They also rely heavily on this Van Deelen

23  case, which is a district court case out of Kansas.

24  Upon review of that case, it is hardly comparable to the

25  case here where we had one prior discrimination case.

34

1  There the Court -- there are so many former employment

2  law discrimination cases that the Court actually has to

3  group them; lawsuits filed between 2002 and 2007;

4  lawsuits filed between 2007 and 2008 and it goes on and

5  on and on. It also talks about 17 other cases that

6  they're going to exclude that weren't employment law.

7  Clearly it's not the same situation here.

8  We've got one prior case that was seven years prior to

9  the events here. Defendants don't have any proof that

10  discrimination didn't occur in this other case and if

11  they bring it up to try to prove that they're strikingly

12  similar, we're going to have to collaterally try that

13  case to have our client testify that those things really

14  happened to her. She wouldn't have been the first

15  person ever to suffer discrimination at two different

16  employers.

17  THE COURT: What about the argument that

18  defendants are making that she could be impeached by the

19  fact she testified that she had not previously been

20  deposed?

21  MS. PELLEGRIN: There's really nothing we

22  can do about a prior statement under oath, Your Honor.

23  If the opportunity arises for them to impeach her on her

24  former deposition, then, you know, they can do so based

25  on the fact that it's a former deposition.

Case 6:12-cv-02063-JSS   Document 214-19   Filed 02/18/25   Page 10 of 85
to purchase a complete copy of the transcript.

35

1       THE COURT: I'm just trying to figure out
2 how that plays out. You know, let's assume that I find
3 that the evidence regarding this prior lawsuit is
4 inadmissible because it -- under 403 or because once you
5 start down that road, then you end up having to try the
6 case to see whether or not her prior complaints were
7 legitimate or not and for whatever reasons I decide it's
8 inadmissible. Are the defendants going to try to at
9 some point say, you know, didn't you tell us that you
10 hadn't been deposed and, in fact, you have been deposed
11 or how does that work?
12       MR. LEEMKUIL: Well, Your Honor, I think
13 it's not just the testimony about being deposed. She
14 gave prior sworn testimony in the prior discrimination
15 suit I think --
16       THE COURT: About what happened in that
17 suit.
18       MR. LEEMKUIL: Right, but she testified, for
19 example, to emotional distress and issues in her life
20 that, you know -- so all of those statements are under
21 oath. I think they all come in under -- you know,
22 they're admissions by a party opponent. They're prior
23 statements given under oath. They're admissible under
24 Rule 801 to cross-examine her.
25       THE COURT: On the damages phase.

36

1       MR. LEEMKUIL: Certainly, Your Honor.
2       THE COURT: Okay. How about the liability
3 phase? If I find that that other case is inadmissible,
4 does it come in; any aspect of it, including the fact
5 that she testified in that case in the deposition; does
6 any aspect of that come in in the liability phase?
7       MR. LEEMKUIL: I think it could, Your Honor,
8 because Ms. Lenius is obviously the plaintiff in this
9 case. Her credibility in this case is going to be a
10 very key issue for the jury to determine. So I think
11 even in determining liability, based on her testimony
12 about things that happened while she worked at Deere,
13 her credibility on those issues is very important. So
14 if, you know, we want to attack her credibility with
15 some of her prior sworn testimony or the fact that she
16 claims she was never deposed, we think that would come
17 in in the liability phase.
18       THE COURT: All right. Ms. Pellegrin, let's
19 assume that I find that for whatever reasons that the
20 prior case is not admissible at least on the liability
21 aspect of it. What about the damages phase? I mean she
22 apparently testified she's having all kinds of issues,
23 da, da, da, da, da, which she now claims that she has as
24 a result of discrimination by John Deere. Aren't the
25 defendants entitled to introduce evidence that she

37

1 complained about the same things five years earlier?
2       MS. PELLEGRIN: I think that in the damages
3 phase the defendants can certainly ask her about prior
4 -- prior complaints or treatment of similar diagnoses or
5 complaints. Whether the substance and nature of this
6 lawsuit comes in as a result of that, I don't think
7 those need to both be admissible. I think they can
8 question her on that without bringing up the entirety of
9 this lawsuit.
10       THE COURT: So basically you would say isn't
11 it true that in a prior proceeding you testified da, da,
12 da, da and the jury wouldn't necessarily know what that
13 prior proceeding is?
14       MS. PELLEGRIN: To an extent, yes, I would
15 agree with that. I think that if they're going to bring
16 up a prior inconsistent statement in the deposition,
17 they first have to establish that it is, in fact,
18 inconsistent. But if that occurs and they -- and she
19 denies that she previously testified about something,
20 then yes, it would come in in an impeachment form at
21 that point.
22       THE COURT: So again, for example, she's
23 testifying in the damages phase. One of the six
24 defendants' attorneys asks her isn't it true that you
25 complained of this and that in 2007 and unless she says

38

1 yes and basically testifies in conformance with what she
2 testified to back then, then it would never come?
3       MS. PELLEGRIN: That would be our position.
4       THE COURT: All right. Let's, again, try to
5 keep moving here. Well, first of all, are there any
6 other lawsuits that we're talking about here? I've kind
7 of forgotten.
8       MR. LEEMKUIL: Your Honor, I think in the
9 next motion that plaintiffs brought speaks to lawsuits
10 more generally; not prior complaints of discrimination.
11       THE COURT: So other legal actions?
12       MR. LEEMKUIL: Right.
13       THE COURT: All right. What are the other
14 legal actions we're talking about here, Ms. Pellegrin?
15       MS. PELLEGRIN: Well, it seems to me that
16 the defendants intend to bring up a prior car accident
17 involving Ms. Lenius, a prior personal injury lawsuit
18 involving Ms. Lenius and her father, a criminal charge
19 that was found to be not guilty with regard to
20 Ms. Lenius. I believe that covers it. And we would
21 include in that Ms. Forster's prior work comp action,
22 which I believe that defendants agree with us on that.
23       THE COURT: Who's speaking for the
24 defendants?
25       MR. LEEMKUIL: I am, Your Honor.

to purchase a complete copy of the transcript.

**39**

1    THE COURT: Mr. Leemkuil, apparently Lenius
2  was involved in two prior acts -- accidents and I guess
3  those resulted in lawsuits. Are those admissible in the
4  liability phase?
5    MR. LEEMKUIL: Your Honor, we're just
6  arguing that these are admissible to damages.
7    THE COURT: Because at that time she alleged
8  certain complaints?
9    MR. LEEMKUIL: Right. My understanding is
10  in 2008 she was in an auto accident that ultimately
11  culminated in a neck surgery and found its way into
12  litigation as well. Certainly we think those are the
13  kinds of things that could cause some emotional distress
14  for Ms. Lenius.
15    And the other legal proceedings that we
16  would include in this are Ms. Lenius was charged with
17  domestic abuse of her husband in 2001. You know, she's
18  testified that -- in this case that defendants' alleged
19  actions have caused strain on her relationship. I think
20  that she has told her doctor at one point that she
21  wanted a divorce, so to the extent she's trying to blame
22  defendants for some kind of strain on her relationship
23  with her husband, we think the fact that she
24  domestically assaulted him in 2001 would be relevant to
25  those claimed damages.

**40**

1    THE COURT: Do you want to respond to that,
2  Ms. Pellegrin?
3    MS. PELLEGRIN: Thank you, Your Honor.
4  Clearly the defendants have the right to ask her about
5  her relationship with her husband. You know, previous
6  injuries such as the auto accident, the neck surgery;
7  they do appear in her medical records. They're able to
8  achieve this without bringing up any details related to
9  any of these actual lawsuits.
10    You can -- they can certainly ask her about
11  her relationship with her husband without bringing up
12  the domestic assault charge in which she was found not
13  guilty. That seems to clearly have more unfair
14  prejudice to plaintiffs than any probative value that it
15  may offer and the same thing with the actual lawsuit
16  related to this auto accident. They certainly can ask
17  her about her neck injury and her neck surgery without
18  going into the fact that she had a lawsuit related to
19  that.
20    THE COURT: All right. No. 5 in the motion
21  in limine is disparate impact evidence. The way I
22  understood it from reading the various documents is the
23  parties generally agree that this is not a disparate
24  impact case, but they didn't necessarily agree on what
25  kind of evidence could be offered in this particular

**41**

1  case. Ms. Pellegrin, what are you getting at on this
2  one?
3    MS. PELLEGRIN: As far as paragraph 5, if
4  I'm understanding defendants' resistance to paragraph 5,
5  we aren't resisting any evidence related to the
6  implementation of GJE. In fact, we're going to use that
7  same evidence in our case to prove that GJE is pretext.
8  However, defendants' assertion that they can offer any
9  evidence as to the overall impact on a worldwide basis
10  is clearly disparate impact evidence.
11    We've never alleged that GJE itself is
12  discriminatory. We've never alleged that the GJE
13  worldwide results were discriminatory. We are only
14  alleging that in Mr. Matson and D'Cruz' department there
15  was disparate treatment and, therefore, these statistics
16  of upgrades and downgrades in Mexico and China and all
17  throughout the country are clearly irrelevant and are
18  disparate impact evidence that don't speak to any issue
19  as far as the disparate treatment of the plaintiffs.
20    But we would be -- our motion in limine had
21  nothing to do with the implementation of GJE, which it
22  appears that the bulk of the defendants' resistance
23  describes how the implementation should be admissible
24  and we would agree with that.
25    THE COURT: Well, we've got a whole big

**42**

1  motion on I guess the admissibility of GJE evidence that
2  we'll be getting to, but I seem to recall when I ruled
3  on the motion for summary judgment -- and I may not have
4  the numbers exactly right -- but it seemed like John
5  Deere asserted generally that 70 percent of the
6  employees stayed at the same level and I think
7  20 percent got raises and 10 percent went down.
8    Is John Deere intending to offer more
9  detailed testimony as to that or I mean is that more or
10  less it? Is there any testimony that John Deere intends
11  to offer with respect to, for example, how it affected
12  older women?
13    MS. HULETT: John Deere does not have any
14  evidence about how GJE affected older women worldwide.
15  The evidence that Deere intends to offer relates to the
16  companywide GJE outcome as the Court just described. It
17  is not broken down by any protected class.
18    THE COURT: So -- and I'm not trying to put
19  words in your mouth, but there's going to be some
20  general testimony as to sort of how G -- what the
21  overall results of GJE were to show that it wasn't I
22  guess some sort of effort to just downgrade everybody,
23  but there's not going to be any testimony as to that it
24  favorably affected women or that it favorably affected
25  older workers or the opposite of either of those?

to purchase a complete copy of the transcript.

43

1 There's no --

2     MS. HULETT:  There's been no evidence of

3 that nature that has come out in the course of this case

4 and we don't --

5     THE COURT:  Which basically is what the

6 disparate impact case would be if it were one.

7     MS. HULETT:  Correct.  And we've never

8 alleged that -- Deere has never alleged that the GJE had

9 a disparate impact on anyone.

10     THE COURT:  What's the whole thing about

11 Asia and whatnot?  Are you going to break it down by

12 region?

13     MS. HULETT:  Certainly Deere intends to

14 present evidence to rebut plaintiffs' claim that the GJE

15 was a pretext for intentional discrimination, and part

16 of Deere's defense is to present complete evidence about

17 the GJE outcome worldwide and the implementation of the

18 Hay Methodology worldwide and that includes testimony

19 from our expert witness, Richard Sperling.

20     THE COURT:  Is that a specific exhibit?

21     MS. HULETT:  G-20.

22     THE COURT:  All right.  Any further comments

23 on that issue?

24     MS. PELLEGRIN:  Your Honor, we would just

25 reassert that I don't see how the worldwide results of

44

1 GJE have anything to do with the specific department in

2 which we're claiming these managers manipulated GJE

3 disparately affect our plaintiffs in this case.

4     THE COURT:  Okay.  Well again, I'm not

5 ruling on any of this stuff today.  It doesn't seem to

6 be, you know, terribly probative.  On the other hand, I

7 don't know that it's terribly prejudicial either to

8 alert the jury that this wasn't some kind of wholesale

9 attempt to -- to downgrade people's job pay grades.  But

10 on the other hand, plaintiffs aren't claiming that

11 anyway, so it's sort of like rebutting an argument that

12 really isn't being made.  But on the other hand, I

13 guess, you know, it keeps the jury from speculating on

14 the other hand.  I think that was like three hands in

15 one sentence.

16     MS. HULETT:  Your Honor, our expert witness

17 will testify about expected outcomes based on the Hay

18 Methodology and implementation of the Hay system in

19 companies, and we anticipate that he'll testify that the

20 outcome at Deere was consistent with the outcome at most

21 companies.  We believe that's relevant, for example, to

22 rebut plaintiffs' claim that the GJE was a pretext for

23 intentional discrimination.

24     THE COURT:  Yeah, and we'll get to that

25 whole thing I think when we get to that motion, but --

45

1 and, frankly, I would anticipate that you're going to be

2 permitted to offer a whole bunch of evidence on how GJE

3 worked and how it was implemented and how it came out

4 and the whole thing.

5     But to a large extent, if I understand the

6 plaintiffs correctly, you're arguing something that

7 they're really not fighting about.  They're saying that

8 great, the Hay group geniuses; the proper procedure was

9 set up.  They did their thing.  They worked it all out.

10 Good for them.  It all was fine except in this

11 particular department, you had some managers who didn't

12 like older workers and they weren't crazy about women

13 and perhaps they didn't particularly like these two

14 women and so they manipulated that system in order to

15 get the results they wanted and that's the fighting

16 issue.

17     Now, presumably, amongst your testimony as

18 to this whole big how GJE works thing, you're going to

19 have a bunch of testimony as to how that couldn't have

20 happened here; that all of the procedures were in place

21 and that Cruz (sic) could not have manipulated it in a

22 way.

23     MS. HULETT:  Absolutely that is part of our

24 defense --

25     THE COURT:  Right.

46

1     MS. HULETT:  -- but part of it has to --

2 necessarily includes the big picture.

3     THE COURT:  Sure.  And I anticipate that

4 you're going to be permitted to offer the big picture.

5 I just hate to have us spend a full day of testimony on

6 the big picture when the plaintiffs aren't contesting

7 the big picture.  They're -- they're -- you know, in

8 order to understand what happened in this case, you have

9 to have some understanding as to how the Hay group

10 implemented GJE.  You have to understand how that works,

11 but I don't know that you have to know what the result

12 was in Asia in order to decide whether or not the system

13 was manipulated to discriminate against the plaintiffs

14 in Waterloo.

15     But in any event, you know, I -- we'll wait

16 until we get to that motion, but I anticipate that we're

17 going to hear a lot of testimony about GJE.  As I

18 understand it, there's not going to be any testimony

19 that older women fared better than the average people or

20 that, you know, however the results impacted older women

21 specifically as a group; right?

22     MS. HULETT:  That is correct, Your Honor.

23     THE COURT:  Okay.  All right.  No. 6, mixed

24 motive/same decision evidence.  And again, I think this

25 may be the subject of some other motions as well, but,

to purchase a complete copy of the transcript.

47

1 Ms. Pellegrin, do you wish to address that?

2 MS. PELLEGRIN: I think this -- this motion

3 -- this specific paragraph, Your Honor, will come down

4 to a number of issues that we'll discuss today about how

5 the -- this Court's summary judgment decision will play

6 out in trial. Our -- our understanding is that the

7 Court determined that the sole issue for the jury is

8 whether GJE was pretext for discrimination.

9 At this point, defendants have never

10 admitted that they discriminated for a lawful reason as

11 a mixed motive case would present and, therefore, since

12 the Court has previously decided the pretext issue is

13 the only factual issue left for the jury, it would be

14 our position that offering this defense would -- would

15 confuse the jury.

16 And to address specifically defendants'

17 argument and their resistance, that our -- our alleging

18 gender and age as the definition of mixed motive would

19 misstate the law and that a mixed motive is a lawful and

20 unlawful reason; not two unlawful reasons.

21 THE COURT: Response?

22 MS. HULETT: Your Honor, this is really not

23 even an evidentiary issue. This is a legal argument

24 asking the Court to decide in advance of trial how the

25 Court will instruct the jury. As the Eighth Circuit

48

1 recognized in Gross v. FBL Financial Group, it's up to

2 the Court after the evidence is presented to decide

3 whether the Court was to instruct the jury using a mixed

4 motive or single motive instruction and that is not

5 dependent on the plaintiffs' unilateral declaration.

6 In any event, the ultimate issue at trial

7 under Title VII, the ADEA or the ICRA will be whether

8 intentional discrimination occurred. What this

9 particular argument asks the Court to do is to preclude

10 defendants from offering evidence that age or sex was

11 not outcome determinative and defendants should be

12 permitted to offer that as part of their defense.

13 THE COURT: What other evidence would you be

14 offering?

15 MS. HULETT: Well, that's our case is that

16 age and sex did not -- did not -- was not outcome

17 determinative to the job mapping decisions that will be

18 at issue.

19 THE COURT: You're not offering any evidence

20 of any other motives other than -- well, that it was not

21 age and sex; that it was GJE? You're not claiming some

22 other motive for --

23 MS. HULETT: That is correct.

24 THE COURT: All right. We're going to be

25 getting to the evidentiary issues as to what's

49

1 admissible and inadmissible. I think that's covered by

2 some other parts of various motions.

3 Again, my -- the liability issue is focused

4 on the issue of whether when these plaintiffs did not

5 get a raise to pay Grade 7 when GJE was implemented, it

6 was because of age or sex discrimination or because it

7 was a legitimate GJE outcome. And as a general

8 proposition, evidence that doesn't pertain to that issue

9 is going to be inadmissible during the liability phase.

10 Which brings us, I guess, to the length of

11 the EEOC investigation. More generally, I guess what we

12 tell the jury about the EEOC, if anything, and I guess

13 this goes to a variety of other parts of the motions.

14 You know, they filed a claim; to the extent to which

15 it's admissible that they filed the claim. Is the claim

16 itself admissible? The investigation; what the

17 investigation consisted of? What can the investigator

18 testify to? Can the investigator testify as to evidence

19 that she obtained; any conclusions the EEOC reached; the

20 time frame associated with that investigation?

21 I think the parties agree that the whole

22 laches thing is not anything the jury would hear about,

23 but what is the plaintiffs' position as to what the jury

24 is going to hear about the fact that there is an EEOC

25 and what role they played in this case?

50

1 MS. PELLEGRIN: Well, Your Honor, just to

2 begin, our actual motion in limine was that we don't

3 want the defendants to blame the plaintiffs for that

4 length of time in delaying the lawsuit. But to open

5 that up to a number of other issues that are present in

6 the defendants' motion and in their resistance to that

7 paragraph, we have tried to get the investigator to

8 testify. We have been unable to do that.

9 So the -- what we're asking for is what you

10 alluded to earlier; that the jury is informed that there

11 was an investigation; that the EEOC was involved for

12 seven years. It's our position that by not doing so, it

13 leaves a lot of questions and doubt in the minds of the

14 jury, especially in light of the number of witnesses who

15 are going to testify that they don't recall specific

16 events due to the delay in time and to the delay in

17 bringing this lawsuit. We are not asking any witness to

18 perjure themselves. Our motion was simply that we

19 didn't want them to blame the plaintiffs for their lack

20 of recollection.

21 And so from -- as far as what evidence will

22 be admitted, it would be our position that if the jury

23 was informed that the EEOC was involved; that it was a

24 seven year investigation, we do not intend to submit

25 evidence as to the details of the investigation. Our

Case 6:12-cv-02063-JSS Document 214 Filed 02/18/25 Page 14 of 85

to purchase a complete copy of the transcript.

51

1 clients are not privy to all of those details so,
2 therefore, they really cannot testify to what Ms. Lemke
3 or any other investigator was doing behind the scenes.
4 She will not be here to testify; nor will any other
5 investigator.
6 And so as far as the collateral issues of
7 having to explain the EEOC investigation, we think that
8 it properly protects the defendant, especially if you were
9 to give some sort of instruction as to not to find that
10 the determination is an expert opinion as to what they
11 should decide.
12 But we do feel that the determination letter
13 as well should be admissible in order to -- to give the
14 jury the entire context as to what happened, why there
15 is such a delay and -- and if they're informed that
16 there was a seven year investigation, it's -- it's
17 unfairly prejudicial to the plaintiffs not to inform the
18 jury as to what the results of that investigation were.
19 THE COURT: How does that -- how do you
20 foresee all that evidence coming in? Who testifies what
21 the EEOC is and what it does?
22 MS. PELLEGRIN: We won't be presenting
23 evidence as to who the EEOC is and what it does. That
24 would be -- and you explained earlier your idea as to
25 explaining to the jury that this was filed with the EEOC

52

1 and there was an investigation. That would be
2 sufficient for us. Our plaintiffs can certainly testify
3 as to -- as to their complaints if it arises. But other
4 than that, they really don't have any information to
5 testify to as far as personal knowledge as far as the
6 investigation goes.
7 THE COURT: So what should the jury make if
8 -- of the -- the results if -- if I allowed that in? If
9 they don't know what the EEOC is or what role it plays
10 or what it does or what the effect of any of its
11 findings may be; other than the fact of explaining to
12 the jury why we're here 10 years later, what does any of
13 this do?
14 MR. RACETTE: Judge, if I could interject, I
15 think we've got two problems with this is one, the delay
16 that -- that prejudice us and two, the results that
17 prejudice perhaps the defendant. And the Court has
18 discretion in this area as I understand the law to allow
19 the decision in by the EEOC, and I think to solve both
20 problems, the best course would be a cautionary
21 instruction with that evidence to come in that it is
22 merely evidence they can consider as to not consider for
23 whatever weight they want. There's been, as you
24 instruct the jury, no evidence here submitted as to what
25 the investigation consisted of or anything like that.

53

1 The defendants are protected by they are
2 going to be able to present their case to the jury that
3 would defeat any such, you know, finding. And, quite
4 frankly, I don't understand the law if you can wait
5 seven years for a decision from a federal government
6 agency and it is meaningless. That to me doesn't make
7 sense in any light that I can see.
8 THE COURT: Does the EEOC ruling have any
9 sort of binding effect on this Court? I mean what do we
10 care? Let's say the EEOC found -- made no finding.
11 Said we don't find any discrimination. I'm assuming --
12 and they gave a right to sue letter. I'm assuming
13 plaintiffs would have gone ahead and sued and you would
14 be in here arguing well, you can't introduce evidence
15 that the EEOC --
16 MR. RACETTE: Correct.
17 THE COURT: -- made a finding of no
18 discrimination. So how can you offer a finding when
19 it's favorable and argue against it if it's unfavorable?
20 MR. RACETTE: I'm not. I agree with you. I
21 think even in that case if it had been seven years, it
22 would probably -- they would argue that and I think they
23 have a good argument that it should come in. I don't
24 think that it shouldn't and I think that we would then
25 be with our evidence saying here's why they made the

54

1 mistake if they found that way.
2 And again, I think perhaps a cautionary
3 instruction as is done in many instances of matters that
4 may or may not cause prejudice to one party or the other
5 could be used in this case for that purpose. I don't
6 think that's unusual and I think it's -- a lot of the
7 cases I saw, they allowed it in without a cautionary
8 instruction.
9 But I think that as you said I think a
10 couple of times this morning already, they're going to
11 wonder. You know, juries wonder, you know, what
12 happened to that? You know, what -- you know, we need
13 to know that and once we don't give them the answer,
14 they speculate. And I think the more answers we can
15 give them, the surer we are that there's not prejudice,
16 you know, for the defense or for the plaintiffs and I
17 think -- at least that's, Judge, my suggestion as to how
18 to cure that.
19 THE COURT: Well, I think everybody in this
20 room has reason to be mad at the EEOC. Frankly, they
21 didn't do the plaintiffs any favors. They didn't the
22 defendants any favors and they don't do the Court any
23 favors when they take a claim and sit on it for seven
24 years. I haven't read the cases yet on the
25 admissibility of what the EEOC did or didn't do. You

to purchase a complete copy of the transcript.

55

1 know, my sense is, particularly in this case whether
2 they frankly sat on their hands for seven years, what
3 they did or didn't do doesn't have much to do with
4 anything other than maybe explain why we're here, you
5 know, 10 years after the fact.
6 What's the defendants' view on what -- you
7 know, globally what the jury should be told about the
8 EEOC generally?
9 MR. HARTY: Absolutely nothing.
10 THE COURT: What do you tell them about the
11 10 year delay?
12 MR. HARTY: I've been thinking about this
13 because it's the same issue that you and I talked about
14 last time. What do we tell the jury about what these
15 ladies have been doing for 10 years? I think one way to
16 handle this would be if the Court were to say you are
17 simply to presume that you're dealing with this
18 immediately after GJE was announced and you're not going
19 to hear what's happened since then.
20 But certainly, if -- if for some reason the
21 plaintiff -- and we're not -- we don't intend to accuse
22 the plaintiffs during the liability phase of the sort of
23 things that give rise to laches. We don't think the
24 EEOC -- I mean Judge Reade's decision in
25 Jones v. Cargill is -- is dispositive in our opinion.

56

1 None of this should come in. It -- not only is it
2 otherwise inadmissible, but the fact that they did an
3 especially poor job in this case really makes it
4 difficult.
5 And then now we understand Ms. Lemke -- the
6 pretrial filings indicated that Ms. Lemke was going to
7 be -- they were going to attempt to compel their
8 attendance and I confirmed with the EEOC last week that
9 that wasn't going to happen. The only time I've ever
10 seen one of these come in is when an EEOC investigator
11 gets on the stand and says I'm Shannon Lemke. I'm from
12 the EEOC. Here's what we do. Here's what we did in
13 this case and even then they only offer it -- the EEOC
14 themselves -- when they are attempting to show
15 retaliation.
16 THE COURT: Again, I haven't read the cases
17 yet and I'm not making any rulings today, but my sense
18 is that what the EEOC did or didn't do isn't very
19 probative of the issue of whether John Deere
20 discriminated against the plaintiffs when they failed to
21 give them the raise from pay Grade 6 to pay Grade 7.
22 It seems like maybe the parties could see
23 whether or not they can agree on some sort of neutral
24 explanation as to why this case is so old because I
25 agree with Mr. Racette. I think sometimes, you know, as

57

1 -- as courts, we -- you know, we don't want to sort of
2 explain things when we're not sure how to explain them,
3 but I think all it does is just promote speculation on
4 the part of the -- of the jurors.
5 And maybe there's, you know, sort of a
6 neutral statement that could be read by me at the
7 beginning of the trial saying, you know, that you'll
8 note that these events occurred 10 years ago. There are
9 reasons for the delay which are unrelated to any of the
10 issues that you're going to hear today or during the
11 course of this trial, which I think is probably true at
12 least with respect to the liability phase, and you
13 should not, you know, consider the delay in any manner
14 in determining your verdict.
15 You know, it's not assessing blame to
16 anybody. It's not really telling them why the case has
17 been sitting for so long. It may or may not still be an
18 issue under the laches thing, but everybody agrees that
19 that's not the jury's consideration. And, frankly, I
20 think once you start talking about the EEOC, it raises
21 -- you know, opens a whole can of worms as to, you know,
22 what they did or didn't do and what weight, if any,
23 should be given to their conclusions. I mean I think
24 whatever side was on the un -- you know, the
25 unsuccessful end of that argues that it doesn't make any

58

1 difference.
2 So in any event, I'll enter some kind of
3 ruling on that whole thing, but meanwhile, you guys may
4 be wanting to think about what, if anything, could we
5 tell the jury about the delay which doesn't prejudice
6 either party.
7 As I understand it, this isn't a case where
8 like the EEOC investigator is going to say well, I
9 talked to Cruz and he made these admissions to me and,
10 therefore, you know, you're going to have her testify as
11 to admissions or use her for impeachment purposes of
12 somebody else's testimony and so forth. The only
13 evidence there will be, I guess, is an application was
14 filed; that they spent seven years investigating it and
15 then plaintiff wants to offer the fact that they made a
16 finding, so I just don't -- I just think it's
17 problematic.
18 Moving on, No. 8, I guess is the evidence of
19 the doctrine of laches and as I understand it goes to
20 that the witnesses should be prohibited from testifying
21 that they're having trouble remembering or something to
22 that effect?
23 MS. PELLEGRIN: No, Your Honor. This
24 paragraph simply reflects the fact that we're asking
25 that defendants cannot ask the jury to find them not

Case 6:12-cv-02063-JSS Document 214-19 Filed 02/18/25 Page 16 of 85
to purchase a complete copy of the transcript.

## 59

1 liable due to this lack of memory. The laches defense,
2 which we do believe was already decided by this Court,
3 if it does come in, of course the defendants can make
4 the record on that issue, but if they do want to offer
5 additional evidence as to laches, that should be solely
6 for the Court.
7 But this paragraph limits it to they cannot
8 make any sort of argument in front of the jury
9 insinuating that they should not be held liable because
10 their witnesses don't specifically recall certain
11 events. We certainly aren't asking anyone to perjure
12 themselves as defendants have argued in their
13 resistance.
14 THE COURT: So you concede that any witness
15 can testify if they say well now, did you tell whatever;
16 you know, Mike Sellers that you're trying to get rid of
17 these old farts and Cruz says I can't remember. It's
18 been 10 years. There's nothing sort of impermissible
19 about that kind of testimony.
20 MS. PELLEGRIN: If that's the truth,
21 Your Honor, obviously we can't preclude a witness from
22 testifying to such. We just don't want the defendants
23 to then use that in their closing argument or whatnot to
24 try to -- to argue that there should be no liability
25 because their witnesses can't remember; especially in

## 60

1 light of the overwhelming documentary evidence that
2 should refresh their recollection.
3 THE COURT: What's the defendants' position?
4 MS. HAAS: I'll speak to that, Your Honor.
5 First, to the plaintiffs' point about the issue being
6 resolved on summary judgment, we read the order to state
7 that the laches issue still remained a viable issue for
8 trial and I think we've talked about how the laches
9 issue is one that will be left for the Court to decide.
10 So I think -- and just to be clear, I -- if
11 -- you know, there will be witnesses who testify that
12 they can't recall to various things because of the
13 passage of time and to the extent that defense counsel
14 needs to refer to that inability to recall, whether
15 during closing arguments or at some other point, I think
16 that should be permitted. But asking the jury to return
17 a verdict in defendants' favor because witnesses can't
18 recall, that's not what we're asking to do.
19 THE COURT: You're not going to get up and
20 say, you know, they should have brought this case
21 10 years ago when people's memories were fresher?
22 MS. HAAS: Right. That would go to the
23 laches argument that would be tried separately.
24 THE COURT: With respect to the laches --
25 and I think that's a subject again of defendants' motion

## 61

1 or another motion -- when I ruled on summary judgment
2 that the issue was raised on laches; it's been a long
3 period and in viewing the evidence in the light most
4 favorable to the nonmovant -- which was the plaintiffs
5 -- I concluded that the defendants were not entitled to
6 dismissal of the action based on laches. But that isn't
7 dispositive on the issue because it wouldn't -- at least
8 in my view wouldn't preclude evidence on that subject.
9 Now, we never get there unless the
10 plaintiffs win a verdict and -- and at that point then
11 presumably outside the presence of the jury, the parties
12 will be permitted to offer testimony as to what was and
13 wasn't done by the plaintiffs in order to move this case
14 along and then I think I would have to make a ruling on
15 whether or not, in fact, laches was a viable defense.
16 But I don't -- I don't think the whole
17 laches thing really is something we have to worry about
18 unless and until the plaintiffs win a verdict and it
19 sounds like the parties are in general agreement that
20 any witness can testify boy, I'm having trouble
21 remembering that. It's been a long time. But as I
22 understand it, the defendants are not going to somehow
23 say that because people can't remember and because this
24 has been so long, you should find for us as opposed to
25 plaintiffs.

## 62

1 No. 9, failure to exhaust administrative
2 remedies. Let me just sort of go right to the
3 defendants on this. Do the defendants believe that that
4 is a jury issue and one that is submitted then to the
5 jury?
6 MS. HAAS: Yes; on liability.
7 THE COURT: So what is the evidence? That
8 they filed complaints; that they named the individual
9 defendants in the body of the complaint but not in the
10 caption and that, therefore, the jury then determines
11 whether or not that's an exhaustion?
12 MS. HAAS: That would be part of it. I
13 think there's other evidence like when the individual
14 defendants became aware that they were parties to the
15 action as opposed to just witnesses.
16 THE COURT: I confess that I haven't read
17 the cases and I don't recall this ever coming up before,
18 but I just always assumed that that was a legal issue
19 for the Court. I mean how does the jury know what is a
20 valid exhaustion and what isn't? Whether or not they're
21 required to put the defendant's name in the caption as
22 opposed to the body of the complaint?
23 MS. HAAS: I believe we've proposed some
24 instructions that would address that particular issue.
25 THE COURT: Has it been done before? I mean

### 63

1  have you got a case where that's been submitted to a
2  jury?
3  MS. HAAS: Off the top of my head I don't,
4  but I can certainly provide something. It's -- it isn't
5  an equitable issue so it's not one that is just for the
6  Court. It is a legal issue that would be --
7  THE COURT: It seems like if there were
8  facts in dispute, a jury may be called upon to determine
9  the facts, but here -- and maybe there are facts, but as
10  far as the complaint itself goes, it speaks for itself
11  as to what's in the caption; what's in the body of it;
12  who's identified; who isn't. And the issue of whether
13  or not that's sufficient exhaustion seems like it would
14  be a legal issue for the Court. I'm -- I'm willing to
15  be educated because I honestly have never seen it
16  before, but it comes before the Court all the time and
17  I've never seen it go before a jury.
18  MS. HAAS: I think the reason this case is
19  different is because the -- there was -- the Court found
20  a disputed issue of fact on the administrative
21  exhaustion for the individually named defendants. One
22  of the -- one of the issues is whether the person who is
23  allegedly a party to the claim knew about -- knew
24  whether they were a party when it was ongoing. There's
25  a -- I can't remember the name of the case, but it's a

### 64

1  case that was decided by Judge Bennett where he talks
2  about that's an important part of determining whether
3  exhaustion should apply or not, so that -- that, to me,
4  seemed to be --
5  THE COURT: Here the three defendants are
6  all John Deere employees.
7  MS. HAAS: That's right.
8  THE COURT: And can we assume that they were
9  told that there had been a complaint filed or no?
10  MS. HAAS: Well, that would be a factual
11  issue.
12  THE COURT: Is there going to be evidence
13  that they didn't know about this complaint?
14  MS. HAAS: That would be some -- I can't
15  tell you exactly what the evidence will be, but --
16  MR. HARTY: Can I chime in --
17  MS. HAAS: Yeah.
18  MR. HARTY: -- Your Honor? Under the Iowa
19  claim, it's clear they have to have been served. They
20  weren't. Now, I would agree it's rare that this --
21  THE COURT: Isn't that a legal issue though?
22  I mean if, in fact, it's undisputed that they were not
23  served -- I mean if it requires I guess a finding of
24  fact as to whether they were served, then maybe the
25  parties are entitled to a jury to make that finding of

### 65

1  fact, although I'm not -- don't know that I would be
2  willing to concede that without having seen a case that
3  says that, but if the facts are undisputed, the law
4  requires one thing or another and for me to instruct the
5  jury that here's what the law requires, facts are
6  undisputed and, therefore, they're required to return a
7  certain verdict; isn't that basically just a legal issue
8  for the Court?
9  MR. HARTY: I think actually because
10  plaintiffs demanded a jury on all triable issues, this
11  is a factual issue. We would be happy if they wanted to
12  stipulate that this could be something for the Court
13  only, we would agree to that. And to the extent there's
14  evidence -- for example, we'll offer evidence from Clyde
15  D'Cruz; he'll say no one ever told me I was actually a
16  defendant in this thing. And he'll say I never got a --
17  something that says I'm a defendant. If -- if -- if you
18  want to agree we keep that out of in front of the jury
19  and let the judge address that, we're more than happy to
20  do that because it will be a side show.
21  THE COURT: Well, I don't know about side
22  show, but I'll -- you know, I'll take a look at the
23  cases. I suggest that maybe the parties look at whether
24  or not they think they can stipulate as to facts and
25  then if there's a dispute as to where those facts lead,

### 66

1  that seems like that's an issue for the Court as a
2  matter of law. If there's a dispute on the facts, then
3  I guess the parties may or may not have to try that
4  dispute on the facts to the jury and then have the jury
5  instructed on what constitutes the law on exhaustion.
6  What's the -- I guess I never did hear from
7  the plaintiffs on this subject.
8  MS. PELLEGRIN: Well, Your Honor, our
9  position is that the Court has already addressed the law
10  and that there should not be any new evidence submitted
11  at trial based on the fact that all of this evidence
12  submitted at summary judgment occurred back in 2004 when
13  -- and subsequently thereafter, related to these
14  charges. I'm not sure what new evidence the defendants
15  intend to submit.
16  THE COURT: Is there any rule that says they
17  have to submit all their evidence in support of their
18  motion for summary judgment? I mean maybe they have
19  more evidence.
20  MS. PELLEGRIN: Perhaps they do, Your Honor.
21  It appears to me that you found that the law is not in
22  their favor in that and if you disagree with us on that,
23  then we would request that it be tried to the Court as
24  an -- as an equitable issue; not to the jury.
25  THE COURT: All right. I'll take a look at

to purchase a complete copy of the transcript.

---

**67**

1  your briefing.

2  No. 10, similarly situated -- oh, this --

3  and I think I read this in your briefs or instructions

4  or someplace. As I understand it, the plaintiff is

5  asking the Court to prohibit the defendants from

6  offering any evidence that the plaintiffs in this case

7  are not similarly situated as the other buyers in PDP

8  and this goes back again to my ruling on the motion for

9  summary judgment.

10  On a motion for summary judgment in a

11  discrimination case, the defendants can defeat the

12  motion in two ways. One is if -- if -- well, strike

13  that. The plaintiffs can defeat defendants' motion for

14  summary judgment in two ways. One is if they have

15  direct evidence of discrimination and I concluded that

16  they do not. So the second way is to show under the

17  McDonnell Douglas shifting process a jury question on

18  the issue of that.

19  And in order to find a prima facie case, it

20  requires that the Court find that the plaintiffs are

21  similarly situated, and in making that finding, I view

22  all of the evidence in the light most favorable to the

23  plaintiffs and I made that finding in viewing the

24  evidence that was submitted at summary judgment stage in

25  the light most favorable to the plaintiffs.

---

**68**

1  But I don't think that precludes -- well,

2  first of all, the -- once the prima facie case is made,

3  then the defendants have to come forward with some

4  explanation as to some nondiscriminatory reason why they

5  did what they did and here they said it was GJE. And

6  then the burden shifts back to the plaintiff to show

7  that it was pretext and basically that's what the jury

8  has to determine.

9  And the fact that I found at the summary

10  judgment stage that they were similarly situated for

11  purposes of establishing a prima facie case in viewing

12  the evidence in the light most favorable to the

13  plaintiff wouldn't seem to preclude the defendants from

14  offering evidence to contest the issue of pretext.

15  In fact, that's -- I mean that's the case.

16  That's what the defendants are arguing is that they're

17  not similarly situated in the sense that they were doing

18  different jobs and, therefore, they were not treated

19  identically.

20  So is there something more to your motion

21  that I'm missing or have I accurately described what

22  you're trying to do?

23  MS. PELLEGRIN: I think that you've

24  accurately described it. The way that we read this

25  Court's ruling is that there were factual issues with

---

**69**

1  related -- with regard to the elements of the prima

2  facie case and the Court specifically said that the

3  material fact issues were -- was whether GJE was pretext

4  or not. Now, whether evidence overlaps between the

5  similarly situated and the pretext, it appears to me

6  that the pretext argument is narrow with regard to the

7  complexity of the commodities. That's been what's

8  pinpointed as the dividing line, but if they want to

9  offer evidence as to all these other reasons whether

10  they were or were not similarly situated, that's where

11  our motion in limine is, is that that's already been

12  decided.

13  THE COURT: What evidence exactly are you

14  claiming is inadmissible under this motion?

15  MS. PELLEGRIN: That the duties of the

16  supply management specialists were different. The

17  purpose of their job was different.

18  THE COURT: So basically they can't offer

19  any evidence about their entire defense?

20  MS. PELLEGRIN: No. Their defense would be

21  that -- that they -- that they're claiming that the

22  commodities -- that there were some commodities that

23  were complex and some that were less complex and that

24  was the difference that resulted in different GJE

25  grades. They never alleged that there's anything else

---

**70**

1  and this Court decided they were similarly situated for

2  the purpose of the prima facie case, and so if they want

3  to put forth evidence that there are different purposes

4  and duties related to these jobs, it would be our

5  position that that should be precluded.

6  THE COURT: All right. No. 11 is I guess

7  similar in the sense that you're asking that the Court

8  preclude any evidence that they did not suffer an

9  adverse employment action. Do you wish to be heard on

10  that one?

11  MS. PELLEGRIN: Well, Your Honor, it would

12  be similar as to -- to this Court's ruling in the

13  summary judgment in that we've suffered an adverse

14  employment action by being failed to promote and so any

15  evidence that they weren't promoted or there wasn't an

16  adverse action would be contrary to this Court's ruling

17  and would confuse the jury on that issue.

18  THE COURT: Now, I know the defendants are

19  arguing that the plaintiffs have a burden of showing

20  adverse employment action. I think it's probably

21  undisputed that they did not get promoted to pay

22  Grade 7. Is there going to be evidence in the damages

23  phase that, in fact, their salaries didn't -- wouldn't

24  have not been affected or what exactly is the argument

25  that's being made here?

---

to purchase a complete copy of the transcript.

71

1     MS. HAAS:  That would be -- yes.  So just a
2  few things.  If there was a liability verdict, we would
3  want to present evidence about what damages plaintiffs
4  would have sustained, which would include evidence about
5  any pay change they would have experienced.  But, you
6  know, the question on liability I think is -- is -- I
7  don't know that it's as clear-cut as it may seem at
8  first blush.
9     Our defense -- one of our defenses is that
10  there was no adverse employment action.  And while I
11  think there's no dispute that there was no upgrade in
12  GJE, I don't know that that necessarily translates to an
13  absence of an adverse action under the law.  So we would
14  want to present evidence.  You know, if there's no --
15  for example, if an employee could not receive an upgrade
16  but had no change in salary or benefits following the no
17  change in upgrade.
18     THE COURT:  How does that apply here though?
19     MS. HAAS:  Well, it would be evidence that
20  there was no tangible change in the employment for the
21  plaintiffs.
22     THE COURT:  I'm having trouble getting my
23  head around this argument.
24     MS. HAAS:  Okay.
25     THE COURT:  The evidence is really

72

1  undisputed that they were at pay Grade 6; right?
2     MS. HAAS:  Right.
3     THE COURT:  And after GJE, their argument is
4  they should have been on pay Grade 7 and they're not
5  because they were discriminated against.  If they can
6  prove that, are you saying that there's -- that there
7  still may not be an adverse employment action?
8     MS. HAAS:  That's right.
9     THE COURT:  And how is that?
10     MS. HAAS:  Well, an adverse employment
11  action requires a showing that there was a negative
12  change in the employment status.  And not getting an
13  upgrade isn't, by itself without any other evidence, a
14  negative change in employment status.
15     THE COURT:  So you don't think this is
16  equivalent to sort of a failure to promote claim?
17     MS. HAAS:  That's right because there was no
18  application; no application pool.  It's very different
19  from a failure to promote.  That would be part of our
20  defense.
21     THE COURT:  And -- and when I ruled on the
22  motion for summary judgment, I did look for cases like
23  this where there was pay grade changes and so forth and
24  I couldn't find any.  There are cases -- not as many as
25  you might think -- on failure to promote and -- for --

73

1  at least for purposes of the motion for summary
2  judgment, I concluded that this was sort of the
3  equivalent of a failure to promote and, frankly, from a
4  logical standpoint, it seems like it ought to be.
5     I mean let's assume that in this case the
6  defendants admitted that we didn't give them a raise --
7  we didn't put them at pay Grade 7 because, you know,
8  frankly, we're trying to discourage older women from
9  staying with us, but there's no promotion involved.  We
10  were just talking about pay grades and so no -- you
11  know, even if we discriminated against them because
12  they're older women, no harm no foul because we're not
13  talking about promotions.  We're simply talking about
14  raises.  Do you think that's the law?
15     MS. HAAS:  I don't know that it -- I think
16  that the evidence we would present on that would be -- I
17  think it would make -- make it clear that I am -- make
18  it clearer than I'm trying to make it.  So I think that
19  -- you know, as I read the Court's order, I read it to
20  say there is a disputed issue of fact over whether there
21  was discrimination and whether plaintiffs suffered an
22  adverse action, and the Court decided there's a disputed
23  issue over whether they experienced an adverse
24  employment action, so evidence -- you know, that goes to
25  trial.

74

1     And so we're then entitled to show evidence
2  of, you know, whether or not they were negatively
3  impacted by this alleged adverse action and that would
4  go to preserve error on the --
5     THE COURT:  Well, in any event, getting back
6  to the motion in limine, I suspect that at the damages
7  phase, if we get there, that the defendants are entitled
8  to offer testimony as to what the impact was of staying
9  at pay Grade 6 as opposed to going to pay Grade 7.  But,
10  you know, if there's a -- a motion, you know, for
11  directed verdict or something of that sort, you know,
12  unless you can provide me with some authority, I would
13  suspect that I'm going to find that failure to go from
14  6 to 7 is the -- analogous to failure to promote if, in
15  fact, it was because of age and sex discrimination.
16     MR. HARTY:  If I may just ask for
17  clarification, Your Honor?  You're not saying we cannot
18  -- you're not precluding us from offering evidence, for
19  example, one of our people to say that's not a promotion
20  at Deere.  Here's how a promotion works at Deere.  This
21  was a re-grading of the entire work force.
22     THE COURT:  Well, you can make any kind of
23  record you want, but again, you know, assuming there's
24  discrimination and that's the -- you know, obviously the
25  big fighting issue, but I find it hard to believe that

DOCUMENT 214-19-JT250422/118/25    www.???.com
to purchase a complete copy of the transcript.

**75**

1  it's the law that you can discriminate against older

2  women by not giving them the pay grade increase that

3  everyone else got because it's not a promotion. It's

4  simply a pay grade increase. You know, we're going to

5  give everybody in this department a $20,000 bonus this

6  year except for you two older women because, frankly,

7  we're not that fond of older women. Well,

8  nonactionable. We're not talking about a promotion.

9  You know, we're simply talking about money and

10  discrimination. If that's the law, you're going to have

11  to prove it to me. You're going to have to come up with

12  some cases that say that.

13          MR. HARTY: That's just -- that is not the

14  law, Your Honor. What you just described is a classic

15  pay discrimination case. That's not what they pled.

16  It's not what the issue is here. The issue here is

17  whether an adverse action occurred and we -- we just

18  don't think this is a failure to promote case, but --

19  but --

20          THE COURT: Okay. Well, again, it seems to

21  me pretty analogous to a failure to promote, but, you

22  know, I'll -- I'll look at the cases. I think I looked

23  at them when I ruled on the motion for summary judgment,

24  but in any event, let's try to finish up the plaintiffs'

25  motion here and then we'll take a break.

**76**

1          The 12th item is a lawsuit brought by

2  Michael Sellers. I guess we might as well talk

3  generally about the fact that Michael Sellers filed a

4  lawsuit; Delyorce Rebouche filed a lawsuit; Mr. Lenius

5  and Mr. Forster filed lawsuits; how we're going to deal

6  with that. Let me -- just to speed this along, let me

7  sort of tell you my preliminary thinking and then either

8  side can tell me where I'm wrong.

9          Obviously, the credibility of any witness is

10  always an issue. The jury is entitled to know where the

11  witness is coming from, and the fact that they have sued

12  John Deere for a similar claim I believe is relevant to

13  their credibility. Now, how that lawsuit came out;

14  whether or not it's still pending; whether or not it got

15  dismissed by a judge; whether or not it was settled;

16  whether or not it went to a jury; whether or not it's on

17  appeal; I think once you start going down those roads,

18  it becomes a little more problematic.

19          So my sense would be that if Michael Sellers

20  testifies, that either side could say isn't true,

21  Mr. Sellers, that you also brought a lawsuit against

22  some or all of these same defendants for similar

23  complaints and -- and more or less leave it at that.

24          Ms. Pellegrin, what do the plaintiffs think?

25          MS. PELLEGRIN: What you've just described,

**77**

1  Your Honor, we're okay with. As long as we aren't going

2  into the specifics related to his -- his lawsuit. A

3  general description of the nature, perhaps, but you

4  know, obviously, if we go into all the specifics, then

5  we're going to have to try collateral issues. We

6  brought a whole stack of exhibits we would have to

7  present on rebuttal if that were to arise. But as far

8  as just a general reference to the fact that he has

9  brought suit against John Deere without the disposition

10  being discussed, we are okay with.

11          THE COURT: What about the defendants?

12          MR. LEEMKUIL: Your Honor, we think that the

13  status and disposition of the cases is inherently bound

14  up in the credibility determination. The fact that Mike

15  Sellers has a case pending on appeal at the

16  Eighth Circuit that he's actively pursuing and has been

17  briefed -- I believe it hasn't been set for oral

18  argument yet -- but that obviously gives him a pretty

19  large incentive and motivation to come in here and give

20  favorable testimony to the plaintiffs. In the event his

21  case was remanded, obviously an outcome favorable to

22  plaintiffs in these cases would potentially have an

23  impact on how his case was resolved.

24          So I think the disposition -- and plaintiffs

25  have told the Court in their briefing that two of the

**78**

1  cases -- Delyorce Rebouche is also pending on appeal at

2  the Eighth Circuit and I believe they've stated in their

3  brief that Gary Lenius and Greg Forster will be

4  appealing once a final judgment is entered in these

5  cases. So in that respect, I think the disposition of

6  the cases is basically just as valuable as the fact that

7  there are claims in the first place.

8          THE COURT: I'm going to take a look at the

9  cases and see what they have to say about this. I'm --

10  I'm reluctant --

11          MS. PELLEGRIN: May I respond, Your Honor?

12          THE COURT: -- to get into much of that

13  because, first of all, the claims are not identical.

14  And, you know, if the evidence is well, isn't it true

15  that the judge threw your case out or ruled against you,

16  then, you know, there's a potential for the jury

17  thinking well, if a judge assumed his claim wasn't any

18  good, then this case is probably not any good either.

19          On the other hand, I guess plaintiffs could

20  argue that, you know, judge has the ability to throw a

21  case out. They threw those cases out. Judge didn't

22  throw this case out so he must have thought there was

23  something here. And so it opens the door to a jury

24  trying to speculate as to, you know, how that all works

25  and then, you know, I -- I guess I maybe agree that the

DOCUMENT 214-19-TEL: (217)782-7908
to purchase a complete copy of the transcript.

79

1  fact that the case is still pending -- albeit on appeal
2  -- maybe adds a little bit to sort of the motivation to
3  sue, but I don't know if it adds enough to overcome the
4  sort of prejudice associated with knowing that the case
5  was dismissed and so forth.
6        I think the fact that they brought a suit
7  and I'm not exactly sure what the language would be but
8  something about on a similar complaint; I think it
9  alerts the jury that this person has an incentive here.
10 He's obviously not happy with John Deere, but it doesn't
11 open all that can of worms with respect to what the
12 status of that case is.  The jury may well believe that
13 it is still pending or they may believe that it got
14 thrown out or they may believe that it's going to be
15 coming up for trial next month or who knows what they're
16 going to believe, but it may be better than telling them
17 that, you know, it was dismissed and has been appealed
18 now.
19        It looked like you wanted to say something,
20 Ms. Pellegrin.
21        MS. PELLEGRIN:  Your Honor, the cases that
22 they cite are completely in line with what you just
23 said.  The courts have found that just purely mentioning
24 that there was a lawsuit against the employer was
25 sufficient enough to show bias without going into any

80

1  further detail.
2        THE COURT:  All right.  No. 13 is evidence
3  regarding Sellers' job.  What's that all about?
4        MS. PELLEGRIN:  It appears to us based on
5  the defendants' exhibits that they are going to be
6  trying collateral issues related to Sellers' job
7  performance and some of his job duties that aren't
8  relative -- relevant at all to the issues that will be
9  before the jury.  The defendants claim that we're
10 somehow conceding that he had poor job performance and
11 we're trying to hide it.  Clearly that fact issue is
12 disputed.
13        As we previously mentioned, we have our
14 15 additional exhibits that if his job performance and
15 job duties are questioned at trial we will have to
16 submit as rebuttal.  This isn't something that we agree
17 with their perspective on.  He will be testifying to --
18 to what he heard D'Cruz say.  His personal observations
19 as to the WWCA audit that he was directly involved with.
20        Defendants argue that we're trying to pick
21 and choose what job duties he gets to testify to.  Well,
22 we are because that one is relevant to the issues that
23 are before the jury.  We don't need to talk about his
24 different charts and audit-related job duties that have
25 nothing to do with whether GJE disparately treated our

81

1  clients and whether there's animus testimony that he can
2  provide testimony for.
3        So it's our position that a number of the
4  job duties and job performance that it appears
5  defendants are trying to bring in to discredit
6  Mr. Sellers are completely irrelevant.
7        THE COURT:  Response?
8        MR. LEEMKUIL:  Thank you, Your Honor.  I
9  think defendants' concerns with respect to Mike Sellers
10 is that plaintiffs want to portray him as kind of a
11 neutral independent coworker who's just here trying to
12 tell his side of the story and be supportive of the
13 plaintiffs.  Obviously, as the Court knows from the
14 summary judgment rulings, Mr. Sellers has asserted a
15 litany of claims against defendants in this case.  He
16 named Clyde D'Cruz as an individual defendant.  He
17 testified that D'Cruz tried to destroy him and ruin his
18 credibility and essentially caused him to develop
19 posttraumatic stress disorder, and the impetus of all
20 that is these alleged unjustified performance reviews
21 from Clyde D'Cruz and Daria Jerauld that Mike Sellers
22 says weren't deserved and were inaccurate.
23        We think that his job performance is highly
24 relevant to his credibility and provided a motive and
25 bias for him to come in here and, depending on the

82

1  Court's ruling, testify that he heard Clyde D'Cruz say
2  that we need to get rid of the old farts or slaughter
3  the old dogs; those kinds of things.  So I think the
4  fact that his performance was lacking and that D'Cruz
5  gave him negative reviews is highly relevant to his
6  credibility.
7        THE COURT:  Well, this is one of those areas
8  where I'm not clear on what the evidence exactly is
9  going to be and I don't know even if I was that I'm
10 going to be able to articulate sort of a ruling on the
11 motion in limine that's going to cover all the
12 situations.
13        As a general proposition, again, the
14 credibility of any witness is always an issue.  Sellers
15 presumably is going to be able to testify as to what
16 jobs he held and why he was in a position to know what
17 he thinks he knows and testify as to, you know,
18 statements that were made or whatever.
19        To the extent that testimony would relate to
20 his credibility and his motive and his relationship with
21 Cruz and so forth, I suspect it's going to be
22 admissible.  And to the extent that it may reflect badly
23 on his job performance, maybe so.
24        Now to the extent they just want to show
25 Sellers is just a, you know, bad apple or something,

to purchase a complete copy of the transcript.

83

1  then you couldn't offer that, you know, for that
2  purpose, but I don't know that I can come up with any
3  kind of form that's going to help you guys much. I
4  think it's going to be during the course of the
5  questioning if you think a question is objectionable,
6  you make your objection and I make a ruling.
7      But certainly when one testifies, they
8  expose themselves to questions which would impact on
9  their credibility and motive to testify. And sometimes,
10  you know, it can be not very flattering evidence.
11      Which brings us to the 14th item and that is
12  Sellers' medical condition. He complains of a variety
13  of physical and psychological issues which he I guess
14  attributes -- I don't know; but I'm assuming he
15  attributes a lot of those to his employment at John
16  Deere and the plaintiff wants to preclude any of that
17  testimony.
18      MS. PELLEGRIN: We would ask that his
19  personal medical conditions be excluded. To the extent
20  that the defendants are able to use it to impeach him,
21  you know, they can do that pursuant to the rules, but we
22  don't feel that that opens up his entire medical history
23  as they propose.
24      THE COURT: Mr. Leemkuil?
25      MR. LEEMKUIL: Thank you, Your Honor. We

84

1  think, as I've stated a couple times, Mr. Sellers'
2  credibility is going to be a huge issue at the trial.
3  We highlighted some of the portions of his deposition in
4  our brief. You know, he testified to extensive memory
5  problems, cognitive difficulties. He testified about a
6  brain fog where he can't remember things. He
7  specifically testified that during the latter part of
8  his employment with Deere, he was having a difficult
9  time remembering things that were happening in meetings
10  with Clyde D'Cruz, so obviously that bears on how
11  accurately he remembered things, statements that he
12  claims Clyde D'Cruz made, so we think evidence of his
13  mental condition and medical issues is relevant and
14  admissible.
15      THE COURT: I'll take a look at it.
16      Anything else on plaintiff's motion in
17  limine, Ms. Pellegrin?
18      MS. PELLEGRIN: No, Your Honor.
19      THE COURT: All right. We've been going for
20  two hours. I need to give Kay a break. We'll take
21  20 minutes and start in again at 2:20.
22      (Recess at 1:57 p.m., until 2:19 p.m.)
23      THE COURT: Let's turn to the defendants'
24  motion in limine. This motion I guess has 41 parts.
25  The first one is testimony that relates to damages

85

1  rather than liability. As I understand the resistance
2  or response, the plaintiffs do not resist paragraph 1 to
3  the extent that it prohibits the testimony of certain
4  things during the liability phase.
5      The motion itself refers to alleged
6  posttraumatic stress disorder; the fact that the
7  plaintiffs are on disability; have not worked for
8  approximately 10 years; receipt of Social Security
9  disability benefits; medical treatment related to their
10  employment at Deere; alleged emotional distress.
11      So if I understand the motion correctly,
12  basically it's just saying you want damages evidence
13  kept for the damages phase and not offered during the
14  liability phase.
15      MR. HARTY: That's right, Your Honor. And I
16  think this is mostly my idea because I just wanted to
17  get some guidance from the Court as to how we describe
18  the status of the plaintiffs.
19      THE COURT: And as I understand, again the
20  resistance is that generally the parties agree that
21  damages come in during the damages phase and not during
22  the liability phase. We haven't resolved I guess that
23  issue of what we tell the jury about the fact that this
24  lawsuit or this trial is coming 10 years after the fact.
25      So as I indicated earlier, I would encourage

86

1  the parties to see if they can think of some neutral way
2  to -- or what to tell the jury. It's going to be
3  obvious to the jury that there's a 10 year gap there and
4  if the parties can agree on what the jury would be told
5  or if they're told nothing but they're told don't worry
6  about it essentially; that you should not concern
7  yourselves with the delay or something to that effect.
8  If you guys can't come up with anything, then I guess I
9  will.
10      No. 2 goes to testimony regarding the
11  dismissed claims brought by Forster, Lenius, Rebouche
12  and Sellers. I think we've maybe already talked about
13  this with respect to Sellers at least. And that is I
14  think we've talked about the fact that a witness can be
15  asked that they have filed a claim against John Deere
16  and then the issue I guess is what, if anything, they
17  can be asked beyond that.
18      Is there anything either side wanted to
19  offer that we haven't already discussed with respect to
20  Sellers? The parties disagree I understand as to the --
21  whether or not they can be asked details regarding some
22  of that stuff.
23      Is the argument pretty much the same here?
24      MR. LEEMKUIL: I think it is, Your Honor.
25  We think that obviously the Court's familiar with each

to purchase a complete copy of the transcript.

87

1  of these individuals after ruling on the summary
2  judgment motions, so I think, suffice it to say, that
3  these individuals all worked in -- with the exception of
4  Mike Sellers all worked in different departments,
5  reported to different decision makers, had different
6  claims.  Two of the -- Greg Forster and Gary Lenius --
7  did not even assert claims of discrimination.  So we
8  think under the 402/403 analysis under Mendelsohn that
9  the substance of their claims and the nature of their
10 claims is inadmissible.
11         THE COURT:  So let me get this straight
12 again; I've already forgotten what our discussion was
13 with relation to Sellers.  As I understood it, with
14 respect to Sellers the defendants believe that the
15 status of the lawsuit is still relevant, but your
16 position is that the substance of the lawsuit is not; is
17 that it?
18         MR. LEEMKUIL:  That's correct.  And I think
19 that would be our position with respect to each of these
20 individuals.
21         THE COURT:  All right.  And what's the
22 plaintiffs' position?
23         MS. PELLEGRIN:  We would reassert what we
24 stated in the -- our -- what we argued related to
25 Sellers.  The fact that a lawsuit exists, that alone is

88

1  sufficient to show motive or bias as the defendants
2  assert that they may enter this evidence in under
3  404(b).  You know, we think it's a misapplication of
4  404(b), but if it's allowed in, the cases that they do
5  cite to state that it is sufficient to show the bias by
6  only stating that there's a lawsuit and not talking
7  about the disposition of that lawsuit or any of the
8  details surrounding it.
9          THE COURT:  So if the defendants are
10 permitted to rule on this issue, the witnesses would be
11 asked about the fact they filed a claim; that -- what
12 the status of that claim is; that is, dismissed on
13 appeal at least for a couple of them, but not be
14 questioned about the substance of the claim.
15         But if the plaintiff was permitted to rule
16 on this issue, they would be asked about the fact they
17 filed a claim, but would not be permitted to offer any
18 evidence as to the status of the claim, but if evidence
19 is permitted on the status of the claim, then you would
20 want to be able to ask questions about the substance of
21 the claim?
22         MS. PELLEGRIN:  I guess it depends on how --
23 how we phrase the status of that claim.  If the Court is
24 willing to describe it as dismissed by the trial court,
25 then we may need to go into the substance of the claims

89

1  to show that we believe they're legitimate claims and
2  issues on appeal.  If it's left generally as far as
3  there's a lawsuit pending and no more information is
4  provided to the jury beyond that, I think that would
5  protect both parties and that would be sufficient to
6  show the bias the defendants are trying to show.
7          THE COURT:  All right.  No. 3 --
8          MR. RACETTE:  Judge, can I go back to 1 one
9  second?  I wanted to clarify something.  In our case in
10 chief as far as damages or damages -- I think I brought
11 that up before -- we would like to in the liability
12 portion bring in Vetter, who is a doctor they saw
13 initially while they're still working, while these
14 problems were still ongoing at work after they got the
15 improper grade.  And I think that's important again for
16 the jury to hear corroboration as to how -- how bad the
17 the acts are that we're claiming here.
18         THE COURT:  So you would have the doctor
19 testify as to what he was told by the plaintiffs?
20         MR. RACETTE:  Correct, Your Honor.
21         THE COURT:  What exception under the hearsay
22 rule are you relying on?
23         MR. RACETTE:  Well, that comes under the
24 normal exception of the history that's given to a doctor
25 -- I don't know if it's 80 -- whatever that exception is

90

1  to medical histories.  That's how it would come in.
2          THE COURT:  But that would -- that normally,
3  at least, would be related to the issue of damages
4  though.  In other words, in the typical case the doctor
5  may be permitted to testify as to what he was told by
6  the patient because it has to do with his treatment and
7  so forth, which goes to the injuries sustained and the
8  damages suffered and so forth.  It's not probative to
9  the issue of liability unless there was some inference
10 that the person -- the patient had, you know, recently
11 made up the story or whatever and here there's evidence
12 that she gave the same story earlier or whatever and I
13 don't know that that's being claimed here.
14         MR. RACETTE:  Yeah, and I may be wrong,
15 Your Honor.  I understand what you're saying.  I get
16 what you're saying, but I think that in the liability
17 portion they're going to try to portray it well, you
18 know, nothing happened except they didn't get a higher
19 grade and -- and the -- what we're alleging is the
20 assault is not a big deal and perhaps it wasn't even an
21 assault or it wasn't that -- that serious.
22         And I think the corroboration is important
23 for the liability portion would -- would be if you go to
24 a doctor and have to see them and the doctor is -- is --
25 you tell that doctor at or near the time when these

to purchase a complete copy of the transcript.

91

1  events are occurring what's going on, that certainly is
2  another form of corroboration when we're trying to show
3  that there was, in fact, discrimination and stress from
4  that going on. That's my point. I understand what the
5  Court is saying.
6          THE COURT: What assault are you referring
7  to?
8          MR. RACETTE: Well, there in the meeting
9  with Mr. Matson on April 14th.
10         THE COURT: That meeting where it blew up --
11         MR. RACETTE: Right.
12         THE COURT: -- and he pushed the chair or
13 something?
14         MR. RACETTE: Yeah.
15         THE COURT: Well --
16         MR. RACETTE: I just wanted to alert the
17 Court.
18         THE COURT: And, you know, that meeting --
19 and I guess we're coming to that. I suspect that that's
20 going to be admissible, but the plaintiffs' description
21 of the meeting to a doctor I suspect is not going to be
22 admissible in the liability phase at least. It may well
23 be admissible when we get to damages.
24         So I -- I -- you know -- and I think we get
25 to the doctor's testimony here later on too, but at

92

1  least at this point, I don't really see any of the
2  experts, including the doctors -- well, I shouldn't say
3  that; not any of the experts. Any of the damages
4  experts and the doctors testifying in the liability
5  phase.
6          No. 3, testimony regarding alleged
7  retaliatory actions. No. 4, has to do with hostile work
8  environment. Let's talk about those two; 3 and 4.
9          Who's speaking?
10         MR. LEEMKUIL: I am, Your Honor.
11         THE COURT: All right. You wish to be
12 heard?
13         MR. LEEMKUIL: I think No. 5 is also tied in
14 with these. That deals with other alleged acts of
15 discrimination that the Court addressed in the summary
16 judgment ruling. Our position is pretty simple, you
17 know. The Court entered a ruling on the summary
18 judgment motion that dismissed in our view, you know,
19 80 percent of these cases. And we think the evidence at
20 trial should reflect that fact.
21         With respect to retaliation, we served some
22 contention interrogatories on the plaintiffs asking them
23 to identify the alleged retaliatory acts. They did so
24 and the Court addressed each of those in the summary
25 judgment ruling and found that they were without merit.

93

1          So in light of that ruling, we would just
2  ask that the Court exclude evidence of these retaliatory
3  acts and the hostile work environment and the other sex
4  or age discrimination; specifically including Wanda's
5  hiring in 2001 and Ms. Forster's move in October 2003.
6          THE COURT: Does the defendant concede that
7  there may be evidence which would be relevant to more
8  than one cause of action? In other words, it could be
9  evidence of harassment, but could it also be evidence of
10 discrimination?
11         MR. LEEMKUIL: Your Honor, I guess are you
12 asking whether it could be relevant as to showing animus
13 or discriminatory intent or something to that effect?
14         THE COURT: Well, part of my problem,
15 frankly, with ruling on some of this stuff is that I
16 think I have some understanding as to some of the
17 incidents and evidence that's going to be offered during
18 the course of this trial, but I'm sure I don't have a
19 handle on sort of everything that happened. And so on
20 each piece of evidence, I'm going to have to think when
21 the objection is made as to its admissibility is this
22 relevant to the issue of whether or not the failure to
23 get a raise was -- I'm not going to put it in terms of
24 failure to get a raise -- the failure to be reallocated
25 to a higher pay grade was the result of discrimination

94

1  or is it simply evidence of, you know, bad behavior on
2  the part of -- or some other cause of action that was
3  previously brought by the plaintiffs?
4          I mean if it's simply evidence of a hostile
5  work environment, I mean the classic -- or retaliation.
6  I mean the classic evidence I guess is that whole towing
7  incident. Certainly evidence of retaliation or you
8  could construe it as evidence of retaliation, but it had
9  nothing to do with the decision to make on the mapping,
10 you know, a year-and-a-half earlier or whatever the time
11 frame was.
12         But there might be other evidence that, you
13 know, could be evidence of a hostile work environment;
14 statements made, you know, other behaviors that at least
15 arguably could be evidence as to a pretext or age and
16 sex discrimination as well. And so I guess my question
17 was that simply because it was identified as evidence of
18 harassment or hostile work environment wouldn't
19 necessarily make it irrelevant to the issue that's
20 remaining in this case. Would you agree with that?
21         MR. LEEMKUIL: I think to a certain extent I
22 would, Your Honor. You know, some of these are
23 obviously going to be case by case determinations, but
24 some of the examples -- you noted the car towing. You
25 know, that happened February of 2005, so we're almost a

to purchase a complete copy of the transcript.

95

1  full year past the implementation of GJE at that point.
2  There's no evidence of who towed the car or ordered the
3  towing of the car.
4        Another example I would think of is the
5  destruction of Ms. Forster's personal property and then
6  later efforts to resolve that. I think the payment to
7  her was ultimately made in 2007 and that was -- that's
8  always been cited as an instance of retaliation.
9        THE COURT: Just -- we're going to get to it
10 sooner or later so I might as well hear it from you now.
11 What's your view on this blowup that occurred at the
12 meeting on April 14th? That occurred as I recall -- I
13 maybe have this wrong -- after the plaintiffs sort of
14 learned that they were not going to be mapped to the
15 higher pay grade. They found out that everyone else
16 essentially in the department was and they had this
17 meeting with I think Matson and he, you know, lost his
18 temper or whatever. I think he concedes that the
19 meeting kind of got out of control. You know, that
20 would be evidence arguably of hostile work environment.
21 Is it also evidence of age and sex discrimination?
22       MR. LEEMKUIL: Your Honor, I think that
23 one's a closer call given the timing of the meeting.
24 You know, it was closer than a lot of these other events
25 to GJE; however, the plaintiffs characterize that as

96

1  kind of the central piece of their hostile work
2  environment claim. That's how we addressed it at
3  summary judgment. That's how the Court addressed it in
4  its ruling and now that the Court has held that that's,
5  you know, not an actionable claim, we think that it
6  would certainly be prejudicial to defendants to allow
7  evidence of this, you know, highly inflammatory
8  description of this meeting that has all along been
9  described as a hostile work environment. And I think
10 under 403, you know, the central piece of unfair
11 prejudice is the risk of a verdict on an improper basis,
12 and we think the risk of a verdict based on a meeting
13 that the Court has held is not actionable --
14       THE COURT: Were there statements made by
15 Matson during that meeting that could be construed as
16 evidence of discrimination?
17       MR. LEEMKUIL: If I recall plaintiffs'
18 description of the meeting, it was essentially Matson
19 telling them to stop complaining about GJE and kind of
20 just put the issue to rest.
21       THE COURT: All right. What's the
22 plaintiffs' position on 3 -- paragraphs 3, 4 and 5 of
23 the motion generally and this April 14th meeting
24 specifically?
25       MS. PELLEGRIN: I think that we're pretty

97

1  reasonable, Your Honor, in conceding that some of these
2  events that are specifically laid out by the defendants;
3  some of them are only going to be admissible during the
4  damages phase. But generally, our argument is that
5  these other acts, even if they were highlighted as
6  examples of hostile work environment or retaliation, do
7  not automatically deem them excludable based on the fact
8  that they also speak to the state of mind of the
9  defendants and can speak to their animus and it can also
10 go to prove pretext.
11       As far as the meeting with Brian Matson, it
12 was -- Matson explains in that meeting when he mapped,
13 he -- he -- he's one of the plaintiffs -- I think it was
14 Ms. Lenius -- says that I heard that you had this mapped
15 out last summer and he concedes that. That will be a
16 disputed fact I'm sure, but, you know, there are
17 statements made during this meeting that are clearly
18 relevant to the GJE mapping and I think the defendants
19 are being a little unreasonable in their
20 characterization of this isn't relevant to the failure
21 to promote.
22       THE COURT: I wish it was as easy as saying
23 sort of everything before May 4, 2004, is relevant and
24 everything after that date isn't, but it's not that easy
25 because there are things that happened before May 4th

98

1  that aren't relevant to the issues remaining in the
2  lawsuit and there are things that may have happened
3  after May 4th which may have reflected on how decisions
4  were made that would be admissible. But I think as a
5  general proposition, things that happened before the
6  implementation are probably more likely to be admissible
7  and things that happened after the implementation are
8  more likely not admissible, although obviously there are
9  exceptions on both.
10       So let's keep moving. No. 6 is defamation
11 claims and No. 7 is towing, and as I read the resistance
12 or response, plaintiffs agree that the testimony
13 regarding the defamation claims and the towing incident
14 would be inadmissible during the liability phase; is
15 that correct?
16       MS. PELLEGRIN: That's correct.
17       THE COURT: As long as we're at it and
18 before I forget, to what extent do the parties believe
19 that all of this other stuff is admissible during the
20 damages phase? In other words, the defendants filed
21 their motion in limine. There's no limitation on
22 liability or damages. Do the defendants take the
23 position that this whole towing thing just never comes
24 in even during the damages phase?
25       MR. LEEMKUIL: I think that would probably

Case 6:12-cv-02063-JSS   Document 214-19   Filed 02/18/25   Page 26 of 85
to purchase a complete copy of the transcript.

99

1  be our position. I think in our reply brief, you know,
2  on some of these that aren't resisted at least for
3  purposes of liability and we think the Court can
4  certainly just reserve ruling on those until the damages
5  phase, but I think the car towing, you know, we would
6  probably maintain that that's not even admissible on the
7  question of damages.
8              THE COURT: And we sort of alluded to this
9  earlier and maybe you guys have fully briefed this in
10 your trial briefs and I just haven't gotten to it yet,
11 but what is your understanding as to how damages would
12 be determined in this trial? The plaintiffs claim
13 extensive emotional injury as a result of their
14 employment at John Deere, but not simply because they
15 didn't get bumped from pay Grade 6 to pay Grade 7. They
16 also attribute it to any number of other incidents. Are
17 they entitled to recover only those damages which are
18 associated with the discrimination if the jury finds
19 some or are they somehow entitled to all of their
20 damages regardless of the cost?
21             MS. PELLEGRIN: Well, we do address that in
22 our trial brief, Your Honor, and our position is that
23 the defendants are essentially trying to apportion their
24 damages, which then puts the burden on them to prove
25 that apportionment is even possible. We believe that

100

1  with the type and nature of these injuries being
2  emotional and mental that that burden is going to be
3  very hard to prove and if they are unable to meet that
4  burden to apportion these different events and how it
5  all played out as to their mental state and these
6  injuries, that apportionment is no longer available to
7  them.
8              THE COURT: So under that view of the law,
9  at the damages phase basically everything that happened
10 is going to come in?
11             MS. PELLEGRIN: Yes. And we would argue
12 that that's true either way. Some of these events speak
13 to the extent of the injuries; not necessarily
14 causation. Simply how our clients interpreted an
15 event would speak to their extent of injuries and their
16 psychological state.
17             THE COURT: What -- and I'm sure you briefed
18 it someplace, but what's the defendants' position as to
19 the measure of damages here?
20             MS. HULETT: Your Honor, this is directly
21 addressed -- particularly the Iowa Civil Rights Act
22 states that a plaintiff can recover damages -- only
23 those damages that were caused by discriminatory or
24 unfair practice and that refers to the practice that's
25 at issue in the trial. There's a case right on point,

101

1  Dutcher v. Randall Foods. We've discussed it at length
2  in our trial brief.
3              Additionally, the authorities are similar
4  interpreting Title VII and ADEA. The causation standard
5  is one that has to be a direct causation of damages by
6  the discriminatory practice that's at issue.
7              THE COURT: That includes emotional distress
8  damages?
9              MS. HULETT: Yes. In fact, Dutcher related
10 to the emotional distress damages; the Iowa Supreme
11 Court case.
12             THE COURT: Ms. Pellegrin, have you read
13 Dutcher?
14             MS. PELLEGRIN: I wouldn't be able to speak
15 to it today, no.
16             THE COURT: All right. Let's move on.
17 No. 6 and 7 -- well, I guess that's just what we got
18 done talking to; 6 and 7. It sounds like the parties
19 are in agreement that during the liability phase at
20 least there won't be any testimony as to those issues.
21             No. 8 I think we've spoken to a little bit
22 already. It's the EEOC's role in this. I guess that
23 goes to 8, 9, 10 and 11.
24             Anything the defendants want to add on the
25 issue of how we handle the whole EEOC aspect of this

102

1  case?
2              MS. HULETT: Well, just a couple of points
3  we want to add, Your Honor. One, regarding the EEOC
4  determinations, we want to just make the Court aware of
5  the issue that because the EEOC issued a determination
6  relating to Title VII and that was not governed by the
7  Iowa Civil Rights Act, that determination relates only
8  to Deere & Company and not to the individual defendants.
9  So under Rule 10 -- Federal Rule of Evidence 105, even
10 if the Court reached a point of allowing the EEOC
11 determinations to be admitted as evidence, the Court
12 would need to instruct the jury that the jury may
13 consider those only for the limited purpose of Deere and
14 not as to the individual defendants because they clearly
15 were not governed by that. They aren't named on that at
16 all. The only respondent is Deere.
17             THE COURT: I mean this case is complicated
18 by the fact that the standard of proof is different in
19 the -- I mean this is not the point that you've just
20 spoken to, but it made me think of the fact that it is
21 complicated by the fact that, as I understand it, the
22 ADEA claim is only against Deere and the federal sex
23 discrimination Title VII claim is only against Deere --
24 notwithstanding the instructions I think that the
25 plaintiffs have submitted -- but the state claims are

Case 6:12-cv-02063-JSS    Document 211    Filed 05/13/15    Page 15 of 55
to purchase a complete copy of the transcript.

**103**

1  against all four.  And then the burden of proof or the
2  standard of proof, I should say, is different between
3  the federal ADEA claim and the state age discrimination
4  claim.  And then we've got two plaintiffs on top of
5  that, so the instructions, depending on how you set them
6  up, get to be pretty complicated as to what has to be
7  proved against each of the defendants on the various
8  claims.
9          And, in fact, I haven't given a lot of time
10  thinking about the instructions yet.  I've looked at
11  your proposed instructions.  I'm trying to figure out if
12  there would be a way to do it by special interrogatory
13  or something of that sort where the jury would make
14  certain findings and then based on that, the appropriate
15  judgments would be entered or if there's a way to
16  simplify it.  Because I'm just afraid that unless you
17  read carefully and unless you kind of know what's going
18  on to begin with, sometimes it's difficult to tell how
19  is that instruction any different than the next one.
20  And sometimes it's just, you know, but for versus
21  motivating factor or something.  So -- in any event, it
22  made me think of that.
23          But your point does illustrate the fact if
24  we go down the EEOC route, it raises sort of a can of
25  worms as far as what's admissible; what the jury is told

**104**

1  about what, you know, what sort of effect that has on
2  their findings.  My sense is that it probably doesn't
3  have, but if it does, it's only limited to, you know,
4  some defendants or one defendant and so forth.
5          Again, I encourage the parties to maybe take
6  a look at this and unless you're really convinced that
7  we have to tell the jury much about the EEOC, maybe the
8  parties can come up with some sort of stipulation that
9  either doesn't refer to them at all or says that it got
10  submitted and that's why it got delayed and sort of not
11  worry about the details.
12          Moving on.  Twelve has to do with settlement
13  offers.  I think the parties have indicated they agree
14  with that.
15          Thirteen has to do with statements allegedly
16  made by Dr. Hoekstra to Wanda Lenius, and as I
17  understand it, the plaintiffs do not resist
18  paragraph 13.
19          Paragraph 14 is evidence regarding Wanda
20  Lenius' belief that Brian Matson was mistreating her
21  because of an alleged affair that he was having with
22  another employee and the plaintiffs do not resist that.
23          Fifteen --
24          MS. WEST:  Your Honor, if I may interject;
25  while plaintiffs do not resist paragraph 14, they still

**105**

1  have not withdrawn trial Exhibits 14 and 103, which have
2  references to the alleged affair.
3          THE COURT:  Are the plaintiffs intending to
4  offer any evidence regarding this alleged affair?
5          MR. RACETTE:  No.  No.  No, Your Honor.
6          THE COURT:  All right.  So to the extent
7  that's reflected in some exhibit -- what were the
8  numbers again on that?
9          MS. WEST:  Trial Exhibits 14 and 103.
10          THE COURT:  All right.  And we'll be talking
11  about exhibits later on here when we get to the pretrial
12  conference aspect of this, but obviously if -- if that's
13  the subject of the motion in limine, then there cannot
14  be any testimony or exhibits which would refer to that.
15          Fifteen has to do with alleged ethical
16  breaches by Matson.  As I understand it -- well, I guess
17  I won't try to characterize it, but it's described, I
18  think, in the brief; the allegations.  That's
19  unresisted.
20          Sixteen, Matson's misdemeanor theft
21  conviction.  That's unresisted.  So paragraphs 12
22  through 16 will be granted as unresisted.
23          Paragraph 17 has to do with hearsay
24  statements from an unknown Mediacom employee and
25  Waterloo police officer alleging -- or regarding the

**106**

1  alleged tapping of Wanda Lenius' home phone, and the
2  plaintiffs concede that that would not come in during
3  the liability phase, but argue that it is admissible on
4  the issue of damages.
5          What -- I'm a little confused as to what
6  that testimony actually is.  What -- what -- would you
7  just have Lenius testify as to what she was told by
8  someone at Mediacom?
9          MS. PELLEGRIN:  What we actually state is
10  that her belief that her phone was tapped would be
11  admissible.  The -- what she was told by the Mediacom
12  person who came out to check her phone box or whatnot.
13  We aren't calling a Mediacom representative to testify
14  to that.
15          THE COURT:  So you would ask her did you
16  believe your phone was tapped and she would say yes, but
17  you wouldn't say how -- why do you think that?
18          MS. PELLEGRIN:  Well, if we asked her why
19  she thought that, the statement would come in not for
20  the truth that the phone was actually tapped, but just
21  that that was her belief that that occurred.
22          THE COURT:  Okay.  So the argument is that
23  if someone from Mediacom told her that and she believed
24  that -- whether it was true or not -- that goes to her
25  damages?

107

1    MS. PELLEGRIN:  This would go to the extent
2  of damages, like I was referencing earlier.
3            THE COURT:  And how is John Deere
4  responsible for what somebody from Mediacom told her?
5            MS. PELLEGRIN:  When I say the extent of
6  damages, it shows what the psychological state of our --
7  of our plaintiffs are and that would be something
8  that --
9            THE COURT:  It may show she's paranoid
10  unless there's some proof of that.
11           MS. PELLEGRIN:  Which I believe that there's
12  -- some of the symptoms of some of her diagnoses would
13  be paranoia.
14           THE COURT:  And -- and again, you're -- and
15  that's going to be attributable to John Deere?
16           MS. PELLEGRIN:  We would argue that the
17  damage that she incurred from then until present time,
18  her interpretation of certain events and extreme
19  paranoia about something would show just how damaged she
20  is.
21           THE COURT:  So basically whatever has
22  happened to her since 2004 John Deere is responsible for
23  it whether they had anything to do with it or not
24  because she believes it.  If she believes it, then
25  that's all that's necessary.

108

1            MR. RACETTE:  Well, Your Honor, it's that
2  she believes John Deere did it as a result of the mental
3  and emotional distress she's incurred as a result of the
4  discrimination.  It's not that anything she believes --
5  if she believes there's dogs in her pantry or something,
6  no.  If she believes -- but if she believes Deere is now
7  actually bugging her phone, we would claim that that
8  goes to the extent her damages just like any other
9  mentally or emotionally injured individual is going to
10  maybe have delusions; maybe hallucinations; maybe, you
11  know, whatever the mental state is.  This is not a
12  physical injury.  This is not she's got a broken bone.
13  She has, you know, lost a leg.  This is mental and
14  emotional problems which manifest themselves in many
15  ways which would be testimony that would have to be
16  relied on, I think, by the experts -- doctors in this
17  case -- and I guess --
18           THE COURT:  Is there going to be any
19  testimony that what she was told was false?
20           MR. RACETTE:  Testimony that that would be a
21  symptom that they would expect to see from this type of
22  discrimination that she suffered.
23           THE COURT:  Here's the problem I'm having.
24  If -- if -- if the evidence was -- I think your argument
25  would be stronger if there was a stipulation or other

109

1  evidence that it's not true; her phone was not being
2  tapped.  But she believed it and, therefore, it's a -- a
3  part of her injury -- a part of her emotional injury
4  because that's what she believed and whatever.
5            But the problem is once that evidence comes
6  in, now the jury is thinking about you mean John Deere
7  tapped her phone?  And even if it's not true and there's
8  no evidence that it's true because -- and you're not
9  offering to prove that it was true but you're not
10  stipulating that it wasn't true; it's highly
11  prejudicial.  I mean under 403, you know, the idea of a
12  company tapping someone's phone, that's serious
13  business.  I mean that would get the jury's attention
14  for sure.
15            I'm going to hear from defendants, but I'm
16  assuming that they've got some concerns about this
17  inference that -- that John Deere tapped their phone.
18  Even if you say well, we don't really know if it's true
19  or not but she believed it and, therefore, it's relevant
20  to damages; it's like telling the jury, you know, I
21  don't know that Mr. Racette is cheating on his wife, but
22  let's assume he is.  You know, that's -- you know, I
23  mean obviously if you're Mr. Racette, that's a little
24  bothersome to you if that's not true and if you're John
25  Deere, if the inference is that they were tapping her

110

1  phone when it's not true, that's a little bothersome.  I
2  don't know if the defendants want to argue that further,
3  but --
4            MR. HARTY:  I can concede that we are
5  bothered by that proposition, Your Honor.
6            THE COURT:  How about Mr. Racette cheating?
7  Are you worried about that at all?
8            MR. HARTY:  I'm less concerned about that.
9            MR. RACETTE:  Can we erase that from the
10  record?
11           MR. HARTY:  She also testified that the
12  police -- that the Waterloo police told her oh, yeah,
13  you must be in litigation.  If you're in litigation, we
14  see this all the time; your phone gets tapped.  It would
15  be -- if they offered it at any stage for the
16  proposition that it's somehow -- it relates to emotional
17  distress, it would be no different than her saying my
18  next-door neighbor told me they heard that John Deere
19  was hosting a black mass in hopes of my demise.  It's
20  highly prejudicial.  It's an out-of-court statement.
21  There's no way we can attack it.
22           THE COURT:  I'm not ruling on any of these
23  things today, but I think that's highly problematic.
24           No. 18 has to do with purported statistical
25  analysis regarding disparate impact.  This was

to purchase a complete copy of the transcript.

111

1 apparently something done by Michael Sellers and I don't
2 think I've seen the exhibit yet, but there's apparently
3 some sort of chart or something that Sellers prepared
4 that does something.
5       What -- what -- what evidence is the
6 plaintiff -- are the plaintiffs intending to offer
7 regarding Sellers' analysis of -- of this situation?
8       MS. PELLEGRIN: Well, the plaintiffs would
9 offer what we call a matrix. It's an actual chart
10 created by Mr. Sellers. He will be able to testify to
11 the substance of that chart and how he came to the --
12 his -- how he made the chart and provide that
13 foundation. It's based on his personal knowledge and
14 observations while he was working there and his research
15 thereafter.
16       THE COURT: Do you remember which exhibit
17 that is?
18       MS. PELLEGRIN: It's Plaintiffs' Exhibits 85
19 and 86.
20       MR. RACETTE: And I think, Judge, 85 is the
21 actual chart. And then 87 --
22       MS. PELLEGRIN: 86 would be the documents
23 that he used to create the chart.
24       MR. RACETTE: And this is something, Judge,
25 quite frankly, I think rather than wasting the Court's

112

1 time today, it would be something that before we would
2 approach that; you can hear it, you know, whatever
3 testimony the Court will desire outside the presence of
4 the jury before we brought it up; something like that.
5       THE COURT: Yeah. When we get done today,
6 we're going to have to talk about sort of how we're
7 going to get some of these things resolved. Trial
8 starts two weeks from today and obviously there's a lot
9 of work to be done at least for me. I don't know if
10 we're going to get through these motions today. I'm --
11 I'm not optimistic.
12       And during the course of the trial, my
13 intent is to go pretty much from 9 to 4:30. We'll --
14 I'll meet with the attorneys every morning at 8:30 to
15 sort of cover last minute issues and -- but one of my
16 pet peeves is keeping juries waiting, so we won't, you
17 know, take an hour to talk about stuff at 8:30. We'll
18 -- at nine o'clock we'll be ready to go. And if we have
19 to get together at eight o'clock, we can do that.
20       But my problem is that all the things I
21 normally do I'm going to have to continue to do and so
22 I'm going to schedule stuff during the noon hour and
23 then starting again at 4:30 for an hour or
24 hour-and-a-half or whatever it takes, and so I'm not
25 going to have a lot of time to sort of, you know, make

113

1 those records outside the presence of the jury unless we
2 do it at six o'clock at night or seven in the morning.
3       So I want to try to resolve as many of these
4 issues as we can before we get started because it's
5 going to be kind of problematic once we get going to
6 have a lot of extra time.
7       MR. RACETTE: The only reason I said that,
8 Judge, in this instance he's probably the only one that
9 knows what -- how it was put together; exactly what the
10 underlying documents represent per se. I'm not able; I
11 don't think Ms. Pellegrin is able or any of us to speak
12 to exactly how that was done and formulated. Okay; we've
13 got a rough idea, but not something I think that
14 the Court would want to base its opinion on or its
15 decision.
16       THE COURT: I mean frankly if -- it's
17 unusual in my experience that -- that someone in
18 Sellers' position would sort of become sort of a
19 quasi-expert in putting together charts and compiling
20 documents into, you know, some sort of summary exhibits
21 and so forth. To the extent I would allow him to do
22 that, it really does then -- or at least arguably --
23 sort of strengthen the defendants' argument that if he's
24 going to start testifying as some kind of, you know,
25 really knowledgeable person, then we are entitled to

114

1 really delve into all of his issues and, you know, his
2 -- the lawsuit and his relationships with these
3 defendants and his mental issues and all the rest of it.
4       So it -- you know, I'm a little, frankly,
5 skeptical as to how far a lay witness can go down that
6 road to begin with; although one can argue that it's no
7 different than an attorney preparing the same document
8 if he were advised of all the underlying information.
9       But if -- you know, to the extent that he's
10 permitted to testify more than just sort of his own
11 personal experiences and instead is sort of
12 extrapolating information and preparing documents, then
13 it really opens him up I think to probably additional
14 scrutiny as to what his motivations are for doing that
15 and what his qualifications are for doing that. In any
16 event, I'll take a look at it.
17       MS. HULETT: Your Honor, may I --
18       THE COURT: I never did hear from
19 defendants, yeah.
20       MS. HULETT: Your Honor, we believe this can
21 be decided today. Page 1 of Plaintiffs' Exhibit --
22 Trial Exhibit 85 is a document prepared by Mr. Sellers
23 that apparently Mr. Sellers wrote on it disparate
24 impact. He was asked about this document in his
25 deposition. He testified that he prepared these

to purchase a complete copy of the transcript.

115

1    materials to track the disparate impact on older
2    employees.  Looking through the materials, it's a chart
3    that Mr. Sellers compiled that purports to list the ages
4    of various people that worked in supply management at
5    various points in time and then there are a number of
6    materials that Mr. Sellers complied in Plaintiffs'
7    Exhibit 86 that are a series of charts and handwritten
8    notes from Mr. Sellers.
9           We don't believe even if Mr. Sellers
10   testifies outside the presence of the jury that there's
11   any way he's going to be able to present adequate
12   testimony to render these admissible, given the narrow
13   scope of the issues that the jury will decide in the
14   liability phase at trial in this case.
15          THE COURT:  I haven't looked at the exhibits
16   yet except just glanced at page 1 of Exhibit 85.  I'm
17   suspicious about the admission of those exhibits, but
18   I'll keep an open mind about it.
19          Exhibit 19 (sic), anonymous surveys.  I've
20   seen references to that in the past.  I guess I'm not
21   clear on what those surveys consisted of or who they
22   were conducted by.
23          Ms. Pellegrin, can you sort of fill me in?
24          MS. PELLEGRIN:  The surveys that we wish to
25   potentially use are John Deere surveys that they

116

1    distribute to their employees.  They are anonymous, but
2    we are only using 2003 to 2005 surveys.  The fact that
3    they are conducted by John Deere themselves we assume
4    means that they would be reliable and that they were
5    conducted properly since they're John Deere surveys.
6           And it would be our position that if they
7    offer evidence that John Deere employees are really
8    happy in supply management at Waterloo or if D'Cruz
9    testifies specifically that his employees were really
10   happy or that he didn't have knowledge that they felt
11   mistreated or that they were mistreated, these surveys
12   serve as direct rebuttal evidence or impeachment
13   evidence because D'Cruz did have -- knew about these
14   surveys and would have read the results of these.
15          So if he testifies that all that his
16   employees were happy; that they didn't feel mistreated;
17   that they didn't feel that he tended to favor younger
18   employees over older employees, we feel that these
19   surveys would provide impeachment evidence specifically
20   in that regard.
21          THE COURT:  So you're not intending to offer
22   them in your case in chief?
23          MS. PELLEGRIN:  We would not offer them
24   unless the testimony comes up that would provide us the
25   proper rebuttal or impeachment.

117

1           THE COURT:  Are those -- have those been
2    marked as exhibits?
3           MS. PELLEGRIN:  Yes.  They're Exhibits 134
4    and 135.
5           THE COURT:  All right.  Response?
6           MR. LEEMKUIL:  Thank you, Your Honor.  We
7    think these surveys are clearly inadmissible hearsay.
8    If you take a look at the exhibits, they're essentially
9    running narratives of anonymous employee comments about
10   their thoughts on the workplace.  A lot of it is just
11   general dissatisfaction and then some of it there's
12   some accusations of age discrimination in the workplace.
13   But we have no idea who the declarant is.  They're
14   completely anonymous comments.  There's no way to
15   cross-examine these people.  We don't know who they are.
16          We've cited several cases in our brief that
17   excluded similar -- similar employee surveys and one
18   that I think sums it up well is the Crumpacker case on
19   page 25 where the court says the court is at a loss to
20   see how this can possibly be admissible.  So I think
21   that sums up our position.
22          We also think under 403 they're unfairly
23   prejudicial to allow anonymous employee comments about
24   their perceived slights or unhappiness in the workplace.
25          THE COURT:  Is there a hearsay exception

118

1    that the plaintiffs are relying on?
2           MS. PELLEGRIN:  No, Your Honor.  I don't
3    think these would qualify as a business record, but as
4    far as reliability and the scope of these surveys, they
5    address Mr. D'Cruz' department specifically and they're
6    specifically the time period that we're requesting, so
7    while we may not be able to identify a specific
8    declarant, we do know it's an employee of Mr. D'Cruz and
9    so any statement --
10          THE COURT:  Could be one of the plaintiffs,
11   in fact.
12          MS. PELLEGRIN:  It could.  And there are
13   enough comments in these surveys that -- that they
14   amount to more employees than just our clients.  And so
15   -- and if nothing else, this gave notice to Mr. D'Cruz
16   that his employees felt that he was discriminating
17   against older employees and so if he's asked that
18   question and he denies it, we feel that we are -- we
19   should be able to impeach him based on these surveys.
20          THE COURT:  Is there evidence that he
21   received the surveys?
22          MR. RACETTE:  I think, Your Honor, as I
23   understand them, these were done every year in a method
24   -- and I can't remember the methodology.  I've got so
25   many things floating around in my head -- but it was

Case 6:12-cv-02063-JSS    Document 214-19    Filed 02/18/25    Page 31 of 85
to purchase a complete copy of the transcript.

119

1  done every year or every other year and then they

2  actually graph these out and showed them to the manager

3  -- which D'Cruz was at that time the whole head of SM --

4  and these are all specific to the SM department under

5  D'Cruz, and then they would graph these out and show

6  that he's not doing well in this area, in this area, in

7  this area. So I'm pretty sure he's aware of these,

8  Your Honor. I'm pretty sure.

9           THE COURT: Let's move on to No. 20. It's

10 evidence regarding the fact that Gayle Forster's

11 daughter decided not to pursue an engineering career.

12 And the plaintiffs concede that that's not admissible in

13 the liability phase; argue that it is admissible on the

14 issue of damages.

15           Do you wish to be heard in that regard,

16 Ms. Pellegrin?

17           MS. PELLEGRIN: Your Honor, this would be

18 similar to our argument previously as far as while it

19 doesn't speak to the liability phase, her reaction to

20 the harm that she -- she suffered as a result of this

21 discrimination and the extent that trickled down to

22 her family, the -- the way that that affected her

23 emotional injury we believe is relevant to that.

24           THE COURT: Is the daughter going to

25 testify?

120

1           MS. PELLEGRIN: No. We're not planning to

2  call her daughter.

3           THE COURT: So this is another one of those

4  this is what she told me and it may or may not be true

5  but I believed it and, therefore, it affected me in a

6  certain way?

7           MS. PELLEGRIN: Well, her reaction to this

8  news would be the way that we would enter it in.

9           THE COURT: How do we know it's true? Or

10 doesn't it make any difference to the plaintiffs that

11 it's true?

12           MS. PELLEGRIN: Again, we would -- we would

13 offer the evidence not for the truth of the matter

14 asserted, but for her reaction to that and how that --

15           THE COURT: So you're conceding it doesn't

16 make any difference if it's true. She may have quit

17 engineering because she decided she didn't like it, but

18 if that's what she told her mother and her mother

19 believed it, then it's admissible.

20           MS. PELLEGRIN: We believe that

21 Ms. Forster's reaction to it is admissible, yes.

22           THE COURT: Well again, if we get into the

23 damages phase, to some extent it's sort of Katie bar the

24 door, but I think there are limitations. I'll have to

25 sort of straighten out in my own head what those

121

1  limitations are, but it just seems like at some point,

2  you know, John Deere isn't responsible for every bad

3  thing that's happened to the plaintiffs in the last

4  10 years; some of which may not have even happened; it's

5  just that the plaintiffs believe they happened.

6           It just -- it seems a stretch to me that the

7  daughter allegedly makes a decision to change her major

8  in college, which is not an unusual experience, for

9  whatever reasons but she allegedly told her mother that

10 it was because of her mother's experience with John

11 Deere, and because of that the jury gets to hear the

12 evidence and presumably, the argument is, award more

13 damages.

14           It just seems like it's -- it's a pretty

15 thin basis for making John Deere pay a higher amount.

16 In any event, I'll take a look at it.

17           No. 21, testimony regarding Sellers' alleged

18 disability, his meeting with Dr. Harding and Kevin

19 Keith, or alleged changes to Deere's medical policies or

20 long-term disability benefits.

21           What's the defendant getting at there?

22           MR. HARTY: Defendant, Your Honor -- my

23 understanding is that the plaintiffs do not resist --

24           THE COURT: Oh, I guess they don't. So let

25 me understand then what we're talking about. Sellers is

122

1  going to testify, and as I understood it, the defendants

2  wanted to offer evidence regarding his mental problems,

3  but when you're talking about alleged disability, you're

4  talking about his application for and receipt of

5  disability benefits?

6           MR. HARTY: No; sorry, Your Honor. It is

7  Exhibit 83. It is a meeting that defendant Kevin Keith

8  had with Mr. Sellers and with Mr. Sellers' -- one of his

9  treating professionals where they walked through their

10 grievances; i.e., Sellers and the folks at Black

11 Hawk-Grundy County walked through their grievances with

12 the way Deere treats disability claims.

13           THE COURT: So your motion goes specifically

14 to a meeting that was had with Sellers and Dr. Harding

15 and Kevin Keith?

16           MR. HARTY: Right. And they've -- well, it

17 goes beyond that, but the only part that I believe is

18 still at issue is that the plaintiffs haven't withdrawn

19 Exhibit 83. But if the Court issues an order consistent

20 with the terms of the requested motion in limine, it

21 would cover Exhibit 83 in our opinion.

22           THE COURT: Are the plaintiffs not resisting

23 that motion then with respect to this meeting that

24 apparently took place?

25           MR. RACETTE: Your Honor, if I understand --

to purchase a complete copy of the transcript.

123

1 I just want to make sure; I may be confused by --
2 there's so many motions we're dealing with, but I think
3 they're saying at one part they want to introduce his
4 disabilities but they don't want to introduce the
5 disabilities. I'm confused kind of as to the
6 defendants' position as to Mike Sellers' disabilities
7 and that's why I don't know.
8         As far as Exhibit 83, we think that that
9 goes to the -- I believe -- and I can't remember --
10 again, I apologize; there's so many different exhibits
11 -- but I believe that that may have involved more than
12 Mike Sellers' claims at that point. I think it was
13 mentioned Gayle Forster's and Wanda Lenius', but if not
14 -- if not, I would agree that we would keep that out if
15 it just goes to Mike Sellers and meeting with Kevin
16 Keith at that point and his claims.
17         THE COURT: All right. Just so we're all
18 clear, I'm trying to avoid any misunderstanding or
19 confusion. As I understand it, Michael Sellers, of
20 course, will testify and it's the defendants' intention
21 to cross-examine him regarding his relationships with
22 the folks at John Deere and also cross-examine him
23 regarding various medical or mental issues including
24 brain fog or memory issues or whatever.
25         What we're talking about here in

124

1 paragraph 21 of defendants' motion in limine is
2 something different. It deals I guess with Exhibit 83
3 and the circumstances surrounding Exhibit 83.
4 Exhibit 83 is a four page typewritten document. It
5 refers to an April 11, 2005, meeting between Kevin
6 Keith, Jim Harding and Mike Sellers. The first page
7 says agenda. I'm assuming this document was prepared by
8 Sellers. It refers to an agenda and then on page 2 are
9 general concerns, including a reference to age
10 discrimination, but also hostile and harassing
11 environment, retaliation; what's described as other
12 serious violations. Page 3, it has my major concerns
13 and that continues onto page 4. There are 14 things
14 listed.
15         And as I understand it, the defendants are
16 asking that the Court preclude Sellers from testifying
17 regarding this meeting, which I assume, in fact, took
18 place on April 11, 2005, and the substance of the
19 meeting and the exhibit specifically.
20         Any objection to that?
21         MR. RACETTE: Was it to me or to -- to me?
22         THE COURT: Yeah.
23         MR. RACETTE: In looking over the exhibit,
24 there are certain portions of this I think is important
25 regarding their notice to Keith about the allegations of

125

1 age discrimination that are being claimed here and their
2 failure to do anything about it. And that's -- that's a
3 portion of -- of -- of our claim in regard to further
4 animus by Deere showing that they never really looked
5 into this.
6         They're going to present a defense that is
7 GJE and only GJE and I think as part of our case, we
8 want to show that we were -- our clients were informing
9 them of the fact that it was age discrimination, gender
10 discrimination and things were going on in this
11 department that they turned a blind eye to altogether,
12 and that certainly in my opinion goes to the very heart
13 of pretext in this case; that they refused to only --
14 they refused to look one way and only looked the way
15 that could help them, and when, in fact, there's a whole
16 discrimination procedure available to Deere that they
17 didn't follow in this case whatsoever starting with
18 Kevin Keith right after this occurred and they made the
19 allegations.
20         THE COURT: Let me make sure I --
21         MR. RACETTE: So I could redact this,
22 Your Honor, is what I'm saying. I could redact this
23 because there are many things in here that are
24 inadmissible that I would agree, but certain things in
25 here seem to be very relevant to our case.

126

1         THE COURT: Let me make sure I understand
2 the facts first. Was there, in fact, a meeting there
3 then on April 5, 2011, between Sellers and Kevin Keith?
4         MR. HARTY: There was, Your Honor.
5         THE COURT: Excuse me?
6         MR. HARTY: There was, Your Honor, yes.
7         THE COURT: And at that meeting was GJE
8 discussed?
9         MR. HARTY: No.
10         THE COURT: It looks like age discrimination
11 was on the agenda or at least under the general
12 concerns.
13         MR. HARTY: Age discrimination, retaliation;
14 hostile environment; the claims that have been dismissed
15 and the meeting did occur long after both of these
16 plaintiffs were no longer even actively working.
17         THE COURT: I'm just -- and I understand
18 this meeting took place a year after the GJE was
19 implemented. It's conceivable -- and I don't know that
20 that's the fact here, but I suppose it's conceivable
21 that when Sellers met with Keith and if he talked about
22 age discrimination, that Keith made some admissions
23 about the implementation of GJE.
24         If, in fact, admissions were made, do you
25 think that's admissible?

DOCUMENT 214-19-3-FILED 02/18/25 www.ilovedoc.com
to purchase a complete copy of the transcript.

---

127

1    MR. HARTY: The record's pretty clear,
2 Your Honor, Harding -- I call him doctor -- Jim Harding
3 said that Kevin Keith made no comments during the
4 meeting.
5    THE COURT: Who is Jim Harding?
6    MR. HARTY: He is a psychologist. He's the
7 plaintiffs' expert witness. And the reason that they
8 had this meeting was because Kevin Keith was the human
9 resource manager who had a relationship to the benefit
10 plans at Deere.
11    THE COURT: Okay. Well, in any event, it --
12 it looks like Exhibit 83 is hearsay. I mean it's a
13 document that is prepared by Sellers. It's not any kind
14 of business document or anything else. It's simply a
15 document that was prepared by Sellers apparently to
16 guide this discussion. It's at least theoretically
17 possible that if Kevin Keith made some admission about
18 the implementation of GJE a year earlier, that that
19 would be admissible -- not the exhibit, but the
20 testimony -- as to what Keith said. But his -- even to
21 the extent Keith said anything about, you know, claims
22 of retaliation and harassment and hostile work
23 environment and so forth, those are not relevant to the
24 issue of age or sex discrimination.
25    It's frankly unlikely that Keith made any

---

128

1 statements a year later about the implementation of GJE
2 which would constitute admissions, but that's the only
3 sort of scenario that I can think of where the testimony
4 regarding -- presumably Sellers' testimony regarding the
5 meeting that took place on April 11th of 2005 would be
6 admissible.
7    Moving on, No. 22, evidence regarding an
8 email from Michelle Wilson to Gayle Forster in 2006. Is
9 -- is that an exhibit that the plaintiffs are intending
10 to offer or --
11    MS. WEST: Yes, Your Honor. Plaintiffs'
12 Exhibit 84, an email from Michelle Sammon dated
13 February 10, 2006, apparently to Gayle Forster. This
14 document is nearly two years old -- I mean past the GJE
15 implementation date; long after both plaintiffs had
16 stopped actively working at John Deere. We think the
17 document is irrelevant. It makes no mention of GJE or
18 any of the job mappings.
19    THE COURT: Who is Michelle Sammon?
20    MS. WEST: It's Michelle Wilson now. She's
21 an employee at John Deere.
22    THE COURT: And is she -- what's her
23 position?
24    MS. WEST: I couldn't tell you her current
25 position, Your Honor, off the top of my head.

---

129

1    THE COURT: And does the -- do the
2 plaintiffs claim that this falls within some exception
3 to the hearsay rule?
4    MS. PELLEGRIN: Ms. Wilson will be
5 testifying at the trial so we believe that we can ask
6 her about her own email.
7    MS. WEST: Which, Your Honor, they did do at
8 her deposition and she didn't remember anything about
9 any of the email.
10    MS. PELLEGRIN: Which we believe that, in
11 itself, is relevant.
12    THE COURT: I haven't really read through
13 the email. It's only one page long, but I haven't
14 studied it. What do the plaintiffs claim the importance
15 of it is?
16    MS. PELLEGRIN: Ms. Wilson insinuates in
17 this email that Clyde D'Cruz had previously
18 discriminated against women. So we would be asking her
19 opinion as to -- as to her observations as a former
20 employee of Clyde D'Cruz.
21    THE COURT: Am I looking at the same one?
22 It's dated February 10, 2006.
23    MS. PELLEGRIN: Yes.
24    THE COURT: Where is that reference at then?
25    MS. PELLEGRIN: She's discussing in the

---

130

1 first paragraph I'll call it the moves of different
2 females and then in the middle paragraph she says these
3 moves were all made by Stefan Zoller. He was the supply
4 manager in Manheim previously. Now he's the new Kim
5 Normoyle. He's considered Clyde's twin by some, and we
6 believe that this email shows that she believes that
7 Clyde was doing similar actions as this other manager
8 and that it reflects her opinion that Clyde D'Cruz was
9 discriminating against women at some point and
10 considering it's in 2006 and she moved out of supply
11 management shortly after -- she moved out of supply
12 management at some point. I don't actually know the
13 exact date. So her knowledge of Clyde D'Cruz would be
14 around the time of GJE or before then and so her opinion
15 of him would be relevant to the time that we're
16 discussing here as far as his animus and the GJE
17 mapping.
18    THE COURT: Assuming that she can testify as
19 to what her knowledge was of what was happening in the
20 department back in 2004, the relevant time period, I'm
21 still not clear why this wouldn't be hearsay? I mean
22 simply because a witness testifies, as far as I know
23 that's not a hearsay exception to everything they write
24 to somebody, is it?
25    MS. PELLEGRIN: Well, we would ask to lay

---

to purchase a complete copy of the transcript.

131

1 foundation for the email, Your Honor, and ask her --
2 THE COURT: Well, I'm assuming you can lay
3 foundation, but that's different than a hearsay
4 objection. It's an out-of-court statement offered to
5 prove the truth of the matter asserted I assume,
6 although every time someone says that, it's not offered
7 to prove the truth of the matter asserted, but the
8 question is then why is it being offered? You know, if
9 -- if -- if Michelle Sammon testifies, you know, in her
10 -- well, I guess I'm unclear as to why this would not be
11 hearsay.
12 MR. RACETTE: Well, Your Honor, this I think
13 will come in if you -- we took her deposition and she
14 claimed not to know anything about it or -- or have made
15 an email itself virtually and so I think it would come
16 in --
17 THE COURT: To refresh her recollection?
18 MR. RACETTE: Well, it would come in for
19 that and come in for impeachment purposes. If she says
20 she never made it and if it's not what she remembers and
21 it's her own email, I think that's a pretty solid
22 inconsistent statement out of court that comes in.
23 THE COURT: So you're going to call Michelle
24 Sammon as a witness and then she's going to testify she
25 doesn't remember making any email and then you're going

132

1 to impeach her -- your own witness -- using an email
2 that she wrote two years after the fact in which she
3 doesn't refer to Cruz at all except saying that this
4 other person that is there now who's making some claim
5 changes in 2006 is considered Clyde's twin by some to
6 prove age and sex discrimination back in 2004? Well,
7 I'll take a look at it.
8 MS. WEST: Your Honor, may I just tell you
9 when Michelle Sammon was asked that question in her
10 deposition she answered again I don't remember writing
11 this email so I don't know what I would have meant by
12 that. Regarding the he's considered Clyde's twin by
13 some?
14 THE COURT: All right. And again, you know,
15 obviously I can't tell people how to try their cases.
16 You guys are smarter than I am by a bunch, but I do know
17 something about juries and, you know, if -- frankly, if
18 that's the evidence that you're going to rely on, the
19 jury isn't going to get it, first of all, and -- and --
20 they just -- they're not going to find that very
21 persuasive that two years after the fact this woman sent
22 an email which she now can't remember at all claiming
23 that some guy that's working there at that point had
24 made some changes and, therefore, he's considered the
25 twin of Cruz by some and she doesn't know why she said

133

1 that. It's just -- if it's probative at all, it's just
2 so paper thin that a jury I just -- personally, I would
3 focus on the real evidence and not, you know, thin reeds
4 that may exist or -- may or may not exist.
5 No. 23, testimony regarding alleged age
6 discrimination against Nancy Kohagen including, but not
7 limited to, a meeting with Kevin Keith. And the
8 response is plaintiffs do not resist paragraph 23, but I
9 thought I read someplace else where there may be some
10 dispute about Kohagen. Is -- is either party intending
11 to call Nancy Kohagen or Kohagen as a witness?
12 MR. RACETTE: We are not.
13 MS. PELLEGRIN: We are not, Your Honor. I
14 think what you're referring to is defendants have
15 asserted that they have the right to present evidence as
16 to the lack of lawsuits and if they intend to -- to
17 present evidence of the lack of lawsuits, then we
18 believe this opens the door to show the other EEOC
19 complaints that were filed, including Nancy Kohagen. So
20 we do not intend to call her or offer evidence with
21 relationship to her job with Kevin Keith or her EEOC
22 complaint absent them not admitting evidence about the
23 lack of lawsuits.
24 THE COURT: Are the defendants intending to
25 call Nancy Kohagen as a witness?

134

1 MS. HULETT: Your Honor, defendants do not
2 intend to call Ms. Kohagen as a witness, but we do want
3 to note that plaintiffs have not withdrawn plaintiffs'
4 exhibit -- Trial Exhibit 81, which is one of the items
5 that we have asked the Court to exclude in this
6 paragraph.
7 THE COURT: Exhibit 81 is one page. It
8 looks like an email from Wanda Lenius to --
9 MR. RACETTE: Yeah; we don't intend to
10 introduce that, Your Honor. We've been so busy we
11 haven't had a chance to look through these.
12 THE COURT: What about going to the other
13 point that Ms. Pellegrin raised? Are the defendants
14 intending to offer evidence that, you know, we
15 implemented GJE and, you know, these four people that
16 testify here are the only four that have sued us?
17 MR. HARTY: Not evidence that precise,
18 Your Honor, but we do intend to offer evidence that we
19 implemented GJE worldwide and that the plaintiffs in
20 this case were treated the same as 80 percent of their
21 coworkers and they're here.
22 THE COURT: That is, they didn't get raises?
23 MR. HARTY: Right.
24 THE COURT: And again, we talked about that
25 earlier, but that's not really the plaintiffs' argument.

to purchase a complete copy of the transcript.

**135**

1  I mean if I understood Ms. Pellegrin correctly, they're
2  not really even contesting the methodology employed by
3  the Hay group or the GJE concept overall or even the
4  overall results. They're basically saying, if I
5  understand their argument correctly, that in this case,
6  given these supervisors, it was misused as a pretext for
7  age and sex discrimination. And so, you know, whether
8  or not anyone else brought an action or not really
9  doesn't make any difference. But you're not offering
10  any specific testimony that -- you're not going to ask
11  some John Deere witness how many lawsuits have been
12  brought as a result of GJE being implemented?
13          MR. HARTY: No.
14          THE COURT: All right.
15          No. 24, the WWCA audit. I think I'm vaguely
16  familiar with this based on the motions for summary
17  judgment. Apparently, there was an internal audit
18  conducted. I think it may be -- I'm not sure of the
19  time frame, but 2002, 2003 or so and a conclusion was
20  reached that -- that there was a -- a gap in knowledge
21  in the supply management department. The defendants
22  don't want any evidence about that. Who wants to speak
23  to that?
24          MR. HARTY: I'll speak to that, Your Honor,
25  and we'll primarily stand on our brief. The audit

**136**

1  itself doesn't indicate that it has anything to do with
2  the age of anyone. It basically attributes the fairly
3  common problem at Deere to position moves and lack of
4  training. Lack of training is not something that has
5  any correlation in any way, shape or form to age or sex.
6          THE COURT: Has the audit been identified as
7  an exhibit?
8          MR. HARTY: It has.
9          THE COURT: What number?
10          MR. RACETTE: Well, Your Honor, we don't
11  have the audit. We've been requesting it. We've never
12  received it. All we have is a memorandum concerning
13  what the violation is.
14          MR. HARTY: The memorandum has been offered
15  as an exhibit.
16          THE COURT: What number is that?
17          MR. HARTY: Bear with me, Your Honor.
18  Exhibit 6. And then there are emails that are related
19  to it.
20          THE COURT: Plaintiff want to speak to that
21  issue?
22          MS. PELLEGRIN: Yes, Your Honor. Defendants
23  seek that this is excludable based on the face of the
24  document. For one, we believe that there are plenty of
25  documents we haven't received -- the actual audit -- and

**137**

1  I don't believe there are any defense exhibits as to the
2  actual audit, so the only testimony or evidence we have
3  at this point is Mr. Sellers was specifically allowed
4  to address the audit and he has supplied an affidavit in
5  summary judgment and explained that he did address the
6  audit. He understood the reasons behind the audit or
7  the reasons for the violation of the gap in training and
8  experience and he can testify to his personal knowledge
9  related to that.
10          And we think that it's directly relevant to
11  -- to the age of these employees and age discrimination,
12  because what Mr. Sellers found was that Mr. D'Cruz was
13  treating younger employees more favorable; putting them
14  in positions that they were not qualified for and
15  pushing out older employees under the guise of a
16  reorganization that we will definitely hear from
17  defendants in their defense.
18          And just because the face of the document
19  doesn't say age discrimination on it, we believe that
20  the substance behind that audit certainly shows and is
21  corroborating of Mr. D'Cruz' plan to shift older
22  employees in less than desirable jobs in order to
23  discriminate against them and either push them into
24  positions that would force them to retire or that
25  they're not promotional opportunities.

**138**

1          And Mr. Sellers has also provided in his
2  affidavit that when he asked Mr. D'Cruz if they could --
3  his idea of the remedy was we need to put these more
4  experienced, more trained employees who happen to also
5  be older employees back in these positions, Mr. D'Cruz
6  said vehemently that that would not be an option. So we
7  think that it speaks to his discriminatory animus.
8          We think it gives an inside look as to these
9  reorganizations that the defendants are going to claim
10  are relevant and are their defense in this matter and
11  Mr. Sellers has direct and personal knowledge of these
12  -- these events.
13          THE COURT: I'll take a look at the whole
14  audit issue and certainly Sellers can testify as to what
15  Cruz may have said about possible age or sex
16  discrimination. Frankly, I'm going to be a little alert
17  though as to the scope of Sellers' testimony. Sellers
18  obviously is unhappy with John Deere and the way he was
19  treated and his lawsuit and all the allegations made in
20  that, and he can testify as to what his personal
21  knowledge is, but I get the sense, frankly, from reading
22  some of the documents and exhibits and hearing the
23  argument here today that, you know, Sellers acted as
24  sort of an investigator and has now reached conclusions
25  about all kinds of things and wants to get up there and

to purchase a complete copy of the transcript.

---

**139**

1 tell this jury what happened and -- and, you know -- and
2 basically give John Deere what for. And he can
3 certainly testify as to his personal knowledge, but to
4 the extent that he's gone out and done some kind of
5 investigation and has reached certain conclusions,
6 that's going to be a little more problematic.
7      MS. PELLEGRIN: Well, if I may, Your Honor,
8 Mr. D'Cruz has testified that he assigned this audit and
9 it was Mr. Sellers' job duty to actually go and
10 investigate this audit and to determine the reason and
11 to provide remedies, so it was actually part of his job
12 duty at John Deere. This wasn't a personal
13 investigation.
14      THE COURT: And I'm not -- and I'm not
15 saying that -- I haven't made any decisions about the
16 audit or the scope of Sellers' testimony about the
17 audit. I'm just saying that given his -- an
18 opportunity, I get the sense that Sellers would love to
19 just spill his guts to the jury about all the things
20 John Deere did wrong and he's not, you know, going to be
21 given that opportunity.
22      No. 25 I guess; 24 and 25 are related.
23 Twenty-six, testimony regarding communications with Sam
24 Allen. And I've kind of forgotten now. I -- was it
25 Mr. Lenius who communicated primarily with Sam Allen?

---

**140**

1      MS. PELLEGRIN: Mr. Lenius and Mrs. Lenius
2 both sent an email to -- email or emails to Mr. Allen.
3      THE COURT: All right. In any event, it
4 looks like based on the resistance, do not resist.
5      So do both sides agree that the fact that
6 emails were sent to or received from John Allen (sic) is
7 just not part of this case?
8      MR. HARTY: We certainly do, pursuant to our
9 motion, Your Honor.
10      MS. PELLEGRIN: We -- we would stand by our
11 resistance as far as we don't intend to offer any
12 evidence related to Mr. Allen; however, if John Deere
13 opens the door to -- to the corporate human resources
14 investigation, we think that certainly becomes relevant
15 as to what they did or didn't do.
16      THE COURT: All right.
17      No. 27, testimony or evidence regarding
18 Kevin Keith's meeting notice about an employee named
19 Mel. As I understand it, if I recall correctly, there
20 was an employee who was employed by John Deere in I
21 think Des Moines or someplace and was thinking about
22 transferring to Waterloo and -- and I may have this
23 wrong but Cruz allegedly made some statement about why
24 we need this older guy and Keith said something to the
25 effect that you may be exposing ourselves to a claim of

---

**141**

1 age discrimination. Have I got that all wrong or more
2 or less right?
3      MS. PELLEGRIN: That's a general
4 description, yes. I believe that the comments in the
5 response from Kevin Keith are pretty precise as to some
6 of the comments made by D'Cruz.
7      THE COURT: All right. And what was the
8 timing on that incident?
9      MS. PELLEGRIN: May 7, 2004.
10      THE COURT: All right. And defendants argue
11 that that is inadmissible. Somebody want to tell me
12 why?
13      MR. HARTY: We've got it pretty well set
14 forth in the brief, Your Honor, but he makes -- the
15 allegation is that it's somehow evidence of intent, a
16 pattern or practice. It's a -- an individual who by the
17 way was hired at the Waterloo works and is still working
18 there. And the -- to the extent that it's a stray
19 comment, that it has no relevance to the claims that are
20 before this Court.
21      THE COURT: Well, how stray is it when Cruz
22 had been making statements about getting rid of those
23 old farts and we can -- they're sheep that we can shoot
24 and words to that effect?
25      MR. HARTY: He doesn't say that this is an

---

**142**

1 old guy. He doesn't say anything. What this is an
2 email saying hey, I -- I'm writing to --
3      THE COURT: Kevin Keith must have thought
4 that it might be some evidence of age discrimination or
5 at least opening or exposing the employer to that claim.
6      MR. HARTY: He clearly did, but what he
7 interpreted was on its face that the question must have
8 been does Mel have much gas left in his tank and is he
9 carrying baggage and neither one of those are age
10 related.
11      THE COURT: You don't think so? Age left in
12 the tank. What the hell else is he talking about?
13      MR. HARTY: There's a whole bunch of people
14 in the supply management operation there who were young;
15 younger than the plaintiffs who didn't have much gas in
16 the tank.
17      THE COURT: So just burned out basically at
18 a young age?
19      MR. HARTY: It was a graveyard. I mean they
20 were putting the wounded -- the walking wounded at
21 supply management.
22      THE COURT: Don't you think at the least the
23 jury should be entitled to hear those comments and judge
24 for themselves what was meant; whether he was talking
25 about older workers or if he was talking about younger

---

to purchase a complete copy of the transcript.

143

1  workers who just were petered out somehow?
2         MR. HARTY:  Not according to our motion,
3  Your Honor.  No.  We think it's -- it's a stray comment
4  that should not be admissible and that Rule 403 should
5  also keep it out.
6         THE COURT:  I'll take a look at it.
7         No. 28 deals with testimony regarding
8  alleged HIPAA violations, forgeries or other misconduct
9  to Gayle's workers' compensation case.  And it looks
10 like defendant -- or excuse me -- plaintiffs agree that
11 that's not admissible during the liability phase;
12 relevant in the damages phase.  I guess I'm not -- I'm
13 not familiar with what that evidence really is.  As I
14 understood it from the comments earlier today, Gayle
15 Forster filed a workers' compensation claim which was
16 either dismissed or withdrawn or something.  She didn't
17 receive any benefits from it.
18        Are there allegations that John Deere forged
19 evidence or documents in that proceeding or violated
20 HIPAA?
21        MS. PELLEGRIN:  Yes, Your Honor.
22 Ms. Forster believed that her -- her medical release was
23 forged to -- that her signature was cut out of a
24 document and pasted in order to receive medical
25 documents in that action.

144

1         MR. RACETTE:  Your Honor, what happened was
2  in the work comp, under 8527 where both sides have
3  medical releases to give all the claimant's information,
4  I think Mike McEnroe was representing Deere in the work
5  comp claim and I guess signed a waiver in her name and I
6  know Mike.  He's a good attorney and I -- I don't know
7  how it happened, but she was upset, as you could imagine
8  she would be, because she thought her signature should
9  not be placed on a document of a waiver, and anyways,
10 she brought him up on ethical violations.  I don't
11 think, Your Honor, we're going to introduce that so I
12 don't think -- we will probably withdraw that at this
13 point, so I don't have any problem with that.
14        THE COURT:  So 28 is unrested at this
15 point?
16        MR. RACETTE:  Yeah.
17        THE COURT:  No. 29, testimony or evidence
18 regarding Sellers' and Forster's complaints to OSHA.
19 And that is unrested.  So 28 and 29 will be granted.
20        No. 30, testimony or evidence regarding
21 plaintiffs' self-generated histories or timelines of
22 alleged mistreatment.  Are you talking about specific
23 exhibits here?
24        MS. WEST:  Yes, Your Honor.  Actually,
25 paragraph 30 and 31 go together.  It's Plaintiffs'

145

1  Exhibits 12, 13, 14, 27, 28, 29 and 30.  They're
2  documents that were not contemporaneously generated by
3  either of the plaintiffs.  They created them either for
4  their attorney Jay Roberts in their work comp matters or
5  they generated them as correspondence to Shannon Lemke
6  at EEOC.  With respect to Exhibit 14, we know from Wanda
7  Lenius' testimony that that document was something that
8  she and her husband generated a few nights before their
9  depositions.
10        They contain self-serving statements,
11 declarations of what is and isn't age discrimination,
12 hostile work environment, harassment.  It's clearly
13 hearsay.  The plaintiffs, if they want to testify about
14 it, can answer questions.  These are documents that
15 should not go back to the jury.
16        MR. RACETTE:  Your Honor, we don't object to
17 that.  We agree that those documents can only be used to
18 refresh their recollection and not be admitted unless it
19 was some other exception that would come up during the
20 course of testimony.
21        THE COURT:  Does the defendant concede that
22 if a witness testifies they can't remember, that you can
23 refresh their recollection with any document prepared by
24 anyone?
25        MR. HARTY:  Can I just chime in here?  Yes.

146

1  Anything to refresh their recollection, but could I ask
2  for some guidance from the Court on once that is
3  presented and then it will be removed and they'll have
4  to then testify without the document?
5         THE COURT:  Yeah.  The technical procedure
6  is that first the witness has to testify that they can't
7  recall and then they generally are asked, you know,
8  would your memory be refreshed if I provide you with the
9  document and they say yes, maybe or whatever and you
10 hand them the document.  They review it.  The question
11 is has your memory been refreshed?  Yes, it has.  The
12 document is retrieved and then the witness testifies as
13 to their recollection refreshed.  They can't simply read
14 the document or read off the document.
15        MR. HARTY:  Thank you, Your Honor.  I
16 assumed that's how the Court did it.  And then with
17 regard to the rule, it's pretty clear I think we could
18 offer it, but -- but -- as an adverse party, but they
19 could not.
20        THE COURT:  I think that's right; that if --
21 if a party uses a document to refresh their
22 recollection, the other side is entitled to see it,
23 first of all, if they haven't seen it before, and then I
24 think in most circumstances would be permitted to offer
25 it so that the jury would know what the witness referred

Case 6:12-cv-02063-JSS   Document 214-19   Filed 02/18/25   Page 38 of 85
to purchase a complete copy of the transcript.

147

1  to in order to refresh their recollection.
2        MR. HARTY:  Thank you, Your Honor.
3        THE COURT:  All right.  No. 32, testimony or
4  evidence regarding Kevin Keith's investigation of
5  complaints of discrimination.  What's the defendant
6  driving at here?
7        MR. HARTY:  Your Honor, this is like a
8  number of the other documents that were generated long
9  after these complaints were made.  We don't think it's
10  relevant.  We think what is relevant is what occurred
11  during GJE, but the plaintiffs want to continually offer
12  evidence of either Deere's failure to adequately conduct
13  an investigation or failure to -- to respond to what the
14  defendants -- or the plaintiffs think should have been a
15  -- the proper response.  It -- it's no different in our
16  opinion than offering our answer in this case or
17  criticizing us for not simply admitting that there was
18  discriminatory conduct.
19        THE COURT:  Do you have specific exhibits
20  that you believe fall within that category?
21        MR. HARTY:  Yes, Your Honor; 50 to 54.
22        THE COURT:  Plaintiffs' response?
23        MS. PELLEGRIN:  Well, we certainly think
24  that the investigation by Mr. Keith immediately
25  thereafter of the mapping and our clients' bringing to

148

1  his attention that they believed they were discriminated
2  against, the investigation that he did participate in,
3  any evidence that would reveal that there was
4  discrimination and corroborate that would certainly be
5  relevant to our claims.  And any investigation that he
6  didn't do would go to pretext and whether they're trying
7  to hide discrimination, so I think these are -- are
8  crucial to our case and -- and very relevant.
9        THE COURT:  I'll take a look at it.
10        Exhibit -- or excuse me -- paragraph 33,
11  Forster's disputes with Matson about vacation requests
12  and travel authorization for supplier visits.  As I
13  recall, these did predate May of 2004; is that correct?
14        MR. HARTY:  They do, Your Honor.
15        THE COURT:  Do you wish to be heard?
16        MR. HARTY:  Our brief speaks to it,
17  Your Honor.  I will -- if I might, I wanted to add to
18  the last with regard to 32, I also wish to include trial
19  Exhibit 25 and 55 through 63A.
20        THE COURT:  Would you say those again for
21  me?
22        MR. HARTY:  I'm sorry, yes; 25 and then 55
23  through 63 and I think they've got a 63A.  Is that
24  right?  No; just 55 through 63.
25        THE COURT:  Ms. Pellegrin, do you wish to be

149

1  heard on the issue of the vacation requests and travel
2  authorization?
3        MS. PELLEGRIN:  I believe our brief sums it
4  up.  Both of these issues occurred before GJE.  They
5  speak to Mr. Matson's disparate treatment of females in
6  his department and we believe this is directly relevant
7  to our claims of disparate treatment.
8        THE COURT:  No. 34, testimony or evidence
9  regarding alleged destruction of Forster's personal
10  property and the plaintiffs concede that's inadmissible
11  during the liability phase and argue that it's relevant
12  during the damages phase.  Either of you wish to be
13  heard further on that subject?
14        MR. HARTY:  Our brief.  Stand on our brief,
15  Your Honor.
16        MS. PELLEGRIN:  I believe that you
17  understand our position on the admissibility and the
18  damages phase as to the extent of her -- her damages.  I
19  do believe that that occurred shortly after she left,
20  but I don't know the exact date off the top of my head,
21  but there may be some temporal significance there.
22        THE COURT:  No. 35, evidence regarding
23  retired employee Michael Grady.  Who's Michael Grady?
24        MR. HARTY:  He's somebody apparently at one
25  point expressed the opinion that he thought older people

150

1  weren't being treated as nicely as younger people.
2        THE COURT:  Is Michael Grady going to
3  testify?
4        MR. RACETTE:  Yeah; he worked there during
5  the time of both Gayle -- he, in fact -- I can't
6  remember, Judge, right now if he worked with her in OFP
7  as well as in PDP.  I can't recall at this stage, but
8  yeah, he would testify that he felt D'Cruz and Matson
9  favored the younger people over the older people and did
10  observe that himself.
11        THE COURT:  Any response?
12        MR. HARTY:  Yeah; he didn't work with them,
13  Your Honor.  He wasn't in the same department.  These
14  are his casual observations and it would be no more
15  relevant than if I were to offer an opinion like that.
16        THE COURT:  Well, as I indicated earlier, I
17  think witnesses can testify as to their personal
18  knowledge and in weighing how much weight to give a
19  witness' testimony, the jury will consider, I guess, the
20  source of the knowledge and how -- you know, how --
21  whether they really know what they're talking about or
22  whether they're just, you know, shooting from the hip or
23  something.  So I guess I'll have to wait for the
24  questions and the answers probably on Michael Grady, but
25  if he was there at the time, I'm assuming he can

Visit www.LexitasLegal.com
to purchase a complete copy of the transcript.

151

1    testify.
2          No. 36 is Rachelle Beuter.  As I recall,
3    Ms. Beuter was a younger woman who worked in the
4    department.  Originally was not mapped to go from
5    6 to 7; however, at just about the time this was being
6    implemented, she got a promotion to a different job and
7    ended up on pay Grade 7.
8          Anybody want to say anything else that's not
9    in their briefs?
10         MR. HARTY:  I'll just simply summarize by
11   saying we can spend an afternoon explaining exactly what
12   happened, but we shouldn't have to because the
13   plaintiffs have repeatedly characterized the promotion
14   of Rachelle Beuter as nothing but an act of retaliation.
15   That is the company thumbing their nose at these older
16   women by promoting a -- a -- what they called one of
17   Charlie's angels; a pretty young female and that's not
18   what's at issue in this case, Your Honor.
19         MR. RACETTE:  Your Honor, it goes directly
20   to proving in this case the pretextual nature of their
21   defense.  It's one of the key pieces of evidence we'll
22   show in this case how Matson and D'Cruz manipulated the
23   entire department to keep and hold these ladies back
24   while promoting each and every one of the young people
25   in there who had less experience in the same job and did

152

1    it right immediately after she was graded 6 turned her
2    into a 7 himself and took an older man that was in her
3    place involving what they have admitted were noncomplex
4    commodities and put her in the 7 and gave her an
5    assistant.  It doesn't have anything to do with
6    retaliation in my mind whatsoever.
7          THE COURT:  Again, I'm not ruling on
8    anything -- any of these motions today, but the events
9    that surrounded the implementation of GJE even if they
10   maybe were not directly related to GJE I suspect are
11   going to be admissible.  And as I recall, the timing of
12   this is such that the younger woman did get a promotion
13   at about the same time that two older women were the
14   only persons in their department that didn't get raised
15   from pay Grade 6 to pay Grade 7, and I would expect that
16   that probably is going to be admissible and the jury can
17   decide how -- how important they think it is.
18         No. 37, testimony or evidence regarding
19   Wanda Lenius' promotion and replacement of Cathy Klein
20   in October of 2003.
21         MS. HULETT:  Your Honor, defendants have
22   decided to withdraw this point based on plaintiffs'
23   argument.
24         THE COURT:  All right.  So you concede that
25   Wanda Lenius can be questioned regarding her work

153

1    history at John Deere, including this promotion and
2    replacement?
3          MS. HULETT:  Yes.
4          THE COURT:  No. 38, testimony or evidence
5    relating to post-GJE communications regarding any
6    investigation into mapping decisions, which I guess is
7    similar to No. 32.  Is there -- are there specific
8    exhibits that you're referring to there or other
9    investigation other than that conducted by Kevin Keith?
10         MR. HARTY:  Trial Exhibit 72 through 77,
11   Your Honor.
12         THE COURT:  Was there any investigation
13   conducted by anyone other than Kevin Keith or are you
14   implying or referencing any other testimony other than
15   what Kevin Keith might have to say or the exhibits
16   you've identified?
17         MR. HARTY:  We're referring to those
18   Exhibits 72 through 77, and it's the same argument,
19   Your Honor.  And that is that whether or not an
20   investigation was conducted after the fact, the scope of
21   the investigation is not at issue in this case because
22   now that the retaliation claims are gone, it's
23   irrelevant.
24         THE COURT:  Any additional argument on that
25   point?

154

1          MS. PELLEGRIN:  Your Honor, the exhibits
2    they reference are an investigation performed by Linda
3    Hibben I believe is what those exhibits include.  These
4    emails describe specifically the complexity of the
5    commodities; why did you map this person to this
6    commodity?  It describes the exact issues and speaks
7    directly to pretext, so I don't know how the defendants
8    can get around the relevance argument there.
9          THE COURT:  I'll take a look at it.
10         No. 39, evidence regarding documents
11   recently disclosed by plaintiffs.  What documents are
12   you referring to?
13         MR. HARTY:  I don't even know, Your Honor.
14   Oh, Trial Exhibit 87.  Oh, yeah.  This is something --
15   they have Mike -- Mike -- Mike Sellers testified he's
16   got books and books and books of documents and he was
17   always going to get them to us.  He never did.  Frankly,
18   we didn't work too hard to get them because we thought
19   they would look a heck of a lot like the -- I think he
20   said in his deposition he had 20 to 30 binders.  We
21   thought what we would end up with was more of the stuff
22   like Exhibit 86 and 87, which is not much use.
23         And the only reason frankly that we included
24   this was because the plaintiffs made an issue concerning
25   the late production of some of our stuff, but also

to purchase a complete copy of the transcript.

155

1  because this is a document that even on its face is not
2  -- one, it's not a Deere document.  Two, it's not
3  complete if it is a Deere document.  And three, it's --
4  it doesn't appear to fall within any of the hearsay
5  exceptions.
6          THE COURT:  Response?
7          MR. RACETTE:  Your Honor, quite frankly, we
8  made this up for easy demonstrative document for the
9  jury to see the people involved in this case and the
10  hierarchy we're talking about.  That's all it is.  So I
11  -- I don't know why they would object.  There's many
12  documents that will be -- we might use.  It's just clear
13  and more succinct and would give the jury a better
14  chance to understand really exactly the people that are
15  involved in this case as opposed to some of the other
16  documents that include more that are actually involved
17  in this case.  That's all it is.
18          MR. HARTY:  If I may, Your Honor, if that's
19  -- that's the same character of the -- the pictures of
20  the components and the other things that we produced.
21  If it didn't exist prior, I understand.  So we don't --
22  we wouldn't -- as long as we're treated the same, we
23  wouldn't object to that.
24          THE COURT:  No. 40, testimony or evidence of
25  alleged age-related comments by Clyde D'Cruz.

156

1          MR. HARTY:  We've briefed it, Your Honor.
2  We've briefed it.  It's the stray comment argument.
3  We've briefed it.  We think we'll be able to establish
4  that D'Cruz --
5          THE COURT:  The no gas left in the tank one
6  you're talking about?
7          MR. HARTY:  It would include that and
8  others.
9          THE COURT:  All right.
10          No. 41, evidence relating to laches.  I
11  think we've already talked about that.  Anything else
12  you wanted to add to that?
13          MR. HARTY:  No, Your Honor.
14          THE COURT:  All right.  I think that does it
15  with respect to the plaintiffs' motion in limine.
16  That's two motions down.  Only four to go.  Here's what
17  I would like to do.  It's five after four.  I've got a
18  hearing at 4:30 that's just going to take a short period
19  of time, but -- like maybe 10 minutes.  Between now and
20  4:30, I want to sort of switch gears into more of
21  pretrial conference mode and talk about some of the sort
22  of trial issues so that we kind of cover that for sure.
23          And then when we get to 4:30, we can talk
24  about how we want to submit the rest of these motions;
25  whether -- the other motions, I think, are more focused

157

1  on just sort of one or two issues so I think they may go
2  faster.  So we can either argue those yet today,
3  tonight.  I'm willing to stay as long as it takes or we
4  can reset the hearing on those motions for later this
5  week or next week and we can talk about whether or not
6  we think we could accomplish that telephonically or not.
7          But let's kind of switch to final pretrial
8  conference here and talk about issues relating to the
9  trial.  And what I would like to do is look at the
10  proposed final pretrial order and talk about witnesses
11  and exhibits.
12          I assume you guys have got copies of your
13  proposed final pretrial order?
14          MR. RACETTE:  I don't think we brought it,
15  Your Honor.  We thought we had it, but we evidently
16  don't.
17          THE COURT:  All right.  Well, let's talk
18  about witnesses anyway.
19          MR. RACETTE:  Sure.
20          THE COURT:  Plaintiffs have listed Gayle
21  Forster and Greg Forster and Wanda Lenius and Gary
22  Lenius, and all four of those folks will appear in
23  person.  Are the plaintiffs going to be here for the
24  entire trial or are they going to come and testify and
25  leave or what's their plan?

158

1          MR. RACETTE:  They plan to be here,
2  Your Honor.
3          THE COURT:  And it would be Ms. Lenius and
4  Ms. Forster then sitting at counsel table?  Shaking your
5  head yes.
6          MR. RACETTE:  Yes; I'm sorry.
7          THE COURT:  And all three of you are going
8  to be here and participate in the entire trial?
9          MR. RACETTE:  Yes, Your Honor.
10          THE COURT:  Okay.
11          MR. RACETTE:  We'll have a paralegal as
12  well, Your Honor.
13          THE COURT:  Okay.  You also have listed
14  Michael Sellers who will testify in person, and then you
15  have Brian Matson, Clyde D'Cruz and Kevin Keith; the
16  three individual defendants in this case.  Are the
17  individual defendants going to be here during the entire
18  trial?
19          MR. HARTY:  They are, Your Honor.
20          THE COURT:  And I assume you can guarantee
21  their attendance.  It's not necessary for the plaintiffs
22  to subpoena them to appear?
23          MR. HARTY:  We will, Your Honor.
24          THE COURT:  Is there someone who's going to
25  appear as corporate representative for John Deere?

to purchase a complete copy of the transcript.

159

1    MR. HARTY:  Sheryl Friend, Your Honor, and
2   she's also on the witness list.
3         THE COURT:  Okay.  Are all you folks going
4   to be here for the trial?
5         MR. HARTY:  We are not, Your Honor.
6         THE COURT:  Who's going to be here?
7         MR. HARTY:  Ryan and Fran did a lot of the
8   work on these pleadings because we've been tied up with
9   other things, so it will be Ms. West, Ms. Hulett and
10  myself here at trial.
11        THE COURT:  Mr. Meier going to appear at
12  trial?
13        MR. MEIER:  Yes, Your Honor.
14        MR. HARTY:  Yeah; he's going to be here.
15        THE COURT:  So four counsel and four
16  defendants.
17        MR. HARTY:  Yes.
18        THE COURT:  And again, you folks will be
19  right there, so I guess you'll figure out how to
20  configure yourselves.  Incidentally, today I wasn't very
21  picky about having you talk into the microphones, but at
22  the time of trial, it is important that you speak into
23  the microphone.  These microphones are actually very
24  directional.  As I'm speaking, it's picking me up, but
25  if I turn it halfway around, right now, it's probably

160

1   not really picking me up.
2         Obviously we have a reporter here.  I assume
3   probably Kay is going to report the trial.  But in
4   addition to that, everything we do in the courtroom is
5   recorded under FTR Gold.  It's an audio recording system
6   and if you're not speaking into the microphone, it
7   doesn't pick you up at all.
8         When you're -- when you're speaking or
9   questioning witnesses, you can either stay at your desk
10  or you can go to the podium; whichever your preference
11  is.  But again, it's necessary that you have a
12  microphone in front of you when you're doing your thing.
13        During the jury selection process and during
14  opening and closing -- or opening statement and closing
15  argument, you're permitted to enter the well in front.
16  And on those occasions, we have a lavaliere mic that you
17  can stick to your clothing so that, again, you are not
18  only picked up so that people in the room can hear you,
19  but in addition so that we can make a recording.
20        Incidentally, before I forgot, I don't
21  require attorneys to ask permission every time they
22  approach a witness to hand them an exhibit, for example,
23  but obviously I trust that you give them the exhibit and
24  then don't hover over them as you're questioning them,
25  particularly if it's an adverse witness.  So basically

161

1   you can go up to the witness stand, give them an exhibit
2   and then go back to where you're at without permission.
3   Again, keep in mind that it's natural that, you know,
4   you've got an exhibit you want to hand up and so you're
5   walking up to the front and you say, you know, Mr. So
6   and so I'm handing you Exhibit 48.  Well, none of that
7   gets picked up, so you can't sort of be speaking as
8   you're moving between places.
9         In any event, going back to the witness
10  list, we have Linda Hibben by deposition.  Is that
11  deposition -- I've already forgotten.  Who is Linda
12  Hibben again?
13        MR. RACETTE:  Linda Hibben is the person who
14  was assigned to investigate how the mapping was done
15  after the fact.
16        THE COURT:  She's an employee of John Deere?
17        MR. RACETTE:  Yeah.
18        THE COURT:  And you've taken her deposition?
19        MR. RACETTE:  Yes.
20        THE COURT:  And you're intending to offer
21  some of it or all of it?
22        MR. RACETTE:  I think at this point we
23  haven't gone over it, but most of it I would think.
24  We've got it here today to give to you.
25        THE COURT:  Was it a video deposition?

162

1         MR. RACETTE:  I can't remember.
2         MR. VINT:  It was not, no.
3         THE COURT:  It was not?
4         MR. VINT:  No.
5         THE COURT:  Do the defendants have any
6   objection to the use of the deposition generally?  I
7   mean I understand your argument it's irrelevant and
8   whatever, but as opposed to Linda Hibben testifying, do
9   you have any objections to her deposition testimony?
10        MR. HARTY:  Not to the general deposition,
11  Your Honor.
12        THE COURT:  All right.  What I'm going to
13  require is that the plaintiffs identify by page and line
14  those pages which you intend to offer at the time of
15  trial and that you provide that to the defendants not
16  later than this Friday.  And that the defendants then
17  identify any additional pages and lines which they would
18  intend to offer, assuming the Court, you know, permits
19  the testimony at all, and also indicate objections that
20  you have; either an objection to the whole thing or
21  objections to specific parts of it or whatever it may
22  be.  And then provide that to me by, let's say,
23  Wednesday of next week and that way, I'll have that in
24  hand by the end of the week so that I can take a look at
25  it before we get to the trial.

to purchase a complete copy of the transcript.

163

1    MR. RACETTE: I assume, Judge, you want us
2 to supply you with our Friday filing as well?
3    THE COURT: Yes. You can provide that to
4 me. And you said you've got a hard copy of the
5 deposition for me today?
6    MR. RACETTE: I think so.
7    THE COURT: Okay. Next we have Dr. Piburn
8 in person. It's indicated that he will be a phase one
9 witness. As I've indicated, I have real doubts as to --
10    MR. RACETTE: No, Judge; it will be phase
11 two.
12    THE COURT: Okay. Dr. Harding, same
13 thing --
14    MR. RACETTE: Yes, yes, yes.
15    THE COURT: -- I assume? And they're going
16 to both be here live; is that right?
17    MR. RACETTE: Yes.
18    THE COURT: Kimberly Vetter, who is a
19 physician's assistant. You have her shown as phase one.
20 Are you now conceding she's phase two?
21    MR. RACETTE: I think that's what we wanted
22 to call it, Your Honor, but you made some arguments
23 saying that that wasn't likely, but we still would like
24 a ruling on that I guess.
25    THE COURT: The -- and I'll take a look at

164

1 it. I think that's listed someplace in the motions, but
2 again, I don't discourage anyone from making whatever
3 record they think they need to make, so if you need to
4 make a record outside the presence of the jury then let
5 me know so we can try to schedule that somehow.
6    Michael Sandberg is a phase two witness.
7 He's the economist. And I know that there are motions
8 pending on all these experts. Michelle Wilson, James
9 Aten, Richard Brammer, Michael Grady, are all phase one
10 witnesses who will appear in person; is that correct?
11    MR. RACETTE: At this point, yes,
12 Your Honor.
13    THE COURT: Valeria Mead and Judith Berkley
14 are phase two witnesses who will appear in person;
15 correct?
16    MR. RACETTE: Yes. They're Deere employees.
17 They said they will produce them.
18    THE COURT: Are you going to produce those
19 without subpoenas?
20    MR. HARTY: We will if we were given
21 48 hours notice in advance to do so, Your Honor. That's
22 what we offered.
23    THE COURT: Incidentally, again, I just want
24 to make sure I cover this before I forget. I had not
25 originally anticipated this case would take that long

165

1 and I think it was before I probably consolidated them
2 as well, but the third week of trial, I'm going to be
3 gone that Friday and the entire following week and the
4 following Monday after that. In other words, I'm going
5 to be gone for 10 days down to Twins spring training
6 down in Fort Meyers. They're going to give me a
7 workout. They're looking for a left fielder and I don't
8 have as much power as I used to, but the speed is still
9 there.
10    So frankly, this is my hope. If it works
11 out timing wise, it will be something of a miracle, but
12 my thinking is that we start the liability phase two
13 weeks from today. We go -- we've got, you know,
14 two-and-a-half weeks at least to get that submitted and
15 then my -- if it all worked out just right, we would
16 finish the liability phase and then if the jury returns
17 a verdict finding that there's liability, we come back
18 after my break with damage -- with the damages aspect of
19 it. And there are some advantages to that. We would
20 have the same jury, but hopefully they haven't, you
21 know, forgotten the testimony they've heard if they're
22 only gone for a week or two.
23    It also gives the parties an opportunity to
24 sort of gear up all of your damages witnesses and get
25 those folks scheduled and get them ready to go and so

166

1 forth. And plus, you know, if we go two-and-a-half
2 weeks on liability, the jury is probably going to want a
3 little break before they hear another week's worth of
4 testimony on damages.
5    My intention is when we pick the jury that
6 I'm going to tell them that it's a bifurcated trial and
7 I'm not going to try to predict how long each phase is
8 going to take, and I don't think I'm really going to
9 tell them that I'm going to be gone after the third week
10 either. I think I'm just going to tell them what I tell
11 all juries and that is that it's difficult to predict
12 how long a case is going to take to try. Sometimes
13 cases come in faster than what we expect. Sometimes
14 they come in slower.
15    I'm going to tell them that we think this
16 case is going to take at least two weeks to try. It
17 could take up to four weeks to try, so they just
18 generally know that they're not going to be done in a
19 week. And -- and then if, in fact, it takes four weeks
20 I guess they've been forewarned and if it only takes two
21 weeks, then that's all it takes. So that's my sort of
22 general idea. Again, I don't know how well that's going
23 to work out timing wise, but that's sort of the
24 preliminary plan.
25    Getting back to witnesses; Shannon Lemke.

Case 6:12-cv-02063-JSS   Document 214-1 Filed 02/18/25   Page 43 of 85
Document 214-19-1 Filed 02/18/25 com
to purchase a complete copy of the transcript.

167

1   As I understand it, she can't be subpoenaed and EEOC
2   isn't going to let her testify and so she won't be here?
3       MR. RACETTE:  Exactly.
4       THE COURT:  And then Sheryl Friend -- who's
5   Sheryl Friend again?  Sheryl Friend; who is she?
6       MR. VINT:  Sheryl Friend I believe was a
7   Deere employee and she's actually going to be Deere's
8   representative at trial.  We had intended to introduce I
9   think it's about one paragraph of her deposition,
10  Your Honor.  It's no more than a page.
11      THE COURT:  Okay.  I want you to follow the
12  same procedure I identified previously.  If you intend
13  to offer any of the deposition, identify it by page and
14  line; send notice to the defendants and then they can
15  indicate if they have any objection to that and then
16  I'll receive that and I'll have that prior to the trial.
17      Looking at defendants' witnesses, we have
18  James Albro, who's an employee of Deere as a conditional
19  witness; will testify depending on how I rule on certain
20  evidentiary issues.  And if he testifies, I take it he's
21  live at trial?
22      MR. HARTY:  Yes, Your Honor.
23      THE COURT:  And Chelsey Allaman, who is a
24  Deere employee.  She'll testify live; is that right?
25      MR. HARTY:  We're going to withdraw her,

168

1   Your Honor.
2       THE COURT:  So she's not testifying?  Dan
3   Allen.  Is he going to testify live?
4       MR. HARTY:  Yes, Your Honor.
5       THE COURT:  James Aten.  That was one of
6   those folks that was identified by the plaintiffs.  So
7   is Deere going to -- he's a Deere employee; is that
8   right?
9       MR. HARTY:  No; he's retired, Your Honor.
10      THE COURT:  Is Deere going to --
11      MR. HARTY:  We're going to provide testimony
12  for our --
13      THE COURT:  So you're not going to provide
14  him for plaintiff's case though?
15      MR. HARTY:  I don't think we can guarantee
16  him though.
17      THE COURT:  So heads up, plaintiffs, if you
18  want Aten here during your case in chief, you have to
19  make sure that he's been subpoenaed to appear.
20      MR. VINT:  I believe he has been,
21  Your Honor, or at least we're in the process of doing
22  so.
23      THE COURT:  Rachelle Beuter still an
24  employee of Deere.  You're going to provide her; is that
25  right?

169

1       MR. HARTY:  We'll guarantee her attendance,
2   Your Honor.
3       THE COURT:  Richard Brammer.  It says
4   defendants are unable to guarantee that he will appear
5   as a live witness at trial.  May need to present his
6   testimony by deposition.  Was he one of those that was
7   the subject of that motion we heard earlier about he's
8   in Florida or someplace?
9       MR. HARTY:  No.  He had what was that?  He
10  had knee replacement surgery, Your Honor, and that's why
11  we just don't know if --
12      THE COURT:  So you're going to claim he's
13  unavailable then?
14      MR. HARTY:  Yes.
15      THE COURT:  Okay.  Well, again, make sure
16  you communicate with the plaintiffs and if you're
17  intending to offer any of his deposition, indicate it by
18  page and line and if the plaintiffs have any objection,
19  then they should respond by the following Wednesday so I
20  can take a look at that.
21      Debbie Burzynski.  Is she going to testify
22  live?
23      MR. HARTY:  Yes, Your Honor.
24      THE COURT:  Stephanie Christensen live?
25      MR. HARTY:  Yes, Your Honor.

170

1       THE COURT:  I guess we can just keep going
2   down the list here.  Gary Dangelser.  Was he one of
3   those that was the subject of that prior motion?
4       MR. HARTY:  He was.
5       THE COURT:  And he's going to be here and
6   testify?
7       MR. HARTY:  We're getting him here.
8       THE COURT:  Clyde D'Cruz, of course, will be
9   here throughout the trial.  Richard Fauser?
10      MR. HARTY:  He will be live.
11      THE COURT:  Okay.  Rhonda Frerichs?
12      MR. HARTY:  She'll be live.
13      THE COURT:  Just going down the list here.
14  Sheryl Friend is the corporate representative.  Jerome
15  Gehrke, Joseph Goodwin, Timothy Hartz; are those all
16  going to be appearing live?
17      MR. HARTY:  All live, Your Honor.
18      THE COURT:  Linda Hibben I think the
19  subject of that prior motion.  She's in Florida; will
20  not be appearing; is, as I understand it, conceded to be
21  unavailable, and, therefore, you should identify the
22  page and lines that you intend to offer and follow the
23  procedure I've described.
24      MR. HARTY:  Can we just go ahead and
25  cross-designate with them, Your Honor?

to purchase a complete copy of the transcript.

171

1          THE COURT:  Cross-designate?

2          MR. HARTY:  We don't have to -- if we --

3    when they designate and we cross-designate in our

4    objections, is that enough?  We don't have to do it

5    separately a second time, do we?

6          THE COURT:  No; if I understand what you're

7    telling me.

8          MR. HARTY:  All right.

9          MR. RACETTE:  There's only one dep, Judge.

10          THE COURT:  Pardon me?

11          MR. RACETTE:  There's just one dep; one

12    deposition.

13          THE COURT:  One for you guys?

14          MR. RACETTE:  Of Hibben, yeah.  I think what

15    you mean, Frank, is you mean that once you give us

16    yours, that's it.

17          MR. HARTY:  That's it.  You won't be

18    expecting anything -- once we get ours on Wednesday,

19    that -- objections and cross-designations, we're good;

20    is that right?

21          THE COURT:  Yeah; I'm not sure I'm following

22    you guys.  But what my intention here is that trial

23    starts two weeks from today.  On this Friday, to the

24    extent that either party intends to offer any deposition

25    for substantive purposes -- I mean you can always I

172

1    guess impeach somebody during the course of the trial,

2    but when you're offering them in lieu of their

3    testimony, by this Friday you let the other side know

4    what depositions you intend to offer and what parts of

5    it.

6          And incidentally, I would encourage the

7    parties not to simply just designate the whole

8    deposition if you don't have to.  My experience has been

9    at least that no matter how good the lawyers are, you

10    can go through the deposition and half of the stuff you

11    can just throw out because it's either irrelevant or

12    it's duplicative or it's a bunch of hemming and hawing

13    or whatever it is and that's the beauty of a deposition

14    is just go through and -- and, you know, mark the meat

15    of it and leave out all of the fat.

16          And so if you notify the other side by

17    Friday what you intend to offer, then by the following

18    Wednesday, which is just the Wednesday before the start

19    of trial, the other side will say we're objecting to

20    this and that and the other thing, but if this comes in,

21    we're offering in addition to what you identified these

22    pages and lines in order to put it in some kind of

23    context or whatever.  And that way, you'll both know

24    before you get to the trial what's being offered, what's

25    being objected to, and more importantly, I'll know it as

173

1    well so I can make some rulings on that.

2          Any questions about that, Mr. Racette?

3          MR. RACETTE:  No.

4          THE COURT:  Any questions about that?

5          MR. HARTY:  I probably made my question more

6    confusing.  We can just offer that deposition testimony

7    during their case in chief when they do; right?

8          THE COURT:  Yes.

9          MR. HARTY:  Okay.  That's all I wanted to

10    know.

11          THE COURT:  To the extent a deposition is

12    offered, we'll offer all parts of it --

13          MR. HARTY:  Thank you.

14          THE COURT:  -- and just as if the witness

15    had testified, and for the most part that's probably

16    what we'll do with live witnesses too, although I think

17    the defendant reserves the right to call them back

18    later.  In other words, if plaintiffs call D'Cruz, you

19    can go ahead and ask him questions and typically we

20    don't restrict it to the scope, although here the scope

21    is going to be pretty broad when you start talking

22    about, you know, what -- the events that happened.  But

23    in addition, if you want to reserve the right to re-call

24    them during your case, you can do that.

25          Are the plaintiffs going to be objecting to

174

1    scope questions on cross-examination?

2          MR. RACETTE:  No.  That's fine, Judge.

3    Whatever you think is good.  And I assume usually what

4    we have -- we'll have someone read it in; we'll put a

5    witness up there.

6          THE COURT:  Right.  We'll put either one of

7    the other attorneys or somebody to read it in and then

8    you play your own parts as far as reading it.  And the

9    scope questions are particularly important if we have a

10    witness who is not a party.  In other words, if

11    plaintiffs call somebody, you know, we wouldn't want to

12    object as to scope and then make that person come back

13    during the defendants' case.  We'll just get it all in.

14          MR. RACETTE:  Yeah.  And I assume if I call,

15    you know, one of the defendants to testify, I can

16    cross-examine him as opposed to, you know, because

17    they're an adverse witness rather than --

18          THE COURT:  Yeah; if they're a party

19    defendant I usually allow, you know, greater leading.

20          All right.  Let's try to get through this

21    witness list and then I've got a hearing.

22          Actually, we're not going to get through

23    this witness list because it's too long, plus I want to

24    talk to you briefly about the exhibits and then I want

25    to talk to you about what we're going to do about the

Case 6:12-cv-02063-JSS    Document 214-19   Filed 02/18/25    Page 45 of 85
to purchase a complete copy of the transcript.

175

1 other pending motions.
2 So I've got a hearing. It should not take
3 more than 10 minutes and the beauty of the new
4 courthouse -- and it really is a beautiful courthouse --
5 but the nice part about it is Judge Reade and I both
6 have two courtrooms available to us. She's down on the
7 second floor. She has a courtroom that's almost
8 identical to this one and then right next-door to her
9 and I've got this one and the one right next-door to me,
10 so during the course of the trial, I'm going to be
11 having hearings during the lunch hour and at 4:30 and so
12 forth. You'll be able to leave your stuff out and even
13 at night you don't have to take it with you -- the
14 courtroom is locked -- because I'll do everything else
15 in Courtroom No. 2. Or actually it's Courtroom No. 4.
16 It's the second courtroom on this floor.
17 So that's what I'm going to do right now.
18 So you guys can take a short break. I'm going to go
19 down to the other courtroom; do my little criminal
20 hearing and then I'll be back and we'll see what else we
21 can get accomplished today.
22 (Recess at 4:28 p.m., until 4:45 p.m.)
23 THE COURT: I would like to finish talking
24 about these witnesses so that we're all clear on who's
25 going to be here and who isn't and then talk briefly

176

1 about the exhibits and then we'll talk about sort of how
2 we're going to get some of the rest of this stuff
3 submitted.
4 Going to the witness list, I've kind of
5 forgotten where we're at. I think we were -- have we
6 talked on page 13 of the proposed final pretrial order
7 No. 18, Daria Jerauld? Did we talk about her?
8 MR. HARTY: She was the next one,
9 Your Honor.
10 THE COURT: Is she going to testify live?
11 MR. HARTY: She is. She's going to be here
12 live, Your Honor. Was there a problem with her? Okay.
13 Yeah; she's got some serious health issues, but yeah,
14 she's going to be here.
15 THE COURT: All right. How about Dennis
16 Jost or Jost?
17 MR. HARTY: Live.
18 THE COURT: Jennifer Kean?
19 MR. HARTY: Live.
20 THE COURT: Kevin Keith, of course, is a
21 party who will be here the entire trial. Keri Kinney?
22 MR. HARTY: Live.
23 THE COURT: Thomas Knoll?
24 MR. HARTY: We're going to withdraw Knoll.
25 THE COURT: So he's not going to testify?

177

1 MR. HARTY: Not going to testify.
2 THE COURT: How about Robert Krogh?
3 MR. HARTY: He's going to be here live.
4 THE COURT: Tamara Kulas?
5 MR. HARTY: She'll be here live.
6 THE COURT: Brian Matson? He's a party.
7 Richard McAnally will testify as a damages witness, so
8 he won't testify during the liability portion?
9 MR. HARTY: No, Your Honor.
10 THE COURT: Michael McGonegle?
11 MR. HARTY: Remember he's the one we had
12 talked about his -- his schedule and the fact that he
13 would have to testify during the first week of trial and
14 I think -- I think Greg had said that was okay. We can
15 call him out of order during their case on Friday.
16 THE COURT: So he's going to testify live
17 out of order?
18 MR. HARTY: Yes.
19 THE COURT: Is that okay, Mr. Racette?
20 MR. RACETTE: That's fine, Your Honor.
21 THE COURT: Matthew Natvig?
22 MR. HARTY: He'll be here live.
23 THE COURT: James Olson?
24 MR. HARTY: Live.
25 THE COURT: Dr. David Price. Is he your

178

1 economic expert?
2 MR. HARTY: Damages. He's a psychologist,
3 Your Honor.
4 THE COURT: Okay. And he'll be live during
5 the damages phase?
6 MR. HARTY: Yes, Your Honor.
7 THE COURT: James -- or Jamie Reinke?
8 MR. HARTY: Live.
9 THE COURT: Dale Schulte?
10 MR. HARTY: Live.
11 THE COURT: Glen Schwab?
12 MR. HARTY: Live.
13 THE COURT: Richard Sperling?
14 MR. HARTY: Live.
15 THE COURT: Micah Steele?
16 MR. HARTY: Live.
17 THE COURT: And Dr. Taylor is going to
18 testify as a damages witness in the damages phase. Is
19 he going to be here live?
20 MR. HARTY: Yes, Your Honor.
21 THE COURT: Mindy Westendorf?
22 MR. HARTY: She'll be here live.
23 THE COURT: Donald Wulfekuhle?
24 MR. HARTY: He'll be live.
25 THE COURT: And that's all the witnesses you

to purchase a complete copy of the transcript.

179

1 expect at this point? So refresh my recollection; which
2 witnesses do you have that you're going to be calling by
3 deposition and will not be here live?
4 MR. HARTY: We don't have anyone,
5 Your Honor, I don't think. Well, McAnally. Did I tell
6 you he was going to be here live? He's the one that's
7 only going to be in the damages portion and he would not
8 be live. He would be by deposition, Your Honor.
9 MS. HULETT: And Mr. Brammer based on at
10 least our uncertainty about his medical condition and
11 ability to travel, but if plaintiffs subpoena him and
12 get him here then we won't call him a second time or
13 present his deposition testimony.
14 THE COURT: Okay. And again, the reason I
15 go through these, there are sort of two reasons. One is
16 that I want to make sure that both sides are on the same
17 page as far as whether or not you're going to provide
18 the witness at the time of trial. In other words, I
19 don't want to get to trial and have the plaintiffs
20 wanting to call some Deere employee and not having
21 subpoenaed them and believing that the defendant was
22 going to provide them and then there's a dispute as to
23 whether or not any agreement was reached. So to the
24 extent you're relying on the other side to produce a
25 witness, make sure you nail that down; maybe even

180

1 exchange emails so there's a clear record as to any
2 agreement in that regard.
3 The second reason I go through the list is
4 that everybody is on the same page as far as any of the
5 witnesses who they expect to be called by deposition.
6 So that, first of all, if there's a problem with using
7 the deposition; for example, if there's a question about
8 a witness' unavailability, that -- that the other side
9 be alerted to that so if they have to make a record
10 regarding unavailability, they're prepared to do that.
11 So if either side intends -- if either side
12 intends to argue that the deposition itself is
13 inadmissible because the witness is not unavailable or
14 for some other reason of that sort, make sure you let
15 the other side know that so they can have whatever
16 testimony they need in order to -- to prove
17 unavailability. And then obviously, as we've discussed,
18 make sure you identify pages and lines.
19 Any questions or comments about then the
20 witnesses that you intend to call or the other side
21 intends to call? I mean I understand you've got some
22 objections as to whether or not they have relevant
23 evidence, but other than that?
24 MR. RACETTE: No, Your Honor.
25 THE COURT: All right. Let's take a look at

181

1 the list of exhibits briefly. The parties have
2 submitted just a ton of exhibits. As I indicated
3 earlier, the defendants' exhibits fill 13 three inch
4 binders. I don't know; what is that, 300 pages in one
5 of these things or more or less? I mean it's like
6 4,000 pages of exhibits, and the plaintiffs have got
7 six binders. You know, obviously I can't tell you how
8 to try your case and if you believe that all of those
9 exhibits are necessary in order to prove your case or
10 prove your defense, then you make whatever record you
11 think you need to make.
12 I can tell you one short horror story that I
13 had when I was on the state court bench. There was a
14 case where a pretty good trial lawyer actually had a
15 plaintiff's case and I thought it was a good plaintiff's
16 case and it was just -- liability was iffy, but
17 horrendous damages -- injuries to the plaintiff and, in
18 fact, he ended up dying then.
19 But the plaintiff's attorney got up and made
20 a three hour closing argument and the first hour the
21 jury was listen to him. The second hour, they had
22 stopped listening. Anyone who was looking at the jury
23 could tell that they had just turned him off. They were
24 no longer listening. And the third hour, I think that
25 they were -- he affirmatively pissed them off. I mean

182

1 they were mad at him for taking so much time you
2 could tell if you just watched the jury, and the jury
3 came back with a defendant's verdict and I'm convinced
4 that it was because the plaintiff's attorney made them
5 mad during the closing argument.
6 And I'm not directing this at plaintiff's
7 attorney. I think it applies to both sides, but I think
8 it was a case of an attorney knowing a lot about the law
9 and not knowing much about juries and my view at least
10 if -- if I know anything about juries is that they're
11 not very good about focusing on a case for long periods
12 of time; you know, three hour closing arguments or three
13 week trials.
14 And so again, you guys, you know, are
15 experienced lawyers. You know your case better than I
16 do. You present whatever record and try your case any
17 way you like, but I think either side that prolongs the
18 case unnecessarily or gives the jury the impression that
19 their time is being wasted does so at their own peril
20 because I think they'll be paying attention to you --
21 what you have to say for the first period of time and
22 then after a while will start to turn it off and then
23 after that, they're going to get pissed off. And you're
24 -- you know, whichever side it happens to be and so you
25 don't do your clients any good by going on and on about

183

1    some, you know, technical point that you think is -- the
2    Eighth Circuit might like but that the jury just is not
3    interested in.
4            With respect to -- and that was all sort of
5    leading up to the whole issue of exhibits.  It sounds
6    like -- in looking at the exhibit list, I -- I see a lot
7    of exhibits which are B and C exhibits.  In the typical
8    case, I see very few Category C exhibits because
9    Category C means you're objecting to foundation and
10   typically the foundation is not the problem.  I mean,
11   you know, that there would be someone who can testify as
12   to what the exhibit is.
13           And so if -- if you have a foundational
14   objection that's fine and I guess by making it a
15   Category C exhibit, it alerts the other side to the fact
16   that they're going to have to have somebody lay
17   the appropriate foundation for the exhibit.  But if
18   foundation is not really what you're objecting to.
19   You're instead objecting to relevancy or, you know, 403
20   or whatever it is, then it should be Category B; not
21   Category C, because we don't want to spend a lot of time
22   laying foundation for exhibits where foundation is not
23   really the problem; that it's some other issue.
24           Frankly, most of the cases or a lot of the
25   cases I have, the majority of the exhibits are

184

1    Category A exhibits where there is no objection.  My
2    intention is and my practice is that at the beginning of
3    the trial, I have all of the Category A exhibits offered
4    and received into evidence without objection before any
5    other evidence is offered; both the plaintiffs' exhibits
6    and the defendants' exhibits.  So you can anticipate
7    that anything that ends up being a Category A exhibit
8    will come in at the beginning of the trial.  You don't
9    have to offer and admit it later on.  You can refer to
10   it during plaintiffs' case in chief even if it's a
11   defendants' exhibit.  Basically, those just all come in
12   because there is no objection.
13           Category B exhibits obviously you'll have to
14   offer during the course of the evidence and then an
15   objection is made and then I'll rule on the objection.
16           And again, to the extent that it truly is a
17   Category C exhibit, then the party's on notice that
18   they're going to have to provide foundation.
19           But in looking at some of these exhibits,
20   the plaintiffs have, for example -- well, I could pick
21   out any page in the proposed final pretrial order, but I
22   just happened to open to page 5 here.  Performance
23   evaluations for Gayle Forster A -- for 1998, 1999,
24   2000, 2001 and 2002 and defendants have identified those
25   as B and C exhibits.  I'm assuming that those are John

185

1    Deere's documents, so it doesn't seem like foundation
2    would really be a problem.  I mean I guess if the
3    plaintiffs have to subpoena the custodian of the records
4    or whoever keeps this stuff at John Deere to have them
5    testify that these are true copies, then I guess they're
6    on notice that they have to do that.  But there's really
7    not much point in doing that if these are John Deere's
8    records and there is no question about foundation.
9    Instead, I'm assuming the real objection is that --
10   relevance or -- or 403 or whatever the other objection
11   is.  So --
12           MR. HARTY:  Can I just --
13           THE COURT:  Go ahead.
14           MR. HARTY:  Okay.  On the performance
15   evaluations that have been marked as exhibits by the
16   plaintiffs, no one at Deere will be able to come in here
17   and lay the foundation for them because they are not
18   accurate copies of the performance evaluations the
19   plaintiffs received at Deere.  And -- and we received a
20   stack of documents today, so we may have some exhibits
21   -- objections that are -- that are removed, but there's
22   a whole bunch of exhibits with the plaintiffs' circling
23   and check marks and underscoring on them and it's not
24   just, you know, doodles.  It's like look; this is an old
25   guy and he's not being treated right.  That's why we're

186

1    objecting.
2            And then the other category of our
3    objections, Your Honor, is -- I used to not have any
4    objections at all to -- to the foundation and -- and I
5    ran into -- it's within the last five years I've ran
6    into some plaintiff's lawyers who have apparently never
7    read 602 and so they -- like, for example, some GJE
8    document; if I don't object to it that they've got to
9    lay the right foundation, they use it with their own
10   witness and their own plaintiff gets up there and says
11   yeah, that's a GJE document and then they -- they
12   proceed to talk about it.
13           THE COURT:  But the point is if it
14   legitimately is a GJE document, then what is the
15   objection as to foundation?
16           MR. HARTY:  That's my problem, Your Honor.
17   Rule 602; you have a witness who is attempting to
18   testify about a document that they do not have any
19   personal knowledge of.
20           THE COURT:  I get that.  But my point is
21   that so what you would have to do is call, I guess,
22   somebody who's -- can lay the foundation for the GJE
23   documents and have them lay the foundation, receive the
24   exhibit, then have your witnesses testify to it.  And
25   the point is that if there's no dispute that it's a

to purchase a complete copy of the transcript.

## 187

1 legitimate document and it's not been altered and it's
2 not been marked on or -- or parts deleted or whatever,
3 then why go through that whole exercise?
4 I mean why can't the parties under Rule 1
5 agree that that is an authentic GJE document and we're
6 not going to require you to call someone from GJE who
7 will lay that foundation because we know that you could
8 do it if you wanted to spend the time and money to do
9 it.
10 Now, I realize it's different if -- if the
11 performance evaluation is not the original document;
12 it's been changed around and whatnot. That's different,
13 but, you know, the idea here is to try a case as -- as
14 -- I can't remember the wording of GJ -- or Exhibit 1,
15 but -- excuse me. I can't remember the wording of
16 Rule 1, but basically it's to try cases efficiently,
17 inexpensively, you know, and not unnecessarily throw up
18 roadblocks, and if a document is legitimate; it's
19 authentic; there's no question the foundation could be
20 laid if need be, then why don't the parties just
21 acknowledge that and move on instead of, you know,
22 making it an objection and requiring the other side to
23 -- to make that -- to make that foundation evidence?
24 MR. HARTY: Okay. So that's exhibit -- okay
25 let's -- if you look at Exhibit 1, Your Honor. They

## 188

1 call it harassment policy. It is a collection of
2 documents that are not the Deere harassment policy. One
3 page might be from the harassment policy.
4 THE COURT: Well, yeah, and again, you know,
5 I don't want to spend a lot of time talking about how
6 people should try cases, but in an ideal world, 90 days
7 ago or longer ago than that because I'm not sure when
8 the discovery deadline was, but the parties obtain these
9 documents. They figure out what documents they think
10 they want to offer and then they make requests for
11 admissions and they say Exhibit 1, is this a true and
12 accurate copy of whatever, and if it's not, then you say
13 no, it's not. And then the plaintiffs are alerted to
14 the fact that they've got a problem with this exhibit
15 some way or another. And if you say yes, it is, well
16 then, foundation has been established and away we go and
17 you don't have a problem at the time of trial.
18 We don't live in the ideal world though. We
19 live in the real world and I know that, you know, it
20 seems like it's the rare case where attorneys ever get
21 around to doing that.
22 But anyway, the bottom line is that the
23 parties are free to make whatever objection they want
24 and if foundation -- if it's a C exhibit, then the other
25 side's on notice that foundation is going to be an issue

## 189

1 and you need to be prepared to address it.
2 And, frankly, to the extent that any
3 documents have been altered, you know, you may want to
4 try to get your hands on an unaltered document because
5 if parts have been underlined or there are comments made
6 on stuff, that may well affect its admissibility.
7 MR. RACETTE: Your Honor, can I comment too
8 because I'm disturbed. We have asked for the
9 performance evaluations since day one in this case of
10 our clients. We've never received them. These -- these
11 performance evaluations are two that our clients had
12 with them. And we -- we have not received those as of
13 this date. The harassment policy that he's talking
14 about was testified to Kevin Keith as the harassment
15 policy.
16 So I -- I'm disturbed at the way Deere has
17 defended this case and now I'm hearing from Mr. Harty
18 there's a stack of documents we're going to get tonight
19 that has some of this stuff in it and we'll have this
20 motion in a moment.
21 MR. HARTY: Your Honor, if I may --
22 THE COURT: Let him --
23 MR. HARTY: The stack of documents came from
24 Amy to me.
25 THE COURT: Let him finish.

## 190

1 MR. RACETTE: I don't understand. I agree
2 with the Court. I don't try stuff by ambush or
3 Rule 602. I think that when we have requested these
4 documents; we don't receive them and then ambush us
5 when we don't have the originals or not the complete
6 one, we've been relying on these all through discovery.
7 Nobody said anything to us about this isn't the proper
8 performance evaluation. We've been trying to get the
9 performance evaluations. If you notice in our exhibit
10 list, we've listed then. We don't have them yet.
11 THE COURT: Well, you know, and again, I
12 understand that I -- I live in the real world; not an
13 ideal world, but, you know, the rules provide remedies
14 when you don't get documents. You know, you file
15 motions to compel. You bring the matter to the
16 attention of the Court and not two weeks before the
17 trial and the final pretrial conference. You bring it
18 to the attention of the Court at the time the discovery
19 deadline expires and you haven't gotten everything that
20 you think you're entitled to under the rules. You file
21 motions to compel. You get the Court involved and you
22 either get them or you get a ruling that you're not
23 entitled to them, but you don't sort of sit back and
24 then complain that you don't have them, you know, at the
25 final pretrial conference.

to purchase a complete copy of the transcript.

**191**

1    MR. RACETTE:  And again, we've had so many
2    documents sorting through as you can see with the
3    volumes that you're dealing with now that we kept
4    thinking we would get them.  There's no reason not to
5    and I just -- and maybe -- yeah, maybe -- I don't
6    usually operate filing motions to compel on everything.
7    We would have been filing motions to compel with the
8    Court.  I guess maybe on a number of things I should
9    have.  But I just don't understand why we don't have
10   those documents.  I really don't.
11        THE COURT:  All right.  Mr. Harty, you
12   wanted to say something?
13        MR. HARTY:  I did want to make a record and
14   I apologize interrupting Mr. Racette.  He misunderstood
15   what I just told the Court and it occurred to me I had
16   better make it very clear.  Shortly before this hearing
17   started, Ms. Pellegrin came in and gave us a stack of
18   documents.  We're not providing you with any documents.
19   This stack of documents are what we've told counsel
20   before was we are objecting to a number of the exhibits.
21        For example, Plaintiffs' Exhibit 2.  This is
22   a document entitled the Hay guide chart.  Clearly that's
23   -- that's one of our documents that we're offering.
24   They're -- what you'll find in your notebook is a
25   version that has been annotated and underlined for

**192**

1    purposes of -- I don't know if it was someone did it in
2    a deposition or if it was their clients did it, but we
3    told them we can't admit.  We can't just concede that
4    that's admissible.  So Ms. Pellegrin brought me a clean
5    copy of Exhibit 2 because we had produced this a long
6    time ago.  So it's not a matter of them not having the
7    production.  It's a matter of them not going through and
8    providing us with -- and the Court with copies of
9    exhibits that hadn't been marked up by somebody; either
10   plaintiffs or plaintiffs' counsel.
11        And just so I can make my record, the other
12   exhibits that I think we'll review and if they are clean
13   we may change our position, but the other documents that
14   were handed to us today were apparently clean copies of
15   Exhibits 11, 77, 31 and I think that must be it.  Now,
16   there are more documents that are -- that are marked up,
17   but these must be the only ones that they have tonight.
18   That was our argument and our point, Your Honor.
19        THE COURT:  Well, even in relatively simple
20   cases, going through exhibits is sometimes problematic.
21   One of the things, frankly, that always bothers me is
22   when some exhibits are contained in both the plaintiffs'
23   and defendants' exhibits so they're Exhibit 42 and
24   they're also Exhibit, you know, G-108 or whatever.  And
25   sometimes I require the parties go back and -- and pull

**193**

1    any exhibits that are defendants' exhibits that are
2    duplicates of exhibits which the plaintiffs intend to
3    offer.  Here it sounds like this is complicated by the
4    fact that the exhibits are not identical; that some of
5    them have been annotated in some way.
6        This case, of course, is magnified 100 fold
7    by the fact that the parties apparently intend to offer
8    6,000 pages of exhibits.  In addition, today during the
9    course of our hearing on the motions in limine, I find
10   out that at least some of the plaintiffs' exhibits are
11   no longer being offered and are being withdrawn.
12        So I -- I guess what I'm going to suggest --
13   I'm not going to make you go through and pull duplicates
14   because I just think assuming given the volume of the
15   documents we're talking about here that would be very
16   expensive and time consuming.
17        But what I am asking you to do is go back
18   and look at your exhibit lists that were attached to the
19   proposed final pretrial order and to the extent that
20   you're not offering any of those exhibits, that you
21   indicate that it is withdrawn.  You should not renumber
22   the exhibits because that would be tremendously
23   confusing.  But if there's a particular exhibit that's
24   no longer being offered, then on the attachment to the
25   proposed final pretrial order, just put withdrawn under

**194**

1    that exhibit.
2        In addition, perhaps the parties could
3    confer this week and maybe you can agree that some of
4    these exhibits that are being objected to because
5    they've been annotated -- maybe you can agree that the
6    originals that are not marked up could be substituted
7    and the foundational objection perhaps could be
8    withdrawn, and -- and retaining, you know, any relevance
9    objections or other objections you may have in that
10   regard.
11        Frankly, I'm just trying to simplify this
12   case as much as I can.  It's going to be complicated
13   enough and difficult enough without unnecessary hassle
14   over exhibits; particularly exhibits which apparently
15   the example given by Mr. Harty where both parties are
16   offering the exhibit but one of them has apparently been
17   annotated; maybe the parties can simply agree that an
18   unannotated version could come in and the other one we
19   don't need any more and just eliminate that problem.
20        Oftentimes at final pretrial conferences I
21   go through the exhibits in some detail with the parties,
22   but honestly, you know, it's 5:15 and I don't feel much
23   like going through I don't know how many individual
24   exhibits we have here, but it must be several hundred.
25   The plaintiffs have 146 and the defendants appear to

to purchase a complete copy of the transcript.

195

1  have more, although they've used a more creative
2  numbering system and so I'm not exactly sure how many
3  there are.
4          So in any event, I would just encourage the
5  parties to go back and sort of review that and see
6  whether or not you can simplify at all the whole issue
7  of -- of exhibits.
8          I want to just touch briefly on the trial
9  itself just because -- in case we decide that we don't
10 need to get back together again before the trial.  The
11 trial starts at -- two weeks from today.  The jury -- I
12 think they're told to be here at, I don't know, eight or
13 8:15.  We'll start with the jury at nine o'clock.  I'm
14 going -- and we'll start with the jury every day at
15 nine o'clock, but I want to meet with the attorneys not
16 later than 8:30 every day -- including the first day of
17 trial -- to talk about any last minute issues.
18         That first day of trial, we'll call -- the
19 jury will come up.  I'll greet them; explain to them why
20 they're here.  We call 14 names forward.  I'll take
21 hardship excuses.  I sort of give them a pep talk and
22 impress upon them the importance of jury service.  I'm
23 anticipating there may be more hardship excuses here
24 than the normal case because a lot of people can serve
25 three or four days but three or four weeks is a

196

1  different issue and so we'll hopefully have enough
2  jurors here if I excuse people we'll still have plenty
3  to use.
4          After the hardship excuses are done, I'll
5  ask some questions about the case and about -- I'll go
6  through the witness list to see if they know any of
7  these folks.  I'll ask them some general questions
8  about, you know, if they've made any claims as -- as an
9  employee or any -- believe that they've been
10 discriminated against.  Questions of -- of a general
11 nature.
12         You will be provided with their
13 questionnaires.  I think those -- I don't know if those
14 are available now.  Mr. Coberly, do you know?
15         THE CLERK:  I'm not sure, Judge.
16         THE COURT:  You can get those prior to
17 trial.  We use a relatively detailed questionnaire here
18 in the Northern District of Iowa, so you'll have a fair
19 amount of information about these folks before you ever
20 start.
21         After I'm done, each side is given up to
22 45 minutes in which to ask additional questions.  And
23 then after that, you'll take three peremptory challenges
24 each and we'll reduce the 14 down to eight that will
25 hear the case.  There will not be any alternates.  If

197

1  something happens to a juror, then we go with less than
2  eight.  We'll talk in more detail before the jury
3  selection process when we meet that first morning prior
4  to the jury selection.
5          Any general questions about that right now?
6          MR. HARTY:  No, Your Honor.
7          THE COURT:  All right.  And again, as I told
8  you earlier, we'll go more or less from nine to 4:30.  I
9  generally try to meet with the attorneys at the end of
10 the day to talk about what's going to happen the next
11 day; what witnesses are anticipated; if they expect any
12 issues that are going to be coming up the next day that
13 we need to talk about; things of that sort.
14         I'm guessing that during the course of this
15 trial, on most days I'm going to have things scheduled
16 at 4:30 so I don't know that I'll be able to meet you
17 right then, but basically you're going to have to stick
18 around and I'll meet you when I'm done, which will
19 probably be five or 5:30 depending on what else I've got
20 scheduled.
21         I'm sure I'm not thinking of something about
22 the jury process itself, but any questions about sort of
23 the nuts and bolts of jury service or the jury trial
24 itself at this point?
25         MR. RACETTE:  No, Your Honor.

198

1          MR. HARTY:  Just a couple questions,
2  Your Honor.  Do you require us to give the other party
3  24 hour notice as to when we plan to call witnesses?
4          THE COURT:  That's not a bad idea, but I've
5  never actually done that.  Again, what I typically do is
6  after -- like if this were the first day of trial, I
7  would be talking to you guys and say okay plaintiffs,
8  it's your case; who are you going to call tomorrow and
9  then they would identify those folks and it would give
10 you the evening.  Normally we don't require 24 hours
11 notice.  I'm not opposed to that.  Do the parties want
12 some kind of requirement?  It always begs the question
13 what happens if they -- something changes and they want
14 to call somebody the next day that they haven't
15 identified.
16         MR. HARTY:  I understand.  I just have dealt
17 with some judges that did and some that didn't.
18 Objections.  Do you want a response or do you want us to
19 wait until you say do you have any response?
20         THE COURT:  I want you to wait and we'll
21 talk about jury selection the first day of trial, but
22 when we're picking the jury, if you're going to take
23 strikes I'll have you make your motion to strike in open
24 court in front of everybody and I don't invite response.
25 I don't invite further questioning by the other side.

DOCUMENT 214-19 150 02/18/25
to purchase a complete copy of the transcript.

199

1  Sometimes I'll follow up with the juror with some
2  questions and then I'll just make a decision.
3  But with respect to objections, if -- if --
4  sometimes I'll rule without a response. If I'm going to
5  overrule it, I can do that. If I'm thinking about
6  sustaining it, I'll ask for a response. Make sure you
7  don't make talking objections. There's a real dispute
8  as to how vocal lawyers can be when making an objection.
9  Typically it doesn't require a lot. Objection; hearsay
10  or objection; leading or objection; vague as to time or
11  something that's not suggestive in the objection that's
12  giving the witness some kind of clue. Objection,
13  Your Honor; he can't possibly remember that given the
14  fact that it was 10 years ago. Overruled. You may
15  answer. I can't possibly remember that. It was
16  10 years ago. I mean obviously you can't make
17  objections which give some kind of clue to the witness
18  as to what their answer may be. If you feel it's
19  absolutely necessary to approach the bench, you can ask
20  to approach the bench and I may or may not agree to do
21  that.
22  Again, one of my pet peeves is keeping
23  jurors waiting. I used to have colleagues in state
24  court where the trial is supposed to start at
25  nine o'clock and the attorneys come in at five to nine

200

1  and they had stuff they wanted to talk about and they'd
2  finally get started with the jury about 10:30 and the
3  jury would obviously be upset and I don't blame them.
4  Or during the course of the trial there
5  would be an objection made and the judge would excuse
6  the jury and then spend an hour talking about the
7  objection and then call them back in. I don't make the
8  jury wait in the mornings and it's very rare that I
9  would send them out to -- to have some long-winded
10  discussion about an objection. Sometimes I'll take a
11  short discussion at sidebar, but that's about it.
12  You know, frankly, I'm going to be making
13  all kinds of rulings in this case. I already have and
14  I've got a lot of tough ones coming and I'm going to be
15  making a lot of evidentiary rulings. Some of them will
16  be right; some of them will be wrong; some of them will
17  be wrong but not prejudicial or reverse -- you know,
18  enough to cause reversal. Hopefully I won't have too
19  many that would cause reversal, but we can't -- you
20  know, I learned a long time ago we can't hassle over
21  every single ruling I make because life is too short.
22  Any other questions about the trial?
23  MR. HARTY: No, Your Honor.
24  THE COURT: All right. Let's talk about the
25  fact that we've got a lot of stuff remaining here.

201

1  We've got four motions. We've got the Rule 104 motion
2  and we've got three motions to exclude evidence.
3  Frankly, I like to get together with the lawyers when I
4  have big, thick motions with lot of arguments because
5  it's a lot easier for me to sort of interact and get the
6  information I need.
7  Today, for example, I think it's not as good
8  for me at least to go through the motions in limine
9  telephonically. The remaining motions are I think more
10  focused probably or narrower issues than what the
11  motions in limine were, so I guess I'm not opposed to
12  doing it telephonically. I'm guessing the argument
13  still could be fairly lengthy. I know, however, that
14  you guys -- some of you come up from Des Moines and it's
15  a hassle to have to drive over here and it's not
16  inexpensive to have to drive over here, and I guess I'm
17  willing to do it telephonically if -- if the parties
18  agree.
19  So what -- what's -- what's your sense --
20  what's the plaintiffs' sense about setting a telephonic
21  hearing on the remaining motions?
22  MR. RACETTE: That would be fine,
23  Your Honor.
24  THE COURT: What do the defendants think?
25  MR. HARTY: We had talked about doing just

202

1  that with the exception of the motion for sanctions,
2  Your Honor. Mr. Vint is -- as I understand it is going
3  to be arguing that and he -- he had to -- he has to
4  leave but he's hung around here because that's the one
5  that gives us -- depending on what the Court does, it
6  might have impact on witnesses and exhibits. And if we
7  can get that one out of the way.
8  THE COURT: I thought I looked at all the
9  motions, but I don't recall what the motion for
10  sanctions is.
11  MR. VINT: I think, Your Honor, we entitled
12  it a motion to exclude GJE defense evidence.
13  THE COURT: Oh, okay. So you guys want to
14  argue that now?
15  MR. VINT: Yes, Your Honor.
16  THE COURT: All right. Have at it.
17  MR. VINT: Thank you, Judge. At issue here
18  are 360 pages approximately of exhibits that were
19  provided by Deere to plaintiffs in December and January
20  of this past year -- December 2014, January of 2015.
21  Many of the documents -- especially in December -- are
22  documents that are new and we don't have any objection
23  to those necessarily.
24  But included in those documents were a
25  number of documents provided by Deere now that existed

to purchase a complete copy of the transcript.

203

1  in 2002 through 2004.  They're documents that were
2  subject to specific discovery requests by the plaintiff.
3  They're not just documents that are initial disclosure
4  documents, Your Honor.  They're documents that we have
5  requested from counsel and were told that they would be
6  looking for them and were subsequently told didn't
7  exist, which begs the question of what exactly did John
8  Deere do to try to actually find these documents when
9  requested.
10          Third is disclose documents in a timely
11  manner under Rule 26 allows the Court broad discretion
12  as to whatever sanction it deems appropriate.  The
13  complicating factor here, Judge, we would normally just
14  say to exclude the documents and move on as the Court
15  did in the prior motion regarding Mr. Sandberg; however,
16  many of the documents are relevant to plaintiffs' case
17  itself.  Documents that we would have liked to have used
18  during depositions of the individual defendants.
19          In particular, there are job descriptions
20  from September of 2004 for the Supply Management
21  Specialist II and III positions which we did not
22  previously have.  We had been told that they were not
23  available.  There's a comparison cart from September of
24  2003 of -- of the SMS II and SMS III positions.
25          It's long been a contention of the

204

1  plaintiffs' case that Mr. Matson and Mr. D'Cruz had
2  advanced knowledge of the GJE classifications and grades
3  long before they should have and were -- because of that
4  were allowed to manipulate where these persons were
5  placed.  This chart may well have been allowed by -- or
6  been given to Mr. D'Cruz and Mr. Matson and -- and
7  relied upon by them in moving the plaintiffs into the
8  positions that they moved into on October 1 of 2003.
9          On January 9th of this year, we received a
10  long chart from July of 2003 indicating the initial GJE
11  mapping of every employee in supply management,
12  including the plaintiffs and a number of other relevant
13  persons who are going to testify.  Again, this
14  corroborates testimony or -- corroborates testimony by
15  our party -- or our plaintiffs indicating that they were
16  told that GJE mapping was done in July of 2003 by
17  Matson.  Matson has since denied that that's the case.
18          There's an email to a Jim Olson, who
19  apparently is a person in HR at Deere dated October 9,
20  2003, that is crucial to the plaintiffs' case.  This is
21  an email that includes what purports to be the initial
22  GJE job grades and specifically put in there in bright
23  red large font do not disclose this to other persons.
24  This was October 9 of 2003.
25          In the subsequent investigation of why

205

1  Ms. Lenius was put into the position that she was in
2  October 1 of 2003, Mr. Matson told Deere HR -- including
3  Mr. Olson -- that he had done -- that he had put her in
4  a Grade 6 position because he was working on GJE mapping
5  and expected she would be in a Grade 6.  If that is the
6  case, then how is it that Mr. Matson knew this
7  information before Olson did and before other higher ups
8  at Deere did?  Obviously, questions that we would like
9  to have asked Mr. Matson had we had the documents at
10  that time.
11          There's -- it's either that he didn't have
12  it and -- and had another rationale for why he moved
13  Mr. Lenius -- or Mrs. Lenius -- excuse me -- into that
14  spot or he did have that information in contradiction to
15  what Deere's experts have said he was supposed to have.
16          There's a document dated January 21 of 2004
17  regarding the mapping of a Micah Steele.  Mr. Steele is
18  an employee in hydraulics who was given a Grade 6
19  initially and was promoted to a Grade 7 before he had
20  actually taken the job.  Not coincidentally, he was a
21  30-something male.  Mr. Steele was promoted by
22  Mr. Matson in a memo we previously had.
23          The January 21, 2004, email string from
24  Deere's higher ups at HR indicated they specifically had
25  no idea of what the position that Mr. Steele was taking

206

1  did in the way of work and that they would have to talk
2  to Waterloo, at which point Waterloo stepped in and said
3  we've already talked about and we agree you should be at
4  a 7.  This goes to the heart of the many claimed layers
5  that -- that GJE had that were supposed to prevent a
6  manager such as D'Cruz or Matson from determining where
7  employees would fall.  Obviously Deere HR had no idea
8  what was going on with supply management at that time.
9          These are all documents that were relevant
10  to the plaintiffs' claims and could have been used
11  during discovery.  They're all documents that would have
12  been relevant to the summary judgment resistances filed
13  not just by the two named defendants that are still
14  left, but at least two of the other defendants as well
15  -- or plaintiffs; excuse me, Your Honor -- and the fact
16  that they weren't provided; the fact that -- that Deere
17  effectively told the Court that the record was full once
18  discovery had closed on January 31st and that all
19  documents relevant to resist their summary judgments
20  were available was patently false.
21          The Court's determination I think could be
22  markedly changed based on these documents.  The fact
23  that they further relied upon the summary judgment
24  ruling in their motions in limine and their other
25  pretrial motions saying that the Court's already

to purchase a complete copy of the transcript.

207

1 determined these things obviously without the full
2 amount of the evidence that was available.
3 Normally, I would buy the claim that it's
4 inadvertence; that it was something that came up later,
5 but frankly as we just talked about only minutes ago,
6 this goes back to a long string of documentary issues
7 involving Deere disclosures.
8 The Mel email that we discussed before,
9 we've repeatedly requested that Deere provide the email
10 from D'Cruz to Keith that drew that response. We've
11 never received it. It's been said that it just doesn't
12 exist. We have -- in fact the document in question
13 about the meeting regarding Mel is here only because
14 Ms. Lenius was able to find a copy of it.
15 We talked about the WWCA audit, the
16 performance evaluations; any number of other documents
17 that have been requested by the plaintiffs and Deere has
18 been noncooperative in handing them over claiming simply
19 that they don't exist; just like these documents didn't
20 exist until about six weeks ago.
21 The Court in September indicated during the
22 hearing on Mr. Sandberg's testimony that -- that those
23 documents came in too late; that they were not available
24 at the time of trial; that they were 13 months after the
25 designation was due and because of that they would not

208

1 be included at trial. Just as Mr. Harty just indicated,
2 we just want to be treated the same. I mean we have --
3 THE COURT: There's a distinction though
4 between limiting Sandberg's testimony and excluding all
5 GJE testimony. As I recall my ruling, I concluded that
6 the supplemental reports or at least some of the
7 supplemental reports submitted by Sandberg were too late
8 and, therefore, he was limited to his testimony that he
9 gave in his original reports. Here, if I accept your
10 argument, as I understand it, it would basically
11 preclude the defendants from offering basically their
12 entire defense; that is, that their actions were based
13 on GJE.
14 MR. VINT: A couple things, Your Honor.
15 First off, given the extremely tardy nature of them, I
16 think that that sanction is -- is warranted. Second, we
17 have given the Court a number of other sanctions that
18 could be availed of rather than precluding the defense
19 entirely, including new depositions of D'Cruz and
20 Matson. The problem there being, of course, we're two
21 weeks from trial and the -- the usefulness of those
22 depositions given the current trial date is certainly
23 questionable.
24 Before filing our motion, we simply did, you
25 know, rack our brains to come up with what we felt was a

209

1 sufficient sanction. Given how late it was that these
2 were disclosed, we had to come up with the one
3 essentially on the GJE exclusion it seems to be
4 the only thing that would be truly available given the
5 late date of the disclosure.
6 THE COURT: Response?
7 MR. HARTY: Very, very briefly, Your Honor.
8 Otherwise, I'll stand on our brief because we have
9 thoroughly briefed it. There's -- there's no excuse
10 for the documents not being produced earlier. When we
11 learned from Mr. Olson in preparing for trial that he
12 had a file, we said well, you better send it to us just
13 in case. We thought we already had it and we looked at
14 it and it was new stuff. We in our -- as we briefed it,
15 we believe it was -- a lot of it was simply different
16 versions of things plaintiffs have already had. We
17 produced it.
18 And -- and I'm not going to dignify the
19 other allegations concerning documentary improprieties.
20 I'll simply say that they didn't file a single motion to
21 compel; nor did they even threaten to file a motion to
22 compel and when we've got a 10 year old case I assume
23 they understood just like us that their clients
24 testified that they gave stuff to the EEOC and never got
25 it back. They didn't keep copies. We didn't bring any

210

1 motion to compel on that.
2 With regard to Olson and the Olson
3 documents, we have already said we understand that a --
4 a deposition of Mr. Olson at the cost of the defendant
5 would -- would be appropriate in this case. We don't
6 think there's any grounds for excluding our defense
7 essentially.
8 THE COURT: Any brief response, Mr. Vint?
9 MR. VINT: Very briefly, Your Honor. While
10 I appreciate Mr. Harty's response, on October 1 of 2013
11 plaintiffs requested all of James Olson's documents. It
12 was an actual discovery request given to them. The fact
13 that Mr. Olson apparently had a file that was not
14 provided for another 15 months only reiterates the
15 purposes of our motion. That's all I have. Thank you.
16 THE COURT: I'm going to take the matter
17 under advisement. I don't know if you have your
18 schedules with you, but let's pick a date and a time for
19 telephonic hearing on the three remaining motions, which
20 I guess basically are the defendants' motions. Frankly,
21 the sooner the better for me because the sooner we get
22 them submitted, the more time I have to try to work on
23 them.
24 MR. RACETTE: Judge, are these -- are these
25 motions the -- I think are all involving damage experts?

Electronically signed by Patrice Murray (301-319-2468-2506)
to purchase a complete copy of the transcript.

211

1    THE COURT: Yes.
2        MR. RACETTE: Would it be advantageous for
3    everybody to give us more time to schedule those
4    hearings at a time between, you know, the -- if there is
5    a finding of liability, we could schedule those after
6    that? Would that -- would that be appropriate? I'm
7    just suggesting it might save everybody time and we
8    could do it that way and then we aren't really wasting
9    time if there's an adverse finding and, of course, if
10   there's a positive finding, we could easily take those
11   up I think within a half morning or something.
12       THE COURT: Yeah; I'm not necessarily
13   opposed to that. I'm just sort of thinking -- I mean
14   obviously I have your motions. I have your briefs. I'm
15   assuming that most of your argument is contained within
16   your briefs so I'm assuming I won't learn a lot more
17   during oral argument and, of course, if I can look at
18   these in advance of the trial.
19       Frankly, I think it requires me to give some
20   preliminary look at them even if I don't hear the oral
21   arguments because depending on the timing of all this,
22   if the jury finds liability and, therefore, I have to
23   rule on these motions, you know, I need some time to do
24   that and if I just sort of ignore the motions and start
25   from scratch, I don't know how long that might take and

212

1    depending on where we're at, you know, we want to keep
2    the case moving along.
3        But, you know, I can certainly look at the
4    motions and the briefs and resistances with the briefs
5    and have sort of a preliminary understanding of what the
6    issues are and maybe some preliminary ideas as to where
7    I might go if I get that -- if we get to that point and
8    then if the jury finds liability, sort of let you guys
9    refresh my thinking by making arguments and then rule on
10   it at that time.
11       What does the defense think?
12       MR. HARTY: We're available tomorrow if you
13   want to do it --
14       THE COURT: What do you think to the
15   suggestion that we wait on the arguments until we find
16   out if we need to do that? Frankly, I'm going to be
17   busy enough trying to figure out what the measure of
18   damages is and, you know, whether they're offsets and
19   what the instructions are supposed to look like, and if
20   I can delay having to rule on -- on the experts' issues,
21   that's probably helpful to me.
22       Now, we can hear argument now and I can
23   still, frankly, delay or we can wait and -- and we can
24   cross those bridges if we get to them.
25       MR. HARTY: We're completely comfortable

213

1    with whatever the Court wants to do.
2        THE COURT: All right. Let's do this.
3    Let's let it go for now and I'm going to concentrate on
4    those things that I have to do before this trial starts.
5    And then if I have time to look at the expert motions
6    and -- and want to get started on those, then I'll let
7    you know and we can set up a time for a telephonic
8    hearing. If not, I'll -- I'll get familiar with them
9    and then we'll argue it immediately after the jury gets
10   back and then I'll make some sort of rulings on those.
11       So where we're at at this point is that I
12   guess all the motions have been argued. I'm going to
13   start working on the instructions. I usually try to
14   have a draft of the instructions done before the trial
15   ever starts so that you at least know the format that
16   I'm following. You obviously will disagree as to
17   probably some of what's in there, but you'll know kind
18   of how I've got it set up.
19       I encourage the instruction process to be a
20   dialog during the course of the trial. So, in other
21   words, you know, when we meet first thing in the morning
22   or after the trial at night, if you say, you know,
23   Judge, I can see where you're going on this, but if
24   you're going to go that way, here's some additional
25   instructions I think you need or whatever, let me know

214

1    that and then I continue to work on it, because by the
2    time we get done with the evidence, I'm going to have my
3    instructions pretty much good to go.
4        Obviously, they may change a little bit
5    depending on what the evidence is, but they'll be pretty
6    much ready to go and then, of course, you'll have time
7    to take formal objections and exceptions, but if I know
8    your objection in advance, you may convince me and I'll
9    change or at least I'll know what the issues are so I
10   have a chance to look at them and it won't take so long
11   for objections and exception. So that's a heads up how
12   I intend to handle the instructions.
13       I guess as far as I know, we have nothing
14   else scheduled between now and time of trial so -- and
15   nothing else that needs to be argued.
16       MR. RACETTE: One other thing. If we want
17   mediation -- if we have a mediation, should we just
18   contact you about that?
19       THE COURT: Let me know if you're interested
20   in mediation. Judge Strand would be the judge who would
21   handle that. I was going to mention and I mention in
22   every case at the final pretrial conference and that is
23   that I obviously cannot be involved in any sort of
24   settlement discussions. I don't want to know if there's
25   been any offers made or any demands made or what the

to purchase a complete copy of the transcript.

215

1 numbers may be.

2     Frankly, I assumed that the chances of

3 settling this case weren't very good because if you were

4 going to settle it, you know, frankly you should have

5 settled it a month ago or more before you spent all this

6 time working up all these motions, which I'm guessing

7 John Deere is thinking are -- are not inexpensive.

8     However, this is a case, frankly, that is I

9 think sort of ripe for settlement because I don't think

10 it's a slam dunk on either side of the issue here. I

11 think that the plaintiffs could end up with a big goose

12 egg or I think they could end up with a big number. You

13 know, if the evidence comes in and the jury concludes

14 that these two older women were discriminated against,

15 you know, they may not be happy with John Deere and, you

16 know, big corporations sometimes juries, you know, when

17 they get mad at them, they can throw the book at them.

18     So this is a case that both parties have

19 some incentive to settle. You've already spent a

20 tremendous amount of time and effort on this case; both

21 sides have. I mean obviously Deere has had to pay a lot

22 of money for the defense. Plaintiffs have got a lot of

23 time invested, not to mention expense. I don't know how

24 much you've spent so far, but it's not insignificant.

25     But, you know, you're not home yet by any

216

1 means. If this case actually goes four weeks, I mean,

2 you know, you can estimate for yourselves what the cost

3 of defense is. It's tremendous. And in addition, if we

4 get to the damages phase, these witnesses are going to

5 be -- these expert witnesses are going to be expensive.

6 You know, they don't come to Cedar Rapids and testify

7 live at the trial for nothing. They -- they aren't

8 going to be cheap either, you know, and so plaintiffs

9 are going to have to incur that expense. Defendant is

10 going to have to incur that expense. So this is still

11 -- even though you've already spent I'm sure just a ton

12 of money, this case is no where near to be home.

13     Plus, I'm not shy about admitting that, you

14 know, reversible error happens all the time and it can

15 certainly happen to me. In 28 years, I've been reversed

16 more than once and if you spend three or four weeks

17 trying this case -- and it -- whoever loses is probably

18 going to appeal it because of the money they're going to

19 have invested in it -- and then it gets reversed and you

20 have to do it over again, now you're really talking

21 about a lot of money. You know, a settlement eliminates

22     And so, you know, a settlement eliminates

23 not only the cost of defending or prosecuting the

24 appeal; it also eliminates the risk of having to retry

25 it whichever way it goes is not a happy thing.

217

1     You know, this laches issue is not -- you

2 know, I know that on summary judgment I concluded that

3 laches didn't apply and I may well conclude the same

4 thing after hearing evidence, but there were cases that

5 concluded that after some period of time, you know,

6 there's no magic number there, but at some point, it's

7 just too late. You just can't bring a case 20 years

8 later. The question is can you bring it seven or

9 eight years later? So that's not a done deal. You

10 know, there are just a lot of issues here that are ripe

11 for error.

12     And so I encourage the parties to sort of

13 rethink where they're at on settlement and to the extent

14 you're able to reach some agreement, that would be

15 preferable for any number of reasons.

16     MR. HARTY: One last thing, Your Honor. I

17 apologize. We -- I neglected to -- Deere asked us to

18 raise the fact that there's an existence of a CMS lien

19 in this case and I understand that a file has been

20 opened up, but we wanted to, for the record, alert the

21 Court to that.

22     THE COURT: CMS being medical bills?

23     MR. HARTY: Yeah; Medicare lien.

24     THE COURT: All right. Well, that's an

25 issue I guess we'll have to address if we get to the

218

1 damages phase. And I guess in that regard, I always

2 have to go back. There's an Iowa case -- I can't

3 remember the name of it now -- that lays out pretty

4 clearly what the process is in that regard. I know it

5 becomes a little complicated when Medicare is involved

6 and, in any event, the parties I guess should give that

7 some thought as well and we will talk about that if we

8 get to the damages issue.

9     Anything else we need to do today,

10 Mr. Racette?

11     MR. RACETTE: No, Your Honor.

12     THE COURT: Mr. Harty?

13     MR. HARTY: No, Your Honor.

14     THE COURT: All right. Have a good evening.

15     (Proceedings concluded at 5:46 p.m.)

16

17

18

19

20

21

22

23

24

25

to purchase a complete copy of the transcript.

219

1
2
3

4           C E R T I F I C A T E

5

6       I, Kay C. Carr, a Certified Shorthand Reporter of
    the State of Iowa, do hereby certify that I acted as the
7   official court reporter at the proceedings in the
    above-entitled matter at the time and place indicated.

8
        That I reported in shorthand all of the proceedings
9   had at the said time and place and that said shorthand
    notes were reduced to print by means of a computer-aided
10  transcription device under my direction and supervision,
    and that the foregoing typewritten pages are a full and
11  complete transcript of the shorthand notes so taken.

12      I further certify that I am not related to or
    employed by any of the parties to this proceeding, and
13  further that I am not a relative or employee of any
    attorney of counsel employed by the parties hereto or
14  financially interested in the action.

15      IN WITNESS WHEREOF, I have set my hand this 13th
    day of February, 2015.

16

17

18          ___/s/  Kay C. Carr_____
            Kay C. Carr
19          Certified Shorthand Reporter
            Registered Professional Reporter
20          Cedar Rapids, Iowa
            (319) 362-1543

to purchase a complete copy of the transcript.

## $

**$20,000** [1] - 75:5
**$500,000** [1] - 8:15

## 1

**1** [12] - 85:2, 89:8, 114:21, 115:16, 187:4, 187:14, 187:16, 187:25, 188:11, 204:8, 205:2, 210:10
**10** [24] - 24:9, 42:7, 52:12, 55:5, 55:11, 55:15, 57:8, 59:18, 60:21, 67:2, 85:8, 85:24, 86:3, 101:23, 102:9, 121:4, 128:13, 129:22, 156:19, 165:5, 175:3, 199:14, 199:16, 209:22
**100** [1] - 193:6
**103** [2] - 105:1, 105:9
**104** [3] - 11:15, 17:9, 201:1
**105** [1] - 102:9
**10:30** [1] - 200:2
**11** [5] - 70:6, 101:23, 124:5, 124:18, 192:15
**111** [1] - 2:4
**11th** [1] - 128:5
**12** [2] - 105:21, 145:1
**12-CV-2063** [1] - 3:4
**12-CV-2072** [1] - 3:5
**12th** [1] - 76:1
**13** [7] - 3:20, 80:2, 104:18, 145:1, 176:6, 181:3, 207:24
**134** [1] - 117:3
**135** [1] - 117:4
**14** [4] - 5:17, 6:4, 104:19, 104:25, 105:1, 105:9, 124:13, 145:1, 145:6, 195:20, 196:24
**146** [1] - 194:25
**149** [2] - 5:24, 6:3
**14th** [4] - 83:11, 91:9, 95:12, 96:23
**15** [2] - 80:14, 210:14
**16** [1] - 105:22
**1600** [1] - 2:7
**17** [2] - 34:5, 105:23
**18** [2] - 110:24, 176:7
**19** [1] - 115:19
**1995** [1] - 16:11
**1997** [2] - 28:18, 30:13
**1998** [1] - 184:23
**1999** [3] - 28:23, 30:13, 184:23
**1:57** [1] - 84:22

## 2

**2** [5] - 86:10, 124:8, 175:15, 191:21, 192:5
**20** [5] - 42:7, 84:21, 119:9,

154:20, 217:7
**2000** [1] - 184:24
**2001** [4] - 39:17, 39:24, 93:5, 184:24
**2002** [4] - 34:3, 135:19, 184:24, 203:1
**2003** [11] - 93:5, 116:2, 135:19, 152:20, 203:24, 204:8, 204:10, 204:16, 204:20, 204:24, 205:2
**2004** [14] - 23:7, 26:16, 26:22, 66:12, 97:23, 107:22, 130:20, 132:6, 141:9, 148:13, 203:1, 203:20, 205:16, 205:23
**2005** [5] - 94:25, 116:2, 124:5, 124:18, 128:5
**2006** [5] - 128:8, 128:13, 129:22, 130:10, 132:5
**2007** [4] - 34:3, 34:4, 37:25, 95:7
**2008** [2] - 34:4, 39:10
**2011** [1] - 126:3
**2013** [1] - 210:10
**2014** [1] - 202:20
**2015** [2] - 23:6, 202:20
**21** [4] - 121:17, 124:1, 205:16, 205:23
**22** [1] - 128:7
**23** [2] - 133:5, 133:8
**24** [4] - 135:15, 139:22, 198:3, 198:10
**25** [5] - 117:19, 139:22, 148:19, 148:22
**26** [1] - 203:11
**27** [2] - 140:17, 145:1
**2700** [1] - 2:4
**28** [5] - 143:7, 144:14, 144:19, 145:1, 216:15
**28-and-a-half** [1] - 4:11
**29** [3] - 144:17, 144:19, 145:1
**2:19** [1] - 84:22
**2:20** [1] - 84:21

## 3

**3** [6] - 89:7, 92:6, 92:8, 96:22, 124:12
**30** [4] - 144:20, 144:25, 145:1, 154:20
**30-something** [1] - 205:21
**300** [1] - 181:4
**31** [2] - 144:25, 192:15
**31st** [1] - 206:18
**32** [3] - 147:3, 148:18, 153:7
**33** [1] - 148:10
**34** [1] - 149:8
**35** [1] - 149:22
**36** [1] - 151:2
**360** [1] - 202:18
**37** [1] - 152:18

**38** [1] - 153:4
**39** [1] - 154:10

## 4

**4** [6] - 92:7, 92:8, 96:22, 97:23, 124:13, 175:15
**4,000** [1] - 181:6
**40** [1] - 155:24
**400** [1] - 2:10
**402/403** [1] - 87:8
**403** [8] - 22:11, 35:4, 96:10, 109:11, 117:22, 143:4, 183:19, 185:10
**404(b** [2] - 30:9, 88:4
**404(b)** [2] - 31:1, 88:3
**41** [3] - 5:18, 84:24, 156:10
**413** [1] - 16:11
**42** [1] - 192:23
**45** [1] - 196:22
**48** [2] - 161:6, 164:21
**49** [1] - 6:13
**4:28** [1] - 175:22
**4:30** [8] - 112:13, 112:23, 156:18, 156:20, 156:23, 175:11, 197:8, 197:16
**4:45** [1] - 175:22
**4th** [2] - 97:25, 98:3

## 5

**5** [7] - 40:20, 41:3, 41:4, 92:13, 96:22, 126:3, 184:22
**5,000** [1] - 4:13
**50** [1] - 147:21
**50309-3899** [1] - 2:8
**50312** [1] - 2:4
**52401-2030** [1] - 2:11
**54** [1] - 147:21
**55** [4] - 5:19, 148:19, 148:22, 148:24
**5:15** [1] - 194:22
**5:30** [1] - 197:19
**5:46** [1] - 218:15

## 6

**6** [20] - 3:21, 21:24, 22:6, 26:14, 46:23, 56:21, 72:1, 74:9, 74:14, 98:10, 99:15, 101:17, 101:18, 136:18, 151:5, 152:1, 152:15, 205:4, 205:5, 205:18
**6,000** [2] - 3:23, 193:8
**602** [3] - 186:7, 186:17, 190:3
**625** [1] - 2:10
**63** [2] - 148:23, 148:24
**63A** [2] - 148:19, 148:23
**64** [1] - 16:11

## 7

**7** [24] - 3:21, 21:8, 21:24, 22:7, 26:14, 49:5, 56:21, 70:22, 72:4, 73:7, 74:9, 74:14, 98:11, 99:15, 101:17, 101:18, 141:9, 151:5, 151:7, 152:2, 152:4, 152:15, 205:19, 206:4
**70** [1] - 42:5
**700** [1] - 2:7
**72** [2] - 153:10, 153:18
**77** [3] - 153:10, 153:18, 192:15

## 8

**8** [3] - 58:18, 101:21, 101:23
**80** [3] - 89:25, 92:19, 134:20
**801** [1] - 35:24
**81** [2] - 134:4, 134:7
**83** [8] - 122:7, 122:19, 122:21, 123:8, 124:2, 124:3, 124:4, 127:12
**84** [1] - 128:12
**85** [4] - 111:18, 111:20, 114:22, 115:16
**8527** [1] - 144:2
**86** [4] - 111:19, 111:22, 115:7, 154:22
**87** [3] - 111:21, 154:14, 154:22
**8:15** [1] - 195:13
**8:30** [2] - 112:14, 112:17, 195:16

## 9

**9** [5] - 62:1, 101:23, 112:13, 204:19, 204:24
**90** [1] - 188:6
**9th** [2] - 204:9

## A

**ability** [2] - 78:20, 179:11
**able** [20] - 27:1, 40:7, 53:2, 82:10, 82:15, 83:20, 88:20, 101:14, 111:10, 113:10, 113:11, 115:11, 118:7, 118:19, 156:3, 175:12, 185:16, 197:16, 207:14, 217:14
**absence** [1] - 71:13
**absent** [1] - 133:22
**absolutely** [3] - 45:23, 55:9, 199:19
**abuse** [1] - 39:17
**accept** [1] - 208:9

Downloaded from ... to purchase a complete copy of the transcript.

**access** [1] - 14:22
**accident** [4] - 38:16, 39:10, 40:6, 40:16
**accidents** [1] - 39:2
**accomplish** [1] - 157:6
**accomplished** [1] - 175:21
**according** [1] - 143:2
**account** [1] - 18:4
**accurate** [2] - 185:18, 188:12
**accurately** [3] - 68:21, 68:24, 84:11
**accusations** [1] - 117:12
**accuse** [1] - 55:21
**achieve** [1] - 40:8
**acknowledge** [1] - 187:21
**act** [1] - 151:14
**Act** [2] - 100:21, 102:7
**acted** [1] - 138:23
**action** [19] - 38:21, 61:6, 62:15, 70:9, 70:14, 70:16, 70:20, 71:10, 71:13, 72:7, 72:11, 73:22, 73:24, 74:3, 75:17, 93:8, 94:2, 135:8, 143:25
**actionable** [2] - 96:5, 96:13
**actions** [6] - 38:11, 38:14, 39:19, 92:7, 130:7, 208:12
**actively** [6] - 7:13, 8:23, 22:25, 77:16, 126:16, 128:16
**acts** [7] - 30:9, 39:2, 89:17, 92:14, 92:23, 93:3, 97:5
**actual** [8] - 40:9, 40:15, 50:2, 111:9, 111:21, 136:25, 137:2, 210:12
**add** [4] - 101:24, 102:3, 148:17, 156:12
**addition** [8] - 14:14, 160:4, 160:19, 172:21, 173:23, 193:8, 194:2, 216:3
**additional** [9] - 23:23, 23:24, 59:5, 80:14, 114:13, 153:24, 162:17, 196:22, 213:24
**additionally** [1] - 101:3
**address** [10] - 47:1, 47:16, 62:24, 65:19, 99:21, 118:5, 137:4, 137:5, 189:1, 217:25
**addressed** [6] - 66:9, 92:15, 92:24, 96:2, 96:3, 100:21
**addresses** [1] - 16:12
**adds** [2] - 79:2, 79:3
**ADEA** [4] - 48:7, 101:4, 102:22, 103:3
**adequate** [1] - 115:11
**adequately** [1] - 147:12
**Administration** [2] - 14:24, 19:16
**administrative** [2] - 62:1,

63:20
**admissibility** [7] - 12:17, 33:15, 42:1, 54:25, 93:21, 149:17, 189:6
**admissible** [48] - 12:25, 15:24, 19:12, 21:5, 21:17, 21:18, 22:8, 22:10, 22:12, 30:8, 35:23, 36:20, 37:7, 39:3, 39:6, 41:23, 49:1, 49:15, 49:16, 51:13, 82:22, 84:14, 91:20, 91:22, 91:23, 97:3, 98:4, 98:6, 98:8, 98:19, 99:6, 103:25, 106:3, 106:11, 115:12, 117:20, 119:12, 119:13, 120:19, 120:21, 126:25, 127:19, 128:6, 143:4, 143:11, 152:11, 152:16, 192:4
**admission** [2] - 115:17, 127:17
**admissions** [7] - 35:22, 58:9, 58:11, 126:22, 126:24, 128:2, 188:11
**admit** [3] - 21:25, 184:9, 192:3
**admitted** [7] - 33:19, 47:10, 50:22, 73:6, 102:11, 145:18, 152:3
**admitting** [3] - 133:22, 147:17, 216:13
**advance** [4] - 47:24, 164:21, 211:18, 214:8
**advanced** [2] - 26:1, 204:2
**advantageous** [1] - 211:2
**advantages** [1] - 165:19
**adverse** [16] - 70:9, 70:13, 70:16, 70:20, 71:10, 71:13, 72:7, 72:10, 73:22, 73:23, 74:3, 75:17, 146:18, 160:25, 174:17, 211:9
**advise** [1] - 8:11
**advised** [1] - 114:8
**advisement** [1] - 210:17
**affair** [2] - 104:21, 105:2, 105:4
**affect** [2] - 44:3, 189:6
**affected** [7] - 42:11, 42:14, 42:24, 70:24, 119:22, 120:5
**affidavit** [2] - 137:4, 138:2
**affirmatively** [1] - 181:25
**afraid** [1] - 103:16
**afternoon** [2] - 19:4, 151:11
**afterwards** [1] - 22:7
**age** [34] - 47:18, 48:10, 48:16, 48:21, 49:6, 74:15, 93:4, 94:15, 95:21, 103:3, 117:12, 124:9, 125:1, 125:9, 126:10, 126:13, 126:22, 127:24, 132:6, 133:5, 135:7, 136:2, 136:5, 137:11, 137:19, 138:15, 141:1, 142:4, 142:9, 142:11, 142:18, 145:11,

155:25
**age-related** [1] - 155:25
**agency** [1] - 53:6
**agenda** [3] - 124:7, 124:8, 126:11
**ages** [1] - 115:3
**ago** [11] - 57:8, 60:21, 188:7, 192:6, 199:14, 199:16, 200:20, 207:5, 207:20, 215:5
**agree** [40] - 8:4, 12:17, 15:3, 15:5, 19:5, 19:10, 19:16, 24:23, 37:15, 38:22, 40:23, 40:24, 41:24, 49:21, 53:20, 56:23, 56:25, 64:20, 65:13, 65:18, 78:25, 80:16, 85:20, 86:4, 94:20, 98:12, 104:13, 123:14, 125:24, 140:5, 143:10, 145:17, 187:5, 190:1, 194:3, 194:5, 194:17, 199:20, 201:18, 206:3
**agreement** [7] - 7:17, 32:15, 61:19, 101:19, 179:23, 180:2, 217:14
**agrees** [1] - 57:18
**ahead** [4] - 53:13, 170:24, 173:19, 185:13
**akin** [1] - 13:22
**albeit** [1] - 79:1
**Albro** [1] - 167:18
**alert** [4] - 44:8, 91:16, 138:16, 217:20
**alerted** [2] - 180:9, 188:13
**alerts** [2] - 79:9, 183:15
**Allaman** [1] - 167:23
**allegation** [1] - 141:15
**allegations** [9] - 30:16, 30:17, 30:22, 105:18, 124:25, 125:19, 138:19, 143:18, 209:19
**alleged** [32] - 7:10, 22:19, 24:2, 28:14, 28:18, 39:7, 39:18, 41:11, 41:12, 43:8, 69:25, 74:3, 81:20, 85:5, 85:10, 92:6, 92:14, 92:23, 104:21, 105:2, 105:4, 105:15, 106:1, 121:17, 121:19, 122:3, 133:5, 143:8, 144:22, 149:9, 155:25
**allegedly** [5] - 63:23, 104:15, 121:7, 121:9, 140:23
**alleges** [1] - 25:6
**alleging** [4] - 41:14, 47:17, 90:19, 105:25
**Allen** [6] - 139:24, 139:25, 140:2, 140:6, 140:12, 168:3
**allow** [5] - 52:18, 96:6, 113:21, 117:23, 174:19
**allowed** [5] - 52:8, 54:7, 88:4, 204:4, 204:5
**allowing** [1] - 102:10

**allows** [1] - 203:11
**alluded** [2] - 50:10, 99:8
**almost** [4] - 24:5, 30:16, 94:25, 175:7
**alone** [1] - 87:25
**altered** [2] - 187:1, 189:3
**alternates** [1] - 196:25
**altogether** [1] - 125:11
**ambush** [2] - 190:2, 190:4
**America** [1] - 2:10
**amount** [9] - 3:18, 13:11, 18:16, 19:23, 118:14, 121:15, 196:19, 207:2, 215:20
**amounts** [4] - 10:25, 11:20, 17:13, 19:14
**AMY** [1] - 2:3
**Amy** [2] - 3:10, 189:24
**analogous** [2] - 74:14, 75:21
**analysis** [3] - 87:8, 110:25, 111:7
**Angel** [1] - 3:12
**ANGEL** [1] - 2:6
**angels** [1] - 151:17
**animus** [6] - 81:1, 93:12, 97:9, 125:4, 130:16, 138:7
**ANNA** [1] - 2:6
**annotated** [4] - 191:25, 193:5, 194:5, 194:17
**announced** [1] - 55:18
**anonymous** [5] - 115:19, 116:1, 117:9, 117:14, 117:23
**answer** [6] - 19:19, 54:13, 145:14, 147:16, 199:15, 199:18
**answered** [1] - 132:10
**answers** [3] - 13:1, 54:14, 150:24
**anticipate** [6] - 33:8, 44:19, 45:1, 46:3, 46:16, 184:6
**anticipated** [2] - 164:25, 197:11
**anticipating** [1] - 195:23
**anyway** [3] - 44:11, 157:18, 188:22
**anyways** [1] - 144:9
**apologize** [5] - 12:12, 18:10, 123:10, 191:14, 217:17
**appeal** [8] - 76:17, 77:15, 78:1, 79:1, 88:13, 89:2, 216:18, 216:24
**appealed** [1] - 79:17
**appealing** [1] - 78:4
**appear** [12] - 6:3, 40:7, 155:4, 157:22, 158:22, 158:25, 159:11, 164:10, 164:14, 168:19, 169:4, 194:25
**APPEARANCES** [1] - 2:1
**appearing** [2] - 170:16,

to purchase a complete copy of the transcript.

170:20
**apple** [1] - 82:25
**application** [4] - 58:13, 72:18, 122:4
**applications** [5] - 15:9, 15:12, 15:20, 15:23, 24:18
**applied** [2] - 14:15, 20:3
**applies** [1] - 182:7
**apply** [4] - 11:4, 64:3, 71:18, 217:3
**apportion** [2] - 99:23, 100:4
**apportionment** [2] - 99:25, 100:6
**appreciate** [1] - 210:10
**approach** [5] - 27:22, 112:2, 160:22, 199:19, 199:20
**appropriate** [8] - 15:2, 16:4, 16:5, 103:14, 183:17, 203:12, 210:5, 211:6
**April** [7] - 91:9, 95:12, 96:23, 124:5, 124:18, 126:3, 128:5
**area** [4] - 52:18, 119:6, 119:7
**areas** [1] - 82:7
**arguably** [3] - 94:15, 95:20, 113:22
**argue** [20] - 16:3, 17:15, 27:23, 53:19, 53:22, 59:24, 78:20, 80:20, 100:11, 106:3, 107:16, 110:2, 114:6, 119:13, 141:10, 149:11, 157:2, 180:12, 202:14, 213:9
**argued** [4] - 59:12, 87:24, 213:12, 214:15
**argues** [1] - 57:25
**arguing** [7] - 26:25, 39:6, 45:6, 53:14, 68:16, 70:19, 202:3
**argument** [48] - 8:5, 17:25, 19:22, 23:19, 23:24, 26:2, 26:10, 27:3, 32:17, 34:17, 44:11, 47:17, 47:23, 48:9, 53:23, 59:8, 59:23, 60:23, 69:6, 70:24, 71:23, 72:3, 77:18, 86:23, 97:4, 106:22, 108:24, 113:23, 119:18, 121:12, 134:25, 135:5, 138:23, 152:23, 153:18, 153:24, 154:8, 156:2, 160:15, 162:7, 181:20, 182:5, 192:18, 201:12, 208:10, 211:15, 211:17, 212:22
**arguments** [10] - 17:10, 26:19, 28:7, 60:15, 163:22, 182:12, 201:4, 211:21, 212:9, 212:15
**arise** [1] - 77:7
**arises** [2] - 34:23, 52:3
**articulate** [1] - 82:10

**Asia** [2] - 43:11, 46:12
**aspect** [6] - 36:4, 36:6, 36:21, 101:25, 105:12, 165:18
**assault** [4] - 40:12, 90:20, 90:21, 91:6
**assaulted** [1] - 39:24
**assert** [2] - 87:7, 88:2
**asserted** [4] - 42:5, 81:14, 120:14, 131:5, 131:7, 133:15
**assertion** [1] - 41:8
**assessing** [1] - 57:15
**assigned** [2] - 137:3, 139:8, 161:14
**assistant** [2] - 152:5, 163:19
**associated** [4] - 32:20, 49:20, 79:4, 99:18
**assume** [17] - 7:23, 35:2, 36:19, 64:8, 73:5, 109:22, 116:3, 124:17, 131:5, 157:12, 158:20, 160:2, 163:1, 163:15, 174:3, 174:14, 209:22
**assumed** [4] - 62:18, 78:17, 146:16, 215:2
**assuming** [17] - 14:1, 14:6, 53:11, 53:12, 74:23, 83:14, 109:16, 124:7, 130:18, 131:2, 150:25, 162:18, 184:25, 185:9, 193:14, 211:15, 211:16
**Aten** [3] - 164:9, 168:5, 168:18
**attached** [1] - 193:18
**attachment** [1] - 193:24
**attack** [2] - 36:14, 110:21
**attempt** [2] - 44:9, 56:17
**attempting** [2] - 56:14, 186:17
**attendance** [3] - 56:8, 158:21, 169:1
**attention** [5] - 109:13, 148:1, 182:20, 190:16, 190:18
**attorney** [7] - 114:7, 144:6, 145:4, 181:19, 182:4, 182:7, 182:8
**attorneys** [11] - 3:10, 3:11, 8:11, 37:24, 112:14, 160:21, 174:7, 188:20, 195:15, 197:9, 199:25
**attributable** [1] - 107:15
**attribute** [1] - 99:16
**attributes** [3] - 83:14, 83:15, 136:2
**audio** [1] - 160:5
**audit** [19] - 80:19, 80:24, 135:15, 135:17, 135:25, 136:6, 136:11, 136:25, 137:2, 137:4, 137:6, 137:20, 138:14, 139:8, 139:10, 139:16, 139:17,

207:15
**audit-related** [1] - 80:24
**authentic** [2] - 187:5, 187:19
**authorities** [1] - 101:3
**authority** [1] - 74:12
**authorization** [2] - 148:12, 149:2
**auto** [3] - 39:10, 40:6, 40:16
**automatically** [1] - 97:7
**available** [11] - 24:13, 100:6, 125:16, 175:6, 196:14, 203:23, 206:20, 207:2, 207:23, 209:4, 212:12
**availed** [1] - 208:18
**Avenue** [1] - 2:4
**average** [4] - 4:9, 5:3, 5:8, 46:19
**avoid** [1] - 123:18
**award** [1] - 121:12
**aware** [4] - 11:8, 62:14, 102:4, 119:7

## B

**backpay** [1] - 17:3
**bad** [5] - 82:25, 89:16, 94:1, 121:2, 198:4
**badly** [1] - 82:22
**baggage** [1] - 142:9
**bar** [1] - 120:23
**base** [1] - 113:14
**based** [19] - 21:11, 34:24, 36:11, 44:17, 61:6, 66:11, 80:4, 96:12, 97:7, 103:14, 111:13, 118:19, 135:16, 136:23, 140:4, 152:22, 179:9, 206:22, 208:12
**basis** [18] - 18:21, 41:9, 96:11, 121:15
**Batiste** [1] - 33:16
**bear** [1] - 136:17
**bears** [1] - 84:10
**beautiful** [1] - 175:4
**beauty** [2] - 172:13, 175:3
**became** [1] - 62:14
**become** [3] - 12:25, 27:23, 113:18
**becomes** [4] - 27:21, 76:18, 140:14, 218:5
**began** [2] - 11:5, 14:8
**begin** [3] - 50:2, 103:18, 114:6
**beginning** [3] - 57:7, 184:2, 184:8
**begs** [2] - 198:12, 203:7
**behalf** [4] - 2:4, 2:8, 2:11, 9:5
**behavior** [1] - 94:1
**behaviors** [1] - 94:14
**behind** [3] - 51:3, 137:6,

137:20
**belabor** [1] - 19:3
**belief** [4] - 32:14, 104:20, 106:10, 106:21
**believes** [8] - 107:24, 108:2, 108:4, 108:5, 108:6, 130:6
**bench** [3] - 181:13, 199:19, 199:20
**benefit** [2] - 13:22, 127:9
**benefits** [30] - 9:2, 9:3, 9:4, 9:23, 10:8, 10:13, 10:17, 10:20, 11:4, 11:7, 11:19, 11:20, 14:1, 14:9, 14:16, 14:23, 20:2, 20:4, 20:14, 22:3, 22:4, 25:19, 25:20, 26:24, 27:17, 71:16, 85:9, 121:20, 122:5, 143:17
**Bennett** [1] - 64:1
**Berkley** [1] - 164:13
**best** [4] - 6:8, 6:12, 29:22, 52:20
**BETH** [1] - 2:3
**better** [7] - 46:19, 79:16, 155:13, 182:15, 191:16, 209:12, 210:21
**between** [13] - 5:18, 20:20, 34:3, 34:4, 69:4, 103:2, 124:5, 126:3, 156:19, 161:8, 208:4, 211:4, 214:14
**Beuter** [4] - 151:2, 151:3, 151:14, 168:23
**beyond** [4] - 17:24, 86:17, 89:4, 122:17
**bias** [5] - 79:25, 81:25, 88:1, 88:5, 89:6
**bifurcate** [1] - 27:3
**bifurcated** [2] - 20:19, 166:6
**bifurcation** [1] - 20:8
**big** [13] - 11:17, 41:25, 45:18, 46:2, 46:4, 46:6, 46:7, 74:25, 90:20, 201:4, 215:11, 215:12, 215:16
**bills** [1] - 217:22
**binders** [6] - 3:20, 3:22, 6:7, 154:20, 181:4, 181:7
**binding** [1] - 53:9
**bit** [4] - 27:13, 79:2, 101:21, 214:4
**Black** [1] - 122:10
**black** [1] - 110:19
**blame** [5] - 39:21, 50:3, 50:19, 57:15, 200:3
**blew** [1] - 91:10
**blind** [1] - 125:11
**blowup** [1] - 95:11
**blush** [1] - 71:8
**body** [3] - 62:9, 62:22, 63:11
**bolts** [1] - 197:23
**bone** [1] - 108:12
**bonus** [1] - 75:5

to purchase a complete copy of the transcript.

**book** [1] - 215:17
**books** [3] - 154:16
**bothered** [1] - 110:5
**bothers** [1] - 192:21
**bothersome** [2] - 109:24, 110:1
**bottom** [1] - 188:22
**bound** [1] - 77:13
**box** [1] - 106:12
**boy** [1] - 61:20
**brain** [2] - 84:6, 123:24
**brains** [1] - 208:25
**Brammer** [3] - 164:9, 169:3, 179:9
**breaches** [1] - 105:16
**break** [6] - 43:11, 75:25, 84:20, 165:18, 166:3, 175:18
**Brian** [4] - 97:11, 104:20, 158:15, 177:6
**bridges** [1] - 212:24
**brief** [16] - 6:13, 78:3, 84:4, 99:1, 99:22, 101:2, 105:18, 117:16, 135:25, 141:14, 148:16, 149:3, 149:14, 209:8, 210:8
**briefed** [9] - 30:6, 77:17, 99:9, 100:17, 156:1, 156:2, 156:3, 209:9, 209:14
**briefing** [2] - 67:1, 77:25
**briefly** [6] - 174:24, 175:25, 181:1, 195:8, 209:7, 210:9
**briefs** [8] - 18:11, 67:3, 99:10, 151:9, 211:14, 211:16, 212:4
**bright** [1] - 204:22
**bring** [10] - 34:11, 37:15, 38:16, 81:5, 89:12, 190:15, 190:17, 209:25, 217:7, 217:8
**bringing** [5] - 37:8, 40:8, 40:11, 50:17, 147:25
**brings** [2] - 49:10, 83:11
**broad** [4] - 21:1, 21:13, 173:21, 203:11
**broken** [2] - 42:17, 108:12
**brought** [17] - 8:2, 38:9, 60:20, 76:1, 76:21, 77:6, 77:9, 79:6, 86:11, 89:10, 94:3, 112:4, 135:8, 135:12, 144:10, 157:14, 192:4
**bugging** [1] - 108:7
**bulk** [1] - 41:22
**bumped** [3] - 22:6, 26:13, 99:15
**bunch** [7] - 24:1, 45:2, 45:19, 132:16, 142:13, 172:12, 185:22
**burden** [6] - 68:6, 70:19, 99:24, 100:2, 100:4, 103:1
**burned** [1] - 142:17
**Burzynski** [1] - 169:21
**business** [4] - 21:10,

109:13, 118:3, 127:14
**busy** [2] - 134:10, 212:17
**buy** [2] - 26:2, 207:3
**buyers** [1] - 67:7

## C

**calculation** [2] - 18:23, 19:1
**cannot** [7] - 22:17, 51:2, 58:25, 59:7, 74:17, 105:13, 214:23
**caption** [3] - 62:10, 62:21, 63:11
**car** [5] - 38:16, 94:24, 95:2, 95:3, 99:5
**care** [1] - 53:10
**career** [1] - 119:11
**carefully** [1] - 103:17
**Cargill** [1] - 55:25
**carrying** [1] - 142:9
**cart** [1] - 203:23
**case** [178] - 4:3, 4:6, 4:20, 4:21, 5:7, 6:1, 6:9, 8:2, 11:6, 11:17, 11:22, 17:2, 20:16, 20:20, 21:1, 22:17, 23:14, 23:18, 30:10, 31:6, 31:7, 32:4, 32:8, 32:10, 32:19, 33:1, 33:4, 33:6, 33:10, 33:23, 33:24, 33:25, 34:8, 34:10, 34:13, 35:6, 36:3, 36:5, 36:9, 36:20, 39:18, 40:24, 41:1, 41:7, 43:3, 43:6, 44:3, 46:8, 47:11, 48:15, 49:25, 53:2, 53:21, 54:5, 55:1, 56:3, 56:13, 56:24, 57:16, 58:7, 60:20, 61:13, 63:1, 63:18, 63:25, 64:1, 65:2, 67:6, 67:11, 67:19, 68:2, 68:11, 68:15, 69:2, 70:2, 73:5, 75:15, 75:18, 77:15, 77:21, 77:23, 78:15, 78:18, 78:21, 78:22, 79:1, 79:4, 79:12, 81:15, 89:9, 90:4, 94:20, 94:23, 100:25, 101:11, 102:1, 102:17, 108:17, 115:14, 116:22, 117:18, 125:7, 125:13, 125:17, 125:25, 134:20, 135:5, 140:7, 143:9, 147:16, 148:8, 151:18, 151:20, 151:22, 153:21, 155:9, 155:15, 155:17, 158:16, 164:25, 166:12, 166:16, 168:14, 168:18, 173:7, 173:24, 174:13, 177:15, 181:8, 181:9, 181:14, 181:15, 181:16, 182:8, 182:11, 182:15, 182:16, 182:18, 183:8, 184:10, 187:13, 188:20, 189:9, 189:17, 193:6, 194:12, 195:9, 195:24, 196:5,

196:25, 198:8, 200:13, 203:16, 204:1, 204:17, 204:20, 205:6, 209:13, 209:22, 210:5, 212:2, 214:22, 215:3, 215:8, 215:18, 215:20, 216:1, 216:12, 216:17, 217:7, 217:19, 218:2
**cases** [33] - 3:2, 23:16, 33:15, 34:2, 34:5, 54:7, 54:24, 56:16, 62:17, 65:23, 72:22, 72:24, 75:12, 75:22, 77:13, 77:22, 78:1, 78:5, 78:6, 78:9, 78:21, 79:21, 88:4, 92:19, 117:16, 132:15, 166:13, 183:24, 183:25, 187:16, 188:6, 192:20, 217:4
**casual** [1] - 150:14
**category** [2] - 147:20, 186:2
**Category** [10] - 183:8, 183:9, 183:15, 183:20, 183:21, 184:1, 184:3, 184:7, 184:13, 184:17
**Cathy** [1] - 152:19
**causation** [2] - 100:14, 101:4, 101:5
**caused** [2] - 39:19, 81:18, 100:23
**cautionary** [2] - 52:20, 54:2, 54:7
**Cedar** [2] - 2:11, 216:6
**Center** [1] - 2:4
**central** [2] - 96:1, 96:10
**certain** [12] - 39:8, 59:10, 65:7, 85:3, 94:21, 103:14, 107:18, 120:6, 124:24, 125:24, 139:5, 167:19
**certainly** [29] - 31:8, 33:8, 33:11, 36:1, 37:3, 39:12, 40:10, 40:16, 43:13, 52:2, 55:20, 59:11, 63:4, 83:7, 91:1, 94:7, 96:6, 99:4, 125:12, 137:20, 138:14, 139:3, 140:8, 140:14, 147:23, 148:4, 208:22, 212:3, 216:15
**chair** [1] - 91:12
**challenges** [1] - 196:23
**chance** [2] - 134:11, 155:14, 214:10
**chances** [1] - 215:2
**change** [10] - 71:5, 71:16, 71:17, 71:20, 72:12, 72:14, 121:7, 192:13, 214:4, 214:9
**changed** [2] - 187:12, 206:22
**changes** [5] - 72:23, 121:19, 132:5, 132:24, 198:13
**character** [1] - 155:19
**characterization** [1] - 97:20

**characterize** [2] - 95:25, 105:17
**characterized** [1] - 151:13
**charge** [3] - 31:7, 38:18, 40:12
**charged** [1] - 39:16
**charges** [1] - 66:14
**Charlie's** [1] - 151:17
**chart** [10] - 111:3, 111:9, 111:11, 111:12, 111:21, 111:23, 115:2, 191:22, 204:5, 204:10
**charts** [3] - 80:24, 113:19, 115:7
**cheap** [1] - 216:8
**cheating** [2] - 109:21, 110:6
**check** [3] - 7:9, 106:12, 185:23
**Chelsey** [1] - 167:23
**chief** [5] - 89:10, 116:22, 168:18, 173:7, 184:10
**chime** [3] - 20:6, 64:16, 145:25
**China** [1] - 41:16
**choose** [2] - 4:16, 80:21
**Christensen** [1] - 169:24
**circling** [1] - 185:22
**Circuit** [8] - 16:9, 16:11, 30:7, 33:17, 47:25, 77:16, 78:2, 183:2
**circumstances** [2] - 124:3, 146:24
**cite** [3] - 16:11, 79:22, 88:5
**cited** [3] - 16:10, 95:8, 117:16
**Civil** [3] - 31:6, 100:21, 102:7
**claim** [46] - 11:10, 17:3, 23:21, 23:23, 32:19, 33:5, 43:14, 44:22, 49:14, 49:15, 54:23, 63:23, 64:19, 72:16, 76:12, 78:17, 80:9, 86:15, 88:11, 88:12, 88:14, 88:17, 88:18, 88:19, 88:21, 88:23, 96:2, 96:5, 99:12, 102:22, 102:23, 103:3, 103:4, 108:7, 125:3, 129:2, 129:14, 132:4, 138:9, 140:25, 142:5, 143:15, 144:5, 169:12, 207:3
**claimant's** [1] - 144:3
**claimed** [5] - 39:25, 90:13, 125:1, 131:14, 206:4
**claiming** [8] - 44:2, 44:10, 48:21, 69:14, 69:21, 89:17, 132:22, 207:18
**claims** [31] - 7:10, 26:5, 32:17, 36:16, 36:23, 78:7, 78:13, 81:15, 84:12, 86:11, 87:6, 87:7, 87:9, 87:10, 88:25, 89:1, 98:11, 98:13, 102:25, 103:8, 122:12,

to purchase a complete copy of the transcript.

123:12, 123:16, 126:14, 127:21, 141:19, 148:5, 149:7, 153:22, 196:8, 206:10

**clarification** [1] - 74:17
**clarify** [2] - 13:21, 89:9
**class** [1] - 42:17
**classic** [3] - 75:14, 94:5, 94:6
**classifications** [1] - 204:2
**clean** [3] - 192:4, 192:12, 192:14
**clear** [14] - 60:10, 64:19, 71:7, 73:17, 82:8, 115:21, 123:18, 127:1, 130:21, 146:17, 155:12, 175:24, 180:1, 191:16
**clear-cut** [1] - 71:7
**clearer** [1] - 73:18
**clearly** [13] - 34:7, 40:4, 40:13, 41:10, 41:17, 80:11, 97:17, 102:14, 117:7, 142:6, 145:12, 191:22, 218:4
**CLERK** [1] - 196:15
**client** [3] - 29:10, 29:11, 34:13
**clients** [11] - 4:22, 51:1, 81:1, 100:14, 118:14, 125:8, 182:25, 189:10, 189:11, 192:2, 209:23
**clients'** [1] - 147:25
**close** [1] - 30:12
**closed** [1] - 206:18
**closeness** [1] - 30:24
**closer** [3] - 9:16, 95:23, 95:24
**closing** [7] - 59:23, 60:15, 160:14, 181:20, 182:5, 182:12
**clothing** [1] - 160:17
**clue** [2] - 199:12, 199:17
**Clyde** [14] - 65:14, 81:16, 81:21, 82:1, 84:10, 84:12, 129:17, 129:20, 130:7, 130:8, 130:13, 155:25, 158:15, 170:8
**Clyde's** [3] - 130:5, 132:5, 132:12
**CMS** [2] - 217:18, 217:22
**Coberly** [1] - 196:14
**cognitive** [1] - 84:5
**coincidentally** [1] - 205:20
**collateral** [15] - 8:20, 11:16, 12:7, 16:12, 16:14, 17:25, 18:9, 18:20, 19:22, 24:13, 24:23, 28:6, 51:6, 77:5, 80:6
**collaterally** [1] - 34:12
**colleagues** [1] - 199:23
**collecting** [3] - 10:12, 20:13, 20:14
**collection** [1] - 188:1

**college** [1] - 121:8
**combination** [1] - 13:7
**comfortable** [1] - 212:25
**coming** [10] - 8:14, 28:6, 51:20, 62:17, 76:11, 79:15, 85:24, 91:19, 197:12, 200:14
**comment** [4] - 141:19, 143:3, 156:2, 189:7
**comments** [13] - 43:22, 117:9, 117:14, 117:23, 118:13, 127:3, 141:4, 141:6, 142:23, 143:14, 155:25, 180:19, 189:5
**Commission** [1] - 31:7
**commodities** [5] - 69:7, 69:22, 152:4, 154:5
**commodity** [1] - 154:6
**common** [1] - 136:3
**communicate** [1] - 169:16
**communicated** [1] - 139:25
**communications** [2] - 139:23, 153:5
**comp** [4] - 38:21, 144:2, 144:5, 145:4
**companies** [1] - 13:23, 44:19, 44:21
**Company** [7] - 3:3, 3:5, 16:21, 18:9, 18:19, 19:15, 102:8
**company** [5] - 25:7, 25:16, 26:1, 109:12, 151:15
**companywide** [1] - 42:16
**comparable** [1] - 33:24
**comparison** [1] - 203:23
**compel** [8] - 56:7, 190:15, 190:21, 191:6, 191:7, 209:21, 209:22, 210:1
**compensated** [1] - 28:3
**compensation** [6] - 9:4, 11:4, 11:6, 11:10, 143:9, 143:15
**compiled** [1] - 115:3
**compiling** [1] - 113:19
**complain** [1] - 190:24
**complained** [2] - 37:1, 37:25
**complaining** [1] - 96:19
**complains** [1] - 83:12
**complaint** [8] - 31:6, 62:9, 62:22, 63:10, 64:9, 64:13, 79:8, 133:22
**complaints** [15] - 28:9, 30:15, 32:22, 35:6, 37:4, 37:5, 38:10, 39:8, 52:3, 62:8, 76:23, 133:19, 144:18, 147:5, 147:9
**complete** [3] - 43:16, 155:3, 190:5
**completed** [1] - 15:13
**completely** [4] - 79:22, 81:6, 117:14, 212:25
**complex** [2] - 69:23

**complexity** [2] - 69:7, 154:4
**complicated** [6] - 102:17, 102:21, 103:6, 193:3, 194:12, 218:5
**complicating** [1] - 203:13
**complied** [1] - 115:6
**components** [1] - 155:20
**concede** [11] - 25:3, 59:14, 65:2, 93:6, 106:2, 110:4, 119:12, 145:21, 149:10, 152:24, 192:3
**conceded** [1] - 170:20
**concedes** [2] - 95:18, 97:15
**conceding** [4] - 80:10, 97:1, 120:15, 163:20
**conceivable** [2] - 126:19, 126:20
**concentrate** [1] - 213:3
**concept** [1] - 135:3
**concern** [2] - 24:21, 86:6
**concerned** [1] - 110:8
**concerning** [4] - 7:8, 136:12, 154:24, 209:19
**concerns** [5] - 81:9, 109:16, 124:9, 124:12, 126:12
**conclude** [2] - 27:18, 217:3
**concluded** [7] - 61:5, 67:15, 73:2, 208:5, 217:2, 217:5, 218:15
**concludes** [1] - 215:13
**conclusion** [1] - 135:19
**conclusions** [4] - 49:19, 57:23, 138:24, 139:5
**condition** [4] - 15:14, 83:12, 84:13, 179:10
**conditional** [1] - 167:18
**conditions** [1] - 83:19
**conduct** [2] - 147:12, 147:18
**conducted** [7] - 115:22, 116:3, 116:5, 135:18, 153:9, 153:13, 153:20
**confer** [1] - 194:3
**conference** [7] - 3:8, 105:12, 156:21, 157:8, 190:17, 190:25, 214:22
**conferences** [1] - 194:20
**confess** [1] - 62:16
**configure** [1] - 159:20
**confirmed** [1] - 56:8
**conformance** [1] - 38:1
**confuse** [2] - 47:15, 70:17
**confused** [3] - 106:5, 123:1, 123:5
**confusing** [2] - 173:6, 193:23
**confusion** [1] - 123:19
**consider** [7] - 20:23, 22:11, 52:22, 57:13, 102:13, 150:19

**consideration** [1] - 57:19
**considered** [6] - 13:13, 15:22, 130:5, 132:5, 132:12, 132:24
**considering** [1] - 130:10
**consisted** [3] - 49:17, 52:25, 115:21
**consistent** [2] - 44:20, 122:19
**consolidated** [2] - 23:16, 165:1
**constitute** [1] - 128:2
**constitutes** [1] - 66:5
**construe** [1] - 94:8
**construed** [1] - 96:15
**consuming** [1] - 193:16
**contact** [1] - 214:18
**contain** [1] - 145:10
**contained** [3] - 15:8, 192:22, 211:15
**contemplate** [1] - 18:24
**contemporaneously** [1] - 145:2
**contention** [2] - 92:22, 203:25
**contest** [1] - 68:14
**contested** [1] - 6:18
**contesting** [2] - 46:6, 135:2
**context** [2] - 51:14, 172:23
**contingent** [1] - 27:15
**continually** [1] - 147:11
**continuance** [8] - 10:2, 10:5, 11:19, 13:5, 13:22, 13:25, 16:24, 26:23
**continuation** [6] - 8:25, 9:10, 9:13, 9:18, 9:23, 27:16
**continue** [2] - 112:21, 214:1
**continued** [4] - 20:1, 22:2, 25:18
**continues** [1] - 124:13
**continuing** [1] - 29:20
**contradiction** [1] - 205:14
**contrary** [1] - 70:16
**control** [1] - 95:19
**conviction** [1] - 105:21
**convince** [1] - 214:8
**convinced** [2] - 104:6, 182:3
**copies** [6] - 157:12, 185:5, 185:18, 192:8, 192:14, 209:25
**copy** [5] - 32:6, 163:4, 188:12, 192:5, 207:14
**corporate** [3] - 140:13, 158:25, 170:14
**corporations** [1] - 215:16
**correct** [22] - 9:25, 11:1, 11:11, 12:3, 13:14, 14:6, 14:10, 14:13, 14:17, 16:1, 30:1, 43:7, 46:22, 48:23, 53:16, 87:18, 89:20, 98:15,

Case 6:12-cv-02063-JSS    Document 214-19   Filed 02/18/25    Page 62 of 85

to purchase a complete copy of the transcript.

98:16, 148:13, 164:10, 164:15
   **correctly** [6] - 8:22, 45:6, 85:11, 135:1, 135:5, 140:19
   **correlation** [1] - 136:5
   **correspondence** [1] - 145:5
   **corroborate** [1] - 148:4
   **corroborates** [2] - 204:14
   **corroborating** [1] - 137:21
   **corroboration** [3] - 89:16, 90:22, 91:2
   **cost** [4] - 99:20, 210:4, 216:2, 216:23
   **counsel** [8] - 3:14, 33:9, 60:13, 158:4, 159:15, 191:19, 192:10, 203:5
   **country** [1] - 41:17
   **County** [1] - 122:11
   **couple** [6] - 54:10, 84:1, 88:13, 102:2, 198:1, 208:14
   **course** [25] - 6:10, 20:19, 43:3, 52:20, 57:11, 59:3, 83:4, 93:18, 112:12, 123:20, 145:20, 170:8, 172:1, 175:10, 176:20, 184:14, 193:6, 193:9, 197:14, 200:4, 208:20, 211:9, 211:17, 213:20, 214:6
   **court** [11] - 29:21, 33:23, 88:24, 110:20, 117:19, 131:4, 131:22, 181:13, 198:24, 199:24
   **COURT** [384] - 3:1, 7:2, 7:4, 7:12, 7:20, 8:1, 9:7, 9:15, 9:22, 10:7, 10:11, 10:15, 10:19, 10:23, 11:3, 11:7, 11:9, 11:12, 11:24, 12:12, 13:3, 13:15, 13:18, 14:4, 14:11, 14:14, 14:18, 14:25, 15:21, 16:2, 16:16, 16:24, 17:6, 18:2, 18:10, 18:22, 19:2, 19:18, 19:24, 20:15, 25:17, 26:9, 28:21, 28:24, 29:3, 29:6, 29:10, 29:14, 29:23, 30:2, 30:5, 31:2, 31:10, 31:20, 32:9, 32:16, 33:12, 34:17, 35:1, 35:16, 35:25, 36:2, 36:18, 37:10, 37:22, 38:4, 38:11, 38:13, 38:23, 39:1, 39:7, 40:1, 40:20, 41:25, 42:18, 43:5, 43:10, 43:20, 43:22, 44:4, 44:24, 45:25, 46:3, 46:23, 47:21, 48:13, 48:19, 48:24, 51:19, 52:7, 53:8, 53:17, 54:19, 55:10, 56:16, 59:14, 60:3, 60:19, 60:24, 62:7, 62:16, 62:25, 63:7, 64:5, 64:8, 64:12, 64:21, 65:21, 66:16, 66:25, 69:13, 69:18, 70:6, 70:18, 71:18, 71:22, 71:25, 72:3, 72:9,

72:15, 72:21, 74:5, 74:22, 75:20, 77:11, 78:8, 78:12, 80:2, 81:7, 82:7, 83:24, 84:15, 84:19, 84:23, 85:19, 87:11, 87:21, 88:9, 89:7, 89:18, 89:21, 90:2, 91:6, 91:10, 91:12, 91:15, 91:18, 92:11, 93:6, 93:14, 95:9, 96:14, 96:21, 97:22, 98:17, 99:8, 100:8, 100:17, 101:7, 101:12, 101:16, 102:17, 105:3, 105:6, 105:10, 106:15, 106:22, 107:3, 107:9, 107:14, 107:21, 108:18, 108:23, 110:6, 110:22, 111:16, 112:5, 113:16, 114:18, 115:15, 116:21, 117:1, 117:5, 117:25, 118:10, 118:20, 119:9, 119:24, 120:3, 120:9, 120:15, 120:22, 121:24, 122:13, 122:22, 123:17, 124:22, 125:20, 126:1, 126:5, 126:7, 126:10, 126:17, 127:5, 127:11, 128:19, 128:22, 129:1, 129:12, 129:21, 129:24, 130:18, 131:2, 131:17, 131:23, 132:14, 133:24, 134:7, 134:12, 134:22, 134:24, 135:14, 136:6, 136:9, 136:16, 136:20, 138:13, 139:14, 140:3, 140:16, 141:7, 141:10, 141:21, 142:3, 142:11, 142:17, 142:22, 143:6, 144:14, 144:17, 145:21, 146:5, 146:20, 147:3, 147:19, 147:22, 148:9, 148:15, 148:20, 148:25, 149:8, 149:22, 150:2, 150:11, 150:16, 152:7, 152:24, 153:4, 153:12, 153:24, 154:9, 155:6, 155:24, 156:5, 156:9, 156:14, 157:17, 157:20, 158:3, 158:7, 158:10, 158:13, 158:20, 158:24, 159:3, 159:6, 159:11, 159:15, 159:18, 161:16, 161:18, 161:20, 161:25, 162:3, 162:5, 162:12, 163:3, 163:7, 163:12, 163:15, 163:18, 163:25, 164:13, 164:18, 164:23, 167:4, 167:11, 167:23, 168:2, 168:5, 168:10, 168:13, 168:17, 168:23, 169:3, 169:12, 169:15, 169:24, 170:1, 170:5, 170:8, 170:11, 170:13, 170:18, 171:1, 171:6, 171:10, 171:13, 171:21, 173:4, 173:8, 173:11, 173:14, 174:6,

174:18, 175:23, 176:10, 176:15, 176:18, 176:20, 176:23, 176:25, 177:2, 177:4, 177:6, 177:10, 177:16, 177:19, 177:21, 177:23, 177:25, 178:4, 178:7, 178:9, 178:11, 178:13, 178:15, 178:17, 178:21, 178:23, 178:25, 179:14, 180:25, 185:13, 186:13, 186:20, 188:4, 189:22, 189:25, 190:11, 191:11, 192:19, 196:16, 197:7, 198:4, 198:20, 200:24, 201:24, 202:8, 202:13, 202:16, 208:3, 209:6, 210:8, 210:16, 211:1, 211:12, 212:14, 213:2, 214:19, 217:22, 217:24, 218:12, 218:14
   **Court** [96] - 3:1, 3:2, 7:7, 12:5, 12:9, 12:21, 12:24, 12:25, 13:10, 13:12, 15:15, 16:6, 16:18, 17:16, 18:6, 20:9, 24:22, 25:4, 27:22, 32:4, 33:17, 34:1, 34:2, 42:16, 47:7, 47:12, 47:24, 47:25, 48:2, 48:3, 48:9, 52:17, 53:9, 54:22, 55:16, 59:2, 59:6, 60:9, 62:19, 63:6, 63:14, 63:16, 63:19, 65:8, 65:12, 66:1, 66:9, 66:23, 67:5, 67:20, 69:2, 70:1, 70:7, 73:22, 77:25, 81:13, 85:17, 88:23, 91:5, 91:17, 92:15, 92:17, 92:24, 93:2, 96:3, 96:4, 96:13, 99:3, 101:11, 102:4, 102:10, 102:11, 112:3, 113:14, 122:19, 124:16, 134:5, 141:20, 146:2, 146:16, 162:18, 190:2, 190:16, 190:18, 190:21, 191:8, 191:15, 192:8, 202:5, 203:11, 203:14, 206:17, 207:21, 208:17, 213:1, 217:21
   **Court's** [10] - 47:5, 68:25, 70:12, 70:16, 73:19, 82:1, 86:25, 111:25, 206:21, 206:25
   **courthouse** [2] - 175:4
   **courtroom** [7] - 4:7, 23:13, 160:4, 175:7, 175:14, 175:16, 175:19
   **Courtroom** [2] - 175:15
   **courtrooms** [1] - 175:6
   **courts** [2] - 57:1, 79:23
   **cover** [5] - 82:11, 112:15, 122:21, 156:22, 164:24
   **covered** [1] - 49:1
   **covers** [1] - 38:20
   **coworker** [1] - 81:11
   **coworkers** [2] - 30:21,

134:21
   **crazy** [1] - 45:12
   **create** [1] - 111:23
   **created** [2] - 111:10, 145:3
   **creative** [1] - 195:1
   **credibility** [14] - 32:18, 36:9, 36:13, 36:14, 76:9, 76:13, 77:14, 81:18, 81:24, 82:6, 82:14, 82:20, 83:9, 84:2
   **criminal** [2] - 38:18, 175:19
   **criticism** [1] - 30:19
   **criticizing** [1] - 147:17
   **cross** [12] - 31:9, 35:24, 117:15, 123:21, 123:22, 170:25, 171:1, 171:3, 171:19, 174:1, 174:16, 212:24
   **cross-designate** [3] - 170:25, 171:1, 171:3
   **cross-designations** [1] - 171:19
   **cross-examination** [2] - 31:9, 174:1
   **cross-examine** [5] - 35:24, 117:15, 123:21, 123:22, 174:16
   **crucial** [2] - 148:8, 204:20
   **Crumpacker** [1] - 117:18
   **Cruz** [9] - 45:21, 58:9, 59:17, 82:21, 132:3, 132:25, 138:15, 140:23, 141:21
   **culminated** [1] - 39:11
   **cure** [1] - 54:18
   **curiosity** [1] - 28:22
   **current** [2] - 128:24, 208:22
   **custodian** [1] - 185:3
   **cut** [2] - 71:7, 143:23
   **cuts** [1] - 27:2

## D

   **D'Cruz** [36] - 65:15, 80:18, 81:16, 81:17, 81:21, 82:1, 82:4, 84:10, 84:12, 116:8, 116:13, 118:8, 118:15, 119:3, 119:5, 129:17, 129:20, 130:8, 130:13, 137:12, 138:2, 138:5, 139:8, 141:6, 150:8, 151:22, 155:25, 156:4, 158:15, 170:8, 173:18, 204:1, 204:6, 206:6, 207:10, 208:19
   **D'Cruz'** [3] - 41:14, 118:5, 137:21
   **Dale** [1] - 178:9
   **damage** [3] - 107:17, 165:18, 210:25
   **damaged** [1] - 107:19

to purchase a complete copy of the transcript.

**damages** [83] - 11:16, 12:25, 13:8, 15:1, 15:7, 15:15, 15:23, 17:18, 17:21, 18:15, 19:12, 20:20, 21:2, 21:3, 23:23, 24:1, 24:25, 27:7, 28:4, 35:25, 36:21, 37:2, 37:23, 39:6, 39:25, 70:22, 71:3, 74:6, 84:25, 85:12, 85:13, 85:21, 89:10, 90:3, 90:8, 91:23, 92:3, 97:4, 98:20, 98:22, 98:24, 99:4, 99:7, 99:11, 99:17, 99:20, 99:24, 100:9, 100:19, 100:22, 100:23, 101:5, 101:8, 101:10, 106:4, 106:25, 107:2, 107:6, 108:8, 109:20, 119:14, 120:23, 121:13, 143:12, 149:12, 149:18, 165:18, 165:24, 166:4, 177:7, 178:2, 178:5, 178:18, 179:7, 181:17, 212:18, 216:4, 218:1, 218:8

**Dan** [1] - 168:2

**Dangelser** [1] - 170:2

**Daria** [2] - 81:21, 176:7

**date** [8] - 97:24, 128:15, 130:13, 149:20, 189:13, 208:22, 209:5, 210:18

**dated** [4] - 128:12, 129:22, 204:19, 205:16

**dates** [2] - 11:2, 14:5

**daughter** [4] - 119:11, 119:24, 120:2, 121:7

**David** [2] - 3:13, 177:25

**days** [5] - 5:6, 165:5, 188:6, 195:25, 197:15

**deadline** [2] - 188:8, 190:19

**deal** [3] - 76:5, 90:20, 217:9

**dealing** [3] - 55:17, 123:2, 191:3

**deals** [3] - 92:14, 124:2, 143:7

**dealt** [1] - 198:16

**Deb** [1] - 3:12

**Debbie** [1] - 169:21

**DEBRA** [1] - 2:6

**December** [3] - 202:19, 202:20, 202:21

**decide** [12] - 12:5, 18:6, 35:7, 46:12, 47:24, 48:2, 51:11, 60:9, 115:13, 152:17, 195:9

**decided** [10] - 47:12, 59:2, 64:1, 69:12, 70:1, 73:22, 114:21, 119:11, 120:17, 152:22

**deciding** [1] - 21:17

**decision** [14] - 12:8, 16:9, 21:10, 33:17, 46:24, 47:5, 52:19, 53:5, 55:24, 87:5, 94:9, 113:15, 121:7, 199:2

**decisions** [5] - 27:13, 48:17, 98:3, 139:15, 153:6

**declarant** [2] - 117:13, 118:8

**declaration** [1] - 48:5

**declarations** [1] - 145:11

**Deelen** [1] - 33:22

**deem** [1] - 97:7

**deems** [1] - 203:12

**Deere** [112] - 3:3, 3:4, 3:14, 7:14, 8:23, 10:20, 13:6, 13:21, 16:21, 16:22, 18:5, 18:9, 18:19, 19:15, 19:25, 20:11, 25:23, 30:15, 36:12, 36:24, 42:5, 42:8, 42:10, 42:13, 42:15, 43:8, 43:13, 44:20, 56:19, 64:6, 74:20, 76:12, 77:9, 79:10, 83:16, 84:8, 85:10, 86:15, 99:14, 102:8, 102:13, 102:16, 102:22, 102:23, 107:3, 107:15, 107:22, 108:2, 108:6, 109:6, 109:17, 109:25, 110:18, 115:25, 116:3, 116:5, 116:7, 121:2, 121:11, 121:15, 122:12, 123:22, 125:4, 125:16, 127:10, 128:16, 128:21, 135:11, 136:3, 138:18, 139:2, 139:12, 139:20, 140:12, 140:20, 143:18, 144:4, 153:1, 155:2, 155:3, 158:25, 161:16, 164:16, 167:7, 167:18, 167:24, 168:7, 168:10, 168:24, 179:20, 185:4, 185:16, 185:19, 188:2, 189:16, 202:19, 202:25, 203:8, 206:7, 206:16, 207:7, 207:9, 207:17, 215:7, 215:15, 215:21, 217:17

**Deere's** [11] - 14:2, 14:9, 16:23, 43:16, 121:19, 147:12, 167:7, 185:1, 185:7, 205:15, 205:24

**defamation** [3] - 21:22, 98:10, 98:13

**defeat** [2] - 67:11, 67:13

**defend** [1] - 53:3

**Defendant** [1] - 3:14

**defendant** [21] - 13:16, 17:1, 30:3, 51:8, 52:17, 65:16, 65:17, 81:16, 93:6, 104:4, 121:21, 121:22, 122:7, 143:10, 145:21, 147:5, 173:17, 174:19, 179:21, 210:4, 216:9

**defendant's** [2] - 62:21, 182:3

**defendants** [102] - 3:11, 6:24, 10:6, 19:10, 23:20, 23:22, 24:16, 33:15, 34:9, 34:18, 35:8, 36:25, 37:3, 38:16, 38:22, 38:24, 39:22, 40:4, 47:9, 48:10, 48:11, 50:3, 53:1, 54:22, 58:25, 59:3, 59:12, 59:22, 61:5, 61:22, 62:3, 62:9, 62:14, 63:21, 64:5, 66:14, 67:5, 67:11, 68:3, 68:13, 68:16, 70:18, 73:6, 74:7, 76:22, 77:11, 80:9, 80:20, 81:5, 81:15, 83:20, 87:14, 88:1, 88:9, 89:6, 96:6, 97:2, 97:9, 97:18, 98:20, 98:22, 99:23, 101:24, 102:8, 102:14, 103:7, 104:4, 109:15, 110:2, 114:3, 114:19, 122:1, 124:15, 133:14, 133:24, 134:1, 134:13, 135:21, 136:22, 137:17, 138:9, 141:10, 147:14, 152:21, 154:7, 158:16, 158:17, 159:16, 162:5, 162:15, 162:16, 167:14, 169:4, 174:15, 184:24, 194:25, 201:24, 203:18, 206:13, 206:14, 208:11

**Defendants** [2] - 2:8, 2:11

**defendants'** [32] - 3:19, 5:16, 5:17, 13:19, 37:24, 39:18, 41:4, 41:8, 41:22, 47:16, 50:6, 55:6, 60:3, 60:17, 60:25, 67:13, 80:5, 81:9, 84:23, 100:18, 113:23, 123:6, 123:20, 124:1, 167:17, 174:13, 181:3, 184:6, 184:11, 192:23, 193:1, 210:20

**defended** [1] - 189:17

**defending** [1] - 216:23

**defense** [25] - 43:16, 45:24, 47:14, 48:12, 54:16, 59:1, 60:13, 61:15, 69:19, 69:20, 71:9, 72:20, 125:6, 137:1, 137:17, 138:10, 151:21, 181:10, 202:12, 208:12, 208:18, 210:6, 212:11, 215:22, 216:3

**defenses** [1] - 71:9

**definitely** [1] - 137:16

**definition** [1] - 47:18

**delay** [11] - 50:16, 51:15, 52:15, 55:11, 57:9, 57:13, 58:5, 86:7, 212:20, 212:23

**delayed** [1] - 104:10

**delaying** [2] - 12:13, 50:4

**deleted** [1] - 187:2

**delusions** [1] - 108:10

**delve** [1] - 114:1

**Delyorce** [2] - 76:4, 78:1

**demanded** [1] - 65:10

**demands** [1] - 214:25

**demise** [1] - 110:19

**demonstrative** [1] - 155:8

**denied** [1] - 204:17

**denies** [2] - 37:19, 118:18

**Dennis** [1] - 176:15

**dep** [2] - 171:9, 171:11

**department** [15] - 41:14, 44:1, 45:11, 75:5, 95:16, 118:5, 119:4, 125:11, 130:20, 135:21, 149:6, 150:13, 151:4, 151:23, 152:14

**departments** [1] - 87:4

**dependent** [1] - 48:5

**deposed** [6] - 32:5, 34:20, 35:10, 35:13, 36:16

**deposition** [39] - 32:4, 32:7, 34:24, 34:25, 36:5, 37:16, 84:3, 114:25, 129:8, 131:13, 132:10, 154:20, 161:10, 161:11, 161:18, 161:25, 162:6, 162:9, 162:10, 163:5, 167:9, 167:13, 169:6, 169:17, 171:12, 171:24, 172:8, 172:10, 172:13, 173:6, 173:11, 179:3, 179:8, 179:13, 180:5, 180:7, 180:12, 192:2, 210:4

**depositions** [5] - 145:9, 172:4, 203:18, 208:19, 208:22

**Des** [4] - 2:4, 2:8, 140:21, 201:14

**describe** [3] - 85:17, 88:24, 154:4

**described** [9] - 42:16, 68:21, 68:24, 75:14, 76:25, 96:9, 105:17, 124:11, 170:23

**describes** [2] - 41:23, 154:6

**description** [5] - 77:3, 91:20, 96:8, 96:18, 141:4

**descriptions** [1] - 203:19

**deserved** [1] - 81:22

**designate** [5] - 170:25, 171:1, 171:3, 172:7

**designation** [1] - 207:25

**designations** [1] - 171:19

**desirable** [1] - 137:22

**desire** [1] - 112:3

**desk** [1] - 160:9

**destroy** [1] - 81:17

**destroyed** [2] - 7:10, 7:15

**destruction** [2] - 95:5, 149:9

**detail** [5] - 4:8, 5:5, 80:1, 194:21, 197:2

**detailed** [4] - 5:9, 17:10, 42:9, 196:17

**details** [6] - 40:8, 50:25, 51:1, 86:21, 88:8, 104:11

**determination** [7] - 12:19, 51:10, 51:12, 77:14, 102:5, 102:7, 206:21

to purchase a complete copy of the transcript.

**determinations** [3] - 94:23, 102:4, 102:11

**determinative** [2] - 48:11, 48:17

**determine** [6] - 11:25, 18:14, 36:10, 63:8, 68:8, 139:10

**determined** [3] - 47:7, 99:12, 207:1

**determines** [2] - 13:1, 62:10

**determining** [4] - 36:11, 57:14, 64:2, 206:6

**develop** [1] - 81:18

**diagnoses** [2] - 37:4, 107:12

**dialog** [1] - 213:20

**difference** [6] - 29:16, 58:1, 69:24, 120:10, 120:16, 135:9

**different** [28] - 34:15, 63:19, 68:18, 69:16, 69:17, 69:24, 70:3, 72:18, 80:24, 87:4, 87:5, 100:4, 102:18, 103:2, 103:19, 110:17, 114:7, 123:10, 124:2, 130:1, 131:3, 147:15, 151:6, 187:10, 187:12, 196:1, 209:15

**difficult** [6] - 4:17, 5:10, 15:14, 24:14, 56:4, 84:8, 103:18, 166:11, 194:13

**difficulties** [1] - 84:5

**dignify** [1] - 209:18

**direct** [5] - 17:1, 67:15, 101:5, 116:12, 138:11

**directed** [1] - 74:11

**directing** [1] - 182:6

**directional** [1] - 159:24

**directly** [9] - 16:22, 17:4, 80:19, 100:20, 137:10, 149:6, 151:19, 152:10, 154:7

**disabilities** [3] - 123:4, 123:5, 123:6

**disability** [37] - 9:2, 9:3, 9:14, 9:23, 10:1, 10:3, 10:4, 10:12, 10:16, 10:17, 10:20, 11:19, 11:20, 13:6, 13:7, 13:23, 14:1, 14:9, 14:16, 15:9, 15:11, 15:20, 16:25, 18:5, 20:2, 20:4, 22:4, 25:19, 26:24, 27:17, 85:7, 85:9, 121:18, 121:20, 122:3, 122:5, 122:12

**disagree** [3] - 66:22, 86:20, 213:16

**disclose** [2] - 203:10, 204:23

**disclosed** [2] - 154:11, 209:2

**disclosure** [2] - 203:3, 209:5

**disclosures** [1] - 207:7

**discourage** [2] - 73:8, 164:2

**discovery** [7] - 188:8, 190:6, 190:18, 203:2, 206:11, 206:18, 210:12

**discredit** [1] - 81:5

**discretion** [2] - 52:18, 203:11

**discriminate** [3] - 46:13, 75:1, 137:23

**discriminated** [11] - 21:20, 22:5, 26:13, 47:10, 56:20, 72:5, 73:11, 129:18, 148:1, 196:10, 215:14

**discriminating** [2] - 118:16, 130:9

**discrimination** [67] - 8:2, 21:9, 22:20, 24:3, 25:12, 28:10, 28:19, 30:22, 32:8, 33:25, 34:2, 34:10, 34:15, 35:14, 36:24, 38:10, 43:15, 44:23, 47:8, 48:8, 49:6, 53:11, 53:18, 67:11, 67:15, 73:21, 74:15, 74:24, 75:10, 75:15, 87:7, 91:3, 92:15, 93:4, 93:10, 93:25, 94:16, 95:21, 96:16, 99:18, 102:23, 103:3, 108:4, 108:22, 117:12, 119:21, 124:10, 125:1, 125:9, 125:10, 125:16, 126:10, 126:13, 126:22, 127:24, 132:6, 133:6, 135:7, 137:11, 137:19, 138:16, 141:1, 142:4, 145:11, 147:5, 148:4, 148:7

**discriminatory** [7] - 41:12, 41:13, 93:13, 100:23, 101:6, 138:7, 147:18

**discuss** [1] - 47:4

**discussed** [6] - 77:10, 86:19, 101:1, 126:8, 180:17, 207:8

**discussing** [2] - 129:25, 130:16

**discussion** [5] - 12:15, 87:12, 127:16, 200:10, 200:11

**discussions** [4] - 6:16, 6:23, 8:10, 214:24

**dismissal** [1] - 61:6

**dismissed** [24] - 8:3, 11:6, 28:23, 28:24, 28:25, 29:2, 29:7, 29:19, 29:21, 30:13, 31:14, 31:21, 32:12, 32:15, 32:24, 76:15, 79:5, 79:17, 86:11, 88:12, 88:24, 92:18, 126:14, 143:16

**disorder** [2] - 81:19, 85:6

**disparate** [13] - 40:21, 40:23, 41:10, 41:15, 41:18, 41:19, 43:6, 43:9, 110:25, 114:23, 115:1, 149:5, 149:7

**disparately** [1] - 44:3,

**disposed** [1] - 33:10

**disposition** [6] - 32:10, 77:9, 77:13, 77:24, 78:5, 88:7

**dispositive** [2] - 55:25, 61:7

**disprove** [1] - 4:25

**dispute** [9] - 63:8, 65:25, 66:2, 66:4, 71:11, 133:10, 179:22, 186:25, 199:7

**disputed** [5] - 63:20, 73:20, 73:22, 80:12, 97:16

**disputes** [1] - 148:11

**dissatisfaction** [1] - 117:11

**distinction** [1] - 208:3

**distress** [7] - 35:19, 39:13, 85:10, 101:7, 101:10, 108:3, 110:17

**distribute** [1] - 116:1

**District** [1] - 196:18

**district** [1] - 33:23

**disturbed** [2] - 189:8, 189:16

**divided** [2] - 23:14, 23:18

**dividing** [1] - 69:8

**divorce** [1] - 39:21

**docket** [1] - 5:25

**Docket** [1] - 6:3

**docketed** [1] - 6:1

**doctor** [11] - 5:23, 39:20, 89:12, 89:18, 89:24, 90:4, 90:24, 90:25, 91:21, 127:2

**doctor's** [1] - 91:25

**doctors** [3] - 92:2, 92:4, 108:16

**doctrine** [1] - 58:19

**document** [40] - 4:8, 114:7, 114:22, 114:24, 124:4, 124:7, 127:13, 127:14, 127:15, 128:14, 128:17, 136:24, 137:18, 143:24, 144:9, 145:7, 145:23, 146:4, 146:9, 146:10, 146:12, 146:14, 146:21, 155:1, 155:2, 155:3, 155:8, 186:8, 186:11, 186:14, 186:18, 187:1, 187:5, 187:11, 187:18, 189:4, 191:22, 205:16, 207:12

**Document** [1] - 5:24

**documentary** [3] - 60:1, 207:6, 209:19

**documents** [62] - 40:22, 111:22, 113:10, 113:20, 114:12, 136:25, 138:22, 143:19, 143:25, 145:2, 145:14, 145:17, 147:8, 154:10, 154:11, 154:16, 155:12, 155:16, 185:1, 185:20, 186:23, 188:2, 188:9, 189:3, 189:18,

189:23, 190:4, 190:14, 191:2, 191:10, 191:18, 191:19, 191:23, 192:13, 192:16, 193:15, 202:21, 202:22, 202:24, 202:25, 203:1, 203:3, 203:4, 203:8, 203:10, 203:14, 203:16, 203:17, 205:9, 206:9, 206:11, 206:19, 206:22, 207:16, 207:19, 207:23, 209:10, 210:3, 210:11

**dogs** [2] - 82:3, 108:5

**dollars** [1] - 8:16

**domestic** [2] - 39:17, 40:12

**domestically** [1] - 39:24

**Donald** [1] - 178:23

**done** [23] - 27:8, 54:3, 61:13, 62:25, 101:18, 111:1, 112:5, 112:9, 113:12, 118:23, 119:1, 139:4, 161:14, 166:18, 196:4, 196:21, 197:18, 198:5, 204:16, 205:3, 213:14, 214:2, 217:9

**doodles** [1] - 185:24

**door** [8] - 27:20, 78:23, 110:18, 120:24, 133:18, 140:13, 175:8, 175:9

**doubt** [1] - 50:13

**doubts** [1] - 163:9

**Douglas** [1] - 67:17

**down** [21] - 5:22, 26:10, 32:20, 35:5, 42:7, 42:17, 43:11, 47:3, 76:17, 103:24, 114:5, 119:21, 156:16, 165:5, 165:6, 170:2, 170:13, 175:6, 175:19, 179:25, 196:24

**downgrade** [2] - 42:22, 44:9

**downgrades** [1] - 41:16

**Dr** [7] - 104:16, 121:18, 122:14, 163:7, 163:12, 177:25, 178:17

**draft** [1] - 213:14

**drew** [1] - 207:10

**drive** [2] - 201:15, 201:16

**driving** [1] - 147:6

**due** [3] - 50:16, 59:1, 207:25

**dunk** [1] - 215:10

**duplicates** [2] - 193:2, 193:13

**duplicative** [1] - 172:12

**during** [57] - 6:10, 19:11, 24:15, 29:12, 49:9, 55:22, 57:10, 60:15, 83:4, 84:7, 85:4, 85:13, 85:21, 93:17, 96:15, 97:3, 97:17, 98:14, 98:19, 98:24, 101:19, 106:2, 112:12, 112:22, 127:3, 143:11, 145:19, 147:11, 149:11, 149:12,

to purchase a complete copy of the transcript.

150:4, 158:17, 160:13, 168:18, 172:1, 173:7, 173:24, 174:13, 175:10, 175:11, 177:8, 177:13, 177:15, 178:4, 182:5, 184:10, 184:14, 193:8, 197:14, 200:4, 203:18, 206:11, 207:21, 211:17, 213:20

**Dutcher** [3] - 101:1, 101:9, 101:13

**duties** [7] - 69:15, 70:4, 80:7, 80:15, 80:21, 80:24, 81:4

**duty** [2] - 139:9, 139:12

**dying** [1] - 181:18

# E

**easier** [1] - 201:5
**easily** [1] - 211:10
**easy** [3] - 97:22, 97:24, 155:8
**economic** [1] - 178:1
**economist** [1] - 164:7
**educated** [1] - 63:15
**EEOC** [39] - 23:2, 23:4, 49:11, 49:12, 49:19, 49:24, 50:11, 50:23, 51:7, 51:21, 51:23, 51:25, 52:9, 52:19, 53:8, 53:10, 53:15, 54:20, 54:25, 55:8, 55:24, 56:8, 56:10, 56:12, 56:13, 56:18, 57:20, 58:8, 101:25, 102:3, 102:5, 102:10, 103:24, 104:7, 133:18, 133:21, 145:6, 167:1, 209:24

**EEOC's** [1] - 101:22
**effect** [8] - 52:10, 53:9, 58:22, 86:7, 93:13, 104:1, 140:25, 141:24

**effectively** [1] - 206:17
**efficient** [2] - 5:2, 5:21
**efficiently** [1] - 187:16
**effort** [2] - 42:22, 215:20
**efforts** [1] - 95:6
**egg** [1] - 215:12
**eight** [6] - 20:12, 112:19, 195:12, 196:24, 197:2, 217:9

**Eighth** [8] - 16:9, 16:11, 30:7, 33:17, 47:25, 77:16, 78:2, 183:2

**either** [37] - 12:9, 12:24, 16:4, 19:15, 23:11, 29:25, 42:25, 44:7, 58:6, 76:7, 76:20, 78:18, 86:18, 100:12, 104:9, 133:10, 137:23, 143:16, 145:3, 147:12, 149:12, 157:2, 160:9, 162:20, 166:10, 171:24, 172:11, 174:6, 180:11, 182:17, 190:22,

192:9, 205:11, 215:10, 216:8

**elements** [1] - 69:1
**eliminate** [1] - 194:19
**eliminates** [2] - 216:22, 216:24

**email** [23] - 128:8, 128:12, 129:6, 129:9, 129:13, 129:17, 130:6, 131:1, 131:15, 131:21, 131:25, 132:1, 132:11, 132:22, 134:8, 140:2, 142:2, 204:18, 204:21, 205:23, 207:8, 207:9

**emails** [5] - 136:18, 140:2, 140:6, 154:4, 180:1

**emotional** [12] - 35:19, 39:13, 85:10, 99:13, 100:2, 101:7, 101:10, 108:3, 108:14, 109:3, 110:16, 119:23

**emotionally** [1] - 108:9
**employed** [2] - 135:2, 140:20

**employee** [26] - 13:24, 13:25, 14:1, 25:23, 71:15, 104:22, 105:24, 117:9, 117:17, 117:23, 118:8, 128:21, 129:20, 140:18, 140:20, 149:23, 161:16, 167:7, 167:18, 167:24, 168:7, 168:24, 179:20, 196:9, 204:11, 205:18

**employees** [21] - 13:22, 42:6, 64:6, 115:2, 116:1, 116:7, 116:9, 116:16, 116:18, 118:14, 118:16, 118:17, 137:11, 137:13, 137:15, 137:22, 138:4, 138:5, 164:16, 206:7

**employer** [7] - 17:1, 17:4, 28:14, 28:18, 30:18, 79:24, 142:5

**employers** [1] - 34:16
**employment** [16] - 34:1, 34:6, 70:9, 70:14, 70:20, 71:10, 71:20, 72:7, 72:10, 72:12, 72:14, 73:24, 83:15, 84:8, 85:10, 99:14

**encourage** [8] - 4:5, 4:23, 85:25, 104:5, 172:6, 195:4, 213:19, 217:12

**end** [8] - 33:6, 35:5, 57:25, 154:21, 162:24, 197:9, 215:11, 215:12

**ended** [2] - 151:7, 181:18
**ends** [1] - 184:7
**engineering** [2] - 119:11, 120:17

**enter** [4] - 58:2, 88:2, 120:8, 160:15

**entered** [4] - 17:12, 78:4, 92:17, 103:15

**entering** [2] - 8:7, 8:8

**entire** [11] - 51:14, 69:19, 74:21, 83:22, 151:23, 157:24, 158:8, 158:17, 165:3, 176:21, 208:12

**entirely** [1] - 208:19
**entirety** [1] - 37:8
**entitled** [16] - 11:21, 36:25, 61:5, 64:25, 74:1, 74:7, 76:10, 99:17, 99:19, 113:25, 142:23, 146:22, 190:20, 190:23, 191:22, 202:11

**environment** [13] - 92:8, 93:3, 94:5, 94:13, 94:18, 95:20, 96:2, 96:9, 97:6, 124:11, 126:14, 127:23, 145:12

**equitable** [2] - 63:5, 66:24
**equivalent** [2] - 72:16, 73:3

**erase** [1] - 110:9
**error** [4] - 33:19, 74:4, 216:14, 217:11

**especially** [5] - 50:14, 51:8, 56:3, 59:25, 202:21

**ESQ** [8] - 2:3, 2:3, 2:6, 2:7, 2:10

**essentially** [9] - 30:21, 81:18, 86:6, 95:16, 96:18, 99:23, 117:8, 209:3, 210:7

**establish** [2] - 37:17, 156:3

**established** [1] - 188:16
**establishing** [1] - 68:11
**estimate** [1] - 216:2
**estimating** [1] - 3:23
**ethical** [2] - 105:15, 144:10

**evaluation** [2] - 187:11, 190:8

**evaluations** [7] - 184:23, 185:15, 185:18, 189:9, 189:11, 190:9, 207:16

**evening** [2] - 198:10, 218:14

**event** [17] - 29:14, 29:15, 46:15, 48:6, 58:2, 74:5, 75:24, 77:20, 100:15, 103:21, 114:16, 121:16, 127:11, 140:3, 161:9, 195:4, 218:6

**events** [13] - 34:9, 50:16, 57:8, 59:11, 91:1, 95:24, 97:2, 100:4, 100:12, 107:18, 138:12, 152:8, 173:22

**eventually** [1] - 7:16
**Evidence** [1] - 102:9
**evidence** [193] - 7:8, 8:4, 8:9, 12:11, 12:18, 13:10, 15:4, 15:8, 15:23, 16:14, 18:8, 18:21, 20:23, 21:14, 21:16, 22:9, 23:19, 23:23, 25:12, 26:4, 27:21, 29:24,

30:8, 30:10, 30:25, 31:2, 31:14, 32:9, 33:5, 35:3, 36:25, 40:21, 40:25, 41:5, 41:7, 41:9, 41:10, 41:18, 42:1, 42:14, 42:15, 43:2, 43:14, 43:16, 45:2, 46:24, 48:2, 48:10, 48:13, 48:19, 49:8, 49:18, 50:21, 50:25, 51:20, 51:23, 52:21, 52:22, 52:24, 53:14, 53:25, 58:13, 58:18, 59:5, 60:1, 61:3, 61:8, 62:7, 62:13, 64:12, 64:15, 65:14, 66:10, 66:11, 66:14, 66:17, 66:19, 67:6, 67:15, 67:22, 67:24, 68:12, 68:14, 69:4, 69:9, 69:13, 69:19, 70:3, 70:8, 70:15, 70:22, 71:3, 71:4, 71:14, 71:19, 71:25, 72:13, 73:16, 73:24, 74:1, 74:18, 78:14, 80:2, 82:8, 83:10, 84:12, 85:12, 88:2, 88:18, 90:11, 92:19, 93:2, 93:7, 93:9, 93:17, 93:20, 94:1, 94:4, 94:6, 94:7, 94:8, 94:12, 94:13, 94:15, 94:17, 95:2, 95:20, 95:21, 96:7, 96:16, 102:11, 104:19, 105:4, 108:24, 109:1, 109:5, 109:8, 111:5, 116:7, 116:12, 116:13, 116:19, 118:20, 119:10, 120:13, 121:12, 122:2, 128:7, 132:18, 133:3, 133:15, 133:17, 133:20, 133:22, 134:14, 134:17, 134:18, 135:22, 137:2, 140:12, 140:17, 141:15, 142:4, 143:13, 143:19, 144:17, 144:20, 147:4, 147:12, 148:3, 149:8, 149:22, 151:21, 152:18, 153:4, 154:10, 155:24, 156:10, 180:23, 184:4, 184:5, 184:14, 187:23, 201:2, 202:12, 207:2, 214:2, 214:5, 215:13, 217:4

**evidentiary** [4] - 47:23, 48:25, 167:20, 200:15

**evidently** [1] - 157:15
**exact** [3] - 130:13, 149:20, 154:6

**exactly** [14] - 18:2, 42:4, 64:15, 69:13, 70:24, 79:7, 82:8, 113:9, 113:12, 151:11, 155:14, 167:3, 195:2, 203:7

**examination** [2] - 31:9, 174:1

**examine** [5] - 35:24, 117:15, 123:21, 123:22, 174:16

**example** [23] - 8:10, 15:8, 15:24, 22:1, 24:21, 25:5, 26:4, 27:16, 35:19, 37:22,

to purchase a complete copy of the transcript.

42:11, 44:21, 65:14, 71:15,
74:19, 95:4, 160:22, 180:7,
184:20, 186:7, 191:21,
194:15, 201:7
 **examples** [2] - 94:24, 97:6
 **except** [5] - 45:10, 75:6,
90:18, 115:16, 132:3
 **exception** [10] - 87:3,
89:21, 89:24, 89:25,
117:25, 129:2, 130:23,
145:19, 202:1, 214:11
 **exceptions** [3] - 98:9,
155:5, 214:7
 **exchange** [1] - 180:1
 **excludable** [2] - 97:7,
136:23
 **exclude** [8] - 7:8, 8:9,
34:6, 93:2, 134:5, 201:2,
202:12, 203:14
 **excluded** [5] - 15:4, 33:18,
33:21, 83:19, 117:17
 **excluding** [3] - 18:21,
208:4, 210:6
 **exclusion** [1] - 209:3
 **excuse** [11] - 5:24, 7:2,
126:5, 143:10, 148:10,
187:15, 196:2, 200:5,
205:13, 206:15, 209:9
 **excuses** [3] - 195:21,
195:23, 196:4
 **exercise** [1] - 187:3
 **exhaust** [1] - 62:1
 **exhaustion** [6] - 62:11,
62:20, 63:13, 63:21, 64:3,
66:5
 **exhausts** [1] - 13:24
 **exhibit** [33] - 4:8, 43:20,
105:7, 111:2, 111:16,
124:19, 124:23, 127:19,
128:9, 134:4, 136:7,
136:15, 148:10, 160:22,
160:23, 161:1, 161:4,
183:6, 183:12, 183:15,
183:17, 184:7, 184:11,
184:17, 186:24, 187:24,
188:14, 188:24, 190:9,
193:18, 193:23, 194:1,
194:16
 **Exhibit** [30] - 114:21,
114:22, 115:7, 115:16,
115:19, 122:7, 122:19,
122:21, 123:8, 124:2,
124:3, 124:4, 127:12,
128:12, 134:4, 134:7,
136:18, 145:6, 148:19,
153:10, 154:14, 154:22,
161:6, 187:14, 187:25,
188:11, 191:21, 192:5,
192:23, 192:24
 **Exhibits** [7] - 105:1,
105:9, 111:18, 117:3,
145:1, 153:18, 192:15
 **exhibits** [74] - 3:19, 3:21,
3:24, 4:13, 4:16, 4:24, 5:9,

31:5, 31:17, 77:6, 80:5,
80:14, 105:11, 105:14,
113:20, 115:15, 115:17,
117:2, 117:8, 123:10,
137:1, 138:22, 144:23,
147:19, 153:8, 153:15,
154:1, 154:3, 157:11,
174:24, 176:1, 181:1,
181:2, 181:3, 181:6, 181:9,
183:5, 183:7, 183:8,
183:22, 183:25, 184:1,
184:3, 184:5, 184:6,
184:13, 184:19, 184:25,
185:15, 185:20, 185:22,
191:20, 192:9, 192:12,
192:20, 192:22, 192:23,
193:1, 193:2, 193:4, 193:8,
193:10, 193:20, 193:22,
194:4, 194:14, 194:21,
194:24, 195:7, 202:6,
202:18
 **exist** [7] - 133:4, 155:21,
203:7, 207:12, 207:19,
207:20
 **existed** [2] - 10:5, 202:25
 **existence** [1] - 217:18
 **exists** [1] - 87:25
 **expect** [6] - 108:21,
152:15, 166:13, 179:1,
180:5, 197:11
 **expected** [3] - 4:3, 44:17,
205:5
 **expecting** [1] - 171:18
 **expense** [3] - 215:23,
216:9, 216:10
 **expensive** [1] - 26:21,
193:16, 216:5
 **experience** [7] - 5:4,
113:17, 121:8, 121:10,
137:8, 151:25, 172:8
 **experienced** [4] - 71:5,
73:23, 138:4, 182:15
 **experiences** [1] - 114:11
 **expert** [8] - 43:19, 44:16,
51:10, 113:19, 127:7,
178:1, 213:5, 216:5
 **experts** [7] - 92:2, 92:3,
92:4, 108:16, 164:8,
205:15, 210:25
 **experts'** [1] - 212:20
 **expires** [1] - 190:19
 **explain** [6] - 27:1, 51:7,
55:4, 57:2, 195:19
 **explained** [2] - 51:24,
137:5
 **explaining** [3] - 51:25,
52:11, 151:11
 **explains** [1] - 97:12
 **explanation** [4] - 23:9,
24:16, 56:24, 68:4
 **expose** [1] - 83:8
 **exposing** [2] - 140:25,
142:5
 **expressed** [1] - 149:25

 **extensive** [2] - 84:4, 99:13
 **extent** [38] - 5:19, 8:9,
11:13, 19:11, 37:14, 39:21,
45:5, 49:14, 60:13, 65:13,
82:19, 82:22, 82:24, 83:19,
85:3, 94:21, 98:18, 100:13,
100:15, 105:6, 107:1,
107:5, 108:8, 113:21,
114:9, 119:21, 120:23,
127:21, 139:4, 141:18,
149:18, 171:24, 173:11,
179:24, 184:16, 189:2,
193:19, 217:13
 **extra** [1] - 113:6
 **extrapolating** [1] - 114:12
 **extreme** [1] - 107:18
 **extremely** [1] - 208:15
 **eye** [1] - 125:11

# F

 **F.3d** [1] - 16:11
 **face** [4] - 136:23, 137:18,
142:7, 155:1
 **facie** [5] - 67:19, 68:2,
68:11, 69:2, 70:2
 **fact** [93] - 9:8, 11:14, 13:4,
16:12, 19:25, 22:2, 22:24,
23:3, 24:7, 26:23, 34:19,
34:25, 35:10, 36:4, 36:15,
37:17, 39:23, 40:18, 41:6,
49:24, 52:11, 55:5, 56:2,
58:15, 58:24, 61:15, 63:20,
64:22, 64:24, 65:1, 66:11,
68:9, 68:15, 69:3, 70:23,
73:20, 74:15, 76:3, 76:11,
77:8, 77:14, 78:6, 79:1,
79:6, 80:11, 82:4, 85:6,
85:23, 85:24, 86:14, 87:25,
88:11, 88:16, 91:3, 92:20,
97:7, 97:16, 101:9, 102:18,
102:20, 102:21, 103:9,
103:23, 116:2, 118:11,
119:10, 124:17, 125:9,
125:15, 126:2, 126:20,
126:24, 132:2, 132:21,
140:5, 150:5, 153:20,
161:15, 166:19, 177:12,
181:18, 183:15, 188:14,
193:4, 193:7, 199:14,
200:25, 206:15, 206:16,
206:22, 207:12, 210:12,
217:18
 **factor** [2] - 103:21, 203:13
 **facts** [12] - 8:22, 28:15,
63:8, 63:9, 65:3, 65:5,
65:24, 65:25, 66:2, 66:4,
126:2
 **factual** [5] - 13:21, 47:13,
64:10, 65:11, 68:25
 **failed** [4] - 21:7, 21:21,
56:20, 70:14
 **failure** [16] - 62:1, 72:16,
72:19, 72:25, 73:3, 74:13,

74:14, 75:18, 75:21, 93:22,
93:24, 97:20, 125:2,
147:12, 147:13
 **fair** [2] - 18:7, 196:18
 **fairly** [2] - 136:2, 201:13
 **fall** [3] - 147:20, 155:4,
206:7
 **falls** [2] - 12:18, 129:2
 **false** [2] - 108:19, 206:20
 **familiar** [4] - 86:25,
135:16, 143:13, 213:8
 **family** [1] - 119:22
 **far** [29] - 8:1, 14:12, 14:18,
28:3, 29:17, 41:3, 41:19,
50:21, 51:6, 52:5, 63:10,
77:7, 89:2, 89:10, 97:11,
103:25, 114:5, 118:4,
119:18, 123:8, 130:16,
130:22, 140:11, 174:8,
179:17, 180:4, 214:13,
215:24
 **fared** [1] - 46:19
 **farts** [1] - 59:17, 82:2,
141:23
 **faster** [2] - 157:2, 166:13
 **fat** [1] - 172:15
 **father** [1] - 38:18
 **Fauser** [1] - 170:9
 **favor** [3] - 60:17, 66:22,
116:17
 **favorable** [8] - 53:19,
61:4, 67:22, 67:25, 68:12,
77:20, 77:21, 137:13
 **favorably** [2] - 42:24
 **favored** [1] - 150:9
 **favors** [3] - 54:21, 54:22,
54:23
 **FBL** [1] - 48:1
 **fear** [1] - 12:7
 **February** [1] - 94:25,
128:13, 129:22
 **Federal** [1] - 102:9
 **federal** [3] - 53:5, 102:22,
103:3
 **felt** [4] - 116:10, 118:16,
150:8, 208:25
 **female** [1] - 151:17
 **females** [2] - 130:2, 149:5
 **few** [3] - 71:2, 145:8,
183:8
 **fielder** [1] - 165:7
 **fifteen** [2] - 104:23, 105:15
 **fighting** [4] - 24:24, 45:7,
45:15, 74:25
 **figure** [9] - 4:24, 23:10,
27:5, 31:12, 35:1, 103:11,
159:19, 188:9, 212:17
 **file** [9] - 6:2, 11:9, 190:14,
190:20, 209:12, 209:20,
209:21, 210:13, 217:19
 **filed** [25] - 28:13, 30:13,
31:6, 31:7, 31:23, 32:22,
33:5, 34:3, 34:4, 49:14,
49:15, 51:25, 58:14, 62:8,

to purchase a complete copy of the transcript.

64:9, 76:3, 76:4, 76:5,
86:15, 88:11, 88:17, 98:20,
133:19, 143:15, 206:12

**filing** [4] - 163:2, 191:6,
191:7, 208:24

**filings** [1] - 56:6

**fill** [4] - 3:20, 6:6, 115:23,
181:3

**fills** [1] - 3:21

**final** [14] - 3:7, 3:17, 78:4,
157:7, 157:10, 157:13,
176:6, 184:21, 190:17,
190:25, 193:19, 193:25,
194:20, 214:22

**finally** [1] - 200:2

**Financial** [1] - 48:1

**findings** [3] - 52:11,
103:14, 104:2

**fine** [6] - 5:5, 45:10, 174:2,
177:20, 183:14, 201:22

**finish** [4] - 75:24, 165:16,
175:23, 189:25

**First** [1] - 2:10

**first** [37] - 5:14, 6:15, 6:17,
6:22, 9:7, 9:9, 15:6, 23:15,
23:19, 26:11, 30:11, 34:14,
37:17, 38:5, 60:5, 68:2,
71:8, 78:7, 78:13, 84:25,
124:6, 126:2, 130:1,
132:19, 146:6, 146:23,
177:13, 180:6, 181:20,
182:21, 195:16, 195:18,
197:3, 198:6, 198:21,
208:15, 213:21

**five** [7] - 3:23, 30:14, 37:1,
156:17, 186:5, 197:19,
199:25

**flattering** [1] - 83:10

**floating** [1] - 118:25

**floor** [3] - 25:8, 175:7,
175:16

**Florida** [2] - 169:8, 170:19

**focus** [4] - 4:23, 19:21,
26:11, 133:3

**focused** [3] - 49:3, 156:25,
201:10

**focusing** [1] - 182:11

**fog** [2] - 84:6, 123:24

**fold** [1] - 193:6

**folks** [11] - 25:8, 122:10,
123:22, 157:22, 159:3,
159:18, 165:25, 168:6,
196:7, 196:19, 198:9

**follow** [4] - 125:17,
167:11, 170:22, 199:1

**following** [8] - 12:22,
71:16, 165:3, 165:4,
169:19, 171:21, 172:17,
213:16

**fond** [1] - 75:7

**font** [1] - 204:23

**Foods** [1] - 101:1

**force** [2] - 74:21, 137:24

**foremost** [1] - 15:6

**foresee** [1] - 51:20

**forewarned** [1] - 166:20

**forged** [2] - 143:18,
143:23

**forgeries** [1] - 143:8

**forget** [2] - 98:18, 164:24

**forgot** [1] - 160:20

**forgotten** [6] - 38:7,
87:12, 139:24, 161:11,
165:21, 176:5

**form** [4] - 37:20, 83:3,
91:2, 136:5

**formal** [1] - 214:7

**format** [1] - 213:15

**former** [5] - 28:18, 34:1,
34:24, 34:25, 129:19

**forms** [1] - 15:12

**formulated** [1] - 113:12

**Forster** [18] - 3:4, 6:1, 7:9,
7:18, 11:5, 25:6, 76:5,
78:3, 86:11, 87:6, 128:8,
128:13, 143:15, 143:22,
157:21, 158:4, 184:23

**Forster's** [9] - 38:21, 93:5,
95:5, 119:10, 120:21,
123:13, 144:18, 148:11,
149:9

**Fort** [1] - 165:6

**forth** [19] - 11:17, 18:12,
18:17, 22:4, 22:11, 27:1,
58:12, 70:3, 72:23, 79:5,
82:21, 90:7, 90:8, 104:4,
113:21, 127:23, 141:14,
166:1, 175:12

**forward** [3] - 25:9, 68:3,
195:20

**foul** [1] - 73:12

**foundation** [24] - 111:13,
131:1, 131:3, 183:9,
183:10, 183:17, 183:18,
183:22, 184:18, 185:1,
185:8, 185:17, 186:4,
186:9, 186:15, 186:22,
186:23, 187:7, 187:19,
187:23, 188:16, 188:24,
188:25

**foundational** [2] - 183:13,
194:7

**four** [16] - 103:1, 124:4,
134:15, 134:16, 156:16,
156:17, 157:22, 159:15,
166:17, 166:19, 195:25,
201:1, 216:1, 216:16

**frame** [3] - 49:20, 94:11,
135:19

**framework** [1] - 20:18

**Fran** [1] - 159:7

**FRAN** [1] - 2:10

**Frances** [1] - 3:11

**FRANK** [1] - 2:6

**Frank** [2] - 3:12, 171:15

**frankly** [36] - 26:15, 26:18,
45:1, 53:4, 54:20, 55:2,
57:19, 73:3, 73:8, 75:6,

93:15, 111:25, 113:16,
114:4, 127:25, 132:17,
138:16, 138:21, 154:17,
154:23, 155:7, 165:10,
183:24, 189:2, 192:21,
194:11, 200:12, 201:3,
207:5, 210:20, 211:19,
212:16, 212:23, 215:2,
215:4, 215:8

**free** [1] - 188:23

**Frerichs** [1] - 170:11

**fresher** [1] - 60:21

**Friday** [7] - 162:16, 163:2,
165:3, 171:23, 172:3,
172:17, 177:15

**Friend** [6] - 159:1, 167:4,
167:5, 167:6, 170:14

**front** [9] - 9:21, 12:24,
19:9, 59:8, 65:18, 160:12,
160:15, 161:5, 198:24

**FTR** [1] - 160:5

**full** [4] - 46:5, 95:1,
206:17, 207:1

**fully** [1] - 99:9

**funds** [1] - 16:23

# G

**G-108** [1] - 192:24

**G-20** [1] - 43:21

**gap** [3] - 86:3, 135:20,
137:7

**Gary** [4] - 78:3, 87:6,
157:21, 170:2

**gas** [3] - 142:8, 142:15,
156:5

**Gayle** [10] - 3:4, 25:5,
119:10, 123:13, 128:8,
128:13, 143:14, 150:5,
157:20, 184:23

**Gayle's** [1] - 143:9

**gear** [1] - 165:24

**gears** [1] - 156:20

**Gehrke** [1] - 170:15

**gender** [2] - 47:18, 125:9

**general** [19] - 20:15,
20:24, 22:8, 42:20, 49:7,
61:19, 77:3, 77:8, 82:13,
98:5, 117:11, 124:9,
126:11, 141:3, 162:10,
166:22, 196:7, 196:10,
197:5

**generally** [15] - 17:25,
38:10, 40:23, 42:5, 49:11,
55:8, 76:3, 85:20, 89:2,
96:23, 97:4, 146:7, 162:6,
166:18, 197:9

**generated** [5] - 144:21,
145:2, 145:5, 145:8, 147:8

**geniuses** [1] - 45:8

**given** [27] - 7:9, 20:8,
26:6, 30:24, 35:23, 57:23,
89:24, 95:23, 103:9,

115:12, 135:6, 139:17,
139:21, 164:20, 193:14,
194:15, 196:21, 199:13,
204:6, 205:18, 208:15,
208:17, 208:22, 209:1,
209:4, 210:12

**GJ** [1] - 187:14

**GJE** [73] - 21:8, 21:21,
30:23, 41:6, 41:7, 41:11,
41:12, 41:21, 42:1, 42:14,
42:16, 42:21, 43:8, 43:14,
43:17, 44:1, 44:2, 44:22,
45:2, 45:18, 46:10, 46:17,
47:8, 48:21, 49:5, 49:7,
55:18, 68:5, 69:3, 69:24,
71:12, 72:3, 80:25, 95:1,
95:25, 96:19, 97:18, 125:7,
126:7, 126:18, 126:23,
127:18, 128:1, 128:14,
128:17, 130:14, 130:16,
134:15, 134:19, 135:3,
135:12, 147:11, 149:4,
152:9, 152:10, 153:5,
186:7, 186:11, 186:14,
186:22, 187:5, 187:6,
202:12, 204:2, 204:10,
204:16, 204:22, 205:4,
206:5, 208:5, 208:13, 209:3

**glanced** [1] - 115:16

**Glen** [1] - 178:11

**globally** [1] - 55:7

**God** [1] - 23:4

**Gold** [1] - 160:5

**Goode** [2] - 2:7, 2:10

**Goodwin** [1] - 170:15

**goose** [1] - 215:11

**governed** [2] - 102:6,
102:15

**government** [3] - 15:10,
15:19, 53:5

**grade** [7] - 72:23, 75:2,
75:4, 89:15, 90:19, 93:25,
95:15

**Grade** [21] - 21:8, 22:6,
22:7, 49:5, 56:21, 70:22,
72:1, 72:4, 73:7, 74:9,
99:15, 151:7, 152:15,
205:4, 205:5, 205:18,
205:19

**graded** [1] - 152:1

**grades** [5] - 44:9, 69:25,
73:10, 204:2, 204:22

**grading** [1] - 74:21

**Grady** [5] - 149:23, 150:2,
150:24, 164:9

**Grand** [1] - 2:4

**granted** [2] - 105:22,
144:19

**graph** [2] - 119:2, 119:5

**graveyard** [1] - 142:19

**great** [2] - 25:11, 45:8

**Great** [1] - 2:10

**greater** [2] - 11:13, 174:19

**greet** [1] - 195:19

www.oasisreporting.com
to purchase a complete copy of the transcript.

**Greg** [5] - 3:10, 78:3, 87:6, 157:21, 177:14
**GREGORY** [1] - 2:3
**grievances** [2] - 122:10, 122:11
**Gross** [1] - 48:1
**grounds** [1] - 210:6
**Group** [1] - 48:1
**group** [5] - 34:3, 45:8, 46:9, 46:21, 135:3
**Grundy** [1] - 122:11
**guarantee** [4] - 158:20, 168:15, 169:1, 169:4
**guarantees** [1] - 4:14
**guess** [66] - 5:12, 5:19, 5:21, 18:3, 24:10, 29:15, 39:2, 42:1, 42:22, 44:13, 49:10, 49:11, 49:12, 58:13, 58:18, 64:23, 66:3, 66:6, 70:6, 76:2, 78:19, 78:25, 83:13, 84:24, 85:22, 86:8, 86:16, 88:22, 91:19, 93:11, 94:6, 94:16, 101:17, 101:22, 105:16, 108:17, 115:20, 121:24, 124:2, 131:10, 139:22, 143:12, 144:5, 150:19, 150:23, 153:6, 159:19, 163:24, 166:20, 170:1, 172:1, 183:14, 185:2, 185:5, 186:21, 191:8, 193:12, 201:11, 201:16, 210:20, 213:12, 214:13, 217:25, 218:1, 218:6
**guessing** [4] - 26:16, 197:14, 201:12, 215:6
**guidance** [3] - 7:7, 85:17, 146:2
**guide** [2] - 127:16, 191:22
**guilty** [2] - 38:19, 40:13
**guise** [1] - 137:15
**guts** [1] - 139:19
**guy** [4] - 132:23, 140:24, 142:1, 185:25
**guys** [15] - 9:25, 58:3, 83:3, 86:8, 99:9, 132:16, 157:12, 171:13, 171:22, 175:18, 182:14, 198:7, 201:14, 202:13, 212:8

# H

**Haas** [1] - 3:12
**HAAS** [20] - 2:10, 60:4, 60:22, 62:6, 62:12, 62:23, 63:3, 63:18, 64:7, 64:10, 64:14, 64:17, 71:1, 71:19, 71:24, 72:2, 72:8, 72:10, 72:17, 73:15
**half** [6] - 94:10, 112:24, 165:14, 166:1, 172:10, 211:11
**halfway** [1] - 159:25

**hallucinations** [1] - 108:10
**hand** [9] - 44:6, 44:10, 44:12, 44:14, 78:19, 146:10, 160:22, 161:4, 162:24
**handed** [1] - 192:14
**handing** [2] - 161:6, 207:18
**handle** [8] - 20:9, 23:4, 24:11, 55:16, 93:19, 101:25, 214:12, 214:21
**handled** [1] - 23:1
**handling** [3] - 6:25, 7:3, 13:15
**hands** [4] - 12:9, 44:14, 55:2, 189:4
**handwritten** [1] - 115:7
**hang** [1] - 27:5
**happy** [8] - 65:11, 65:19, 79:10, 116:8, 116:10, 116:16, 215:15, 216:25
**harassing** [1] - 124:10
**harassment** [11] - 21:23, 28:19, 93:9, 94:18, 127:22, 145:12, 188:1, 188:2, 188:3, 189:13, 189:14
**hard** [5] - 20:22, 74:25, 100:3, 154:18, 163:4
**Harding** [7] - 121:18, 122:14, 124:6, 127:2, 127:5, 163:12
**hardly** [1] - 33:24
**hardship** [3] - 195:21, 195:23, 196:4
**harm** [2] - 73:12, 119:20
**Harty** [7] - 3:12, 7:4, 189:17, 191:11, 194:15, 208:1, 218:12
**HARTY** [137] - 2:6, 6:25, 7:3, 7:6, 7:19, 7:24, 20:6, 24:20, 25:21, 55:9, 55:12, 64:16, 64:18, 65:9, 74:16, 75:13, 85:15, 110:4, 110:8, 110:11, 121:22, 122:6, 122:16, 126:4, 126:6, 126:9, 126:13, 127:1, 127:6, 134:17, 134:23, 135:13, 135:24, 136:8, 136:14, 136:17, 140:8, 141:13, 141:25, 142:6, 142:13, 142:19, 143:2, 145:25, 146:15, 147:2, 147:7, 147:21, 148:14, 148:16, 148:22, 149:14, 149:24, 150:12, 151:10, 153:10, 153:17, 154:13, 155:18, 156:1, 156:7, 156:13, 158:19, 158:23, 159:1, 159:5, 159:7, 159:14, 159:17, 162:10, 164:20, 167:22, 167:25, 168:4, 168:9, 168:11, 168:15, 169:1, 169:9,

169:14, 169:23, 169:25, 170:4, 170:7, 170:10, 170:12, 170:17, 170:24, 171:2, 171:8, 171:17, 173:5, 173:9, 173:13, 176:8, 176:11, 176:17, 176:19, 176:22, 176:24, 177:1, 177:3, 177:5, 177:9, 177:11, 177:18, 177:22, 177:24, 178:2, 178:6, 178:8, 178:10, 178:12, 178:14, 178:16, 178:20, 178:22, 178:24, 179:4, 185:12, 185:14, 186:16, 187:24, 189:21, 189:23, 191:13, 197:6, 198:1, 198:16, 200:23, 201:25, 209:7, 212:12, 212:25, 217:16, 217:23, 218:13
**Harty's** [1] - 210:10
**Hartz** [1] - 170:15
**hassle** [3] - 194:13, 200:20, 201:15
**hate** [1] - 46:5
**hawing** [1] - 172:12
**Hawk** [1] - 122:11
**Hawk-Grundy** [1] - 122:11
**Hay** [7] - 43:18, 44:17, 44:18, 45:8, 46:9, 135:3, 191:22
**head** [9] - 11:2, 63:3, 71:23, 118:25, 119:3, 120:25, 128:25, 149:20, 158:5
**heads** [2] - 168:17, 214:11
**health** [1] - 176:13
**hear** [32] - 6:19, 12:2, 12:6, 12:10, 17:10, 18:8, 23:19, 23:22, 24:1, 24:3, 26:19, 28:7, 46:17, 49:22, 49:24, 55:19, 57:10, 66:6, 89:16, 95:10, 109:15, 112:2, 114:18, 121:11, 137:16, 142:23, 160:18, 166:3, 196:25, 211:20, 212:22
**heard** [12] - 70:9, 80:18, 82:1, 92:12, 97:14, 110:18, 119:15, 148:15, 149:1, 149:13, 165:21, 169:7
**hearing** [15] - 3:6, 138:22, 156:18, 157:4, 174:21, 175:2, 175:20, 189:17, 191:16, 193:9, 201:21, 207:22, 210:19, 213:8, 217:4
**hearings** [2] - 175:11, 211:4
**hearsay** [13] - 89:21, 105:23, 117:7, 117:25, 127:12, 129:3, 130:21, 130:23, 131:3, 131:11, 145:13, 155:4, 199:9
**heart** [2] - 125:12, 206:4

**heavily** [1] - 33:22
**heck** [1] - 154:19
**held** [5] - 30:7, 59:9, 82:16, 96:4, 96:13
**hell** [2] - 23:6, 142:12
**help** [2] - 83:3, 125:15
**helpful** [1] - 212:21
**hemming** [1] - 172:12
**Hibben** [7] - 154:3, 161:10, 161:12, 161:13, 162:8, 170:18, 171:14
**hide** [2] - 80:11, 148:7
**hierarchy** [1] - 155:10
**higher** [6] - 90:18, 93:25, 95:15, 121:15, 205:7, 205:24
**highlighted** [2] - 84:3, 97:5
**highly** [6] - 81:23, 82:5, 96:7, 109:10, 110:20, 110:23
**himself** [2] - 150:10, 152:2
**hip** [1] - 150:22
**HIPAA** [2] - 143:8, 143:20
**hired** [1] - 141:17
**hiring** [1] - 93:5
**histories** [2] - 90:1, 144:21
**history** [4] - 26:15, 83:22, 89:24, 153:1
**Hoekstra** [1] - 104:16
**hold** [1] - 151:23
**home** [3] - 106:1, 215:25, 216:12
**honestly** [2] - 63:15, 194:22
**Honor** [176] - 7:1, 7:19, 7:25, 9:6, 9:12, 9:20, 13:17, 13:20, 15:6, 16:20, 24:20, 25:22, 29:8, 30:4, 31:4, 31:25, 34:22, 35:12, 36:1, 36:7, 38:8, 38:25, 39:5, 40:3, 43:24, 44:16, 46:22, 47:3, 47:22, 50:1, 58:23, 59:21, 60:4, 64:18, 66:8, 66:20, 70:11, 74:17, 75:14, 77:1, 77:12, 78:11, 79:21, 81:8, 83:25, 84:18, 85:15, 86:24, 89:20, 90:15, 92:10, 93:11, 94:22, 95:22, 97:1, 99:22, 100:20, 102:3, 104:24, 105:5, 108:1, 110:5, 114:17, 114:20, 117:6, 118:2, 118:22, 119:8, 119:17, 121:22, 122:6, 122:25, 125:22, 126:4, 126:6, 127:2, 128:21, 128:25, 129:7, 131:1, 131:12, 132:8, 133:13, 134:1, 134:10, 134:18, 135:24, 136:10, 136:17, 136:22, 139:7, 140:9, 141:14, 143:3, 143:21, 144:1, 144:11,

www.CaReporting.com
to purchase a complete copy of the transcript.

144:24, 145:16, 146:15, 147:2, 147:7, 147:21, 148:14, 148:17, 149:15, 150:13, 151:18, 151:19, 152:21, 153:11, 153:19, 154:1, 154:13, 155:7, 155:18, 156:1, 156:13, 157:15, 158:2, 158:9, 158:12, 158:19, 158:23, 159:1, 159:5, 159:13, 162:11, 163:22, 164:12, 164:21, 167:10, 167:22, 168:1, 168:4, 168:9, 168:21, 169:2, 169:10, 169:23, 169:25, 170:17, 170:25, 176:9, 176:12, 177:9, 177:20, 178:3, 178:6, 178:20, 179:5, 179:8, 180:24, 186:3, 186:16, 187:25, 189:7, 189:21, 192:18, 197:6, 197:25, 198:2, 199:13, 200:23, 201:23, 202:2, 202:11, 202:15, 203:4, 206:15, 208:14, 209:7, 210:9, 217:16, 218:11, 218:13
  **hope** [1] - 165:10
  **hopefully** [3] - 165:20, 196:1, 200:18
  **hopes** [1] - 110:19
  **Hopkins** [1] - 2:3
  **horrendous** [1] - 181:17
  **horror** [1] - 181:12
  **hostile** [13] - 92:7, 93:3, 94:4, 94:13, 94:18, 95:20, 96:1, 96:9, 97:6, 124:10, 126:14, 127:22, 145:12
  **hosting** [1] - 110:19
  **hour** [12] - 112:17, 112:22, 112:23, 112:24, 175:11, 181:20, 181:21, 181:24, 182:12, 198:3, 200:6
  **hour-and-a-half** [1] - 112:24
  **hours** [3] - 84:20, 164:21, 198:10
  **house** [1] - 3:14
  **hover** [1] - 160:24
  **HR** [4] - 204:19, 205:2, 205:24, 206:7
  **Huebner** [1] - 2:3
  **huge** [1] - 84:2
  **Hulett** [3] - 3:12, 13:18, 159:9
  **HULETT** [39] - 2:6, 13:17, 13:20, 14:10, 14:13, 14:17, 14:20, 15:5, 16:1, 16:8, 16:19, 16:25, 17:24, 18:3, 18:18, 18:24, 19:14, 19:21, 42:13, 43:2, 43:7, 43:13, 43:21, 44:16, 45:23, 46:1, 46:22, 47:22, 48:15, 48:23, 100:20, 101:9, 102:2,

114:17, 114:20, 134:1, 152:21, 153:3, 179:9
  **human** [2] - 127:8, 140:13
  **hundred** [2] - 32:6, 194:24
  **hundred-plus** [1] - 32:6
  **hung** [1] - 202:4
  **husband** [5] - 39:17, 39:23, 40:5, 40:11, 145:8
  **hydraulics** [1] - 205:18

## I

  **i.e** [1] - 122:10
  **ICRA** [1] - 48:7
  **idea** [11] - 51:24, 85:16, 109:11, 113:13, 117:13, 138:3, 166:22, 187:13, 198:4, 205:25, 206:7
  **ideal** [3] - 188:6, 188:18, 190:13
  **ideas** [1] - 212:6
  **identical** [3] - 78:13, 175:8, 193:4
  **identically** [1] - 68:19
  **identified** [9] - 63:12, 94:17, 136:6, 153:16, 167:12, 168:6, 172:21, 184:24, 198:15
  **identify** [8] - 92:23, 118:7, 162:13, 162:17, 167:13, 170:21, 180:18, 198:9
  **iffy** [1] - 181:16
  **ignore** [1] - 211:24
  **ignored** [1] - 22:18
  **II** [2] - 203:21, 203:24
  **III** [2] - 203:21, 203:24
  **illustrate** [1] - 103:23
  **imagine** [1] - 144:7
  **immediately** [6] - 9:22, 14:8, 55:18, 147:24, 152:1, 213:9
  **impact** [14] - 40:21, 40:24, 41:9, 41:10, 41:18, 43:6, 43:9, 74:8, 77:23, 83:8, 110:25, 114:24, 115:1, 202:6
  **impacted** [2] - 46:20, 74:3
  **impeach** [5] - 34:23, 83:20, 118:19, 132:1, 172:1
  **impeached** [1] - 34:18
  **impeachment** [15] - 15:7, 15:17, 16:15, 37:20, 58:11, 116:12, 116:19, 116:25, 131:19
  **impermissible** [1] - 59:18
  **impetus** [1] - 81:19
  **implementation** [13] - 41:6, 41:21, 41:23, 43:17, 44:18, 95:1, 98:6, 98:7, 126:23, 127:18, 128:1, 128:15, 152:9
  **implemented** [10] - 21:8, 21:21, 45:3, 46:10, 49:5,

126:19, 134:15, 134:19, 135:12, 151:6
  **implicates** [1] - 16:14
  **implying** [1] - 153:14
  **importance** [2] - 129:14, 195:22
  **important** [9] - 4:20, 36:13, 64:2, 89:15, 90:22, 124:24, 152:17, 159:22, 174:9
  **importantly** [1] - 172:25
  **impress** [1] - 195:22
  **impression** [1] - 182:18
  **improper** [2] - 89:15, 96:11
  **improprieties** [1] - 209:19
  **in-house** [1] - 3:14
  **inability** [1] - 60:14
  **inaccurate** [1] - 81:22
  **inadmissible** [17] - 12:23, 16:7, 27:18, 35:4, 35:8, 36:3, 49:1, 49:9, 56:2, 69:14, 87:10, 98:14, 117:7, 125:24, 141:11, 149:10, 180:13
  **inadvertence** [1] - 207:4
  **incentive** [3] - 77:19, 79:9, 215:19
  **inch** [2] - 3:21, 181:3
  **incident** [3] - 94:7, 98:13, 141:8
  **incidentally** [5] - 8:6, 159:20, 160:20, 164:23, 172:6
  **incidents** [2] - 93:17, 99:16
  **include** [7] - 38:21, 39:16, 71:4, 148:18, 154:3, 155:16, 156:7
  **included** [5] - 12:20, 30:17, 154:23, 202:24, 208:1
  **includes** [4] - 43:18, 46:2, 101:7, 204:21
  **including** [12] - 36:4, 92:2, 93:4, 123:23, 124:9, 133:6, 133:19, 153:1, 195:16, 204:12, 205:2, 208:19
  **income** [4] - 8:20, 12:11, 12:23, 24:12
  **incomes** [1] - 12:7
  **inconsistent** [3] - 37:16, 37:18, 131:22
  **increase** [2] - 75:2, 75:4
  **increased** [2] - 30:19, 30:20
  **incumbent** [1] - 8:11
  **incur** [2] - 216:9, 216:10
  **incurred** [2] - 107:17, 108:3
  **independent** [1] - 81:11
  **indicate** [5] - 136:1, 162:19, 167:15, 169:17, 193:21

  **indicated** [10] - 56:6, 85:25, 104:13, 150:16, 163:8, 163:9, 181:2, 205:24, 207:21, 208:1
  **indicating** [2] - 204:10, 204:15
  **individual** [11] - 62:8, 62:13, 81:16, 102:8, 102:14, 108:9, 141:16, 158:16, 158:17, 194:23, 203:18
  **individually** [2] - 20:23, 63:21
  **individuals** [3] - 87:1, 87:3, 87:20
  **inexpensive** [2] - 201:16, 215:7
  **inexpensively** [1] - 187:17
  **inference** [3] - 90:9, 109:17, 109:25
  **inflammatory** [1] - 96:7
  **inform** [1] - 51:17
  **information** [17] - 3:18, 8:12, 8:18, 10:6, 13:21, 14:22, 15:11, 29:9, 52:4, 89:3, 114:8, 114:12, 144:3, 196:19, 201:6, 205:7, 205:14
  **informed** [3] - 50:10, 50:23, 51:15
  **informing** [1] - 125:8
  **inherently** [1] - 77:13
  **initial** [3] - 203:3, 204:10, 204:21
  **injured** [1] - 108:9
  **injuries** [7] - 40:6, 90:7, 100:1, 100:6, 100:13, 100:15, 181:17
  **injury** [7] - 38:17, 40:17, 99:13, 108:12, 109:3, 119:23
  **inside** [1] - 138:8
  **insignificant** [1] - 215:24
  **insinuates** [1] - 129:16
  **insinuating** [1] - 59:9
  **instance** [2] - 95:8, 113:8
  **instances** [1] - 54:3
  **instead** [5] - 17:19, 114:11, 183:19, 185:9, 187:21
  **instruct** [6] - 27:6, 47:25, 48:3, 52:24, 65:4, 102:12
  **instructed** [5] - 17:17, 18:1, 18:4, 18:6, 66:5
  **instruction** [8] - 18:7, 48:4, 51:9, 52:21, 54:3, 54:8, 103:19, 213:19
  **instructions** [14] - 18:12, 18:14, 62:24, 67:3, 102:24, 103:5, 103:10, 103:11, 212:19, 213:13, 213:14, 213:25, 214:3, 214:12
  **insurance** [5] - 9:2, 10:12, 10:16, 13:6, 16:22

to purchase a complete copy of the transcript.

**intend** [21] - 31:15, 38:16, 50:24, 55:21, 66:15, 133:16, 133:20, 134:2, 134:9, 134:18, 140:11, 162:14, 162:18, 167:12, 170:22, 172:4, 172:17, 180:20, 193:2, 193:7, 214:12

**intended** [1] - 167:8

**intending** [11] - 31:11, 42:8, 105:3, 111:6, 116:21, 128:9, 133:10, 133:24, 134:14, 161:20, 169:17

**intends** [7] - 42:10, 42:15, 43:13, 171:24, 180:11, 180:12, 180:21

**intent** [4] - 23:12, 93:13, 112:13, 141:15

**intention** [4] - 123:20, 166:5, 171:22, 184:2

**intentional** [3] - 43:15, 44:23, 48:8

**interact** [1] - 201:5

**interested** [2] - 183:3, 214:19

**interject** [2] - 52:14, 104:24

**internal** [1] - 135:17

**interpretation** [1] - 107:18

**interpreted** [2] - 100:14, 142:7

**interpreting** [1] - 101:4

**interrelated** [1] - 27:4

**interrogatories** [1] - 92:22

**interrogatory** [1] - 103:12

**interrupting** [1] - 191:14

**introduce** [10] - 27:21, 27:24, 31:17, 36:25, 53:14, 123:3, 123:4, 134:10, 144:11, 167:8

**introducing** [1] - 22:24

**invested** [2] - 215:23, 216:19

**investigate** [2] - 139:10, 161:14

**investigating** [1] - 58:14

**investigation** [28] - 49:11, 49:16, 49:17, 49:20, 50:11, 50:24, 50:25, 51:7, 51:16, 51:18, 52:1, 52:6, 52:25, 139:5, 139:13, 140:14, 147:4, 147:13, 147:24, 148:2, 148:5, 153:6, 153:9, 153:12, 153:20, 153:21, 154:2, 204:25

**investigator** [8] - 49:17, 49:18, 50:7, 51:3, 51:5, 56:10, 58:8, 138:24

**invite** [2] - 198:24, 198:25

**involved** [13] - 32:3, 39:2, 50:11, 50:23, 73:9, 80:19, 123:11, 155:9, 155:15, 155:16, 190:21, 214:23, 218:5

**involving** [5] - 38:17, 38:18, 152:3, 207:7, 210:25

**Iowa** [10] - 2:4, 2:8, 2:11, 31:6, 64:18, 100:21, 101:10, 102:7, 196:18, 218:2

**irrelevant** [7] - 41:17, 81:6, 94:19, 128:17, 153:23, 162:7, 172:11

**isolation** [1] - 30:18

**issue** [16] - 5:1, 6:18, 6:22, 7:15, 7:21, 8:5, 8:10, 8:21, 11:17, 12:21, 13:9, 16:5, 16:13, 16:18, 17:15, 20:25, 21:2, 21:3, 21:6, 21:13, 21:19, 21:24, 22:5, 23:20, 24:11, 24:12, 24:23, 24:24, 27:10, 28:6, 30:6, 36:10, 41:18, 43:23, 45:16, 47:7, 47:12, 47:13, 47:23, 48:6, 48:18, 49:3, 49:4, 49:8, 55:13, 56:19, 57:18, 59:4, 60:5, 60:7, 60:9, 61:2, 61:7, 62:4, 62:18, 62:24, 63:5, 63:6, 63:12, 63:14, 63:20, 64:11, 64:21, 65:7, 65:11, 66:1, 66:24, 67:18, 68:14, 70:17, 73:20, 73:23, 74:25, 75:16, 76:10, 80:11, 82:14, 84:2, 85:23, 86:16, 88:10, 88:16, 90:3, 90:9, 93:22, 94:19, 96:20, 100:25, 101:6, 101:25, 102:5, 106:4, 119:14, 122:18, 127:24, 136:21, 138:14, 149:1, 151:18, 153:21, 154:24, 183:5, 183:23, 188:25, 195:6, 196:1, 202:17, 215:10, 217:1, 217:25, 218:8

**issued** [1] - 102:5

**issues** [51] - 4:9, 4:24, 5:19, 6:4, 19:3, 22:1, 25:5, 35:19, 36:13, 36:22, 47:4, 48:25, 50:5, 51:6, 57:10, 63:22, 65:10, 68:25, 69:3, 77:5, 80:6, 80:8, 80:22, 83:13, 84:13, 89:2, 98:1, 101:20, 112:15, 113:4, 114:1, 114:3, 115:13, 122:19, 123:23, 123:24, 149:4, 154:6, 156:22, 157:1, 157:8, 167:20, 176:13, 195:17, 197:12, 201:10, 207:6, 212:6, 212:20, 214:9, 217:10

**item** [5] - 6:15, 7:21, 8:19, 76:1, 83:11

**items** [3] - 15:4, 17:12, 134:4

**itself** [14] - 41:11, 49:16, 63:10, 72:13, 85:5, 129:11, 131:15, 136:1, 180:12, 195:9, 197:22, 197:24, 203:17

**J**

**James** [6] - 164:8, 167:18, 168:5, 177:23, 178:7, 210:11

**Jamie** [1] - 178:7

**January** [6] - 202:19, 202:20, 204:9, 205:16, 205:23, 206:18

**Jay** [1] - 145:4

**Jennifer** [1] - 176:18

**Jerauld** [2] - 81:21, 176:7

**Jerome** [1] - 170:14

**Jim** [4] - 124:6, 127:2, 127:5, 204:18

**Jo** [1] - 3:3

**job** [25] - 44:9, 48:17, 56:3, 69:17, 80:3, 80:6, 80:7, 80:10, 80:14, 80:15, 80:21, 80:24, 81:4, 81:23, 82:23, 128:18, 133:21, 139:9, 139:11, 151:6, 151:25, 203:19, 204:22, 205:20

**jobs** [4] - 68:18, 70:4, 82:16, 137:22

**John** [53] - 10:20, 13:5, 14:9, 19:25, 36:24, 42:4, 42:8, 42:10, 42:13, 56:19, 64:6, 76:12, 77:9, 79:10, 83:15, 86:15, 99:14, 107:3, 107:15, 107:22, 108:2, 109:6, 109:17, 109:24, 110:18, 115:25, 116:3, 116:5, 116:7, 121:2, 121:10, 121:15, 123:22, 128:16, 128:21, 135:11, 138:18, 139:2, 139:12, 139:20, 140:6, 140:12, 140:20, 143:18, 153:1, 158:25, 161:16, 184:25, 185:4, 185:7, 203:7, 215:7, 215:15

**Jones** [1] - 55:25

**Joseph** [1] - 170:15

**Jost** [2] - 176:16

**Judge** [18] - 29:17, 54:17, 55:24, 64:1, 111:20, 111:24, 113:8, 150:6, 163:1, 163:10, 171:9, 174:2, 175:5, 196:15, 202:17, 203:13, 213:23, 214:20

**judge** [14] - 4:11, 20:6, 52:14, 65:19, 76:15, 78:15, 78:17, 78:20, 78:21, 89:8, 142:23, 200:5, 210:24, 214:20

**judges** [1] - 198:17

**judgment** [29] - 17:12, 28:24, 42:3, 47:5, 60:6, 61:1, 66:12, 66:18, 67:9, 67:10, 67:14, 67:24, 68:10, 70:13, 72:22, 73:2, 75:23, 78:4, 81:14, 87:2, 92:16, 92:18, 92:25, 96:3, 135:17, 137:5, 206:12, 206:23, 217:2

**judgments** [2] - 103:15, 206:19

**Judith** [1] - 164:13

**July** [2] - 204:10, 204:16

**juries** [7] - 54:11, 112:16, 132:17, 166:11, 182:9, 182:10, 215:16

**juror** [4] - 5:3, 5:8, 197:1, 199:1

**jurors** [5] - 4:10, 5:6, 57:4, 196:2, 199:23

**jury** [157] - 4:6, 4:13, 5:1, 12:1, 12:6, 12:10, 12:20, 12:24, 13:9, 13:10, 16:6, 16:18, 17:16, 17:17, 17:20, 18:1, 18:3, 18:5, 18:7, 18:14, 18:22, 18:25, 19:9, 20:10, 23:5, 23:9, 23:13, 23:14, 23:25, 24:8, 25:13, 25:23, 27:5, 27:23, 31:20, 31:21, 32:21, 32:23, 33:3, 36:10, 37:12, 44:8, 44:13, 47:7, 47:13, 47:15, 47:25, 48:3, 49:12, 49:22, 49:23, 50:10, 50:14, 50:22, 51:14, 51:18, 51:25, 52:7, 52:12, 52:24, 53:2, 55:7, 55:14, 58:5, 58:25, 59:8, 60:16, 61:11, 62:4, 62:5, 62:10, 62:19, 63:2, 63:8, 63:17, 64:25, 65:5, 65:10, 65:18, 66:4, 66:24, 67:17, 68:7, 70:17, 76:10, 76:16, 78:16, 78:23, 79:9, 79:12, 80:9, 80:23, 85:23, 86:2, 86:3, 86:4, 89:4, 89:16, 99:18, 102:12, 103:13, 103:25, 104:7, 109:6, 109:20, 112:4, 113:1, 115:10, 115:13, 121:11, 132:19, 133:2, 139:1, 139:19, 142:23, 145:15, 146:25, 150:19, 152:16, 155:9, 155:13, 160:13, 164:4, 165:16, 165:20, 166:2, 166:5, 181:21, 181:22, 182:2, 182:18, 183:2, 195:11, 195:13, 195:14, 195:19, 195:22, 197:2, 197:4, 197:22, 197:23, 198:21, 198:22, 200:2, 200:3, 200:6, 200:8, 211:22, 212:8, 213:9, 215:13

**jury's** [2] - 57:19, 109:13

Case 6:12-cv-02063-JSS    Document 214-3    Filed 02/18/25    Page 71 of 85

to purchase a complete copy of the transcript.

# K

**Kansas** [1] - 33:23
**Katie** [1] - 120:23
**Kay** [2] - 84:20, 160:3
**Kean** [1] - 176:18
**keep** [16] - 4:5, 19:5,
26:17, 27:12, 28:5, 38:5,
65:18, 98:10, 115:18,
123:14, 143:5, 151:23,
161:3, 170:1, 209:25, 212:1
**keeping** [2] - 112:16,
199:22
**keeps** [2] - 44:13, 185:4
**Keith** [29] - 121:19, 122:7,
122:15, 123:16, 124:6,
124:25, 125:18, 126:3,
126:21, 126:22, 127:3,
127:8, 127:17, 127:20,
127:21, 127:25, 133:7,
133:21, 140:24, 141:5,
142:3, 147:24, 153:9,
153:13, 153:15, 158:15,
176:20, 189:14, 207:10
**Keith's** [2] - 140:18, 147:4
**kept** [2] - 85:13, 191:3
**Keri** [1] - 176:21
**Kevin** [22] - 121:18, 122:7,
122:15, 123:15, 124:5,
125:18, 126:3, 127:3,
127:8, 127:17, 133:7,
133:21, 140:18, 141:5,
142:3, 147:4, 153:9,
153:13, 153:15, 158:15,
176:20, 189:14
**key** [2] - 36:10, 151:21
**Kim** [1] - 130:4
**Kimberly** [1] - 163:18
**kind** [31] - 21:11, 22:13,
22:21, 23:9, 38:6, 39:22,
40:25, 44:8, 58:2, 59:19,
74:22, 81:10, 83:3, 95:19,
96:1, 96:19, 103:17, 113:5,
113:24, 123:5, 127:13,
139:4, 139:24, 156:22,
157:7, 172:22, 176:4,
198:12, 199:12, 199:17,
213:17
**kinds** [5] - 36:22, 39:13,
82:3, 138:25, 200:13
**Kinney** [1] - 176:21
**Klein** [1] - 152:19
**knee** [1] - 169:10
**Knoll** [2] - 176:23, 176:24
**knowing** [3] - 79:4, 182:8,
182:9
**knowledge** [16] - 14:20,
29:5, 52:5, 111:13, 116:10,
130:13, 130:19, 135:20,
137:8, 138:11, 138:21,
139:3, 150:18, 150:20,
186:19, 204:2
**knowledgeable** [1] -

113:25
**knows** [5] - 23:4, 79:15,
81:13, 82:17, 113:9
**Kohagen** [7] - 133:6,
133:10, 133:11, 133:19,
133:25, 134:2
**Krogh** [1] - 177:2
**Kulas** [1] - 177:4

# L

**laches** [17] - 49:22, 55:23,
57:18, 58:19, 59:1, 59:5,
60:7, 60:8, 60:23, 60:24,
61:2, 61:6, 61:15, 61:17,
156:10, 217:1, 217:3
**lack** [2] - 50:19, 59:1,
133:16, 133:17, 133:23,
136:3, 136:4
**lacking** [1] - 82:4
**ladies** [2] - 55:15, 151:23
**laid** [2] - 97:2, 187:20
**language** [1] - 79:7
**large** [3] - 45:5, 77:19,
204:23
**last** [11] - 3:20, 24:9,
55:14, 56:8, 97:15, 112:15,
121:3, 148:18, 186:5,
195:17, 217:16
**lasts** [1] - 13:24
**late** [6] - 154:25, 207:23,
208:7, 209:1, 209:5, 217:7
**lately** [1] - 28:12
**latter** [1] - 84:7
**lavaliere** [1] - 160:16
**law** [21] - 11:24, 11:25,
28:7, 34:2, 34:6, 47:19,
52:18, 53:4, 65:3, 65:5,
66:2, 66:5, 66:9, 66:21,
71:13, 73:14, 75:1, 75:10,
75:14, 100:8, 182:8
**lawful** [2] - 47:10, 47:19
**lawsuit** [38] - 28:18, 28:22,
29:25, 30:11, 30:12, 31:12,
31:14, 31:23, 32:2, 32:3,
32:22, 33:16, 33:20, 35:3,
37:6, 37:9, 38:17, 40:15,
40:18, 50:4, 50:17, 76:1,
76:4, 76:13, 76:21, 77:2,
79:24, 85:24, 87:15, 87:16,
87:25, 88:6, 88:7, 89:3,
98:2, 114:2, 138:19
**lawsuits** [13] - 28:9, 30:8,
34:3, 34:4, 38:6, 38:9,
39:3, 40:9, 76:5, 133:16,
133:17, 133:23, 135:11
**lawyer** [2] - 4:12, 181:14
**lawyers** [6] - 5:4, 172:9,
182:15, 186:6, 199:8, 201:3
**lay** [10] - 20:18, 114:5,
130:25, 131:2, 183:16,
185:17, 186:9, 186:22,
186:23, 187:7

**layers** [1] - 206:4
**laying** [1] - 183:22
**lays** [1] - 218:3
**lead** [1] - 65:25
**leading** [2] - 174:19,
183:5, 199:10
**leaking** [1] - 15:16
**learn** [1] - 211:16
**learned** [3] - 95:14,
200:20, 209:11
**least** [35] - 4:1, 5:2, 19:9,
27:9, 36:20, 54:17, 57:12,
61:7, 73:1, 86:13, 88:13,
90:3, 91:22, 92:1, 94:14,
99:2, 101:20, 112:9,
113:22, 126:11, 127:16,
142:5, 142:22, 165:14,
166:16, 168:21, 172:9,
179:10, 182:9, 193:10,
201:8, 206:14, 208:6,
213:15, 214:9
**leave** [5] - 76:23, 157:25,
172:15, 175:12, 202:4
**leaves** [1] - 50:13
**led** [1] - 25:25
**Leemkuil** [4] - 3:13, 30:5,
39:1, 83:24
**LEEMKUIL** [30] - 2:7,
30:4, 30:6, 31:4, 31:18,
31:25, 32:11, 33:7, 35:12,
35:18, 36:1, 36:7, 38:8,
38:12, 38:25, 39:5, 39:9,
77:12, 81:8, 83:25, 86:24,
87:18, 92:10, 92:13, 93:11,
94:21, 95:22, 96:17, 98:25,
117:6
**left** [11] - 25:18, 25:22,
47:13, 60:9, 89:2, 142:8,
142:11, 149:19, 156:5,
165:7, 206:14
**leg** [1] - 108:13
**legal** [9] - 38:11, 38:14,
39:15, 47:23, 62:18, 63:6,
63:14, 64:21, 65:7
**legitimate** [6] - 21:10,
35:7, 49:7, 89:1, 187:1,
187:18
**legitimately** [1] - 186:14
**Lela** [1] - 3:4
**Lemke** [6] - 51:2, 56:5,
56:6, 56:11, 145:5, 166:25
**length** [3] - 49:10, 50:4,
101:1
**lengthy** [1] - 201:13
**Lenius** [35] - 3:3, 5:25,
6:2, 9:9, 11:9, 28:17,
30:14, 31:8, 31:16, 36:8,
38:17, 38:18, 38:20, 39:1,
39:14, 39:16, 76:4, 78:3,
86:11, 87:6, 97:14, 104:16,
106:7, 134:8, 139:25,
140:1, 152:25, 157:21,
157:22, 158:3, 205:1,
205:13, 207:14

**Lenius'** [8] - 31:5, 32:1,
33:9, 104:20, 106:1,
123:13, 145:7, 152:19
**less** [11] - 12:18, 42:10,
69:23, 76:23, 110:8,
137:22, 141:2, 151:25,
181:5, 197:1, 197:8
**letter** [2] - 51:12, 53:12
**letting** [2] - 26:21, 26:22
**level** [1] - 42:6
**liability** [67] - 12:8, 19:11,
19:17, 19:24, 20:5, 20:20,
20:21, 20:25, 21:6, 21:18,
22:13, 24:4, 24:15, 24:19,
24:25, 25:1, 27:9, 27:11,
27:19, 27:24, 28:4, 36:2,
36:6, 36:11, 36:17, 36:20,
39:4, 49:3, 49:9, 55:22,
57:12, 59:24, 62:6, 71:2,
71:6, 85:1, 85:4, 85:14,
85:22, 89:11, 90:9, 90:16,
90:23, 91:22, 92:4, 98:14,
98:22, 99:3, 101:19, 106:3,
115:14, 119:13, 119:19,
143:11, 149:1, 165:12,
165:16, 165:17, 166:2,
177:8, 181:16, 211:5,
211:22, 212:8
**liable** [4] - 23:20, 23:22,
59:1, 59:9
**lie** [1] - 25:11
**lien** [2] - 217:18, 217:23
**lieu** [1] - 172:2
**life** [2] - 35:19, 200:21
**light** [8] - 50:14, 53:7,
60:1, 61:3, 67:22, 67:25,
68:12, 93:1
**likely** [3] - 98:6, 98:8,
163:23
**limine** [26] - 5:14, 5:15,
5:16, 5:23, 6:15, 7:22,
12:17, 19:6, 19:23, 40:21,
41:20, 50:2, 69:11, 74:6,
82:11, 84:17, 84:24, 98:21,
105:13, 122:20, 124:1,
156:15, 193:9, 201:8,
201:11, 206:24
**limitation** [1] - 98:21
**limitations** [2] - 120:24,
121:1
**limited** [5] - 21:1, 102:13,
104:3, 133:7, 208:8
**limiting** [1] - 208:4
**limits** [1] - 59:7
**Linda** [6] - 154:2, 161:10,
161:11, 161:13, 162:8,
170:18
**line** [7] - 5:22, 69:8, 79:22,
162:13, 167:14, 169:18,
188:22
**lines** [4] - 162:17, 170:22,
172:22, 180:18
**list** [13] - 115:3, 159:2,
161:10, 170:2, 170:13,

to purchase a complete copy of the transcript.

174:21, 174:23, 176:4,
180:3, 181:1, 183:6,
190:10, 196:6
**listed** [5] - 124:14, 157:20,
158:13, 164:1, 190:10
**listen** [1] - 181:21
**listening** [2] - 181:22,
181:24
**lists** [1] - 193:18
**litany** [1] - 81:15
**litigation** [4] - 29:13,
39:12, 110:13
**live** [38] - 163:16, 167:21,
167:24, 168:3, 169:5,
169:22, 169:24, 170:10,
170:12, 170:16, 170:17,
173:16, 176:10, 176:12,
176:17, 176:19, 176:22,
177:3, 177:5, 177:16,
177:22, 177:24, 178:4,
178:8, 178:10, 178:12,
178:14, 178:16, 178:19,
178:22, 178:24, 179:3,
179:6, 179:8, 188:18,
188:19, 190:12, 216:7
**locked** [1] - 175:14
**lodged** [1] - 30:14
**logical** [1] - 73:4
**long-term** [10] - 10:3,
10:4, 10:19, 14:1, 14:8,
15:11, 16:25, 18:4, 20:2,
121:20
**long-winded** [1] - 200:9
**look** [39] - 4:14, 4:15,
4:17, 6:11, 16:8, 65:22,
65:23, 66:25, 72:22, 75:22,
78:8, 84:15, 104:6, 114:16,
117:8, 121:16, 125:14,
132:7, 134:11, 138:8,
138:13, 143:6, 148:9,
154:9, 154:19, 157:9,
162:24, 163:25, 169:20,
180:25, 185:24, 187:25,
193:18, 211:17, 211:20,
212:3, 212:19, 213:5,
214:10
**looked** [8] - 75:22, 79:19,
103:10, 115:15, 125:4,
125:14, 202:8, 209:13
**looking** [9] - 115:2,
124:23, 129:21, 165:7,
167:17, 181:22, 183:6,
184:19, 203:6
**looks** [6] - 29:20, 126:10,
127:12, 134:8, 140:4, 143:9
**loses** [1] - 216:17
**loss** [1] - 117:19
**lost** [2] - 95:17, 108:13
**love** [1] - 139:18
**LTD** [1] - 26:2
**lunch** [1] - 175:11

# M

**mad** [4] - 54:20, 182:1,
182:5, 215:17
**magic** [1] - 217:6
**magnified** [1] - 193:6
**maintain** [1] - 99:6
**major** [2] - 121:7, 124:12
**majority** [1] - 183:25
**makers** [1] - 87:5
**male** [1] - 205:21
**man** [1] - 152:2
**management** [11] - 25:7,
69:16, 115:4, 116:8,
130:11, 130:12, 135:21,
142:14, 142:21, 204:11,
206:8
**Management** [1] - 203:20
**manager** [5] - 119:2,
127:9, 130:4, 130:7, 206:6
**managers** [2] - 44:2,
45:11
**Manheim** [1] - 130:4
**manifest** [1] - 108:14
**manipulate** [1] - 204:4
**manipulated** [5] - 44:2,
45:14, 45:21, 46:13, 151:22
**manner** [3] - 4:1, 57:13,
203:11
**map** [1] - 154:5
**mapped** [4] - 95:14, 97:12,
97:14, 151:4
**mapping** [1] - 48:17,
94:9, 97:18, 130:17,
147:25, 153:6, 161:14,
204:11, 204:16, 205:4,
205:17
**mappings** [1] - 128:18
**mark** [1] - 172:14
**marked** [7] - 31:5, 117:2,
185:15, 187:2, 192:9,
192:16, 194:6
**markedly** [1] - 206:22
**marks** [1] - 185:23
**mass** [1] - 110:19
**material** [1] - 69:3
**materials** [3] - 115:1,
115:2, 115:6
**matrix** [1] - 111:9
**Matson** [24] - 41:14, 91:9,
95:17, 96:15, 96:18, 97:11,
97:12, 104:20, 105:16,
148:11, 150:8, 151:22,
158:15, 177:6, 204:1,
204:6, 204:17, 205:2,
205:6, 205:9, 205:22,
206:6, 208:20
**Matson's** [2] - 105:20,
149:5
**matter** [13] - 3:1, 3:5, 5:7,
66:2, 120:13, 131:5, 131:7,
138:10, 172:9, 190:15,
192:6, 192:7, 210:16

**matters** [2] - 54:3, 145:4
**Matthew** [1] - 177:21
**McAnally** [2] - 177:7,
179:5
**McDonnell** [1] - 67:17
**McEnroe** [1] - 144:4
**McGonegle** [1] - 177:10
**Mead** [1] - 164:13
**mean** [55] - 19:7, 20:15,
21:14, 22:18, 22:22, 23:5,
26:15, 26:17, 27:3, 27:7,
31:2, 31:12, 31:22, 36:21,
42:9, 53:9, 55:24, 57:23,
62:19, 62:25, 64:22, 64:23,
66:18, 68:15, 73:5, 94:4,
94:5, 94:6, 102:17, 102:19,
109:6, 109:11, 109:13,
109:23, 113:16, 127:12,
128:14, 130:21, 135:1,
142:19, 162:7, 171:15,
171:25, 180:21, 181:5,
181:25, 183:10, 185:2,
187:4, 199:16, 208:2,
211:13, 215:21, 216:1
**meaningless** [1] - 53:6
**means** [4] - 18:20, 116:4,
183:9, 216:1
**meant** [2] - 132:11, 142:24
**meanwhile** [2] - 32:6, 58:3
**measure** [8] - 11:16, 13:8,
15:1, 17:18, 17:21, 18:15,
100:19, 212:17
**meat** [1] - 172:14
**Mediacom** [6] - 105:24,
106:8, 106:11, 106:13,
106:23, 107:4
**mediation** [3] - 214:17,
214:20
**medical** [16] - 15:13,
15:16, 40:7, 83:12, 83:19,
83:22, 84:13, 85:9, 90:1,
121:19, 123:23, 143:22,
143:24, 144:3, 179:10,
217:22
**Medicare** [2] - 217:23,
218:5
**meet** [8] - 100:3, 112:14,
195:15, 197:3, 197:9,
197:16, 197:18, 213:21
**meeting** [34] - 91:8, 91:10,
91:18, 91:21, 95:12, 95:17,
95:19, 95:23, 96:8, 96:12,
96:15, 96:18, 96:23, 97:11,
97:12, 97:17, 121:18,
122:7, 122:14, 122:23,
123:15, 124:5, 124:17,
124:19, 126:2, 126:7,
126:15, 126:18, 127:4,
127:8, 128:5, 133:7,
140:18, 207:13
**meetings** [1] - 84:9
**meets** [1] - 30:9
**MEIER** [1] - 159:13
**Meier** [2] - 3:13, 159:11

**Mel** [4] - 140:19, 142:8,
207:8, 207:13
**memo** [1] - 205:22
**memorandum** [2] -
136:12, 136:14
**memories** [1] - 60:21
**memory** [6] - 29:12, 59:1,
84:4, 123:24, 146:8, 146:11
**Mendelsohn** [1] - 87:8
**mental** [9] - 84:13, 100:2,
100:5, 108:2, 108:11,
108:13, 114:3, 122:2,
123:23
**mentally** [1] - 108:9
**mention** [4] - 128:17,
214:21, 215:23
**mentioned** [2] - 80:13,
123:13
**mentioning** [1] - 79:23
**merely** [1] - 52:22
**merit** [1] - 92:25
**met** [2] - 30:10, 126:21
**method** [1] - 118:23
**Methodology** [2] - 43:18,
44:18
**methodology** [2] - 118:24,
135:2
**Mexico** [1] - 41:16
**Meyers** [1] - 165:6
**mic** [1] - 160:16
**Micah** [2] - 178:15, 205:17
**Michael** [13] - 76:2, 76:3,
76:19, 111:1, 123:19,
149:23, 150:2, 150:24,
158:14, 164:6, 164:9,
177:10
**Michelle** [8] - 128:8,
128:12, 128:19, 128:20,
131:9, 131:23, 132:9, 164:8
**microphone** [4] - 9:15,
159:23, 160:6, 160:12
**microphones** [2] - 159:21,
159:23
**middle** [1] - 130:2
**might** [17] - 22:9, 24:20,
26:2, 72:25, 76:2, 94:12,
95:10, 142:4, 148:17,
153:15, 155:12, 183:2,
188:3, 202:6, 211:7,
211:25, 212:7
**Mike** [14] - 59:16, 77:14,
81:9, 81:21, 87:4, 123:6,
123:12, 123:15, 124:6,
144:4, 144:6, 154:15
**mind** [6] - 4:5, 21:18, 97:8,
115:18, 152:6, 161:3
**minds** [1] - 50:13
**Mindy** [1] - 178:21
**minute** [2] - 112:15,
195:17
**minutes** [5] - 84:21,
156:19, 175:3, 196:22,
207:5
**miracle** [1] - 165:11

to purchase a complete copy of the transcript.

**misapplication** [1] - 88:3
**misconduct** [1] - 143:8
**misdemeanor** [1] - 105:20
**missing** [1] - 68:21
**misstate** [1] - 47:19
**mistake** [1] - 54:1
**mistreated** [3] - 116:11, 116:16
**mistreating** [1] - 104:20
**mistreatment** [1] - 144:22
**misunderstanding** [2] - 17:7, 123:18
**misunderstood** [2] - 16:19, 191:14
**misused** [1] - 135:6
**mixed** [5] - 46:23, 47:11, 47:18, 47:19, 48:3
**mode** [1] - 156:21
**Moines** [4] - 2:4, 2:8, 140:21, 201:14
**moment** [1] - 189:20
**Monday** [1] - 165:4
**money** [8] - 7:17, 19:23, 75:9, 187:8, 215:22, 216:12, 216:18, 216:21
**month** [2] - 79:15, 215:5
**months** [2] - 207:24, 210:14
**morning** [6] - 54:10, 112:14, 113:2, 197:3, 211:11, 213:21
**mornings** [1] - 200:8
**Moses** [1] - 16:9
**most** [17] - 5:2, 5:6, 5:21, 14:21, 14:22, 16:17, 44:20, 61:3, 67:22, 67:25, 68:12, 146:24, 161:23, 173:15, 183:24, 197:15, 211:15
**mostly** [1] - 85:16
**mother** [3] - 120:18, 121:9
**mother's** [1] - 121:10
**motion** [71] - 5:15, 5:16, 5:17, 5:23, 6:13, 6:15, 11:15, 12:16, 17:9, 19:6, 19:22, 38:9, 40:20, 41:20, 42:1, 42:3, 44:25, 46:16, 47:2, 50:2, 50:6, 50:18, 60:25, 61:1, 66:18, 67:8, 67:10, 67:12, 67:13, 68:20, 69:11, 69:14, 72:22, 73:1, 74:6, 74:10, 75:23, 75:25, 82:11, 84:16, 84:24, 85:5, 85:11, 92:18, 96:23, 98:21, 105:13, 122:13, 122:20, 122:23, 124:1, 140:9, 143:2, 156:15, 169:7, 170:3, 170:19, 189:20, 198:23, 201:1, 202:1, 202:9, 202:12, 203:15, 208:24, 209:20, 209:21, 210:1, 210:15
**motions** [51] - 3:7, 3:16, 5:13, 5:14, 5:15, 6:5, 6:6, 7:22, 8:7, 20:19, 21:16,

46:25, 49:2, 49:13, 87:2, 112:10, 123:2, 135:16, 152:8, 156:16, 156:24, 156:25, 157:4, 164:1, 164:7, 175:1, 190:15, 190:21, 191:6, 191:7, 193:9, 201:1, 201:2, 201:4, 201:8, 201:9, 201:11, 201:21, 202:9, 206:24, 206:25, 210:19, 210:20, 210:25, 211:14, 211:23, 211:24, 212:4, 213:5, 213:12, 215:6
**motivating** [1] - 103:21
**motivation** [2] - 77:19, 79:2
**motivations** [1] - 114:14
**motive** [10] - 47:11, 47:18, 47:19, 48:4, 48:22, 81:24, 82:20, 83:9, 88:1
**motive/same** [1] - 46:24
**motives** [1] - 48:20
**mouth** [1] - 42:19
**movant** [1] - 6:19
**move** [10] - 6:21, 25:11, 25:16, 26:3, 61:13, 93:5, 101:16, 119:9, 187:21, 203:14
**moved** [6] - 7:11, 25:6, 130:10, 130:11, 204:8, 205:12
**moves** [1] - 130:1, 130:3, 136:3
**moving** [11] - 19:5, 27:12, 28:5, 38:5, 58:18, 98:10, 104:12, 128:7, 161:8, 204:7, 212:2
**MR** [247] - 6:25, 7:3, 7:6, 7:19, 7:24, 20:6, 24:20, 25:21, 29:17, 30:4, 30:6, 31:4, 31:18, 31:25, 32:11, 33:7, 35:12, 35:18, 36:1, 36:7, 38:8, 38:12, 38:25, 39:5, 39:9, 52:14, 53:16, 53:20, 55:9, 55:12, 64:16, 64:18, 65:9, 74:16, 75:13, 77:12, 81:8, 83:25, 85:15, 86:24, 87:18, 89:8, 89:20, 89:23, 90:14, 91:8, 91:11, 91:14, 91:16, 92:10, 92:13, 93:11, 94:21, 95:22, 96:17, 98:25, 105:5, 108:1, 108:20, 110:4, 110:8, 110:9, 110:11, 111:20, 111:24, 113:7, 117:6, 118:22, 121:22, 122:6, 122:16, 122:25, 124:21, 124:23, 125:21, 126:4, 126:6, 126:9, 126:13, 127:1, 127:6, 131:12, 131:18, 133:12, 134:9, 134:17, 134:23, 135:13, 135:24, 136:8, 136:10, 136:14, 136:17, 140:8,

141:13, 141:25, 142:6, 142:13, 142:19, 143:2, 144:1, 144:16, 145:16, 145:25, 146:15, 147:2, 147:7, 147:21, 148:14, 148:16, 148:22, 149:14, 149:24, 150:4, 150:12, 151:10, 151:19, 153:10, 153:17, 154:13, 155:7, 155:18, 156:1, 156:7, 156:13, 157:14, 157:19, 158:1, 158:6, 158:9, 158:11, 158:19, 158:23, 159:1, 159:5, 159:7, 159:13, 159:14, 159:17, 161:13, 161:17, 161:19, 161:22, 162:1, 162:2, 162:4, 162:10, 163:1, 163:6, 163:10, 163:14, 163:17, 163:21, 164:11, 164:16, 164:20, 167:3, 167:6, 167:22, 167:25, 168:4, 168:9, 168:11, 168:15, 168:20, 169:1, 169:9, 169:14, 169:23, 169:25, 170:4, 170:7, 170:10, 170:12, 170:17, 170:24, 171:2, 171:8, 171:9, 171:11, 171:14, 171:17, 173:3, 173:5, 173:9, 173:13, 174:2, 174:14, 176:8, 176:11, 176:17, 176:19, 176:22, 176:24, 177:1, 177:3, 177:5, 177:9, 177:11, 177:18, 177:20, 177:22, 177:24, 178:2, 178:6, 178:8, 178:10, 178:12, 178:14, 178:16, 178:20, 178:22, 178:24, 179:4, 180:24, 185:12, 185:14, 186:16, 187:24, 189:7, 189:21, 189:23, 190:1, 191:1, 191:13, 197:6, 197:25, 198:1, 198:16, 200:23, 201:22, 201:25, 202:11, 202:15, 202:17, 208:14, 209:7, 210:9, 210:24, 211:2, 212:12, 212:25, 214:16, 217:16, 217:23, 218:11, 218:13
**MS** [158] - 9:6, 9:12, 9:19, 9:24, 10:10, 10:14, 10:18, 10:21, 11:1, 11:5, 11:8, 11:11, 11:23, 12:3, 12:22, 13:14, 13:17, 13:20, 14:10, 14:13, 14:17, 14:20, 15:5, 16:1, 16:8, 16:19, 16:25, 17:24, 18:3, 18:18, 18:24, 19:14, 19:21, 28:17, 28:23, 29:1, 29:4, 29:8, 29:11, 30:1, 33:14, 34:21, 37:2, 37:14, 38:3, 38:15, 40:3, 41:3, 42:13, 43:2, 43:7, 43:13, 43:21, 43:24, 44:16,

45:23, 46:1, 46:22, 47:2, 47:22, 48:15, 48:23, 50:1, 51:22, 58:23, 59:20, 60:4, 60:22, 62:6, 62:12, 62:23, 63:3, 63:18, 64:7, 64:10, 64:14, 64:17, 66:8, 66:20, 68:23, 69:15, 69:20, 70:11, 71:1, 71:19, 71:24, 72:2, 72:8, 72:10, 72:17, 73:15, 76:25, 78:11, 79:21, 80:4, 83:18, 84:18, 87:23, 88:22, 96:25, 98:16, 99:21, 100:11, 100:20, 101:9, 101:14, 102:2, 104:24, 105:9, 106:9, 106:18, 107:1, 107:5, 107:11, 107:16, 111:8, 111:18, 111:22, 114:17, 114:20, 115:24, 116:23, 117:3, 118:2, 118:12, 119:17, 120:1, 120:7, 120:12, 120:20, 128:11, 128:20, 128:24, 129:4, 129:7, 129:10, 129:16, 129:23, 129:25, 130:25, 132:8, 133:13, 134:1, 136:22, 139:7, 140:1, 140:10, 141:3, 141:9, 143:21, 144:24, 147:23, 149:3, 149:16, 152:21, 153:3, 154:1, 179:9
**must** [7] - 78:22, 110:13, 142:3, 142:7, 192:15, 192:17, 194:24

**N**

**nail** [1] - 179:25
**name** [4] - 62:21, 63:25, 144:5, 218:3
**named** [6] - 62:8, 63:21, 81:16, 102:15, 140:18, 206:13
**names** [1] - 195:20
**Nancy** [4] - 133:6, 133:11, 133:19, 133:25
**narratives** [1] - 117:9
**narrow** [5] - 20:21, 20:24, 21:13, 69:6, 115:12
**narrower** [1] - 201:10
**natural** [1] - 161:3
**nature** [10] - 23:17, 32:13, 37:5, 43:3, 77:3, 87:9, 100:1, 151:20, 196:11, 208:15
**Natvig** [1] - 177:21
**near** [2] - 90:25, 216:12
**nearly** [1] - 128:14
**necessarily** [9] - 32:2, 37:12, 40:24, 46:2, 71:12, 94:19, 100:3, 202:23, 211:12
**necessary** [9] - 4:25, 17:13, 27:21, 27:23,

Contact Hinrichs Court Reporting at 319-351-4888 or transcripts@hinrichscr.com
to purchase a complete copy of the transcript.

107:25, 158:21, 160:11, 181:9, 199:19
**neck** [4] - 39:11, 40:6, 40:17
**need** [30] - 4:22, 5:20, 12:14, 14:5, 17:18, 23:10, 37:7, 54:12, 80:23, 82:2, 84:20, 88:25, 102:12, 138:3, 140:24, 164:3, 169:5, 180:16, 181:11, 187:20, 189:1, 194:19, 195:10, 197:13, 201:6, 211:23, 212:16, 213:25, 218:9
**needs** [2] - 60:14, 214:15
**negative** [3] - 72:11, 72:14, 82:5
**negatively** [1] - 74:2
**neglected** [1] - 217:17
**neighbor** [1] - 110:18
**neutral** [4] - 56:23, 57:6, 81:11, 86:1
**never** [25] - 32:5, 36:16, 38:2, 41:11, 41:12, 43:7, 43:8, 47:9, 61:9, 63:15, 63:17, 65:16, 66:6, 69:25, 98:23, 114:18, 125:4, 131:20, 136:11, 154:17, 186:6, 189:10, 198:5, 207:11, 209:24
**new** [7] - 66:10, 66:14, 130:4, 175:3, 202:22, 208:19, 209:14
**news** [1] - 120:8
**next** [13] - 38:9, 79:15, 103:19, 110:18, 157:5, 162:23, 163:7, 175:8, 175:9, 176:8, 197:10, 197:12, 198:14
**next-door** [3] - 110:18, 175:8, 175:9
**nice** [1] - 175:5
**nicely** [1] - 150:1
**night** [3] - 113:2, 175:13, 213:22
**nights** [2] - 6:11, 148:8
**nine** [6] - 112:18, 195:13, 195:15, 197:8, 199:25
**nobody** [1] - 190:7
**nonactionable** [1] - 75:8
**noncomplex** [1] - 152:3
**noncooperative** [1] - 207:18
**nondiscriminatory** [1] - 68:4
**none** [4] - 11:8, 15:22, 56:1, 161:6
**nonetheless** [1] - 5:10
**nonmovant** [2] - 6:17, 61:4
**noon** [1] - 112:22
**normal** [2] - 89:24, 195:24
**normally** [6] - 6:10, 90:2, 112:21, 198:10, 203:13,

207:3
**Normoyle** [1] - 130:5
**Northern** [1] - 196:18
**nose** [1] - 151:15
**note** [3] - 6:20, 57:8, 134:3
**notebook** [1] - 191:24
**noted** [1] - 94:24
**notes** [2] - 12:14, 115:8
**nothing** [14] - 23:8, 34:21, 41:21, 55:9, 59:18, 80:25, 86:5, 90:18, 94:9, 118:15, 151:14, 214:13, 214:15, 216:7
**notice** [11] - 118:15, 124:25, 140:18, 164:21, 167:14, 184:17, 185:6, 188:25, 190:9, 198:3, 198:11
**notify** [1] - 172:16
**notwithstanding** [1] - 102:24
**number** [18] - 47:4, 50:5, 50:14, 81:3, 99:16, 115:5, 136:9, 136:16, 147:8, 191:8, 191:20, 202:25, 204:12, 207:16, 208:17, 215:12, 217:6, 217:15
**numbering** [1] - 195:2
**numbers** [4] - 5:25, 42:4, 105:8, 215:1
**nuts** [1] - 197:23
**Nyemaster** [2] - 2:7, 2:10

# O

**o'clock** [6] - 112:18, 112:19, 113:2, 195:13, 195:15, 199:25
**oath** [5] - 15:19, 32:5, 34:22, 35:21, 35:23
**object** [5] - 145:16, 155:11, 155:23, 174:12, 186:8
**objected** [2] - 172:25, 194:4
**objecting** [7] - 172:19, 173:25, 183:9, 183:18, 183:19, 186:1, 191:20
**objection** [31] - 83:6, 93:21, 124:20, 131:4, 162:6, 162:20, 167:15, 169:18, 183:14, 184:1, 184:4, 184:12, 184:15, 185:9, 185:10, 186:15, 187:22, 188:23, 194:7, 199:8, 199:9, 199:10, 199:11, 199:12, 200:5, 200:7, 200:10, 202:22, 214:8
**objectionable** [1] - 83:5
**objections** [17] - 162:9, 162:19, 162:21, 171:4, 171:19, 180:22, 185:21,

186:3, 186:4, 194:9, 198:18, 199:3, 199:7, 199:17, 214:7, 214:11
**observations** [4] - 80:18, 111:14, 129:19, 150:14
**observe** [1] - 150:10
**obtain** [1] - 188:8
**obtained** [1] - 49:19
**obvious** [1] - 86:3
**obviously** [42] - 3:25, 4:19, 4:21, 11:16, 19:7, 20:22, 27:20, 28:3, 28:4, 36:8, 59:21, 74:24, 76:9, 77:4, 77:18, 77:21, 79:10, 81:13, 84:10, 86:25, 94:23, 98:8, 105:12, 109:23, 112:8, 132:15, 138:18, 160:2, 160:23, 180:17, 181:7, 184:13, 199:16, 200:3, 205:8, 206:7, 207:1, 211:14, 213:16, 214:4, 214:23, 215:21
**occasions** [1] - 160:16
**occur** [2] - 34:10, 126:15
**occurred** [15] - 22:20, 24:3, 29:12, 48:8, 57:8, 66:12, 75:17, 95:11, 95:12, 106:21, 125:18, 147:10, 149:4, 149:19, 191:15
**occurring** [1] - 91:1
**occurs** [1] - 37:18
**October** [7] - 93:5, 152:20, 204:8, 204:19, 204:24, 205:2, 210:10
**offer** [57] - 7:9, 8:4, 31:13, 33:5, 40:15, 41:8, 42:8, 42:11, 42:15, 45:2, 46:4, 48:12, 53:18, 56:13, 58:15, 59:4, 61:12, 65:14, 69:9, 69:18, 74:8, 83:1, 86:19, 88:17, 105:4, 111:6, 111:9, 116:7, 116:21, 116:23, 120:13, 122:2, 128:10, 133:20, 134:14, 134:18, 140:11, 146:18, 146:24, 147:11, 150:15, 161:20, 162:14, 162:18, 167:13, 169:17, 170:22, 171:24, 172:4, 172:17, 173:6, 173:12, 184:9, 184:14, 188:10, 193:3, 193:7
**offered** [16] - 8:15, 40:25, 85:13, 93:17, 110:15, 131:4, 131:6, 131:8, 136:14, 164:22, 172:24, 173:12, 184:3, 184:5, 193:11, 193:24
**offering** [16] - 47:14, 48:10, 48:14, 48:19, 67:6, 74:18, 74:18, 109:9, 135:9, 147:16, 172:2, 172:21, 191:23, 193:20, 194:16, 208:11
**offers** [4] - 6:16, 6:23,

104:13, 214:25
**office** [1] - 7:10
**officer** [1] - 105:25
**offset** [15] - 11:20, 12:5, 12:20, 13:1, 13:4, 13:12, 13:13, 16:18, 16:20, 17:3, 17:11, 17:13, 17:22, 18:16, 24:13
**offsets** [8] - 15:2, 15:3, 15:22, 16:4, 16:5, 17:11, 17:19, 212:18
**OFP** [2] - 25:6, 150:6
**oftentimes** [1] - 194:20
**old** [9] - 56:24, 59:17, 82:2, 82:3, 128:14, 141:23, 142:1, 185:24, 209:22
**older** [25] - 42:12, 42:14, 42:25, 45:12, 46:19, 46:20, 73:8, 73:12, 75:1, 75:6, 75:7, 115:1, 116:18, 118:17, 137:15, 137:21, 138:5, 140:24, 142:25, 149:25, 150:9, 151:15, 152:2, 152:13, 215:14
**Olson** [9] - 177:23, 204:18, 205:3, 205:7, 209:11, 210:2, 210:4, 210:13
**Olson's** [1] - 210:11
**once** [15] - 25:22, 32:20, 35:4, 54:13, 57:20, 68:2, 76:17, 78:4, 109:5, 113:5, 146:2, 171:15, 171:18, 206:17, 216:16
**one** [104] - 6:9, 6:25, 7:3, 7:22, 11:3, 13:4, 16:4, 17:8, 22:16, 22:18, 28:12, 30:17, 33:25, 34:8, 37:23, 39:20, 41:2, 43:6, 44:15, 52:15, 54:4, 55:15, 56:10, 60:9, 62:4, 63:5, 63:21, 63:22, 65:4, 65:15, 67:12, 67:14, 70:10, 71:9, 74:19, 80:22, 82:7, 83:7, 84:25, 89:8, 93:8, 97:13, 101:5, 102:3, 103:19, 104:4, 112:15, 113:8, 114:6, 117:17, 118:10, 120:3, 122:8, 123:3, 125:14, 129:13, 129:21, 134:4, 134:7, 136:24, 142:9, 149:24, 151:16, 151:21, 151:24, 155:2, 156:5, 157:1, 163:8, 163:19, 164:9, 167:9, 168:5, 169:6, 170:2, 171:9, 171:11, 171:13, 174:6, 174:15, 175:8, 175:9, 176:8, 177:11, 179:6, 179:15, 181:4, 181:12, 185:16, 188:2, 189:9, 190:6, 191:23, 192:21, 194:16, 194:18, 199:22, 202:4, 202:7, 209:2, 214:16,

to purchase a complete copy of the transcript.

217:16
**One** [1] - 2:10
**one's** [1] - 95:23
**ones** [3] - 4:17, 192:17, 200:14
**ongoing** [3] - 14:18, 63:24, 89:14
**open** [6] - 27:20, 50:4, 79:11, 115:18, 184:22, 198:23
**opened** [1] - 217:20
**opening** [3] - 142:5, 160:14
**opens** [6] - 57:21, 78:23, 83:22, 114:13, 133:18, 140:13
**operate** [1] - 191:6
**operation** [1] - 142:14
**opinion** [11] - 51:10, 55:25, 113:14, 122:21, 125:12, 129:19, 130:8, 130:14, 147:16, 149:25, 150:15
**opponent** [1] - 35:22
**opportunities** [1] - 137:25
**opportunity** [4] - 34:23, 139:18, 139:21, 165:23
**opposed** [10] - 61:24, 62:15, 62:22, 74:9, 155:15, 162:8, 174:16, 198:11, 201:11, 211:13
**opposite** [1] - 42:25
**optimistic** [1] - 112:11
**option** [1] - 138:6
**oral** [3] - 77:17, 211:17, 211:20
**order** [27] - 3:17, 4:25, 7:8, 7:16, 45:14, 46:8, 46:12, 51:13, 60:6, 61:13, 67:19, 73:19, 122:19, 137:22, 143:24, 147:1, 157:10, 157:13, 172:22, 176:6, 177:15, 177:17, 180:16, 181:9, 184:21, 193:19, 193:25
**ordered** [1] - 95:2
**orders** [1] - 8:7
**original** [2] - 187:11, 208:9
**originally** [2] - 151:4, 164:25
**originals** [2] - 190:5, 194:6
**OSHA** [1] - 144:18
**otherwise** [6] - 11:21, 21:5, 24:7, 24:13, 56:2, 209:8
**ought** [2] - 26:25, 73:4
**ourselves** [1] - 140:25
**out-of-court** [2] - 110:20, 131:4
**outcome** [8] - 42:16, 43:17, 44:20, 48:11, 48:16, 49:7, 77:21

**outcomes** [1] - 44:17
**outline** [1] - 24:21
**outside** [6] - 27:22, 61:11, 112:3, 113:1, 115:10, 164:4
**overall** [4] - 41:9, 42:21, 135:3, 135:4
**overcome** [1] - 79:3
**overlap** [1] - 5:19
**overlaps** [1] - 69:4
**overrule** [1] - 199:5
**overruled** [1] - 199:14
**oversee** [1] - 15:15
**overwhelming** [2] - 3:18, 60:1
**own** [9] - 114:10, 120:25, 129:6, 131:21, 132:1, 174:8, 182:19, 186:9, 186:10

## P

**p.m** [5] - 84:22, 175:22, 218:15
**Pacific** [1] - 16:9
**page** [24] - 6:13, 32:7, 114:21, 115:16, 117:19, 124:4, 124:6, 124:8, 124:12, 124:13, 129:13, 134:7, 162:13, 167:10, 167:13, 169:18, 170:22, 176:6, 179:17, 180:4, 184:21, 184:22, 188:3
**pages** [12] - 3:22, 3:23, 4:13, 5:9, 162:14, 162:17, 172:22, 180:18, 181:4, 181:6, 193:8, 202:18
**paid** [12] - 7:18, 8:24, 9:10, 14:7, 16:22, 19:15, 22:2, 25:18, 26:23, 30:20, 32:25
**pantry** [1] - 108:5
**paper** [1] - 133:2
**paragraph** [19] - 41:3, 41:4, 47:3, 50:7, 58:24, 59:7, 85:2, 104:18, 104:19, 104:25, 105:23, 124:1, 130:1, 130:2, 133:8, 134:6, 144:25, 148:10, 167:9
**paragraphs** [2] - 96:22, 105:21
**paralegal** [1] - 158:11
**paranoia** [2] - 107:13, 107:19
**paranoid** [1] - 107:9
**pardon** [1] - 171:10
**part** [25] - 19:17, 25:6, 25:9, 27:8, 27:9, 43:15, 45:23, 46:1, 48:12, 57:4, 62:12, 64:2, 72:19, 84:7, 93:14, 94:2, 109:3, 122:17, 123:3, 125:7, 139:11, 140:7, 173:15, 175:5
**participate** [2] - 148:2,

158:8
**particular** [7] - 8:10, 40:25, 45:11, 48:9, 62:24, 193:23, 203:19
**particularly** [7] - 15:7, 45:13, 55:1, 100:21, 160:25, 174:9, 194:14
**parties** [42] - 4:5, 4:21, 4:23, 19:5, 40:23, 49:21, 56:22, 61:11, 61:19, 62:14, 64:25, 65:23, 66:3, 85:20, 86:1, 86:4, 86:20, 89:5, 98:18, 101:18, 104:5, 104:8, 104:13, 165:23, 172:7, 181:1, 187:4, 187:20, 188:8, 188:23, 192:25, 193:7, 194:2, 194:15, 194:17, 194:21, 195:5, 198:11, 201:17, 215:18, 217:12, 218:6
**parts** [15] - 5:17, 5:18, 8:3, 23:15, 23:19, 27:10, 49:2, 49:13, 84:24, 162:21, 172:4, 173:12, 174:8, 187:2, 189:5
**party** [18] - 8:4, 16:13, 23:11, 35:22, 54:4, 58:6, 63:23, 63:24, 133:10, 146:18, 146:21, 171:24, 174:10, 174:18, 176:21, 177:6, 198:2, 204:15
**party's** [1] - 184:17
**passage** [1] - 60:13
**past** [4] - 95:1, 115:20, 128:14, 202:20
**pasted** [1] - 143:24
**patently** [1] - 206:20
**path** [1] - 32:21
**patience** [1] - 5:4
**patient** [2] - 90:6, 90:10
**PATRICK** [1] - 2:3
**Patrick** [1] - 3:10
**pattern** [1] - 141:16
**pay** [30] - 20:1, 21:8, 22:6, 44:9, 49:5, 56:21, 70:21, 71:5, 72:1, 72:4, 72:23, 73:7, 73:10, 74:9, 75:2, 75:4, 75:15, 93:25, 95:15, 99:15, 121:15, 151:7, 152:15, 215:21
**paying** [2] - 17:5, 182:20
**payment** [1] - 95:6
**payments** [9] - 9:14, 9:18, 14:12, 16:20, 16:22, 17:1, 18:5, 18:8, 18:18
**PC** [3] - 2:3, 2:7, 2:10
**PDP** [4] - 25:9, 25:15, 67:7, 150:7
**peculiarities** [1] - 22:17
**peeves** [2] - 112:16, 199:22
**Pellegrin** [20] - 3:10, 9:7, 28:15, 36:18, 38:14, 40:2, 41:1, 47:1, 76:24, 79:20,

84:17, 101:12, 113:11, 115:23, 119:16, 134:13, 135:1, 148:25, 191:17, 192:4
**PELLEGRIN** [94] - 2:3, 9:6, 9:12, 9:19, 9:24, 10:10, 10:14, 10:18, 10:21, 11:1, 11:5, 11:8, 11:11, 11:23, 12:3, 12:22, 13:14, 28:17, 28:23, 29:1, 29:4, 29:8, 29:11, 30:1, 33:14, 34:21, 37:2, 37:14, 38:3, 38:15, 40:3, 41:3, 43:24, 47:2, 50:1, 51:22, 58:23, 59:20, 66:8, 66:20, 68:23, 69:15, 69:20, 70:11, 76:25, 78:11, 79:21, 80:4, 83:18, 84:18, 87:23, 88:22, 96:25, 98:16, 99:21, 100:11, 101:14, 106:9, 106:18, 107:1, 107:5, 107:11, 107:16, 111:8, 111:18, 111:22, 115:24, 116:23, 117:3, 118:2, 118:12, 119:17, 120:1, 120:7, 120:12, 120:20, 129:4, 129:10, 129:16, 129:23, 129:25, 130:25, 133:13, 136:22, 139:7, 140:1, 140:10, 141:3, 141:9, 143:21, 147:23, 149:3, 149:16, 154:1
**pended** [1] - 23:3
**pending** [12] - 3:6, 3:16, 5:13, 20:19, 76:14, 77:15, 78:1, 79:1, 79:13, 89:3, 164:8, 175:1
**people** [20] - 26:4, 46:19, 61:23, 74:19, 115:4, 117:15, 132:15, 134:15, 142:13, 149:25, 150:1, 150:9, 151:24, 155:9, 155:14, 160:18, 188:6, 195:24, 196:2
**people's** [2] - 44:9, 60:21
**pep** [1] - 195:21
**per** [1] - 113:10
**perceived** [1] - 117:24
**percent** [5] - 42:5, 42:7, 92:19, 134:20
**peremptory** [1] - 196:23
**performance** [17] - 80:7, 80:10, 80:14, 81:4, 81:20, 81:23, 82:4, 82:23, 184:22, 185:14, 185:18, 187:11, 189:9, 189:11, 190:8, 190:9, 207:16
**performed** [1] - 154:2
**perhaps** [10] - 8:24, 9:3, 45:13, 52:17, 54:2, 66:20, 77:3, 90:20, 194:2, 194:7
**peril** [1] - 182:19
**period** [8] - 8:24, 10:11, 61:3, 118:6, 130:20,

Case 6:12-cv-02063-JSS    Document 214-35   Filed 02/18/25    Page 76 of 85
to purchase a complete copy of the transcript.

156:18, 182:21, 217:5
**periods** [1] - 182:11
**perjure** [2] - 50:18, 59:11
**permission** [2] - 160:21, 161:2
**permits** [1] - 162:18
**permitted** [14] - 31:13, 45:2, 46:4, 48:12, 60:16, 61:12, 88:10, 88:15, 88:17, 88:19, 90:5, 114:10, 146:24, 160:15
**perplexed** [1] - 20:8
**person** [16] - 34:15, 63:22, 79:9, 90:10, 106:12, 113:25, 132:4, 154:5, 157:23, 158:14, 161:13, 163:8, 164:10, 164:14, 174:12, 204:19
**personal** [16] - 7:14, 38:17, 52:5, 80:18, 83:19, 95:5, 111:13, 114:11, 137:8, 138:11, 138:20, 139:3, 139:12, 149:9, 150:17, 186:19
**personally** [1] - 133:2
**persons** [4] - 152:14, 204:4, 204:13, 204:23
**perspective** [2] - 5:3, 80:17
**persuasive** [1] - 132:21
**pertain** [1] - 49:8
**pet** [2] - 112:16, 199:22
**petered** [1] - 143:1
**phase** [68] - 12:25, 15:7, 19:11, 19:13, 19:17, 19:24, 20:5, 21:6, 21:18, 22:14, 24:15, 24:25, 25:1, 27:19, 27:25, 29:25, 35:25, 36:3, 36:6, 36:17, 36:21, 37:3, 37:23, 39:4, 49:9, 55:22, 57:12, 70:23, 74:7, 85:4, 85:13, 85:14, 85:21, 85:22, 91:22, 92:5, 97:4, 98:14, 98:20, 98:24, 99:5, 100:9, 101:19, 106:3, 115:14, 119:13, 119:19, 120:23, 143:11, 143:12, 149:11, 149:12, 149:18, 163:8, 163:10, 163:19, 163:20, 164:6, 164:9, 164:14, 165:12, 165:16, 166:7, 178:5, 178:18, 216:4, 218:1
**phone** [12] - 106:1, 106:10, 106:12, 106:16, 106:20, 108:7, 109:1, 109:7, 109:12, 109:17, 110:1, 110:14
**phrase** [1] - 88:23
**physical** [2] - 83:13, 108:12
**physician's** [1] - 163:19
**physicians** [1] - 15:13
**Piburn** [1] - 163:7
**pick** [6] - 4:16, 80:20,

160:7, 166:5, 184:20, 210:18
**picked** [2] - 160:18, 161:7
**picking** [4] - 23:12, 159:24, 160:1, 198:22
**picky** [1] - 159:21
**picture** [4] - 46:2, 46:4, 46:6, 46:7
**pictures** [1] - 155:19
**piece** [4] - 20:23, 93:20, 96:1, 96:10
**pieces** [1] - 151:21
**pinpointed** [1] - 69:8
**pissed** [2] - 181:25, 182:23
**place** [9] - 25:15, 30:19, 45:20, 78:7, 122:24, 124:18, 126:18, 128:5, 152:3
**placed** [2] - 144:9, 204:5
**places** [1] - 161:8
**plaintiff** [18] - 8:15, 13:16, 19:7, 25:5, 36:8, 55:21, 58:15, 67:4, 68:6, 68:13, 83:16, 88:15, 100:22, 111:6, 136:20, 181:17, 186:10, 203:2
**plaintiff's** [8] - 84:16, 168:14, 181:15, 181:19, 182:4, 182:6, 186:6
**Plaintiffs** [1] - 2:5
**plaintiffs** [151] - 3:9, 8:23, 9:5, 9:13, 10:8, 10:24, 11:21, 14:6, 15:9, 15:17, 16:3, 16:21, 17:2, 17:3, 17:5, 17:13, 17:14, 17:20, 18:16, 18:19, 19:15, 20:1, 20:11, 22:22, 23:21, 26:25, 28:13, 33:13, 38:9, 40:14, 41:19, 44:3, 44:10, 45:6, 46:6, 46:13, 49:4, 50:3, 50:19, 51:17, 52:2, 53:13, 54:16, 54:21, 55:22, 56:20, 61:4, 61:10, 61:13, 61:18, 61:25, 65:10, 66:7, 67:6, 67:13, 67:20, 67:23, 67:25, 70:19, 71:3, 71:21, 73:21, 76:24, 77:20, 77:22, 77:24, 78:19, 81:10, 81:13, 85:2, 85:7, 85:18, 89:19, 92:22, 94:3, 95:13, 95:25, 97:13, 98:12, 99:12, 102:25, 103:4, 104:17, 104:22, 104:25, 105:3, 106:2, 107:7, 111:6, 111:8, 118:1, 118:10, 119:12, 120:10, 121:3, 121:5, 121:23, 122:18, 122:22, 126:16, 128:9, 128:15, 129:2, 129:14, 133:8, 134:3, 134:19, 142:15, 143:10, 145:3, 145:13, 147:11, 147:14, 149:10, 151:13, 154:11, 154:24, 157:20,

157:23, 158:21, 162:13, 168:6, 168:17, 169:16, 169:18, 173:18, 173:25, 174:11, 179:11, 179:19, 181:6, 184:20, 185:3, 185:16, 185:19, 188:13, 192:10, 193:2, 194:25, 198:7, 202:19, 204:7, 204:12, 204:15, 206:15, 207:17, 209:16, 210:11, 215:11, 215:22, 216:8
**Plaintiffs'** [5] - 111:18, 114:21, 115:6, 144:25, 191:21
**plaintiffs'** [39] - 3:21, 5:15, 5:17, 5:23, 11:18, 12:1, 15:12, 15:13, 19:22, 29:24, 43:14, 44:22, 48:5, 49:23, 60:5, 75:24, 87:22, 91:20, 96:17, 96:22, 127:7, 128:11, 134:3, 134:25, 144:21, 147:22, 152:22, 156:15, 184:5, 184:10, 185:22, 192:10, 192:22, 193:10, 201:20, 203:16, 204:1, 204:20, 206:10
**plan** [6] - 14:3, 137:21, 157:25, 158:1, 166:24, 198:3
**planning** [2] - 25:9, 120:1
**plans** [1] - 127:10
**play** [2] - 47:5, 174:8
**played** [2] - 49:25, 100:5
**plays** [2] - 35:2, 52:9
**Plaza** [1] - 2:10
**pleadings** [1] - 159:8
**pled** [2] - 28:19, 75:15
**plenty** [2] - 136:24, 196:2
**plus** [4] - 32:6, 166:1, 174:23, 216:13
**podium** [1] - 160:10
**point** [49] - 7:13, 8:22, 10:9, 11:6, 14:15, 24:5, 27:2, 29:6, 35:9, 37:21, 39:20, 47:9, 60:5, 60:15, 61:10, 91:4, 92:1, 95:1, 100:25, 102:10, 102:19, 103:23, 121:1, 123:12, 123:16, 130:9, 130:12, 132:23, 134:13, 137:3, 144:13, 144:15, 149:25, 152:22, 153:25, 161:22, 164:11, 179:1, 183:1, 185:7, 186:13, 186:20, 186:25, 192:18, 197:24, 206:2, 212:7, 213:11, 217:6
**points** [2] - 102:2, 115:5
**police** [3] - 105:25, 110:12
**policies** [1] - 121:19
**policy** [6] - 30:18, 188:1, 188:2, 188:3, 189:13, 189:15
**pool** [1] - 72:18
**poor** [2] - 56:3, 80:10

**portion** [7] - 20:21, 89:12, 90:17, 90:23, 125:3, 177:8, 179:7
**portions** [2] - 84:3, 124:24
**portray** [2] - 81:10, 90:17
**position** [38] - 11:18, 11:23, 12:1, 12:4, 13:8, 13:19, 29:24, 38:3, 47:14, 49:23, 50:12, 50:22, 60:3, 66:9, 70:5, 81:3, 82:16, 87:16, 87:19, 87:22, 92:16, 96:22, 98:23, 99:1, 99:22, 100:18, 113:18, 116:6, 117:21, 123:6, 128:23, 128:25, 136:3, 149:17, 192:13, 205:1, 205:4, 205:25
**positions** [6] - 137:14, 137:24, 138:5, 203:21, 203:24, 204:8
**positive** [1] - 211:10
**possible** [3] - 99:25, 127:17, 138:15
**possibly** [3] - 117:20, 199:13, 199:15
**post** [1] - 153:5
**post-GJE** [1] - 153:5
**posttraumatic** [2] - 81:19, 85:6
**potential** [1] - 78:16
**potentially** [3] - 13:11, 77:22, 115:25
**power** [1] - 165:8
**practice** [5] - 100:24, 101:6, 141:16, 184:2
**precise** [4] - 14:5, 32:13, 134:17, 141:5
**preclude** [9] - 16:13, 48:9, 59:21, 61:8, 68:13, 70:8, 83:16, 124:16, 208:11
**precluded** [1] - 70:5
**precludes** [1] - 68:1
**precluding** [2] - 74:18, 208:18
**predate** [1] - 148:13
**predict** [2] - 166:7, 166:11
**preferable** [2] - 11:14, 217:15
**preference** [1] - 160:10
**prejudging** [1] - 28:1
**prejudice** [10] - 12:7, 32:13, 40:14, 52:16, 52:17, 54:4, 54:15, 58:5, 79:4, 96:11
**prejudicial** [8] - 23:11, 44:7, 51:17, 96:6, 109:11, 110:20, 117:23, 200:17
**preliminary** [5] - 76:7, 166:24, 211:20, 212:5, 212:6
**prepared** [9] - 111:3, 114:22, 114:25, 124:7, 127:13, 127:15, 145:23, 180:10, 189:1

to purchase a complete copy of the transcript.

**preparing** [3] - 114:7, 114:12, 209:11

**presence** [6] - 27:22, 61:11, 112:3, 113:1, 115:10, 164:4

**present** [19] - 5:1, 18:25, 43:14, 43:16, 47:11, 50:5, 53:2, 71:3, 71:14, 73:16, 77:7, 107:17, 115:11, 125:6, 133:15, 133:17, 169:5, 179:13, 182:16

**presented** [3] - 4:13, 48:2, 146:3

**presenting** [1] - 51:22

**preserve** [1] - 74:4

**presumably** [5] - 45:17, 61:11, 82:15, 121:12, 128:4

**presume** [1] - 55:17

**pretend** [1] - 20:12

**pretext** [16] - 41:7, 43:15, 44:22, 47:8, 47:12, 68:7, 68:14, 69:3, 69:5, 69:6, 94:15, 97:10, 125:13, 135:6, 148:6, 154:7

**pretextual** [1] - 151:20

**pretrial** [18] - 3:6, 3:7, 3:17, 56:6, 105:11, 156:21, 157:7, 157:10, 157:13, 176:6, 184:21, 190:17, 190:25, 193:19, 193:25, 194:20, 206:25, 214:22

**pretty** [27] - 4:14, 20:24, 21:1, 21:13, 26:21, 30:7, 75:21, 77:18, 86:23, 92:16, 96:25, 103:6, 112:13, 119:7, 119:8, 121:14, 127:1, 131:21, 141:5, 141:13, 146:17, 151:17, 173:21, 181:14, 214:3, 214:5, 218:3

**prevent** [1] - 206:5

**previous** [2] - 28:13, 40:5

**previously** [11] - 34:19, 37:19, 47:12, 80:13, 94:3, 119:18, 129:17, 130:4, 167:12, 203:22, 205:22

**Price** [1] - 177:25

**prima** [5] - 67:19, 68:2, 68:11, 69:1, 70:2

**primarily** [3] - 25:21, 135:25, 139:25

**privy** [2] - 14:21, 51:1

**probative** [7] - 26:12, 26:14, 40:14, 44:6, 56:19, 90:8, 133:1

**problem** [17] - 26:9, 93:14, 108:23, 109:5, 112:20, 136:3, 144:13, 176:12, 180:6, 183:10, 183:23, 185:2, 186:16, 188:14, 188:17, 194:19, 208:20

**problematic** [6] - 58:17, 76:18, 110:23, 113:5, 139:6, 192:20

**problems** [7] - 32:20, 52:15, 52:20, 84:5, 89:14, 108:14, 122:2

**procedure** [5] - 45:8, 125:16, 146:5, 167:12, 170:23

**procedures** [1] - 45:20

**proceed** [1] - 186:12

**proceeding** [3] - 37:11, 37:13, 143:19

**Proceedings** [1] - 218:15

**proceedings** [1] - 39:15

**process** [7] - 67:17, 160:13, 168:21, 197:3, 197:22, 213:19, 218:4

**produce** [3] - 164:17, 164:18, 179:24

**produced** [4] - 155:20, 192:5, 209:10, 209:17

**production** [2] - 154:25, 192:7

**professionals** [1] - 122:9

**program** [1] - 14:9

**prohibit** [1] - 67:5

**prohibited** [1] - 58:20

**prohibits** [1] - 85:3

**prolongs** [1] - 182:17

**promote** [10] - 57:3, 70:14, 72:16, 72:19, 72:25, 73:3, 74:14, 75:18, 75:21, 97:21

**promoted** [5] - 21:8, 70:15, 70:21, 205:19, 205:21

**promoting** [2] - 151:16, 151:24

**promotion** [11] - 21:24, 73:9, 74:19, 74:20, 75:3, 75:8, 151:6, 151:13, 152:12, 152:19, 153:1

**promotional** [1] - 137:25

**promotions** [1] - 73:13

**proof** [5] - 34:9, 102:18, 103:1, 103:2, 107:10

**proper** [5] - 17:10, 45:8, 116:25, 147:15, 190:7

**properly** [6] - 12:20, 13:13, 15:22, 29:21, 51:8, 116:5

**property** [3] - 7:14, 95:5, 149:10

**propose** [1] - 83:23

**proposed** [9] - 3:17, 62:23, 103:11, 157:10, 157:13, 176:6, 184:21, 193:19, 193:25

**proposition** [7] - 20:24, 22:8, 49:8, 82:13, 98:5, 110:5, 110:16

**prosecuting** [1] - 216:23

**protect** [1] - 89:5

**protected** [2] - 42:17, 53:1

**protects** [1] - 51:8

**prove** [15] - 4:25, 34:11,

41:7, 72:6, 75:11, 97:10, 99:24, 100:3, 109:9, 131:5, 131:7, 132:6, 180:16, 181:9, 181:10

**proved** [1] - 103:7

**provide** [20] - 10:6, 63:4, 74:12, 81:2, 111:12, 116:19, 116:24, 139:11, 146:8, 162:15, 162:22, 163:3, 168:11, 168:13, 168:24, 179:17, 179:22, 184:18, 190:13, 207:9

**provided** [8] - 81:24, 89:4, 138:1, 196:12, 202:19, 202:25, 206:16, 210:14

**providing** [2] - 191:18, 192:8

**proving** [1] - 151:20

**psychological** [3] - 83:13, 100:16, 107:6

**psychologist** [2] - 127:6, 178:2

**pull** [3] - 9:15, 192:25, 193:13

**pulls** [1] - 9:17

**purely** [1] - 79:23

**purported** [1] - 110:24

**purports** [2] - 115:3, 204:21

**purpose** [5] - 54:5, 69:17, 70:2, 83:2, 102:13

**purposes** [14] - 15:25, 16:15, 16:17, 18:17, 22:10, 58:11, 68:11, 70:3, 73:1, 99:3, 131:19, 171:25, 192:1, 210:15

**pursuant** [4] - 29:3, 32:15, 83:21, 140:8

**pursue** [1] - 119:11

**pursuing** [1] - 77:16

**push** [1] - 137:23

**pushed** [1] - 91:12

**pushing** [1] - 137:15

**put** [17] - 30:18, 42:18, 62:21, 70:3, 73:7, 93:23, 96:20, 113:9, 138:3, 152:4, 172:22, 174:4, 174:6, 193:25, 204:22, 205:1, 205:3

**puts** [1] - 99:24

**putting** [3] - 113:19, 137:13, 142:20

**Q**

**qualifications** [1] - 114:15

**qualified** [2] - 10:3, 137:14

**qualify** [1] - 118:3

**qualifying** [2] - 13:24, 19:19

**quasi** [1] - 113:19

**quasi-expert** [1] - 113:19

**questionable** [1] - 208:23

**questioned** [3] - 80:15, 88:14, 152:25

**questioning** [4] - 83:5, 160:9, 160:24, 198:25

**questionnaire** [1] - 196:17

**questionnaires** [1] - 196:13

**questions** [21] - 50:13, 83:8, 88:20, 145:14, 150:24, 173:2, 173:4, 173:19, 174:1, 174:9, 180:19, 196:5, 196:7, 196:10, 196:22, 197:5, 197:22, 198:1, 199:2, 200:22, 205:8

**quit** [1] - 120:16

**quite** [3] - 53:3, 111:25, 155:7

**R**

**RACETTE** [73] - 2:3, 29:17, 52:14, 53:16, 53:20, 89:8, 89:20, 89:23, 90:14, 91:8, 91:11, 91:14, 91:16, 105:5, 108:1, 108:20, 110:9, 111:20, 111:24, 113:7, 118:22, 122:25, 124:21, 124:23, 125:21, 131:12, 131:18, 133:12, 134:9, 136:10, 144:1, 144:16, 145:16, 150:4, 151:19, 155:7, 157:14, 157:19, 158:1, 158:6, 158:9, 158:11, 161:13, 161:17, 161:19, 161:22, 162:1, 163:1, 163:6, 163:10, 163:14, 163:17, 163:21, 164:11, 164:16, 167:3, 171:9, 171:11, 171:14, 173:3, 174:2, 174:14, 177:20, 180:24, 189:7, 190:1, 191:1, 197:25, 201:22, 210:24, 211:2, 214:16, 218:11

**Racette** [9] - 3:10, 56:25, 109:21, 109:23, 110:6, 173:2, 177:19, 191:14, 218:10

**Rachelle** [3] - 151:2, 151:14, 168:23

**rack** [1] - 208:25

**Railroad** [1] - 16:10

**raise** [7] - 21:21, 49:5, 56:21, 73:6, 93:23, 93:24, 217:18

**raised** [3] - 61:2, 134:13, 152:14

**raises** [5] - 42:7, 57:20, 73:14, 103:24, 134:22

**ran** [2] - 186:5

**Randall** [1] - 101:1

**Rapids** [2] - 2:11, 216:6

to purchase a complete copy of the transcript.

**rare** [3] - 64:20, 188:20, 200:8

**rather** [4] - 85:1, 111:25, 174:17, 208:18

**rationale** [1] - 205:12

**re** [2] - 74:21, 173:23

**re-call** [1] - 173:23

**re-grading** [1] - 74:21

**reach** [1] - 217:14

**reached** [7] - 7:17, 49:19, 102:10, 135:20, 138:24, 139:5, 179:23

**reaction** [4] - 119:19, 120:7, 120:14, 120:21

**read** [25] - 6:13, 18:11, 28:11, 28:12, 54:24, 56:16, 57:6, 60:6, 62:16, 67:3, 68:24, 73:19, 98:11, 101:12, 103:17, 116:14, 129:12, 133:9, 146:13, 146:14, 174:4, 174:7, 186:7

**Reade** [1] - 175:5

**Reade's** [1] - 55:24

**reading** [3] - 40:22, 138:21, 174:8

**ready** [3] - 112:18, 165:25, 214:6

**real** [6] - 133:3, 163:9, 185:9, 188:19, 190:12, 199:7

**realize** [2] - 5:25, 187:10

**reallocated** [1] - 93:24

**really** [42] - 4:24, 20:7, 23:16, 24:24, 34:13, 34:21, 44:12, 45:7, 47:22, 51:2, 52:4, 56:3, 57:16, 61:17, 71:25, 92:1, 104:6, 109:18, 113:22, 113:25, 114:1, 114:13, 116:7, 116:9, 125:4, 129:12, 134:25, 135:2, 135:8, 143:13, 150:21, 155:14, 160:1, 166:8, 175:4, 183:18, 183:23, 185:2, 185:6, 191:10, 211:8, 216:20

**reason** [14] - 47:10, 47:20, 54:20, 55:20, 63:18, 68:4, 113:7, 127:7, 139:10, 154:23, 179:14, 180:3, 180:14, 191:4

**reasonable** [1] - 97:1

**reasons** [10] - 35:7, 36:19, 47:20, 57:9, 69:9, 121:9, 137:6, 137:7, 179:15, 217:15

**reassert** [2] - 43:25, 87:23

**Rebouche** [3] - 76:4, 78:1, 86:11

**rebut** [2] - 43:14, 44:22

**rebuttal** [5] - 33:9, 77:7, 80:16, 116:12, 116:25

**rebutting** [1] - 44:11

**receipt** [2] - 85:8, 122:4

**receive** [10] - 9:9, 9:16,

9:17, 11:21, 71:15, 143:17, 143:24, 167:16, 186:23, 190:4

**received** [18] - 9:2, 9:13, 10:8, 11:7, 14:15, 18:17, 20:3, 118:21, 136:12, 136:25, 140:6, 184:4, 185:19, 189:10, 189:12, 204:9, 207:11

**receiving** [4] - 10:16, 10:19, 14:8, 14:12

**recent** [3] - 14:21, 14:22, 16:17

**recently** [2] - 90:10, 154:11

**recess** [2] - 84:22, 175:22

**recognized** [1] - 48:1

**recollection** [11] - 29:20, 50:20, 60:2, 131:17, 145:18, 145:23, 146:1, 146:13, 146:22, 147:1, 179:1

**record** [19] - 59:4, 74:23, 110:10, 118:3, 164:3, 164:4, 180:1, 180:9, 181:10, 182:16, 191:13, 192:11, 206:17, 217:20

**record's** [1] - 127:1

**recorded** [1] - 160:5

**recording** [2] - 160:5, 160:19

**records** [5] - 15:16, 40:7, 113:1, 185:3, 185:8

**recover** [2] - 99:17, 100:22

**recovered** [1] - 17:14

**red** [1] - 204:23

**redact** [2] - 125:21, 125:22

**reduce** [2] - 18:16, 196:24

**reeds** [1] - 133:3

**refer** [6] - 6:2, 60:14, 104:9, 105:14, 132:3, 184:9

**reference** [4] - 77:8, 124:9, 129:24, 154:2

**references** [2] - 105:2, 115:20

**referencing** [2] - 107:2, 153:14

**referred** [1] - 146:25

**referring** [7] - 5:22, 5:25, 91:6, 133:14, 153:8, 153:17, 154:12

**refers** [4] - 85:5, 100:24, 124:5, 124:8

**reflect** [2] - 82:22, 92:20

**reflected** [2] - 98:3, 105:7

**reflects** [2] - 58:24, 130:8

**refresh** [6] - 60:2, 131:17, 145:18, 145:23, 146:1, 146:21, 147:1, 179:1, 212:9

**refreshed** [3] - 146:8, 146:11, 146:13

**refused** [2] - 125:13, 125:14

**regard** [14] - 28:8, 38:19, 69:1, 69:6, 116:20, 119:15, 125:3, 146:17, 148:18, 180:2, 194:10, 210:2, 218:1, 218:4

**regarding** [46] - 7:10, 15:4, 15:23, 18:8, 23:23, 31:14, 35:3, 80:3, 86:10, 86:21, 92:6, 98:13, 102:3, 104:19, 105:4, 105:25, 110:25, 111:7, 119:10, 121:17, 122:2, 123:21, 123:23, 124:17, 124:25, 128:4, 128:7, 132:12, 133:5, 139:23, 140:17, 143:7, 144:18, 144:20, 147:4, 149:9, 149:22, 152:18, 152:25, 153:5, 154:10, 180:10, 203:15, 205:17, 207:13

**regardless** [1] - 99:20

**region** [1] - 43:12

**Reinke** [1] - 178:7

**reiterates** [1] - 210:14

**relate** [1] - 82:19

**related** [26] - 4:9, 21:23, 26:4, 28:3, 28:4, 40:8, 40:16, 40:18, 41:5, 66:13, 69:1, 70:4, 77:2, 80:6, 80:24, 85:9, 87:24, 90:3, 101:9, 136:18, 137:9, 139:22, 140:12, 142:10, 152:10, 155:25

**relates** [4] - 42:15, 84:25, 102:7, 110:16

**relating** [4] - 102:6, 153:5, 156:10, 157:8

**relation** [1] - 87:13

**relationship** [7] - 39:19, 39:22, 40:5, 40:11, 82:20, 127:9, 133:21

**relationships** [2] - 114:2, 123:21

**relative** [1] - 80:8

**relatively** [5] - 20:21, 20:25, 22:19, 192:19, 196:17

**release** [1] - 143:22

**releases** [1] - 144:3

**relevance** [4] - 141:19, 154:8, 185:10, 194:8

**relevancy** [1] - 183:19

**relevant** [41] - 17:4, 39:24, 44:21, 76:12, 80:8, 80:22, 81:24, 82:5, 84:13, 87:15, 93:7, 93:12, 93:22, 97:18, 97:20, 97:23, 98:1, 109:19, 119:23, 125:25, 127:23, 129:11, 130:15, 130:20, 137:10, 138:10, 140:14, 143:12, 147:10, 148:5, 148:8, 149:6, 149:11, 150:15, 180:22, 203:16, 204:12, 206:9, 206:12,

206:19

**reliability** [1] - 118:4

**reliable** [1] - 116:4

**relied** [3] - 108:16, 204:7, 206:23

**reluctant** [1] - 78:10

**rely** [3] - 33:15, 33:22, 132:18

**relying** [4] - 89:22, 118:1, 179:24, 190:6

**remained** [1] - 60:7

**remaining** [6] - 94:20, 98:1, 200:25, 201:9, 201:21, 210:19

**remanded** [1] - 77:21

**remedies** [3] - 62:2, 139:11, 190:13

**remedy** [1] - 138:3

**remember** [24] - 8:17, 12:14, 28:12, 59:17, 59:25, 61:23, 63:25, 84:6, 111:16, 118:24, 123:9, 129:8, 131:25, 132:10, 132:22, 145:22, 150:6, 162:1, 177:11, 187:14, 187:15, 199:13, 199:15, 218:3

**remembered** [1] - 84:11

**remembering** [3] - 58:21, 61:21, 84:9

**remembers** [1] - 131:20

**remind** [1] - 9:8

**remotely** [1] - 4:9

**removed** [3] - 7:14, 146:3, 185:21

**render** [1] - 115:12

**renumber** [1] - 193:21

**reorganization** [1] - 137:16

**reorganizations** [1] - 138:9

**repeatedly** [2] - 151:13, 207:9

**replacement** [3] - 152:19, 153:2, 169:10

**reply** [1] - 99:1

**report** [1] - 160:3

**reported** [1] - 87:5

**reporter** [1] - 160:2

**reports** [3] - 208:6, 208:7, 208:9

**represent** [2] - 4:22, 113:10

**representations** [1] - 15:18

**representative** [4] - 106:13, 158:25, 167:8, 170:14

**represented** [2] - 3:9, 3:11

**representing** [1] - 144:4

**represents** [1] - 3:22

**request** [2] - 66:23, 210:12

**requested** [7] - 122:20, 190:3, 203:5, 203:9, 207:9,

to purchase a complete copy of the transcript.

207:17, 210:11
**requesting** [2] - 118:6, 136:11
**requests** [4] - 148:11, 149:1, 188:10, 203:2
**require** [7] - 160:21, 162:13, 187:6, 192:25, 198:2, 198:10, 199:9
**required** [3] - 18:15, 62:21, 65:6
**requirement** [2] - 30:9, 198:12
**requirements** [1] - 14:2
**requires** [6] - 64:23, 65:4, 65:5, 67:20, 72:11, 211:19
**requiring** [1] - 187:22
**research** [1] - 111:14
**reserve** [2] - 99:4, 173:23
**reserves** [1] - 173:17
**reset** [1] - 157:4
**resist** [8] - 85:2, 104:17, 104:22, 104:25, 121:23, 133:8, 140:4, 206:19
**resistance** [14] - 6:20, 7:24, 16:10, 28:11, 41:4, 41:22, 47:17, 50:6, 59:13, 85:1, 85:20, 98:11, 140:4, 140:11
**resistances** [4] - 6:6, 206:12, 212:4
**resisted** [2] - 7:5, 99:2
**resisting** [3] - 26:20, 41:5, 122:22
**resolve** [3] - 7:16, 95:6, 113:3
**resolved** [5] - 33:4, 60:6, 77:23, 85:22, 112:7
**resource** [1] - 127:9
**resources** [1] - 140:13
**respect** [19] - 12:16, 27:18, 30:22, 42:11, 57:12, 60:24, 78:5, 79:11, 81:9, 86:13, 86:19, 87:14, 87:19, 92:21, 122:23, 145:6, 156:15, 183:4, 199:3
**respond** [4] - 40:1, 78:11, 147:13, 169:19
**respondent** [1] - 102:16
**response** [21] - 33:12, 47:21, 81:7, 85:2, 98:12, 117:5, 133:8, 141:5, 147:15, 147:22, 150:11, 155:6, 198:18, 198:19, 198:24, 199:4, 199:6, 207:10, 209:6, 210:8, 210:10
**responsible** [3] - 107:4, 107:22, 121:2
**rest** [5] - 19:19, 96:20, 114:3, 156:24, 176:2
**restrict** [1] - 173:20
**result** [12] - 21:9, 21:10, 28:21, 36:24, 37:6, 46:11, 93:25, 99:13, 108:2, 108:3,

119:20, 135:12
**resulted** [2] - 39:3, 69:24
**results** [11] - 24:18, 41:13, 42:21, 43:25, 45:15, 46:20, 51:18, 52:8, 52:16, 116:14, 135:4
**retaining** [1] - 194:8
**retaliation** [14] - 28:20, 56:15, 92:21, 94:5, 94:7, 94:8, 95:8, 97:6, 124:11, 126:13, 127:22, 151:14, 152:6, 153:22
**retaliatory** [3] - 92:7, 92:23, 93:2
**rethink** [1] - 217:13
**retire** [1] - 137:24
**retired** [2] - 149:23, 168:9
**retrieved** [1] - 146:12
**retry** [1] - 216:24
**return** [2] - 60:16, 65:6
**returned** [1] - 7:16
**returns** [2] - 13:11, 165:16
**reveal** [1] - 148:3
**reversal** [2] - 200:18, 200:19
**reverse** [1] - 200:17
**reversed** [2] - 216:15, 216:19
**reversible** [2] - 33:19, 216:14
**review** [4] - 33:24, 146:10, 192:12, 195:5
**reviews** [2] - 81:20, 82:5
**Rhonda** [1] - 170:11
**Richard** [6] - 43:19, 164:9, 169:3, 170:9, 177:7, 178:13
**rid** [3] - 59:16, 82:2, 141:22
**Rights** [3] - 31:7, 100:21, 102:7
**ripe** [2] - 219:5, 217:10
**rise** [1] - 55:23
**rises** [1] - 12:18
**risk** [3] - 96:11, 96:12, 216:24
**road** [2] - 26:10, 35:5, 114:6
**roadblocks** [1] - 187:18
**roads** [1] - 76:17
**Robert** [1] - 177:2
**Roberts** [1] - 145:4
**role** [3] - 49:25, 52:9, 101:22
**room** [2] - 54:20, 160:18
**rough** [1] - 113:13
**route** [1] - 103:24
**ruin** [1] - 81:17
**rule** [13] - 66:16, 88:10, 88:15, 89:22, 129:3, 146:17, 167:19, 184:15, 186:17, 199:4, 211:23, 212:9, 212:20
**Rule** [10] - 17:9, 35:24, 102:9, 143:4, 187:4,

187:16, 190:3, 201:1, 203:11
**ruled** [5] - 42:2, 61:1, 72:21, 75:23, 78:15
**rules** [4] - 24:22, 25:4, 83:21, 190:13, 190:20
**ruling** [28] - 8:8, 12:10, 44:5, 53:8, 58:3, 61:14, 67:8, 68:25, 70:12, 70:16, 82:1, 82:10, 83:6, 87:1, 92:16, 92:17, 92:25, 93:1, 93:15, 96:4, 99:4, 110:22, 152:7, 163:24, 190:22, 200:21, 206:24, 208:5
**rulings** [9] - 8:8, 27:14, 27:15, 56:17, 81:14, 173:1, 200:13, 200:15, 213:10
**running** [1] - 117:9
**Ryan** [2] - 3:12, 159:7
**RYAN** [1] - 2:7

# S

**salaries** [1] - 70:23
**salary** [16] - 8:25, 9:10, 9:13, 9:17, 9:23, 10:1, 10:5, 11:18, 13:5, 13:21, 13:25, 16:24, 25:19, 26:23, 27:16, 71:16
**Sam** [2] - 139:23, 139:25
**Sammon** [5] - 128:12, 128:19, 131:9, 131:24, 132:9
**sanction** [3] - 203:12, 208:16, 209:1
**sanctions** [3] - 202:1, 202:10, 208:17
**Sandberg** [3] - 164:6, 203:15, 208:7
**Sandberg's** [2] - 207:22, 208:4
**sat** [1] - 55:2
**satisfied** [1] - 14:2
**save** [1] - 211:7
**saw** [2] - 54:7, 89:12
**scenario** [2] - 17:15, 128:3
**scenes** [1] - 51:3
**schedule** [5] - 112:22, 164:5, 177:12, 211:3, 211:5
**scheduled** [4] - 165:25, 197:15, 197:20, 214:14
**schedules** [1] - 210:18
**Schulte** [1] - 178:9
**Schwab** [1] - 178:11
**scope** [10] - 115:13, 118:4, 138:17, 139:16, 153:20, 173:20, 174:1, 174:9, 174:12
**scratch** [1] - 211:25
**scrutiny** [1] - 114:14
**SE** [1] - 2:10
**se** [1] - 113:10
**second** [6] - 8:19, 67:16,

89:9, 171:5, 175:7, 175:16, 179:12, 180:3, 181:21, 208:16
**Security** [14] - 9:3, 10:8, 10:16, 11:20, 13:6, 14:15, 14:23, 15:9, 15:19, 19:16, 20:4, 22:3, 25:19, 85:8
**security** [1] - 27:17
**see** [22] - 14:4, 24:14, 35:6, 43:25, 53:7, 56:22, 78:9, 86:1, 90:24, 92:1, 108:21, 110:14, 117:20, 146:22, 155:9, 175:20, 183:6, 183:8, 191:2, 195:5, 196:6, 213:23
**seek** [1] - 136:23
**seem** [6] - 42:2, 44:5, 68:13, 71:7, 125:25, 185:1
**selection** [2] - 160:13, 197:3, 197:4, 198:21
**self** [2] - 144:21, 145:10
**self-generated** [1] - 144:21
**self-serving** [1] - 145:10
**Sellers** [51] - 59:16, 76:2, 76:3, 76:19, 76:21, 77:15, 81:6, 81:9, 81:14, 81:21, 82:14, 82:25, 86:12, 86:13, 86:20, 87:4, 87:13, 87:14, 87:25, 111:1, 111:3, 111:10, 114:22, 114:23, 115:3, 115:6, 115:8, 115:9, 121:25, 122:8, 122:10, 122:14, 123:15, 123:19, 124:6, 124:8, 124:16, 126:3, 126:21, 127:13, 127:15, 137:3, 137:12, 138:1, 138:11, 138:14, 138:17, 138:23, 139:18, 154:15, 158:14
**Sellers'** [15] - 80:3, 80:6, 83:12, 84:1, 111:7, 113:18, 121:17, 122:8, 123:6, 123:12, 128:4, 138:17, 139:9, 139:16, 144:18
**send** [3] - 167:14, 200:9, 209:12
**sense** [13] - 24:11, 28:2, 53:7, 55:1, 56:17, 68:17, 70:7, 76:19, 104:2, 138:21, 139:18, 201:19, 201:20
**sent** [3] - 132:21, 140:2, 140:6
**sentence** [1] - 44:15
**separately** [2] - 60:23, 171:5
**September** [3] - 203:20, 203:23, 207:21
**series** [1] - 115:7
**serious** [4] - 90:21, 109:12, 124:12, 176:13
**seriously** [1] - 32:19
**serve** [2] - 116:12, 195:24
**served** [4] - 64:19, 64:23,

Document 214-3 Filed 02/18/25
to purchase a complete copy of the transcript.

64:24, 92:21
**service** [2] - 195:22, 197:23
**serving** [1] - 145:10
**set** [6] - 45:9, 77:17, 103:5, 141:13, 213:7, 213:18
**setting** [1] - 201:20
**settle** [3] - 7:10, 215:4, 215:19
**settled** [2] - 76:15, 215:5
**settlement** [14] - 6:16, 6:23, 8:5, 8:10, 29:3, 29:4, 29:18, 29:22, 32:15, 104:12, 214:24, 215:9, 216:22, 217:13
**settling** [1] - 215:3
**seven** [12] - 23:3, 34:8, 50:12, 50:24, 51:16, 53:5, 53:21, 54:23, 55:2, 58:14, 113:2, 217:8
**sevens** [1] - 26:7
**several** [4] - 4:4, 26:7, 117:16, 194:24
**sex** [15] - 28:19, 48:10, 48:16, 48:21, 49:6, 74:15, 93:3, 94:16, 95:21, 102:22, 127:24, 132:6, 135:7, 136:5, 138:15
**shaking** [1] - 158:4
**Shannon** [3] - 56:11, 145:5, 166:25
**shape** [1] - 136:5
**sheep** [1] - 141:23
**Sheryl** [6] - 159:1, 167:4, 167:5, 167:6, 170:14
**shift** [1] - 137:21
**shifting** [1] - 67:17
**shifts** [1] - 68:6
**shoot** [1] - 141:23
**shooting** [1] - 150:22
**short** [7] - 10:1, 13:23, 156:18, 175:18, 181:12, 200:11, 200:21
**short-term** [2] - 10:1, 13:23
**shortly** [4] - 22:19, 130:11, 149:19, 191:16
**show** [21] - 42:21, 56:14, 65:20, 65:22, 67:16, 68:6, 74:1, 79:25, 82:24, 88:1, 88:5, 89:1, 89:6, 91:2, 107:9, 107:19, 119:5, 125:8, 133:18, 151:22
**showed** [1] - 119:2
**showing** [4] - 70:19, 72:11, 93:12, 125:4
**shown** [1] - 163:19
**shows** [3] - 107:6, 130:6, 137:20
**shy** [1] - 216:13
**sic** [3] - 45:21, 115:19, 140:6
**sick** [1] - 5:7

**side** [26] - 26:5, 57:24, 65:20, 65:21, 76:8, 76:20, 81:12, 86:18, 146:22, 172:3, 172:16, 172:19, 179:24, 180:8, 180:11, 180:15, 180:20, 182:17, 182:24, 183:15, 187:22, 196:21, 198:25, 215:10
**side's** [1] - 188:25
**sidebar** [1] - 200:11
**sides** [6] - 8:4, 140:5, 144:2, 179:16, 182:7, 215:21
**signature** [2] - 143:23, 144:8
**signed** [1] - 144:5
**significance** [1] - 149:21
**similar** [16] - 23:2, 23:17, 30:17, 34:12, 37:4, 70:7, 70:12, 76:12, 76:22, 79:8, 101:3, 117:17, 119:18, 130:7, 153:7
**similarities** [1] - 30:24
**similarity** [1] - 30:16
**similarly** [8] - 67:2, 67:7, 67:21, 68:10, 68:17, 69:5, 69:10, 70:1
**simple** [2] - 92:16, 192:19
**simplicity** [1] - 6:2
**simplify** [3] - 103:16, 194:11, 195:6
**simply** [23] - 6:20, 50:18, 55:17, 58:24, 73:13, 75:4, 75:9, 94:1, 94:4, 94:17, 99:14, 100:14, 127:14, 130:22, 146:13, 147:17, 151:10, 172:7, 194:17, 207:18, 208:24, 209:15, 209:20
**single** [3] - 48:4, 200:21, 209:20
**sit** [3] - 5:8, 54:23, 190:23
**sitting** [3] - 25:13, 57:17, 158:4
**situated** [8] - 67:2, 67:7, 67:21, 68:10, 68:17, 69:5, 69:10, 70:1
**situation** [2] - 34:7, 111:7
**situations** [1] - 82:12
**six** [7] - 6:7, 6:8, 37:23, 113:2, 139:23, 181:7, 207:20
**sixes** [1] - 26:6
**sixteen** [1] - 105:20
**skeptical** [1] - 114:5
**skimmed** [1] - 18:12
**slam** [1] - 215:10
**slaughter** [1] - 82:2
**slights** [1] - 117:24
**slower** [1] - 166:14
**SM** [2] - 119:3, 119:4
**smarter** [1] - 132:16
**SMS** [2] - 203:24
**so-called** [2] - 9:10, 16:24

**social** [1] - 27:17
**Social** [14] - 9:2, 10:8, 10:16, 11:19, 13:6, 14:15, 14:23, 15:8, 15:19, 19:16, 20:3, 22:3, 25:19, 85:8
**sole** [1] - 47:7
**solely** [1] - 59:5
**solve** [1] - 52:19
**someone** [9] - 106:8, 106:23, 113:17, 131:6, 158:24, 174:4, 183:11, 187:6, 192:1
**someplace** [7] - 28:11, 67:4, 100:18, 133:9, 140:21, 164:1, 169:8
**sometimes** [13] - 19:3, 56:25, 83:9, 103:18, 103:20, 166:12, 166:13, 192:20, 192:25, 199:1, 199:4, 200:10, 215:16
**soon** [1] - 10:3
**sooner** [2] - 95:10, 210:21
**sorry** [5] - 11:2, 16:19, 122:6, 148:22, 158:6
**sort** [79] - 4:10, 5:4, 7:21, 8:25, 9:9, 20:17, 22:23, 23:1, 24:2, 27:15, 28:2, 42:20, 42:22, 44:11, 51:9, 53:9, 55:22, 56:23, 57:1, 57:5, 59:8, 59:18, 62:2, 72:16, 73:2, 74:11, 76:7, 79:2, 79:4, 82:10, 93:19, 95:13, 97:23, 99:8, 103:13, 103:24, 104:1, 104:8, 104:10, 111:3, 112:6, 112:15, 112:25, 113:18, 113:20, 113:23, 114:10, 114:11, 115:23, 120:23, 120:25, 128:3, 138:24, 156:20, 156:21, 157:1, 161:7, 165:24, 166:21, 166:23, 176:1, 179:15, 180:14, 183:4, 190:23, 195:5, 195:21, 197:13, 197:22, 201:5, 211:13, 211:24, 212:5, 212:8, 213:10, 214:23, 215:9, 217:12
**sorting** [1] - 191:2
**sounded** [1] - 19:18
**sounds** [5] - 32:2, 61:19, 101:18, 183:5, 193:3
**source** [8] - 12:6, 16:13, 16:14, 17:25, 18:20, 19:22, 24:23, 150:20
**sources** [12] - 8:20, 11:16, 12:11, 12:19, 12:23, 13:5, 13:12, 16:5, 17:14, 18:9, 24:12, 24:13
**speaking** [9] - 6:23, 9:4, 30:2, 38:23, 92:9, 159:24, 160:6, 160:8, 161:7
**speaks** [5] - 38:9, 63:10, 138:7, 148:16, 154:6

**special** [1] - 103:12
**Specialist** [1] - 203:21
**specialists** [1] - 69:16
**specific** [13] - 12:11, 43:20, 44:1, 47:3, 50:15, 118:7, 119:4, 135:10, 144:22, 147:19, 153:7, 162:21, 203:2
**specifically** [19] - 5:13, 46:21, 47:16, 59:10, 69:2, 84:7, 93:4, 96:24, 97:2, 116:9, 116:19, 118:5, 118:6, 122:13, 124:19, 137:3, 154:4, 204:22, 205:24
**specifics** [4] - 9:20, 10:24, 77:2, 77:4
**speculate** [2] - 54:14, 78:24
**speculating** [1] - 44:13
**speculation** [1] - 57:3
**speed** [2] - 76:6, 165:8
**spend** [7] - 46:5, 151:11, 183:21, 187:8, 188:5, 200:6, 216:16
**spent** [5] - 58:14, 215:5, 215:19, 215:24, 216:11
**Sperling** [2] - 43:19, 178:13
**spill** [1] - 139:19
**spoken** [2] - 101:21, 102:20
**spot** [1] - 205:14
**spring** [1] - 165:5
**stack** [6] - 77:6, 185:20, 189:18, 189:23, 191:17, 191:19
**stage** [5] - 15:15, 67:24, 68:10, 110:15, 150:7
**stand** [6] - 56:11, 135:25, 140:10, 149:14, 161:1, 209:8
**standard** [4] - 30:10, 101:4, 102:18, 103:2
**standpoint** [1] - 73:4
**start** [20] - 5:12, 5:14, 26:10, 26:22, 32:20, 35:5, 57:20, 76:17, 84:21, 113:24, 165:12, 172:18, 173:21, 182:22, 195:13, 195:14, 196:20, 199:24, 211:24, 213:13
**started** [5] - 10:25, 113:4, 191:17, 200:2, 213:6
**starting** [2] - 112:23, 125:17
**starts** [5] - 112:8, 171:23, 195:11, 213:4, 213:15
**state** [13] - 33:20, 60:6, 88:5, 97:8, 100:5, 100:16, 102:25, 103:3, 106:9, 107:6, 108:11, 181:13, 199:23
**statement** [10] - 34:22,

Min-U-Script®                        (24) Page 214 - statement                        www.citymaxcompany.com
to purchase a complete copy of the transcript.

**37**:16, **57**:6, **106**:19, **110**:20, **118**:9, **131**:4, **131**:22, **140**:23, **160**:14

**statements** [12] - 35:20, 35:23, 82:18, 84:11, 94:14, 96:14, 97:17, 104:15, 105:24, 128:1, 141:22, 145:10

**States** [2] - 15:10, 15:18
**states** [1] - 100:22
**stating** [1] - 88:6
**statistical** [1] - 110:24
**statistics** [1] - 41:15
**status** [10] - 72:12, 72:14, 77:13, 79:12, 85:18, 87:15, 88:12, 88:18, 88:19, 88:23
**stay** [2] - 157:3, 160:9
**stayed** [1] - 42:6
**staying** [2] - 73:9, 74:8
**steele** [1] - 205:17
**Steele** [4] - 178:15, 205:17, 205:21, 205:25
**Stefan** [1] - 130:3
**Stephanie** [1] - 169:24
**stepped** [1] - 206:2
**stick** [2] - 160:17, 197:17
**still** [31] - 6:11, 10:15, 10:21, 12:6, 13:9, 14:11, 17:6, 18:7, 22:12, 25:22, 57:17, 60:7, 72:7, 76:14, 79:1, 79:13, 87:15, 89:13, 89:14, 104:25, 122:18, 130:21, 141:17, 163:23, 165:8, 168:23, 196:2, 201:13, 206:13, 212:23, 216:10
**stipulate** [2] - 65:12, 65:24
**stipulating** [1] - 109:10
**stipulation** [2] - 104:8, 108:25
**stop** [2] - 22:19, 96:19
**stopped** [4] - 8:23, 14:7, 128:16, 181:22
**story** [4] - 81:12, 90:11, 90:12, 181:12
**straight** [1] - 87:11
**straighten** [1] - 120:25
**strain** [2] - 39:19, 39:22
**Strand** [1] - 214:20
**stray** [4] - 141:18, 141:21, 143:3, 156:2
**Street** [1] - 2:10
**strengthen** [1] - 113:23
**stress** [3] - 81:19, 85:6, 91:3
**stretch** [1] - 121:6
**strike** [2] - 67:12, 198:23
**strikes** [1] - 198:23
**strikingly** [2] - 30:17, 34:11
**string** [2] - 205:23, 207:6
**stronger** [1] - 108:25
**studied** [1] - 129:14
**stuff** [27] - 5:5, 12:2, 19:4,

21:4, 25:8, 26:20, 26:21, 27:14, 44:5, 86:22, 93:15, 98:19, 112:17, 112:22, 154:21, 154:25, 172:10, 175:12, 176:2, 185:4, 189:6, 189:19, 190:2, 200:1, 200:25, 209:14, 209:24

**subject** [14] - 7:20, 7:21, 11:15, 17:8, 46:25, 60:25, 61:8, 66:7, 105:13, 149:13, 169:7, 170:3, 170:19, 203:2
**subjected** [1] - 30:19
**subjects** [2] - 8:13, 17:9
**submit** [5] - 50:24, 66:15, 66:17, 80:16, 156:24
**submitted** [17] - 3:19, 13:10, 15:10, 20:17, 52:24, 62:4, 63:1, 66:10, 66:12, 67:24, 102:25, 104:10, 165:14, 176:3, 181:2, 208:7, 210:22
**subpoena** [3] - 158:22, 179:11, 185:3
**subpoenaed** [3] - 167:1, 168:19, 179:21
**subpoenas** [1] - 164:19
**subsequent** [2] - 9:1, 204:25
**subsequently** [3] - 20:2, 66:13, 203:6
**substance** [9] - 37:5, 87:9, 87:16, 88:14, 88:20, 88:25, 111:11, 124:18, 137:20
**substantive** [1] - 171:25
**substituted** [1] - 194:6
**subtract** [2] - 17:18, 17:23
**succinct** [1] - 155:13
**sue** [2] - 53:12, 79:3
**sued** [3] - 53:13, 76:11, 134:16
**suffer** [2] - 34:15, 70:8
**suffered** [5] - 70:13, 73:21, 90:8, 108:22, 119:20
**suffice** [1] - 87:2
**sufficient** [7] - 52:2, 63:13, 79:25, 88:1, 88:5, 89:5, 209:1
**suggest** [2] - 65:23, 193:12
**suggesting** [1] - 211:7
**suggestion** [2] - 54:17, 212:15
**suggestive** [1] - 199:11
**suit** [6] - 28:13, 30:16, 35:15, 35:17, 77:9, 79:6
**Suite** [3] - 2:4, 2:7, 2:10
**summarize** [1] - 151:10
**summary** [29] - 28:24, 42:3, 47:5, 60:6, 61:1, 66:12, 66:18, 67:9, 67:10, 67:14, 67:24, 68:9, 70:13, 72:22, 73:1, 75:23, 81:14, 87:1, 92:15, 92:17, 92:24,

96:3, 113:20, 135:16, 137:5, 206:12, 206:19, 206:23, 217:2
**summer** [1] - 97:15
**sums** [3] - 117:18, 117:21, 149:3
**supervision** [1] - 30:20
**supervisors** [1] - 135:6
**supplemental** [2] - 208:6, 208:7
**supplied** [1] - 137:4
**supplier** [1] - 148:12
**supplies** [1] - 7:11
**supply** [13] - 25:7, 69:16, 115:4, 116:8, 130:3, 130:10, 130:11, 135:21, 142:14, 142:21, 163:2, 204:11, 206:8
**Supply** [1] - 203:20
**support** [2] - 33:15, 66:17
**supportive** [1] - 81:12
**suppose** [2] - 31:25, 126:20
**supposed** [4] - 199:24, 205:15, 206:5, 212:19
**Supreme** [1] - 101:10
**surer** [1] - 54:15
**surgery** [4] - 39:11, 40:6, 40:17, 169:10
**surrounded** [1] - 152:9
**surrounding** [2] - 88:8, 124:3
**surveys** [15] - 115:19, 115:21, 115:24, 115:25, 116:2, 116:5, 116:11, 116:14, 116:19, 117:7, 117:17, 118:4, 118:13, 118:19, 118:21
**suspect** [6] - 74:6, 74:13, 82:21, 91:19, 91:21, 152:10
**suspicious** [1] - 115:17
**sustained** [2] - 71:4, 90:7
**sustaining** [1] - 199:6
**switch** [2] - 156:20, 157:7
**sworn** [2] - 35:14, 36:15
**symptom** [1] - 108:21
**symptoms** [1] - 107:12
**system** [5] - 44:18, 45:14, 46:12, 160:5, 195:2

**T**

**table** [1] - 158:4
**talks** [2] - 34:5, 64:1
**Tamara** [1] - 177:4
**tangible** [1] - 71:20
**tank** [4] - 142:8, 142:12, 142:16, 156:5
**tapped** [7] - 106:10, 106:16, 106:20, 109:2, 109:7, 109:17, 110:14
**tapping** [1] - 106:1, 109:12, 109:25

**tardy** [1] - 208:15
**Taylor** [1] - 178:17
**technical** [2] - 146:5, 183:1
**telephonic** [3] - 201:20, 210:19, 213:7
**telephonically** [4] - 157:6, 201:9, 201:12, 201:17
**temper** [1] - 95:18
**temporal** [1] - 149:21
**tended** [1] - 116:17
**tendency** [1] - 19:2
**term** [12] - 10:1, 10:3, 10:4, 10:19, 13:23, 14:1, 14:8, 15:11, 16:25, 18:4, 20:2, 121:20
**termination** [1] - 14:23
**terms** [6] - 14:2, 15:17, 16:20, 19:14, 93:23, 122:20
**Terrace** [1] - 2:4
**terribly** [2] - 44:6, 44:7
**testified** [20] - 32:5, 34:19, 35:18, 36:5, 36:22, 37:11, 37:19, 38:2, 39:18, 81:17, 84:4, 84:5, 84:7, 110:11, 114:25, 139:8, 154:15, 173:15, 189:14, 209:24
**testifies** [13] - 31:3, 38:1, 51:20, 76:20, 83:7, 115:10, 116:9, 116:15, 130:22, 131:9, 145:22, 146:12, 167:20
**testify** [71] - 22:23, 26:7, 31:3, 31:8, 33:11, 34:13, 44:17, 44:19, 49:18, 50:8, 50:15, 51:2, 51:4, 52:2, 52:5, 58:10, 59:15, 60:11, 61:20, 80:21, 82:1, 82:15, 82:17, 83:9, 89:19, 90:5, 106:7, 106:13, 111:10, 114:10, 119:25, 122:1, 123:20, 130:18, 131:24, 134:16, 137:8, 138:14, 138:20, 139:3, 145:13, 146:4, 146:6, 150:3, 150:8, 150:17, 151:1, 157:24, 158:14, 167:2, 167:19, 167:24, 168:3, 169:21, 170:6, 174:15, 176:10, 176:25, 177:1, 177:7, 177:8, 177:13, 177:16, 178:18, 183:11, 185:5, 186:18, 186:24, 204:13, 216:6
**testifying** [10] - 37:23, 58:20, 59:22, 80:17, 92:4, 113:24, 124:16, 129:5, 162:8, 168:2
**testimony** [83] - 5:9, 19:8, 19:25, 22:21, 24:1, 32:1, 35:13, 35:14, 36:11, 36:15, 42:9, 42:10, 42:20, 42:23, 43:18, 45:17, 45:19, 46:5, 46:17, 46:18, 58:12, 59:19,

Document R214-3 Filed 02/18/25
to purchase a complete copy of the transcript.

61:12, 74:8, 77:20, 81:1, 81:2, 82:19, 83:17, 84:25, 85:3, 86:10, 91:25, 92:6, 98:12, 101:20, 105:14, 106:6, 108:15, 108:19, 108:20, 112:3, 115:12, 116:24, 121:17, 127:20, 128:3, 128:4, 133:5, 135:10, 137:2, 138:17, 139:16, 139:23, 140:17, 143:7, 144:17, 144:20, 145:7, 145:20, 147:3, 149:8, 150:19, 152:18, 153:4, 153:14, 155:24, 162:9, 162:19, 165:21, 166:4, 168:11, 169:6, 172:3, 173:6, 179:13, 180:16, 204:14, 207:22, 208:4, 208:5, 208:8

**THE** [385] - 3:1, 7:2, 7:4, 7:12, 7:20, 8:1, 9:7, 9:15, 9:22, 10:7, 10:11, 10:15, 10:19, 10:23, 11:3, 11:7, 11:9, 11:12, 11:24, 12:12, 13:3, 13:15, 13:18, 14:4, 14:11, 14:14, 14:18, 14:25, 15:21, 16:2, 16:16, 16:24, 17:6, 18:2, 18:10, 18:22, 19:2, 19:18, 19:24, 20:15, 25:17, 26:9, 28:21, 28:24, 29:3, 29:6, 29:10, 29:14, 29:23, 30:2, 30:5, 31:2, 31:10, 31:20, 32:9, 32:16, 33:12, 34:17, 35:1, 35:16, 35:25, 36:2, 36:18, 37:10, 37:22, 38:4, 38:11, 38:13, 38:23, 39:1, 39:7, 40:1, 40:20, 41:25, 42:18, 43:5, 43:10, 43:20, 43:22, 44:4, 44:24, 45:25, 46:3, 46:23, 47:21, 48:13, 48:19, 48:24, 51:19, 52:7, 53:8, 53:17, 54:19, 55:10, 56:16, 59:14, 60:3, 60:19, 60:24, 62:7, 62:16, 62:25, 63:7, 64:5, 64:8, 64:12, 64:21, 65:21, 66:16, 66:25, 69:13, 69:18, 70:6, 70:18, 71:18, 71:22, 71:25, 72:3, 72:9, 72:15, 72:21, 74:5, 74:22, 75:20, 77:11, 78:8, 78:12, 80:2, 81:7, 82:7, 83:24, 84:15, 84:19, 84:23, 85:19, 87:11, 87:21, 88:9, 89:7, 89:18, 89:21, 90:2, 91:6, 91:10, 91:12, 91:15, 91:18, 92:11, 93:6, 93:14, 95:9, 96:14, 96:21, 97:22, 98:17, 99:8, 100:8, 100:17, 101:7, 101:12, 101:16, 102:17, 105:3, 105:6, 105:10, 106:15, 106:22, 107:3, 107:9, 107:14, 107:21, 108:18, 108:23, 110:6, 110:22, 111:16, 112:5,

113:16, 114:18, 115:15, 116:21, 117:1, 117:5, 117:25, 118:10, 118:20, 119:9, 119:24, 120:3, 120:9, 120:15, 120:22, 121:24, 122:13, 122:22, 123:17, 124:22, 125:20, 126:1, 126:5, 126:7, 126:10, 126:17, 127:5, 127:11, 128:19, 128:22, 129:1, 129:12, 129:21, 129:24, 130:18, 131:2, 131:17, 131:23, 132:14, 133:24, 134:7, 134:12, 134:22, 134:24, 135:14, 136:6, 136:9, 136:16, 136:20, 138:13, 139:14, 140:3, 140:16, 141:7, 141:10, 141:21, 142:3, 142:11, 142:17, 142:22, 143:6, 144:14, 144:17, 145:21, 146:5, 146:20, 147:3, 147:19, 147:22, 148:9, 148:15, 148:20, 148:25, 149:8, 149:22, 150:2, 150:11, 150:16, 152:7, 152:24, 153:4, 153:12, 153:24, 154:9, 155:6, 155:24, 156:5, 156:9, 156:14, 157:17, 157:20, 158:3, 158:7, 158:10, 158:13, 158:20, 158:24, 159:3, 159:6, 159:11, 159:15, 159:18, 161:16, 161:18, 161:20, 161:25, 162:3, 162:5, 162:12, 163:3, 163:7, 163:12, 163:15, 163:18, 163:25, 164:13, 164:18, 164:23, 167:4, 167:11, 167:23, 168:2, 168:5, 168:10, 168:13, 168:17, 168:23, 169:3, 169:12, 169:15, 169:24, 170:1, 170:5, 170:8, 170:11, 170:13, 170:18, 171:1, 171:6, 171:10, 171:13, 171:21, 173:4, 173:8, 173:11, 173:14, 174:6, 174:18, 175:23, 176:10, 176:15, 176:18, 176:20, 176:23, 176:25, 177:2, 177:4, 177:6, 177:10, 177:16, 177:19, 177:21, 177:23, 177:25, 178:4, 178:7, 178:9, 178:11, 178:13, 178:15, 178:17, 178:21, 178:23, 178:25, 179:14, 180:25, 185:13, 186:13, 186:20, 188:4, 189:22, 189:25, 190:11, 191:11, 192:19, 196:15, 196:16, 197:7, 198:4, 198:20, 200:24, 201:24, 202:8, 202:13, 202:16,

208:3, 209:6, 210:8, 210:16, 211:1, 211:12, 212:14, 213:2, 214:19, 217:22, 217:24, 218:12, 218:14

**theft** [1] - 105:20

**themselves** [8] - 15:24, 50:18, 56:14, 59:12, 83:8, 108:14, 116:3, 142:24

**theoretically** [1] - 127:16

**theory** [1] - 24:17

**thereafter** [3] - 66:13, 111:15, 147:25

**therefore** [15] - 16:6, 41:15, 47:11, 51:2, 58:10, 62:10, 65:6, 68:18, 109:2, 109:19, 120:5, 132:24, 170:21, 208:8, 211:22

**they've** [17] - 6:1, 20:3, 20:13, 20:14, 26:8, 78:2, 109:16, 122:16, 148:23, 165:21, 166:20, 186:8, 188:14, 194:5, 195:1, 196:8, 196:9

**thick** [2] - 6:7, 201:4

**thin** [3] - 121:15, 133:2, 133:3

**thinking** [17] - 20:16, 21:19, 25:10, 32:24, 55:12, 76:7, 78:17, 103:10, 109:6, 140:21, 165:12, 191:4, 197:21, 199:5, 211:13, 212:9, 215:7

**thinks** [1] - 82:17

**third** [4] - 165:2, 166:9, 181:24, 203:10

**thirteen** [1] - 104:15

**Thomas** [1] - 176:23

**thoroughly** [1] - 209:9

**thoughts** [1] - 117:10

**thousands** [1] - 5:9

**threaten** [1] - 209:21

**three** [18] - 3:21, 6:9, 16:4, 44:14, 64:5, 155:3, 158:7, 158:16, 181:3, 181:20, 182:12, 195:25, 196:23, 201:2, 210:19, 216:16

**threw** [2] - 78:15, 78:21

**throughout** [2] - 41:17, 170:9

**throw** [5] - 78:20, 78:22, 172:11, 187:17, 215:17

**thrown** [1] - 79:14

**thumbing** [1] - 151:15

**tied** [2] - 92:13, 159:8

**timelines** [1] - 144:21

**timely** [1] - 203:10

**timing** [6] - 95:23, 141:8, 152:11, 165:11, 166:23, 211:21

**Timothy** [1] - 170:15

**tired** [1] - 29:7

**Title** [4] - 48:7, 101:4, 102:6, 102:23

**today** [32] - 3:15, 5:12, 8:8, 17:5, 27:14, 44:5, 47:4, 56:17, 57:10, 101:15, 110:23, 112:1, 112:5, 112:8, 112:10, 114:21, 128:23, 143:14, 152:8, 157:2, 159:20, 161:24, 163:5, 165:13, 171:23, 175:21, 185:20, 192:14, 193:8, 195:11, 201:7, 218:9

**together** [6] - 112:19, 113:9, 113:19, 144:25, 195:10, 201:3

**tomorrow** [2] - 198:8, 212:12

**ton** [2] - 181:2, 216:11

**tonight** [3] - 157:3, 189:18, 192:17

**took** [6] - 122:24, 124:17, 126:18, 128:5, 131:13, 152:2

**top** [5] - 11:2, 63:3, 103:4, 128:25, 149:20

**touch** [1] - 195:8

**tough** [1] - 200:14

**towed** [1] - 95:2

**towing** [7] - 94:6, 94:24, 95:3, 98:11, 98:13, 98:23, 99:5

**track** [1] - 115:1

**trained** [1] - 138:4

**training** [4] - 136:4, 137:7, 165:5

**transcript** [1] - 32:7

**transferred** [1] - 25:10

**transferring** [1] - 140:22

**transition** [1] - 9:22

**transitions** [1] - 13:25

**translates** [1] - 71:12

**travel** [3] - 148:12, 149:1, 179:11

**treated** [8] - 68:18, 80:25, 134:20, 138:19, 150:1, 155:22, 185:25, 208:2

**treating** [3] - 15:12, 122:9, 137:13

**treatment** [7] - 37:4, 41:15, 41:19, 85:9, 90:6, 149:5, 149:7

**treats** [1] - 122:12

**tremendous** [2] - 215:20, 216:3

**tremendously** [1] - 193:22

**triable** [1] - 65:10

**trial** [95] - 3:16, 4:1, 4:4, 4:12, 8:14, 18:11, 23:18, 27:3, 31:5, 47:6, 47:24, 48:6, 57:7, 57:11, 60:8, 66:11, 73:25, 79:15, 80:15, 84:2, 85:24, 88:24, 92:20, 93:18, 99:10, 99:12, 99:22, 100:25, 101:2, 105:1, 105:9, 112:7, 112:12, 115:14, 129:5, 148:18,

to purchase a complete copy of the transcript.

153:10, 156:22, 157:9,
157:24, 158:8, 158:18,
159:4, 159:10, 159:12,
159:22, 160:3, 162:15,
162:25, 165:2, 166:6,
167:8, 167:16, 167:21,
169:5, 170:9, 171:22,
172:1, 172:19, 172:24,
175:10, 176:21, 177:13,
179:18, 179:19, 181:14,
184:3, 184:8, 188:17,
190:17, 195:8, 195:10,
195:11, 195:17, 195:18,
196:17, 197:15, 197:23,
198:6, 198:21, 199:24,
200:4, 200:22, 207:24,
208:1, 208:21, 208:22,
209:11, 211:18, 213:4,
213:14, 213:20, 213:22,
214:14, 216:7

**Trial** [3] - 114:22, 134:4,
154:14
**trials** [1] - 182:13
**trickled** [1] - 119:21
**tried** [8] - 4:6, 6:5, 6:7,
26:8, 50:7, 60:23, 66:23,
81:17
**trouble** [3] - 58:21, 61:20,
71:22
**true** [22] - 10:23, 37:11,
37:24, 57:11, 76:20, 78:14,
100:12, 106:24, 109:1,
109:7, 109:8, 109:9,
109:10, 109:18, 109:24,
110:1, 120:4, 120:9,
120:11, 120:16, 185:5,
188:11
**truly** [2] - 184:16, 209:4
**trust** [1] - 160:23
**truth** [5] - 59:20, 106:20,
120:13, 131:5, 131:7
**try** [42] - 4:4, 4:16, 4:19,
4:20, 4:23, 4:24, 4:25,
19:4, 23:10, 27:8, 27:12,
28:5, 34:11, 34:12, 35:5,
35:8, 38:4, 59:24, 66:3,
75:24, 77:5, 90:17, 105:17,
113:3, 132:15, 164:5,
166:7, 166:12, 166:16,
166:17, 174:20, 181:8,
182:16, 187:13, 187:16,
188:6, 189:4, 190:2, 197:9,
203:8, 210:22, 213:13
**trying** [26] - 19:21, 22:13,
31:12, 35:1, 39:21, 42:18,
59:16, 68:22, 73:8, 73:18,
78:24, 80:6, 80:11, 80:20,
81:5, 81:11, 89:6, 91:2,
99:23, 103:11, 123:18,
148:6, 190:8, 194:11,
212:17, 216:17
**turn** [3] - 84:23, 159:25,
182:22
**turned** [3] - 125:11, 152:1,

181:23
**twelve** [1] - 104:12
**twenty** [1] - 139:23
**twenty-six** [1] - 139:23
**twin** [4] - 130:5, 132:5,
132:12, 132:25
**Twins** [1] - 165:5
**two** [52] - 3:2, 5:6, 5:8,
5:18, 16:4, 20:10, 23:15,
23:16, 23:18, 33:15, 34:15,
39:2, 45:13, 47:20, 52:15,
52:16, 67:12, 67:14, 75:6,
77:25, 84:20, 87:6, 92:8,
103:4, 112:8, 128:14,
132:2, 132:21, 152:13,
155:2, 156:16, 157:1,
163:11, 163:20, 164:6,
164:14, 165:12, 165:14,
165:22, 166:1, 166:16,
166:20, 171:23, 175:6,
179:15, 189:11, 190:16,
195:11, 206:13, 206:14,
208:20, 215:14
**two-and-a-half** [2] -
165:14, 166:1
**type** [2] - 100:1, 108:21
**typewritten** [1] - 124:4
**typical** [2] - 90:4, 183:7
**typically** [4] - 173:19,
183:10, 198:5, 199:9

## U

**ultimate** [1] - 48:6
**ultimately** [2] - 39:10, 95:7
**unable** [3] - 50:8, 100:3,
169:4
**unaltered** [1] - 189:4
**unannotated** [1] - 194:18
**unavailability** [2] - 180:8,
180:10, 180:17
**unavailable** [3] - 169:13,
170:21, 180:13
**uncertainty** [1] - 179:10
**unclear** [2] - 29:12, 131:10
**under** [43] - 8:25, 14:2,
15:19, 17:15, 21:5, 22:11,
24:17, 24:18, 30:22, 30:25,
32:5, 34:22, 35:4, 35:20,
35:21, 35:23, 48:7, 57:18,
64:18, 67:16, 69:14, 71:13,
87:8, 88:2, 89:21, 89:23,
96:10, 100:8, 102:9,
109:11, 117:22, 119:4,
126:11, 137:15, 144:2,
160:5, 187:4, 190:20,
193:25, 203:11, 210:17
**underlined** [2] - 189:5,
191:25
**underlying** [2] - 113:10,
114:8
**underscoring** [1] - 185:23
**understood** [7] - 40:22,

87:13, 122:1, 135:1, 137:6,
143:14, 209:23
**undisputed** [5] - 64:22,
65:3, 65:6, 70:21, 72:1
**unfair** [3] - 40:13, 96:10,
100:24
**unfairly** [2] - 51:17,
117:22
**unfavorable** [1] - 53:19
**unhappiness** [1] - 117:24
**unhappy** [1] - 138:18
**unilateral** [1] - 48:5
**union** [1] - 16:9
**United** [2] - 15:10, 15:18
**unjustified** [1] - 81:20
**unknown** [1] - 105:24
**unlawful** [1] - 47:20
**unless** [13] - 27:19, 37:25,
61:9, 61:18, 74:12, 90:9,
103:16, 103:17, 104:6,
107:10, 113:1, 116:24,
145:18
**unlikely** [2] - 21:24,
127:25
**unnecessarily** [1] -
182:18, 187:17
**unnecessary** [1] - 194:13
**unreasonable** [1] - 97:19
**unrelated** [1] - 57:9
**unresisted** [2] - 105:19,
105:21, 105:22, 144:14,
144:19
**unsuccessful** [1] - 57:25
**unusual** [2] - 54:6,
113:17, 121:8
**up** [79] - 4:7, 9:17, 22:23,
26:15, 33:6, 34:11, 35:5,
37:8, 37:16, 38:16, 40:8,
40:11, 45:9, 48:1, 50:5,
60:19, 62:17, 75:11, 75:24,
77:14, 79:15, 83:2, 83:22,
86:8, 89:11, 90:11, 91:10,
103:6, 104:8, 112:4,
114:13, 116:24, 117:18,
117:21, 138:25, 144:10,
145:19, 149:4, 151:7,
154:21, 155:8, 159:8,
159:24, 160:1, 160:7,
160:18, 161:1, 161:4,
161:5, 161:7, 165:24,
166:17, 168:17, 174:5,
181:18, 181:19, 183:5,
184:7, 186:10, 187:17,
192:9, 192:16, 194:6,
195:19, 196:21, 197:12,
199:1, 201:14, 207:4,
208:25, 209:2, 211:11,
213:7, 213:18, 214:11,
215:6, 215:11, 215:12,
217:20
**upgrade** [4] - 71:11,
71:15, 71:17, 72:13
**upgrades** [1] - 41:16
**ups** [2] - 205:7, 205:24

**upset** [2] - 144:7, 200:3
**useful** [1] - 27:10
**usefulness** [1] - 208:21
**uses** [1] - 146:21

## V

**vacation** [2] - 148:11,
149:1
**vague** [1] - 199:10
**vaguely** [1] - 135:15
**Valeria** [1] - 164:13
**valid** [1] - 62:20
**valuable** [2] - 15:6, 78:6
**value** [2] - 26:15, 40:14
**Van** [1] - 33:22
**variety** [2] - 49:13, 83:12
**various** [12] - 3:6, 8:7,
17:19, 20:19, 24:12, 40:22,
49:2, 60:12, 103:7, 115:4,
115:5, 123:23
**vehemently** [1] - 138:6
**verdict** [12] - 13:11, 57:14,
60:17, 61:10, 61:18, 65:7,
71:2, 74:11, 96:11, 96:12,
165:17, 182:3
**version** [2] - 191:25,
194:18
**versions** [1] - 209:16
**versus** [3] - 3:3, 3:4,
103:20
**Vetter** [2] - 89:12, 163:18
**viable** [2] - 60:7, 61:15
**video** [1] - 161:25
**view** [10] - 20:22, 20:25,
21:2, 55:6, 61:8, 67:21,
92:18, 95:11, 100:8, 182:9
**viewing** [3] - 61:3, 67:23,
68:11
**VII** [4] - 48:7, 101:4, 102:6,
102:23
**VINT** [10] - 2:3, 162:2,
162:4, 167:6, 168:20,
202:11, 202:15, 202:17,
208:14, 210:9
**Vint** [3] - 3:10, 202:2,
210:8
**violated** [1] - 143:19
**violation** [2] - 136:13,
137:7
**violations** [3] - 124:12,
143:8, 144:10
**virtually** [1] - 131:15
**visits** [1] - 148:12
**vocal** [1] - 199:8
**volume** [1] - 193:14
**volumes** [1] - 191:3
**voluntarily** [4] - 28:25,
29:2, 29:18, 31:21
**volunteer** [2] - 8:12, 8:17

Downloaded from www.eScribers.com
to purchase a complete copy of the transcript.

## W

**WADE** [1] - 2:7
**wait** [9] - 11:14, 46:15, 53:4, 150:23, 198:19, 198:20, 200:8, 212:15, 212:23
**waiting** [2] - 112:16, 199:23
**waiver** [2] - 144:5, 144:9
**walked** [2] - 122:9, 122:11
**walking** [2] - 142:20, 161:5
**Walnut** [1] - 2:7
**Wanda** [10] - 3:3, 104:16, 104:19, 106:1, 123:13, 134:8, 145:6, 152:19, 152:25, 157:21
**Wanda's** [1] - 93:4
**wants** [7] - 8:15, 33:9, 58:15, 83:16, 135:22, 138:25, 213:1
**warranted** [1] - 208:16
**wasted** [1] - 182:19
**wasting** [2] - 111:25, 211:8
**watched** [1] - 182:2
**Waterloo** [8] - 46:14, 105:25, 110:12, 116:8, 140:22, 141:17, 206:2
**ways** [4] - 23:2, 67:12, 67:14, 108:15
**Wednesday** [5] - 162:23, 169:19, 171:18, 172:18
**week** [14] - 3:20, 56:8, 157:5, 162:23, 162:24, 165:2, 165:3, 165:22, 166:9, 166:19, 177:13, 182:13, 194:3
**week's** [1] - 166:3
**weekends** [1] - 6:12
**weeks** [18] - 4:4, 5:8, 112:8, 165:13, 165:14, 166:2, 166:16, 166:17, 166:19, 166:21, 171:23, 190:16, 195:11, 195:25, 207:20, 208:21, 216:1, 216:16
**weighing** [1] - 150:18
**weight** [3] - 52:23, 57:22, 150:18
**WEST** [9] - 2:7, 104:24, 105:9, 128:11, 128:20, 128:24, 129:7, 132:8, 144:24
**West** [2] - 3:12, 159:9
**Westendorf** [1] - 178:21
**whatnot** [4] - 43:11, 59:23, 106:12, 187:12
**whatsoever** [2] - 125:17, 152:6
**whereas** [1] - 26:3
**whichever** [3] - 160:10,

182:24, 216:25
**whole** [29] - 7:21, 21:4, 23:2, 27:6, 28:6, 41:25, 43:10, 44:25, 45:2, 45:4, 45:18, 49:21, 57:21, 58:3, 61:16, 77:6, 94:6, 98:23, 101:25, 119:3, 125:15, 138:13, 142:13, 162:20, 172:7, 183:5, 185:22, 187:3, 195:6
**wholesale** [1] - 44:8
**wife** [1] - 109:21
**willing** [5] - 63:14, 65:2, 88:24, 157:3, 201:17
**Wilson** [5] - 128:8, 128:20, 129:4, 129:16, 164:8
**win** [2] - 61:10, 61:18
**winded** [1] - 200:9
**wise** [2] - 165:11, 166:23
**wish** [10] - 47:1, 70:9, 92:11, 97:22, 115:24, 119:15, 148:15, 148:18, 148:25, 149:12
**withdraw** [4] - 144:12, 152:22, 167:25, 176:24
**withdrawn** [8] - 105:1, 122:18, 134:3, 143:16, 193:11, 193:21, 193:25, 194:8
**witness** [49] - 43:19, 44:16, 50:17, 59:14, 59:21, 61:20, 76:9, 76:11, 82:14, 86:14, 114:5, 127:7, 130:22, 131:24, 132:1, 133:11, 133:25, 134:2, 135:11, 145:22, 146:6, 146:12, 146:25, 159:2, 160:22, 160:25, 161:1, 161:9, 163:9, 164:6, 167:19, 169:5, 173:14, 174:5, 174:10, 174:17, 174:21, 174:23, 176:4, 177:7, 178:18, 179:18, 179:25, 180:13, 186:10, 186:17, 196:6, 199:12, 199:17
**witness'** [2] - 150:19, 180:8
**witnesses** [33] - 4:3, 8:12, 8:17, 31:11, 50:14, 58:20, 59:10, 59:25, 60:11, 60:17, 62:15, 88:10, 150:17, 157:10, 157:18, 160:9, 164:10, 164:14, 165:24, 166:25, 167:17, 173:16, 175:24, 178:25, 179:2, 180:5, 180:20, 186:24, 197:11, 198:3, 202:6, 216:4, 216:5
**woman** [3] - 132:21, 151:3, 152:12
**women** [18] - 21:7, 42:12, 42:14, 42:24, 45:12, 45:14,

46:19, 46:20, 73:8, 73:12, 75:2, 75:6, 75:7, 129:18, 130:9, 151:16, 152:13, 215:14
**wonder** [4] - 23:5, 24:8, 54:11
**wondering** [2] - 25:13, 32:23
**wording** [2] - 187:14, 187:15
**words** [11] - 17:17, 42:19, 90:4, 93:8, 98:20, 141:24, 165:4, 173:18, 174:10, 179:18, 213:21
**workers** [4] - 42:25, 45:12, 142:25, 143:1
**workers'** [6] - 9:3, 11:4, 11:5, 11:10, 143:9, 143:15
**workout** [1] - 165:7
**workplace** [3] - 117:10, 117:12, 117:24
**works** [6] - 45:18, 46:10, 74:20, 78:24, 141:17, 165:10
**world** [5] - 188:6, 188:18, 188:19, 190:12, 190:13
**worldwide** [7] - 41:9, 41:13, 42:14, 43:17, 43:18, 43:25, 134:19
**worms** [3] - 57:21, 79:11, 103:25
**worried** [1] - 110:7
**worry** [3] - 61:17, 86:5, 104:11
**worth** [1] - 166:3
**wounded** [2] - 142:20
**wrapped** [1] - 4:7
**write** [1] - 130:23
**writing** [2] - 132:10, 142:2
**written** [1] - 8:7
**wrote** [2] - 114:23, 132:2
**Wulfekuhle** [1] - 178:23
**WWCA** [3] - 80:19, 135:15, 207:15

## Y

**year** [18] - 13:24, 14:7, 50:24, 51:16, 55:11, 75:6, 86:3, 94:10, 95:1, 118:23, 119:1, 126:18, 127:18, 128:1, 202:20, 204:9, 209:22
**year-and-a-half** [1] - 94:10
**years** [31] - 4:11, 20:12, 23:3, 24:9, 30:14, 34:8, 37:1, 50:12, 52:12, 53:5, 53:21, 54:24, 55:2, 55:5, 55:15, 57:8, 58:14, 59:18, 60:21, 85:8, 85:24, 121:4, 128:14, 132:2, 132:21, 186:5, 199:14, 199:16, 216:15, 217:7, 217:9

**young** [4] - 142:14, 142:18, 151:17, 151:24
**younger** [8] - 116:17, 137:13, 142:15, 142:25, 150:1, 150:9, 151:3, 152:12
**yourselves** [3] - 86:7, 159:20, 216:2

## Z

**Zoller** [1] - 130:3

to purchase a complete copy of the transcript.